E-FILED

Monday, 13 January, 2020  06:12:42 PM

Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION**

| | |
|---|---|
| Bruce D. Melton, | ) |
| | ) No. 17-cv-2112 |
| Plaintiff, | ) |
| | ) The Honorable Judge Colin Stirling Bruce |
| v. | ) |
| | ) Magistrate Judge Eric I. Long |
| The Pavilion Behavioral Health System, Joe | ) |
| Sheehy, Jim Capony [*sic*], Ray Reese [*sic*], | ) |
| Adam Putvin, Laurie Crabtree, Donna | ) |
| Gadekan, | ) |
| | ) |
| Defendants. | ) |

**THE PAVILION BEHAVIORAL HEALTH SYSTEM'S MOTION FOR LEAVE
TO FILE UNDER SEAL ITS PETITION TO CONFIRM ARBITRATION
AWARD AND FOR A JUDGMENT IN DEFENDANT'S FAVOR
AND ITS SUPPORTING EXHIBITS C, D AND E**

Defendant The Pavilion Behavioral Health System ("Pavilion") submits this Motion for Leave to File Under Seal Its Petition to Confirm Arbitration Award and for a Judgment in Defendant's Favor and Its Supporting Exhibits C, D, and E pursuant to Local Rules 5.10.  In support therefore, Plaintiff states as follows:

1.      Plaintiff filed a *pro se* Complaint on May 9, 2017, alleging various claims against Pavilion.  (Doc. #1).

2.      The parties attended an arbitration hearing on October 29, 2019, pursuant to the arbitration clause that was included in Plaintiff's employment contract.   (The Alternative Resolution for Conflicts ("ARC") Acknowledgment Form and the ARC Agreement as "Exhibit A" and "Exhibit B" in motion and memorandum, respectively).

3.      Paragraph 8 of the ARC Agreement states, "Except as may be permitted or required by law, as determined by the Arbitrator, neither a party nor an Arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of all parties."  (Sect. 8, Ex. B).

4.      The parties completed the arbitration hearing on December 5, 2019, the arbitrator rendered its final award and the Pavilion now seeks confirmation of that award to be filed under seal.

5.      The Seventh Circuit has explained that a federal court can shield documents from the public when the documents are protected by a rule, statute or privilege. *City of Greensville v. Syngenta Crop. Prot., LLC*, 764 F.3d 695 (7th Cir. 2014).

6.      The Seventh Circuit has also acknowledged that the District Court has the authority to protect confidential documents by sealing material filed with the court.  *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000).

WHEREFORE, The Pavilion Behavioral Health System requests that this Honorable Court enter an order as follows:

1.      granting Defendant leave of court to file its Petition to Confirm Arbitration Award under seal;

2.      granting Defendant leave of court to publicly file a version of its Petition to Confirm Arbitration Award that redacts confidential and sensitive information;

3.      granting Defendant leave of court to file the following exhibits in support of its Petition to Confirm arbitration award under seal: Exhibits C, D, and E;

4.      providing for any other just and appropriate relief.

Respectfully submitted,

The Pavilion Behavioral Health System

By:     /s/     Chad Layton
            One of their Attorneys

Chad Layton, Esq. ARDC#6243339 clayton@smsm.com
Rachel N. Laurel, Esq. ARDC#6330004 rlaurel@smsm.com
SEGAL McCAMBRIDGE SINGER & MAHONEY, LTD.
233 South Wacker Drive, Suite 5500
Chicago, Illinois  60606
Tel: (312) 645-7800  |  Fax: (312) 645-7711

## <u>CERTIFICATE OF SERVICE</u>

      The undersigned certifies that a copy of the Motion to File Arbitration Award Under Seal on Arbitration was served upon all parties of record on **January 13, 2020** as follows:

Mr. Bruce Melton
1304 S. Mattis Ave
Champaign, IL 61821
Brucemelton180@hotmail.com


           By:        /s/ Chad Layton


Chad Layton, Esq. ARDC#6243339 clayton@smsm.com
Rachel N. Laurel, Esq. ARDC#6330004 rlaurel@smsm.com
SEGAL McCAMBRIDGE SINGER & MAHONEY, LTD.
233 South Wacker Drive, Suite 5500
Chicago, Illinois  60606
Tel: (312) 645-7800  |  Fax: (312) 645-7711

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION**

| | |
|---|---|
| Bruce D. Melton, | ) |
| | ) No. 17-cv-2112 |
| Plaintiff, | ) |
| | ) The Honorable Judge Colin Stirling Bruce |
| v. | ) |
| | ) Magistrate Judge Eric I. Long |
| The Pavilion Behavioral Health System, Joe | ) |
| Sheehy, Jim Capony [*sic*], Ray Reese [*sic*], | ) |
| Adam Putvin, Laurie Crabtree, Donna | ) |
| Gadekan, | ) |
| | ) |
| Defendants. | ) |

**THE PAVILION BEHAVIORAL HEALTH SYSTEM'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR LEAVE TO FILE UNDER SEAL ITS
PETITION TO CONFIRM ARBITRATION AWARD AND FOR A
JUDGMENT IN DEFENDANT'S FAVOR AND ITS
<u>SUPPORTING EXHIBITS C, D AND E</u>**

Defendant The Pavilion Behavioral Health System ("Pavilion"), through counsel, submits

the following Memorandum of Law in Support of its Motion for Leave to File Under Seal Its

Petition to Confirm Arbitration Award and for a Judgment in Defendant's Favor and its Supporting

Exhibits C, D, and E:

**INTRODUCTION**

The parties recently proceeded to an arbitration hearing and the Pavilion is seeking to

confirm the arbitration award.  The governing employment contract requires the parties to maintain

the confidentiality of the arbitration.  Accordingly, the Pavilion is seeking leave of court to file

confidential portions of its petition to confirm the arbitration award as well as the supporting

exhibits under seal.

**STATEMENT OF FACTS**

On May 9, 2017, Plaintiff filed a *pro se* Complaint of Employment Discrimination alleging

various claims against the Pavilion.  (Doc. #1).  All of Plaintiff's claims fell within the scope of an

arbitration clause that was included in a contract executed by Plaintiff in conjunction with his employment at the Pavilion.  (Ex. A and Ex. B).  Importantly, the ARC Agreement states that the content and results of the arbitration are to remain confidential.  (Sect. 8, Ex. B).

On July 31, 2017, the Pavilion filed a Motion to Compel Arbitration. (Doc. # 19).  On August 28, 2017, this Honorable Court granted Pavilion's Motion to Compel Arbitration and Stay Proceedings, staying this action under Section 3 of the Federal Arbitration Act and maintaining jurisdiction over the action for purposes of confirming the arbitration award.  (Doc. # 26).  The parties have completed the arbitration hearing, the arbitrator has rendered its final award, and the Pavilion now seeks confirmation of that award.  (The Pavilion's Petition to Confirm Arbitration Award is attached as "Exhibit C" is filed under seal).

## ARGUMENT

The Seventh Circuit has explained that a federal court can shield documents from the public when the documents are protected by a rule, statute or privilege.  *City of Greenville v. Syngenta Crop. Prot., LLC*, 764 F.3d 695, 697 (7th Cir. 2014).  The Seventh Circuit has also acknowledged that a District Court has the authority to protect confidential documents by sealing material filed with the court.  *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000) (stating that litigants "who want secrecy should opt for arbitration.").

In the U.S. District Court for the Central District of Illinois, Local Rule 5.10 expressly states that that:

> A party who has a legal basis for filing a document under seal without prior court order must electronically file a motion for leave to file under seal.  The motion must include an explanation for how the document meets the legal standard for filing sealed documents.

(Local Rule 5.10).  See also Local Rule 5.11 (explaining that "[l]itigants also should consider redacting or filing a motion to file under seal any document that contains information that might

bring harm to anyone or should not be made public for law enforcement or security reasons."). The Central District has, itself, recognized that a District Court can seal documents "upon a showing of good cause" and that it may be appropriate for a court to redact versions of certain documents that are publicly filed. *United States v. Dish Network, L.L.C.*, 943 F. Supp.2d 891, 894 (C.D. Ill. 2013).

In *Dish Network,* the Central District agreed that it was proper for the court to seal certain documents. 943 F. Supp.2d at 894. The *Dish Network* court further stated that that it was appropriate for certain documents to be redacted. *Id.*

In *Emplrs. Ins. Co. v. Ace Prop. & Cas. Ins. Co.*, No. 16-cv-97-bbc, 2016 U.S. Dist. LEXIS 36805, *1 (W.D. Wis. March 22, 2016), a party to arbitration sought to confirm an arbitration award pursuant to the Federal Arbitration Act and also sought leave of court "to keep all case filings under seal." The District Court explained that it was "unnecessary to unseal documents that relate solely to the substance of the arbitration proceedings." *Id.* The District Court further explained that it would "leave sealed the declaration that relates to the substance of the arbitration proceeding." *Id.* at *2.

Here, the ARC Agreement states that the content and results of the arbitration are to remain confidential. (Sect. 8, Ex B). The Pavilion seeks to honor its legal obligations under the ARC Agreement and is asking for leave of court to maintain the confidentiality of the content and results of the arbitration. Moreover, the contents of the final award as well as the transcript from the arbitration hearing each contain sensitive information that is contemplated for protection by Local Rule 5.11. Accordingly, good cause exists to grant the relief requested in this motion. The Pavilion is asking for leave of court to file, under seal, only those documents that include information relating to the content and results of the arbitration.

3

**CONCLUSION**

WHEREFORE, The Pavilion Behavioral Health System requests that this Honorable Court

enter an order as follows:

1.    granting Defendant leave of court to file its Petition to Confirm Arbitration Award
      under seal;

2.    granting Defendant leave of court to publicly file a version of its Petition to Confirm
      Arbitration Award that redacts confidential and sensitive information;

3.    granting Defendant leave of court to file the following exhibits in support of its
      Petition to Confirm arbitration award under seal: Exhibits C, D, and E;

4.    providing for any other just and appropriate relief.

Respectfully submitted,

The Pavilion Behavioral Health System

By:    /s/    Chad Layton
       One of their Attorneys

Chad Layton, Esq. ARDC#6243339 clayton@smsm.com
Rachel N. Laurel, Esq. ARDC#6330004 rlaurel@smsm.com
SEGAL McCAMBRIDGE SINGER & MAHONEY, LTD.
233 South Wacker Drive, Suite 5500
Chicago, Illinois  60606
Tel: (312) 645-7800  |  Fax: (312) 645-7711

## <u>CERTIFICATE OF SERVICE</u>

  The undersigned certifies that a copy of the Memorandum of Law in Support of its Motion for Leave to File Documents Under Seal in Support of Its Motion to Confirm Arbitration Award was served upon all parties of record on **January 13, 2020** as follows:

Mr. Bruce Melton
1304 S. Mattis Ave
Champaign, IL 61821
Brucemelton180@hotmail.com


        By:    /s/ Chad Layton    


Chad Layton, Esq. ARDC#6243339 clayton@smsm.com
Rachel N. Laurel, Esq. ARDC#6330004 rlaurel@smsm.com
SEGAL McCAMBRIDGE SINGER & MAHONEY, LTD.
233 South Wacker Drive, Suite 5500
Chicago, Illinois  60606
Tel: (312) 645-7800 | Fax: (312) 645-7711

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**URBANA DIVISION**

| | |
|---|---|
| Bruce D. Melton, | ) |
| | ) No. 17-cv-2112 |
| Plaintiff, | ) |
| | ) The Honorable Judge Colin Stirling Bruce |
| v. | ) |
| | ) Magistrate Judge Eric I. Long |
| The Pavilion Behavioral Health System, Joe | ) |
| Sheehy, Jim Capony [*sic*], Ray Reese [*sic*], | ) |
| Adam Putvin, Laurie Crabtree, Donna | ) |
| Gadekan, | ) |
| | ) |
| Defendants. | ) |

## <u>ORDER</u>

THIS CAUSE coming to be heard on Defendant The Pavilion Behavioral Health System's Motion for Leave to File Documents Under Seal In Support of Its Petition to Confirm Arbitration Award; all parties having received notice and the court being fully advised; IT IS HEREBY ORDERED:

1. Defendant's Motion is GRANTED;

2. Defendant is granted leave of court to file its Petition to Confirm Arbitration Award under seal;

3. Defendant is granted leave of court to publicly file a version of its Petition to Confirm Arbitration Award that redacts confidential and sensitive information;

4. Defendant is granted leave of court to file the following exhibits in support of its Petition to Confirm arbitration award under seal: Exhibits C, D, and E.

SO ORDERED BY

DATED: _____        _____
                                The Honorable Judge Colin Stirling Bruce
                                United States District Judge

6

# EXHIBIT A



**Alternative
Resolution
of Conflicts**

UHS recognizes that workplace disagreements may arise from time to time. Most UHS subsidiaries have a 3-tier program for resolution of workplace disputes, known as Alternative Resolution of Conflicts (ARC). ARC is an agreement to arbitrate disputes in the workplace. ARC is a contract between you, the employee, and your employer. ARC does not change any other terms and conditions of employment; it is a contract where you and your employer agree to resolve any covered legal disputes through mandatory arbitration instead of by way of court or jury trial. It is your responsibility to review the ARC Agreement. You are entitled to receive a copy of the ARC Agreement upon request.

ARC is a stand-alone legal document that completely covers the arbitration process, so most employee's questions can be answered by referring to provisions in the ARC Program. The following information and FAQs do not replace the ARC Program or supplement the ARC Program terms in anyway.

In the first of three Tiers, which is voluntary and not a prerequisite to arbitration under ARC, you will continue to bring any workplace concerns directly to your employer by following the procedures in the Dispute Resolution Policy as outlined in your Employee Handbook. This is considered Tier One, and we believe many concerns will be resolved at this level. If Tier One doesn't result in a resolution, you may choose to proceed to Tier Two: mediation. Mediation is a voluntary process where procedures and conversations are facilitated by a neutral third party mediator whose purpose is to help both you and your employer reach an agreeable resolution. Although we strongly encourage mediation, it is voluntary and not a prerequisite to arbitration under ARC. If a solution to your concerns is not resolved at Tier Two, then you proceed with Tier Three, mandatory arbitration. Arbitration is an alternative to court. Arbitration is presided over by an arbitrator who is a professional, independent, and impartial third party who listens to both sides, reviews evidence and renders a final, binding decision.

In short, Tier One provides you with an opportunity to directly resolve concerns directly with your employer. If necessary, Tier Two provides an opportunity for both parties to tell their stories to a listener who provides an objective view of the grievance and offers options to resolve the legal dispute. Finally, Tier Three provides both parties with a neutral decision maker who is empowered to end the dispute.

The following Q & A will help you understand the basics of the ARC program. If you have questions after reading these and the ARC Program document, please ask your supervisor or talk with your Human Resources representative.

Frequently asked questions.

**Q - Does the ARC Program change the nature of my at-will employment?**

A - No. Employees are still employed at-will unless otherwise provided by a union contract or law.

**Q - Do I have still have the right to an attorney?**

A - Yes.

**Q - What types of disputes are covered under this program?**

A - ARC covers legal disputes. It does not cover routine workplace disputes, unless they involve or lead to a legal dispute involving violation of law. Examples of issues which may be related to you and your employer are, but are not limited to: allegations of discrimination; disputes relating to wages, hours, or overtime; retaliation for exercising legal rights; defamation; infliction of emotional distress; invasion of privacy; wrongful discharge or wrongful termination; and, breach of contract. Additional information can be found in the ARC Agreement provided to new employees during orientation.

**Q - Are there any claims that cannot be brought under this program?**

A - Yes, the ARC Program lists claims that are not covered. For example, claims for workers' compensation or unemployment compensation benefits or state disability benefits, claims for benefits under any Company benefit plan, including those covered by the Employee Retirement Income Security Act of 1974 (ERISA), disputes under a Collective Bargaining Agreement, and claims that cannot be arbitrated under federal law, among others.

**Q - Can I opt-out of this program?**

A - Yes. Arbitration is not a mandatory condition of employment. Employees may opt of the Program by submitting a completed Opt-Out Notice Form [download here] within thirty days of either being hired or the Effective date of this Program. Employees who timely opt out of the Program will not be subject to any adverse employment action as a consequence of that decision and may pursue any available legal remedies. Employees who do not opt out of the Program within the applicable time frame will be bound by the ARC Agreement.

**Q - How do I initiate mediation or arbitration?**

A - You or your attorney must demand arbitration in writing and deliver the written demand by hand or first class mail to the other party within the applicable statute of limitations period to the UHS legal department.



**ARC ACKNOWLEDGEMENT FORM**

The Pavilion is rolling out a new 3-tier program for resolution of workplace disputes, known as Alternative Resolution of Conflicts (ARC). ARC is an agreement to arbitrate disputes in the workplace. ARC is a contract between you, the employee, and The Pavilion. ARC does not change any other terms and conditions of employment; it simply is a contract where you and The Pavilion agree to resolve any formal disputes through arbitration instead of litigation.

I acknowledge that I received a copy of The Pavilion's ARC Agreement and Opt-Out Form (enclosed). I understand it is my responsibility to review the ARC Agreement.

I understand that Arbitration is not a mandatory condition of employment. I understand that I may opt out of the ARC Program by submitting a completed Opt-Out Form in person, by fax, or mail to the Human Resources Department within thirty days of the date below. I understand that if I opt out of the ARC Program, I will not be subject to any adverse employment action as a consequence of that decision and may pursue any available legal remedies.

**I FURTHER UNDERSTAND THAT IF I DO NOT OPT OUT OF THE ARC PROGRAM WITHIN THIRTY DAYS OF THE DATE INDICATED BELOW, I WILL BE BOUND BY THE ARC AGREEMENT.**

*Bruce Melton*
Print Name

*Bruce Melton*                    *9/14/2015*
Employee Signature                Date

*Dennis Crebston*
HR Representative

*The Pavilion is an Equal Opportunity Employer.*

# EXHIBIT B

**The Pavilion**



**Alternative
Resolution
of Conflicts**

## ALTERNATIVE RESOLUTION FOR CONFLICTS ("ARC") AGREEMENT

The Pavilion recognizes that workplace disagreements may arise from time to time and has a 3-tier program for resolution of workplace disputes, known as Alternative Resolution of Conflicts ("ARC" or "Agreement"). ARC is an agreement to arbitrate disputes in the workplace. ARC is a contract between you, the employee (sometimes referred to as, "Employee", "You" or "I"), and The Pavilion. ARC does not change any other terms and conditions of employment; it is a contract where you and The Pavilion agree to resolve any covered legal disputes through mandatory arbitration instead of by way of court or jury trial. It is your responsibility to review the ARC Agreement. You are entitled to receive a copy of this Alternative Resolution For Conflicts Agreement upon request.

### 1. How This Agreement Applies

This Agreement is governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. and evidences a transaction involving commerce. Except as it otherwise provides, this Agreement applies to any past, present or future dispute arising out of or related to Employee's application for employment, employment and/or termination of employment with The Pavilion or one of its affiliates, subsidiaries or parent companies ("Company") and survives after the employment relationship terminates. Nothing contained in this Agreement shall be construed to prevent or excuse Employee (individually or in concert with others) from utilizing the Company's existing internal procedures for resolution of complaints, and this Agreement is not intended to be a substitute for the utilization of such procedures.

Except as it otherwise provides, this Agreement is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or before a forum other than arbitration. This Agreement requires all such disputes to be resolved only by an arbitrator through final and binding arbitration and not by way of court or jury trial. Such disputes include without limitation disputes arising out of or relating to interpretation or application of this Agreement.

Except as it otherwise provides, this Agreement also applies, without limitation, to disputes regarding the employment relationship, compensation, breaks and rest periods, seating, discrimination, termination, or harassment and claims arising under the Civil Rights Act of 1964, 42 U.S.C. § 1981, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Fair Credit Reporting Act, Uniformed Services Employment and Reemployment Rights Act , Employee Retirement Income Security Act (except for claims for employee benefits under any benefit plan sponsored by the Company and covered by the Employee Retirement Income Security Act of 1974 or funded by insurance), Genetic Information Non-Discrimination Act, and state statutes, if any, addressing the same or similar subject matters, and all other state statutory and common law claims.

### 2. Mediation

Prior to invoking arbitration, the parties are encouraged to use mediation for any covered claims, but mediation is not a mandatory step before arbitration. Mediation is an informal, voluntary and facilitated process for resolving disputes. Mediation sessions are attended by a neutral third party, called a mediator, whose purpose is to help the parties reach a resolution. The mediator will be mutually selected by the parties. The Employer will pay the cost of the mediation.  The Employee may be but is not required to be represented by counsel.

Mediation shall be held within thirty days of the parties' agreement to mediate the dispute. If the mediation fails, You and the Company must pursue the covered dispute only in arbitration and not in court. Arbitration of such disputes is mandatory under this Agreement.

1

### 3. Limitations On How This Agreement Applies

This Agreement does not apply to: (i) Workers' Compensation benefit claims (but workers' compensation discrimination and retaliation claims are covered under this Agreement); (ii) state unemployment or disability insurance compensation claims; (iii) claims for benefits under employee benefit plans covered by ERISA that contain an appeal procedure or other exclusive and/or binding dispute resolution procedure in the respective plan; (iv) claims against a contractor that may not be the subject of a mandatory arbitration agreement as provided by Section 8116 of the Department of Defense ("DoD") Appropriations Act for Fiscal Year 2010 (Pub. L. 111-118), Section 8102 of the Department of Defense ("DoD") Appropriations Act for Fiscal Year 2011 (Pub. L. 112-10, Division A), and their implementing regulations, or any successor DoD appropriations act addressing the arbitrability of claims; and (v) claims that the Dodd-Frank Wall Street Reform and Consumer Protection Act or other controlling federal statutes or lawful, enforceable federal Executive Orders bar from the coverage of mandatory pre-dispute arbitration agreements. This Agreement does not apply to any employee represented by a labor organization, or to the Company with respect to any such employee, except to the extent permitted in any applicable collective bargaining agreement or lawfully imposed by the Company when no collective bargaining agreement is in effect.

Regardless of any other terms of this Agreement, claims may be brought before and remedies awarded by an administrative agency if applicable law permits access to such an agency notwithstanding the existence of an agreement to arbitrate governed by the Federal Arbitration Act. Such administrative claims include without limitation claims or charges brought before the Equal Employment Opportunity Commission (www.eeoc.gov), the U.S. Department of Labor (www.dol.gov), the National Labor Relations Board (www.nlrb.gov), or the Office of Federal Contract Compliance Programs (www.dol.gov/esa/ofccp). Nothing in this Agreement shall be deemed to preclude or excuse a party from bringing an administrative claim before any agency in order to fulfill the party's obligation to exhaust administrative remedies before making a claim in arbitration. The Company will not retaliate against Employee for filing a claim with an administrative agency or for exercising rights (individually or in concert with others) under Section 7 of the National Labor Relations Act.

Disputes that may not be subject to pre-dispute arbitration agreement as provided by the Dodd-Frank Wall Street Reform and Consumer Protection Act (Public Law 111-203) or other controlling federal statutes or lawful, enforceable federal Executive Order are excluded from the coverage of this Agreement.

### 4. Selecting The Arbitrator

The Arbitrator shall be selected by mutual agreement of the Company and the Employee. Unless the Employee and Company mutually agree otherwise, the Arbitrator shall be an attorney licensed to practice in the location where the arbitration proceeding will be conducted or a retired federal or state judicial officer who presided in the jurisdiction where the arbitration will be conducted. If the parties cannot agree to an Arbitrator, the arbitration will be held under the auspices of the American Arbitration Association ("AAA"), and the parties shall select an Arbitrator under the then current Employment Arbitration Rules ("AAA Rules") (the AAA Rules are available through the Company's Law Department or via the Internet at www.adr.org/employment). In all other respects, the arbitration shall be conducted pursuant to the provisions of this ARC Agreement. The appointed Arbitrator shall act under this Agreement with the same force and effect as if the parties had selected the arbitrator by mutual agreement. The location of the arbitration proceeding shall be no more than 45 miles from the place where the Employee last worked for the Company, unless each party to the arbitration agrees in writing otherwise.

### 5. Starting The Arbitration

All claims in arbitration are subject to the same statutes of limitation that would apply in court. The party bringing the claim must demand arbitration in writing and deliver the written demand by hand or first class mail to the other party within the applicable statute of limitations period. The demand for arbitration shall include identification of the parties, a statement of the legal and factual basis of the claim(s), and a specification of the remedy sought. Any demand for arbitration made to the Company shall be provided to the Company's Legal Department at:

      Law Department
      UHS of Delaware, Inc

367 South Gulph Road
King of Prussia, PA 19406

The arbitrator shall resolve all disputes regarding the timeliness or propriety of the demand for arbitration. A party may apply to a court of competent jurisdiction for temporary or preliminary injunctive relief in connection with an arbitrable controversy, but only upon the ground that the award to which that party may be entitled may be rendered ineffectual without such provisional relief.

## 6. How Arbitration Proceedings Are Conducted

Each party will have the right to take the deposition of two individual witnesses and any expert witness designated by another party. Each party also will have the right to propound requests for production of documents to any party and the right to subpoena witnesses and documents for the arbitration, and documents relevant to the case from third parties. Additional discovery may be had by mutual agreement of the parties or where the Arbitrator selected so orders pursuant to a request by either party. The Arbitrator will have the authority to hear and decide dispositive motions, and/or a motion to dismiss and/or a motion for summary judgment by any party and will set a briefing schedule for such motion(s) upon the request of either party. You and the Company agree to bring any dispute in arbitration on an individual basis only, and not on a class, collective, or private attorney general representative action basis. Accordingly,

(a) There will be no right or authority for any dispute to be brought, heard or arbitrated as a class action ("Class Action Waiver"). The Class Action Waiver shall not be severable from this Agreement in any case in which (1) the dispute is filed as a class action and (2) a civil court of competent jurisdiction finds the Class Action Waiver is unenforceable. In such instances, the class action must be litigated in a civil court of competent jurisdiction.

(b) There will be no right or authority for any dispute to be brought, heard or arbitrated as a collective action ("Collective Action Waiver"). The Collective Action Waiver shall not be severable from this Agreement in any case in which (1) the dispute is filed as a collective action and (2) a civil court of competent jurisdiction finds the Collective Action Waiver is unenforceable. In such instances, the collective action must be litigated in a civil court of competent jurisdiction.

(c) There will be no right or authority for any dispute to be brought, heard or arbitrated as a private attorney general representative action ("Private Attorney General Waiver"). The Private Attorney General Waiver does not apply to any claim an Employee brings in arbitration as a private attorney general solely on the Employee's own behalf and not on behalf of or regarding others. The Private Attorney General Waiver shall be severable from this Agreement in any case in which (1) the dispute is filed as a private attorney general action and (2) a civil court of competent jurisdiction finds the Private Attorney General Waiver is unenforceable. In such instances, the private attorney general action must be litigated in a civil court of competent jurisdiction.

Notwithstanding any other clause contained in this Agreement, any claim that all or part of the Class Action Waiver, Collective Action Waiver or Private Attorney General Waiver is invalid, unenforceable, unconscionable, void or voidable may be determined only by a court of competent jurisdiction and not by an arbitrator.

The Class Action Waiver, Collective Action Waiver and Private Attorney General Waiver shall be severable in any case in which the dispute is filed as an individual action and severance is necessary to ensure that the individual action proceeds in arbitration.

## 7. Paying For The Arbitration

Each party will pay the fees for his, her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law. However, in all cases where required by law, the Company will pay the Arbitrator's and arbitration fees. If under applicable law the Company is not required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned between the parties in accordance with said applicable law, and any disputes in that regard will be resolved by the Arbitrator.

## 8. The Arbitration Hearing And Award

3

The parties will arbitrate their dispute before the Arbitrator, who shall confer with the parties regarding the conduct of the hearing and resolve any disputes the parties may have in that regard. Within 30 days of the close of the arbitration hearing, any party will have the right to prepare, serve on the other party and file with the Arbitrator a brief. The Arbitrator may award any party any remedy to which that party is entitled under applicable law, but such remedies shall be limited to those that would be available to a party in his or her individual capacity in a court of law for the claims presented to and decided by the Arbitrator, and no remedies that otherwise would be available to an individual in a court of law will be forfeited by virtue of this Agreement. The Arbitrator will issue a decision or award in writing, stating the essential findings of fact and conclusions of law. Except as may be permitted or required by law, as determined by the Arbitrator, neither a party nor an Arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of all parties. A court of competent jurisdiction shall have the authority to enter a judgment upon the award made pursuant to the arbitration.

### 9. An Employee's Right To Opt Out Of Arbitration

**Arbitration is not a mandatory condition of Employee's employment at the Company, and therefore an Employee may submit a form stating that the Employee wishes to opt out and not be subject to this Agreement.** In order to Opt Out of Arbitration, the Employee must submit a signed and dated statement on a "Alternative Resolution for Conflicts Agreement Opt Out Form" ("Form") that can be obtained from the Company's local or corporate Human Resources Department or online at www.uhsinc.com/careers/ARC Program. In order to be effective, the signed and dated Form must be returned to the Human Resources Department within 30 days of the Employee's receipt of this Agreement. An Employee who timely opts out as provided in this paragraph will not be subject to any adverse employment action as a consequence of that decision and may pursue available legal remedies without regard to this Agreement. **Should an Employee not opt out of this Agreement within 30 days of the Employee's receipt of this Agreement, continuing the Employee's employment constitutes mutual acceptance of the terms of this Agreement by Employee and the Company.** An Employee has the right to consult with counsel of the Employee's choice concerning this.

### 10. Non-Retaliation

It is against Company policy for any Employee to be subject to retaliation if he or she exercises his or her right to assert claims under this Agreement. If any Employee believes that he or she has been retaliated against by anyone at the Company, the Employee should immediately report this to the Human Resources Department.

### 10. Enforcement Of This Agreement

This Agreement is the full and complete agreement relating to the formal resolution of employment-related disputes. Except as stated in paragraph 6, above, in the event any portion of this Agreement is deemed unenforceable, the remainder of this Agreement will be enforceable.

**AGREED:**

The Pavilion _____

**AGREED:**

**EMPLOYEE NAME PRINTED** _____

**EMPLOYEE SIGNATURE** _____

**Date:** _____

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**URBANA DIVISION**

| | |
|---|---|
| Bruce D. Melton, | ) |
| | ) No. 17-cv-2112 |
| Plaintiff, | ) |
| | ) The Honorable Judge Colin Stirling Bruce |
| v. | ) |
| | ) Magistrate Judge Eric I. Long |
| The Pavilion Behavioral Health System, Joe | ) |
| Sheehy, Jim Capony [*sic*], Ray Reese [*sic*], | ) |
| Adam Putvin, Laurie Crabtree, Donna | ) |
| Gadekan, | ) |
| | ) |
| Defendants. | ) |

**THE PAVILION BEHAVIORAL HEALTH SYSTEM'S PETITION TO CONFIRM**
**ARBITRATION AWARD AND FOR A JUDGMENT IN DEFENDANT'S FAVOR**

Defendant The Pavilion Behavioral Health System submits this Petition to Confirm

Arbitration Award in favor of Defendant, resolving all claims in this proceeding, and seeks an

order entering judgment in Defendant's favor.

Respectfully submitted,

The Pavilion Behavioral Health System

By:      /s/      *Chad Layton*
              One of their Attorneys

Chad Layton, Esq. ARDC#6243339 clayton@smsm.com
Rachel Laurel, Esq. ARDC#6330004 rlaurel@smsm.com
SEGAL McCAMBRIDGE SINGER & MAHONEY, LTD.
233 South Wacker Drive, Suite 5500
Chicago, Illinois  60606
Tel: (312) 645-7800  |
Fax: (312) 645-7711

1

**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**URBANA DIVISION**

| | |
|---|---|
| Bruce D. Melton, | ) |
| | ) No. 17-cv-2112 |
| Plaintiff, | ) |
| | ) The Honorable Judge Colin Stirling Bruce |
| v. | ) |
| | ) Magistrate Judge Eric I. Long |
| The Pavilion Behavioral Health System, Joe | ) |
| Sheehy, Jim Capony [*sic*], Ray Reese [*sic*], | ) |
| Adam Putvin, Laurie Crabtree, Donna | ) |
| Gadekan, | ) |
| | ) |
| Defendants. | ) |

**THE PAVILION BEHAVIORAL HEALTH SYSTEM'S MEMORANDUM**
**OF LAW IN SUPPORT OF ITS PETITION TO CONFIRM**
**ARBITRATION AWARD AND FOR A JUDGMENT IN DEFENDANT'S FAVOR**

Defendant The Pavilion Behavioral Health System ("Pavilion"), through counsel, submits the following Memorandum of Law in Support of its Petition to Confirm the Arbitration Award and for a Judgment in Defendant's Favor:

**INTRODUCTION**

On May 9, 2017, Plaintiff Bruce D. Melton ("Melton"), filed a *pro se* Complaint of Employment Discrimination[1] alleging various claims against the Pavilion. (Doc. #1).[2]  The Pavilion filed a Motion to Compel Arbitration and Stay Proceedings on July 31, 2017, in accordance with its Alternative Resolution for Conflicts ("ARC") Acknowledgement Form (attached as "Exhibit A") and its ARC Agreement (attached as "Exhibit B"). (Doc. # 19).  This Court granted Defendants' Motions to Dismiss and the Pavilion's Motion to Compel Arbitration and Stay Proceedings on August 28, 2017, staying this action under Section 3 of the Federal

---

[1] The basis for federal jurisdiction is stated in the Complaint of Employment Discrimination. (pg. 2, Doc. #1).

[2] On August 28, 2017, this Court granted Motions to Dismiss by the individual defendants Joe Sheehy, Jim Caponi, Ray Reis, Adam Putvin, Laurie Crabtree, and Donna Gadekan. (Doc. #26).

Arbitration Act and maintaining jurisdiction over the action for purposes of confirming the arbitration award.  (Doc. # 26).    On June 14, 2018, Plaintiff filed his Demand for Arbitration (attached as "Exhibit C").

In preparation for arbitration, the parties engaged in discovery, which included four depositions and the production and exchange of extensive documentation.  The arbitration hearing took place on October 29, 2019, at which time Plaintiff had a full opportunity to present his claims to the arbitrator, Judge Epstein,[3] via live testimony, documents and depositions.  The Pavilion presented its defense.  On December 5, 2019, Honorable James R. Epstein (Ret.) issued a final award in favor of the Pavilion (attached as "Exhibit D").  By way of this motion, the Pavilion is seeking to confirm the arbitration award and requests entry of judgment in its favor.

## STATEMENT OF FACTS

### I.    THE PAVILION.

The Pavilion is a licensed childcare facility that serves as a residential treatment center for adolescents as well as a residential addiction treatment program.  (Pg. 3, Ex. D).  In light of its patient population, the Department of Children and Family Services ("DCFS") requires the Pavilion to obtain and maintain a licensure as a "childcare facility" and abide by all governing legal standards including the Illinois Child Care Act of 1969.  (*Id.*)  Under this Act, all applicants who are interested in employment at the Pavilion must submit to a criminal background check.

DCFS may find a prospective the Pavilion employee ineligible for employment based on his or her criminal background, and bar the individual from working at the Pavilion.  (pp. 3 – 4, Ex. D).  If DCFS bars a candidate from employment, the Pavilion has the option to request a waiver

---

[3]   Plaintiff submitted his Demand for Arbitration to JAMS Mediation, Arbitration and ADR Services.  (Ex. C).  The parties selected the Honorable James R. Epstein (Ret.) as the arbitrator through JAMS.

in order to allow the applicant to work at its facility.  (*Id.*)  While the Pavilion has the option to request a waiver, the Pavilion is not legally obligated to request a waiver from DCFS.  (*Id.*)  In order to determine whether a waiver is appropriate, the Pavilion reviews the applicant's background and evaluates whether a waiver should be requested under the specific circumstances applicable to the employment candidate.  (*Id.*)  If the Pavilion decides a waiver is appropriate for the applicant, it drafts a request for waiver explaining its reasoning for seeking a waiver.  (*Id.*)

## II.    PLAINTIFF'S EMPLOYMENT AT THE PAVILION AND TERMINATION.

On June 15, 2015, the Pavilion hired Plaintiff as a full-time cook whose responsibilities included preparing food, cleaning the kitchen, serving food, and stocking food for use in the kitchen.  As part of his employment, Plaintiff would have access to and interact with the vulnerable youth residents who were patients at the Pavilion.

In order to work at the Pavilion, Plaintiff underwent a criminal background check that was mandated by DCFS, given that the Pavilion is a licensed childcare facility.  The DCFS criminal background check identified numerous arrests and convictions in Plaintiff's background and, as a result, DCFS classified Plaintiff as ineligible for employment.  (Pg. 3, Ex. D).  In light of the information available to the Pavilion at the time, the Pavilion requested a waiver from DCFS, which was granted, and Plaintiff began his employment.  (Pg. 3, Ex. D).

In late 2016, an audit at DCFS revealed that Plaintiff had not undergone a required criminal background check through the Federal Bureau of Investigations (the "FBI").  (Pg. 4, Ex. D).  Accordingly, DCFS contacted the Pavilion and advised that Mr. Melton, as well as five additional employees at the Pavilion, were required to undergo an additional criminal background check through the FBI.  The FBI criminal background check revealed new information concerning Plaintiff, including additional arrests, charges, and convictions that were not identified in the

original DCFS criminal background check.  (*Id.*).  DCFS determined that Plaintiff was ineligible for employment at the Pavilion.  (*Id.*).

Plaintiff met with Laurie Crabtree, the Director of Human Resources at the Pavilion, concerning the new information revealed in the FBI criminal background check.  (*Id.*).  The FBI criminal background check revealed, for the first time, numerous new criminal matters including several arrests for domestic battery as well as for criminal sexual abuse.  (*Id.*).  Ms. Crabtree discussed the results of the FBI criminal background check with Plaintiff.  (*Id.*).  Ms. Crabtree evaluated the new information, compared it with the information that was previously available concerning Plaintiff, and consulted with the corporate human resources and legal departments.  (*Id.*).  Based on all of the available information, the Pavilion decided that it would not pursue a waiver of the decision by DCFS that Plaintiff was ineligible for employment.  (*Id.*).  In light of the conclusion by DCFS that Plaintiff was not eligible for employment at the Pavilion, he was terminated.  (*Id.*).

### III.    THE ARBITRATION AGREEMENT.

In conjunction with his employment at the Pavilion, Plaintiff executed an agreement that required the parties to submit employment disputes to arbitration.  Plaintiff executed the ARC Acknowledgement Form, which expressly provides that Plaintiff is "**BOUND BY THE ARC AGREEMENT**" and which further provides that Plaintiff and the Pavilion would "resolve any formal disputes through arbitration instead of litigation."  (Ex. A) (emphasis in original).  The ARC Agreement itself provides that "it is a contract where [Plaintiff] and The Pavilion agree to resolve any covered legal disputes through mandatory arbitration instead of by way of court or jury trial." (pg. 1, Ex. B).  The ARC Agreement "applies to any past, present or future disputes arising out of or related to Employee's application for employment, employment and/or

termination of employment with The Pavilion . . . ." and provides that the arbitration is "final and binding. . . ." (Sect. 1, Ex. B). More specifically, the ARC Agreement applies to "disputes regarding the employment relationship, compensation, . . . discrimination, termination, or harassment" as well as claims "arising under the Civil Rights Act of 1964, 42 U.S.C. § 1981, Americans With Disabilities Act, . . . Family Medical Leave Act, . . . and all other state statutory and common law claims." (*Id.* at Sect. 1).

The ARC Agreement describes how the arbitration hearing will proceed. (*Id.* at Sect. 8). Under the terms of the ARC Agreement, an arbitrator is responsible for conducting the hearing and then issuing "a decision or award in writing, stating the essential findings of fact and conclusions of law." (*Id.*). Finally, the ARC Agreement further provides that "[a] court of competent jurisdiction shall have the authority to enter a judgment upon the award made pursuant to the arbitration." (*Id.* at Section 8).

## IV. THE ARBITRATION.

Plaintiff's lawsuit states claims under the Americans with Disabilities Act, as well as for alleged retaliation, failure to stop harassment, wrongful termination and related employment claims. (Pp. 2 – 3, Doc. #1). Plaintiff presented these claims for resolution at arbitration, contending that the Pavilion wrongfully terminated, harassed, retaliated and discriminated against him. (Pg. 2, Ex. D). The Pavilion denied all of Plaintiff's claims and denied any and all liability to Plaintiff. (*Id.*). Accordingly, this matter proceeded to an arbitration hearing.

During the arbitration hearing, each party made an opening statement. The arbitrator, Judge Epstein, heard testimony from Plaintiff as well as Laurie Crabtree. The arbitrator also received and reviewed extensive documents as well as the deposition transcript of Arnetha Truss, the DCFS employee who handled Plaintiff's criminal background check. (*Id.*).

The transcript from the arbitration hearing reflects that Plaintiff had a full and fair opportunity to present his case-in-chief.  (See pp. 14 – 165 of the hearing transcript, attached as "Exhibit E").  In fact, at the end of his case, Plaintiff confirmed that he had rested.  (*Id*. at pg. 165).  The Pavilion then presented its defense (*Id*. at pp. 166 – 268) and the parties proceed to closing arguments.  (*Id*. at 269 – 301).

Following the arbitration, Judge Epstein issued a final award in favor of the Pavilion regarding all of Plaintiff's claims.  As agreed by the parties prior to arbitration, Judge Epstein prepared a written opinion stating the basis for the final award.  Judge Epstein concluded that Plaintiff failed to prove, by a preponderance of the evidence, that he was wrongfully terminated or that the Pavilion had harassed, retaliated or discriminated against Plaintiff.  (pg. 5, Ex. D).  Judge Epstein concluded that the evidence did not support any of Plaintiff's claims.  (*Id.*).

More specifically, Judge Epstein concluded that Plaintiff failed to prove that he was discriminated against based on gender, age, race, religion or any other legally protected class.  (Pp. 5 – 6, Ex. D).  While Plaintiff has medical issues that arose during his employment at the Pavilion, Judge Epstein further concluded there was no evidence that these issues improperly impacted the Pavilion's decision not to seek a second waiver from DCFS.  (Pg. 6, Ex. D).  Judge Epstein further stated that the Pavilion is a state licensed residential facility that serves "a population of children, some of whom had experienced traumatic events. . ." and that the Pavilion's decision to terminate Plaintiff after receiving new information from the FBI criminal background search was neither unlawful nor discriminatory.  (Pp. 5 – 6, Ex. D).  Judge Epstein specifically stated that "[i]t is important to note that the decision of whether to seek a DCFS waiver is a discretionary one; it is not, by any means, a required act."  (Pg. 6, Ex. D).  Judge Epstein further stated that he was "unable to find that any of the other improprieties suggested by Mr. Melton were proved by a

6

preponderance of the evidence."  (Pg. 7, Ex. D).  Accordingly, Judge Epstein found in favor of the

Pavilion on all of Plaintiff's claims.  (Pg. 8, Ex. D).

## ARGUMENT

### I.   THE FEDERAL ARBITRATION ACT GOVERNS THIS MOTION.

A District Court properly reviews an award under the Federal Arbitration Act when the

parties' agreement provides that the award will be enforced under that act.  *Renard v. Ameriprise

Fin. Servs.*, 778 F.3d 563, 567 (7th Cir. 2015).  Moreover, federal law recognizes the propriety of

arbitrating "employment disputes of all kinds. . . ." *Butler Mfg. Co. v. USW*, 336 F.3d 629, 634

(7th Cir. 2003).  *See also Wellpoint Health Networks, Inc. v. John Hancock Life Ins. Co.*, 547 F.

Supp. 2d 899, 907 (N.D. Ill. 2008) (explaining that the Federal Arbitration Act "embodies a federal

policy favoring enforcement of arbitration agreements.").

The Federal Arbitration Act provides that a court "must grant" a motion to enter a judgment

on an arbitration award unless there is a basis for vacating, modifying or correcting that award.  9

U.S.C. § 9.  As the Seventh Circuit has explained, absent the existence of a few exceptions, the

law requires a District Court to enforce an arbitration award if the arbitrator did not exceed "the

scope of the authority conferred upon her by the parties' actions and agreements."  *Butler Mfg.*,

336 F.3d at 632.  The Seventh Circuit has further explained that "[a] court's role in reviewing an

arbitral award is quite limited" and that the award must be enforced "even if the arbitrator's award

contains a serious error of law or fact."  *Id.   Hurn v. Macy's, Inc.*, No. 17-1200, 2017 U.S. LEXIS

221514, *7 (C.D. Ill. Sept. 5, 2017) (explaining that a District Court must uphold an arbitration

award even if an award includes serious factual or legal errors).

Federal law provides that "[a] court must grant an arbitration award great deference so long

as 'the arbitrator is even arguably construing or applying the contract and acting within the scope

of his authority.'"  *Crosby v. Sears Holding Corp.*, 2018 U.S. Dist. LEXIS 45182, 15 C 6396, at

*4-5 (N.D. Ill. March 20, 2018) (citations omitted) (denying plaintiff's motion to vacate an

arbitration award in an employment discrimination matter).   In *Crosby*, the District Court

acknowledged that it was "bound by the arbitrator's decision, which is a final determination of all

of Plaintiff's claims."  *Id.* at *10.

Under the law, "the party seeking to vacate or modify an arbitration award bears the burden

of proof."  *Wilson v. Sterling Foster & Co.*, 1998 U.S. Dist. LEXIS 16913, 98 C 2733, at *17 (N.D.

Ill. Oct. 15, 1998) (granting application to confirm the arbitration award).  Section 10 of the FAA

permits a district court to vacate an arbitration award where "the award was procured by corruption

or fraud; where the arbitrators were partial; where the arbitrators were guilty of misconduct that

prejudiced the rights of a party; or … 'where the arbitrators exceeded their powers, or so

imperfectly executed them that a mutual, final, and definite award upon the subject matter

submitted was not made."  *Wellpoint Health Networks, Inc. v. John Hancock Life Ins. Co.*, 547 F.

Supp. 2d 899, 907-08 (N.D. Ill. 2008) (citing 9 U.S.C. §10(a)(1)-(4)) (granting petition to confirm

the arbitration award).

In *Crosby v. Sears Holding Corp.*, 2018 U.S. Dist. LEXIS 45182, 15 C 6396, at *9-10

(N.D. Ill. March 20, 2018), the court evaluated whether "manifest disregard of the law" remains a

viable basis for vacating an arbitration award.  The District Court stated that, in light of the U.S.

Supreme Court's decision in *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576 (2008), manifest

disregard of the law does not provide a legal basis for vacating an arbitration award unless that

award requires the parties to violate the law.  *Id.* at *10.

Here, the parties have already agreed that the Federal Arbitration Act governs.  (Ex. B,

Section 1) ("[t]his Agreement is governed by the Federal Arbitration Act, 9 U.S.C. § 1 *et seq*. and

evidences a transaction involving commerce.").  Importantly, Plaintiff agreed to submit all of his employment related claims to arbitration, and all of Plaintiff's claims fell within the scope of the claims covered by the ARC Agreement.  Plaintiff had a full opportunity to conduct relevant discovery and present his claims at arbitration, as provided by the ARC Agreement.

Following an extensive hearing, the arbitrator issued an award that explains the basis and rationale for the arbitrator's decision.  The arbitrator rendered a final award in favor of the Pavilion, and that award "resolves all of the claims submitted for decision in this proceeding."  (pg. 8, Ex. D).  There is no evidence that the arbitrator acted improperly or exceeded his powers, there is no basis for vacating or modifying the final award, nor does that award require any party to violate the law.  Accordingly, this Honorable Court should confirm the arbitration award, enter judgment in favor of the Pavilion, and dismiss Plaintiff's lawsuit with prejudice.  *Hurn v. Macy's, Inc.*, No. 17-1200, 2017 U.S. LEXIS 221514, *7 (C.D. Ill. Sept. 5, 2017) (granting defendant's motion to confirm arbitration award concerning plaintiff's employment related claims because there was no basis for vacating or modifying that award).

## CONCLUSION

WHEREFORE, for the reasons stated herein, the Pavilion Behavioral Health System respectfully requests that this Honorable Court enter an order confirming the arbitration award, entering judgment in favor of the Pavilion, and providing for any other just and appropriate relief.

Respectfully submitted,

The Pavilion Behavioral Health System

By:  /s/  *Chad Layton*
        One of their Attorneys

Chad Layton, Esq. ARDC#6243339 clayton@smsm.com
Rachel Laurel, Esq. ARDC#6330004 rlaurel@smsm.com
SEGAL McCAMBRIDGE SINGER & MAHONEY, LTD.
233 South Wacker Drive, Suite 5500
Chicago, Illinois  60606
Tel: (312) 645-7800  |
Fax: (312) 645-7711

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a copy of the Status Report on Arbitration was served upon all parties of record on **January 13, 2020** as follows:

Mr. Bruce Melton
1304 S. Mattis Ave
Champaign, IL 61821
Brucemelton180@hotmail.com

By:  _____/s/ Chad Layton_____

Chad Layton, Esq. ARDC#6243339 clayton@smsm.com
Rachel Laurel, Esq. ARDC#6330004 rlaurel@smsm.com
SEGAL McCAMBRIDGE SINGER & MAHONEY, LTD.
233 South Wacker Drive, Suite 5500
Chicago, Illinois  60606
Tel: (312) 645-7800  |
Fax: (312) 645-7711

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**URBANA DIVISION**

| | |
|---|---|
| Bruce D. Melton, )<br><br>    Plaintiff, )<br><br>v. )<br><br>The Pavilion Behavioral Health System, Joe )<br>Sheehy, Jim Capony [*sic*], Ray Reese [*sic*], )<br>Adam Putvin, Laurie Crabtree, Donna )<br>Gadekan, )<br><br>    Defendants. ) | No. 17-cv-2112<br><br>The Honorable Judge Colin Stirling Bruce<br><br>Magistrate Judge Eric I. Long |

## <u>ORDER</u>

THIS MATTER, coming before the Court on The Pavilion Behavioral Health System's

Petition to Confirm Arbitration Award And For A Judgment in Defendant's Favor; all parties

having received notice and the Court being fully advised; IT IS HEREBY ORDERED:

A.      Defendant's Petition to Confirm the Arbitration Award is GRANTED;

B.      All of Plaintiff's claims are resolved in favor of The Pavilion Behavioral Health System;

C.      Judgment is entered on behalf of The Pavilion Behavioral Health System; and

D.      Plaintiff's lawsuit is dismissed with prejudice.

IT IS SO ORDERED BY:

DATED: _____

_____
The Honorable Judge Colin Stirling Bruce
United States District Judge

1

# EXHIBIT A



UHS recognizes that workplace disagreements may arise from time to time. Most UHS subsidiaries have a 3-tier program for resolution of workplace disputes, known as Alternative Resolution of Conflicts (ARC). ARC is an agreement to arbitrate disputes in the workplace. ARC is a contract between you, the employee, and your employer. ARC does not change any other terms and conditions of employment; it is a contract where you and your employer agree to resolve any covered legal disputes through mandatory arbitration instead of by way of court or jury trial. It is your responsibility to review the ARC Agreement. You are entitled to receive a copy of the ARC Agreement upon request.

ARC is a stand-alone legal document that completely covers the arbitration process, so most employee's questions can be answered by referring to provisions in the ARC Program. The following information and FAQs do not replace the ARC Program or supplement the ARC Program terms in anyway.

In the first of three Tiers, which is voluntary and not a prerequisite to arbitration under ARC, you will continue to bring any workplace concerns directly to your employer by following the procedures in the Dispute Resolution Policy as outlined in your Employee Handbook. This is considered Tier One, and we believe many concerns will be resolved at this level. If Tier One doesn't result in a resolution, you may choose to proceed to Tier Two: mediation. Mediation is a voluntary process where procedures and conversations are facilitated by a neutral third party mediator whose purpose is to help both you and your employer reach an agreeable resolution. Although we strongly encourage mediation, it is voluntary and not a prerequisite to arbitration under ARC. If a solution to your concerns is not resolved at Tier Two, then you proceed with Tier Three, mandatory arbitration. Arbitration is an alternative to court. Arbitration is presided over by an arbitrator who is a professional, independent, and impartial third party who listens to both sides, reviews evidence and renders a final, binding decision.

In short, Tier One provides you with an opportunity to directly resolve concerns directly with your employer. If necessary, Tier Two provides an opportunity for both parties to tell their stories to a listener who provides an objective view of the grievance and offers options to resolve the legal dispute. Finally, Tier Three provides both parties with a neutral decision maker who is empowered to end the dispute.

The following Q & A will help you understand the basics of the ARC program. If you have questions after reading these and the ARC Program document, please ask your supervisor or talk with your Human Resources representative.

Frequently asked questions.

**Q - Does the ARC Program change the nature of my at-will employment?**

A - No. Employees are still employed at-will unless otherwise provided by a union contract or law.

**Q - Do I have still have the right to an attorney?**

A - Yes.

**Q - What types of disputes are covered under this program?**

A - ARC covers legal disputes. It does not cover routine workplace disputes, unless they involve or lead to a legal dispute involving violation of law. Examples of issues which may be related to you and your employer are, but are not limited to: allegations of discrimination; disputes relating to wages, hours, or overtime; retaliation for exercising legal rights; defamation; infliction of emotional distress; invasion of privacy; wrongful discharge or wrongful termination; and, breach of contract. Additional information can be found in the ARC Agreement provided to new employees during orientation.

**Q - Are there any claims that cannot be brought under this program?**

A - Yes, the ARC Program lists claims that are not covered. For example, claims for workers' compensation or unemployment compensation benefits or state disability benefits, claims for benefits under any Company benefit plan, including those covered by the Employee Retirement Income Security Act of 1974 (ERISA), disputes under a Collective Bargaining Agreement, and claims that cannot be arbitrated under federal law, among others.

**Q - Can I opt-out of this program?**

A - Yes. Arbitration is not a mandatory condition of employment. Employees may opt of the Program by submitting a completed Opt-Out Notice Form [download here] within thirty days of either being hired or the Effective date of this Program. Employees who timely opt out of the Program will not be subject to any adverse employment action as a consequence of that decision and may pursue any available legal remedies. Employees who do not opt out of the Program within the applicable time frame will be bound by the ARC Agreement.

**Q - How do I initiate mediation or arbitration?**

A - You or your attorney must demand arbitration in writing and deliver the written demand by hand or first class mail to the other party within the applicable statute of limitations period to the UHS legal department.



**ARC**
**Alternative**
**Resolution**
**of Conflicts**

## ARC ACKNOWLEDGEMENT FORM

The Pavilion is rolling out a new 3-tier program for resolution of workplace disputes, known as Alternative Resolution of Conflicts (ARC). ARC is an agreement to arbitrate disputes in the workplace. ARC is a contract between you, the employee, and The Pavilion. ARC does not change any other terms and conditions of employment; it simply is a contract where you and The Pavilion agree to resolve any formal disputes through arbitration instead of litigation.

I acknowledge that I received a copy of The Pavilion's ARC Agreement and Opt-Out Form (enclosed). I understand it is my responsibility to review the ARC Agreement.

I understand that Arbitration is not a mandatory condition of employment. I understand that I may opt out of the ARC Program by submitting a completed Opt-Out Form in person, by fax, or mail to the Human Resources Department within thirty days of the date below. I understand that if I opt out of the ARC Program, I will not be subject to any adverse employment action as a consequence of that decision and may pursue any available legal remedies.

**I FURTHER UNDERSTAND THAT IF I DO NOT OPT OUT OF THE ARC PROGRAM WITHIN THIRTY DAYS OF THE DATE INDICATED BELOW, I WILL BE BOUND BY THE ARC AGREEMENT.**

*Bruce Melton*
Print Name

*Bruce Melton*                    9/14/2015
Employee Signature                Date

*[signature]*
HR Representative

*The Pavilion is an Equal Opportunity Employer.*

06/05/2013

# EXHIBIT B

**The Pavilion**



**Alternative Resolution of Conflicts**

## ALTERNATIVE RESOLUTION FOR CONFLICTS ("ARC") AGREEMENT

The Pavilion recognizes that workplace disagreements may arise from time to time and has a 3-tier program for resolution of workplace disputes, known as Alternative Resolution of Conflicts ("ARC" or "Agreement"). ARC is an agreement to arbitrate disputes in the workplace. ARC is a contract between you, the employee (sometimes referred to as, "Employee", "You" or "I"), and The Pavilion. ARC does not change any other terms and conditions of employment; it is a contract where you and The Pavilion agree to resolve any covered legal disputes through mandatory arbitration instead of by way of court or jury trial. It is your responsibility to review the ARC Agreement. You are entitled to receive a copy of this Alternative Resolution For Conflicts Agreement upon request.

### 1. How This Agreement Applies

This Agreement is governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. and evidences a transaction involving commerce. Except as it otherwise provides, this Agreement applies to any past, present or future dispute arising out of or related to Employee's application for employment, employment and/or termination of employment with The Pavilion or one of its affiliates, subsidiaries or parent companies ("Company") and survives after the employment relationship terminates. Nothing contained in this Agreement shall be construed to prevent or excuse Employee (individually or in concert with others) from utilizing the Company's existing internal procedures for resolution of complaints, and this Agreement is not intended to be a substitute for the utilization of such procedures.

Except as it otherwise provides, this Agreement is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or before a forum other than arbitration. This Agreement requires all such disputes to be resolved only by an arbitrator through final and binding arbitration and not by way of court or jury trial. Such disputes include without limitation disputes arising out of or relating to interpretation or application of this Agreement.

Except as it otherwise provides, this Agreement also applies, without limitation, to disputes regarding the employment relationship, compensation, breaks and rest periods, seating, discrimination, termination, or harassment and claims arising under the Civil Rights Act of 1964, 42 U.S.C. § 1981, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Fair Credit Reporting Act, Uniformed Services Employment and Reemployment Rights Act , Employee Retirement Income Security Act (except for claims for employee benefits under any benefit plan sponsored by the Company and covered by the Employee Retirement Income Security Act of 1974 or funded by insurance), Genetic Information Non-Discrimination Act, and state statutes, if any, addressing the same or similar subject matters, and all other state statutory and common law claims.

### 2. Mediation

Prior to invoking arbitration, the parties are encouraged to use mediation for any covered claims, but mediation is not a mandatory step before arbitration. Mediation is an informal, voluntary and facilitated process for resolving disputes. Mediation sessions are attended by a neutral third party, called a mediator, whose purpose is to help the parties reach a resolution. The mediator will be mutually selected by the parties. The Employer will pay the cost of the mediation.  The Employee may be but is not required to be represented by counsel.

Mediation shall be held within thirty days of the parties' agreement to mediate the dispute. If the mediation fails, You and the Company must pursue the covered dispute only in arbitration and not in court. Arbitration of such disputes is mandatory under this Agreement.

1

## 3. Limitations On How This Agreement Applies

This Agreement does not apply to: (i) Workers' Compensation benefit claims (but workers' compensation discrimination and retaliation claims are covered under this Agreement); (ii) state unemployment or disability insurance compensation claims; (iii) claims for benefits under employee benefit plans covered by ERISA that contain an appeal procedure or other exclusive and/or binding dispute resolution procedure in the respective plan; (iv) claims against a contractor that may not be the subject of a mandatory arbitration agreement as provided by Section 8116 of the Department of Defense ("DoD") Appropriations Act for Fiscal Year 2010 (Pub. L. 111-118), Section 8102 of the Department of Defense ("DoD") Appropriations Act for Fiscal Year 2011 (Pub. L. 112-10, Division A), and their implementing regulations, or any successor DoD appropriations act addressing the arbitrability of claims; and (v) claims that the Dodd-Frank Wall Street Reform and Consumer Protection Act or other controlling federal statutes or lawful, enforceable federal Executive Orders bar from the coverage of a mandatory pre-dispute arbitration agreements. This Agreement does not apply to any employee represented by a labor organization, or to the Company with respect to any such employee, except to the extent permitted in any applicable collective bargaining agreement or lawfully imposed by the Company when no collective bargaining agreement is in effect.

Regardless of any other terms of this Agreement, claims may be brought before and remedies awarded by an administrative agency if applicable law permits access to such an agency notwithstanding the existence of an agreement to arbitrate governed by the Federal Arbitration Act. Such administrative claims include without limitation claims or charges brought before the Equal Employment Opportunity Commission (www.eeoc.gov), the U.S. Department of Labor (www.dol.gov), the National Labor Relations Board (www.nlrb.gov), or the Office of Federal Contract Compliance Programs (www.dol.gov/esa/ofccp). Nothing in this Agreement shall be deemed to preclude or excuse a party from bringing an administrative claim before any agency in order to fulfill the party's obligation to exhaust administrative remedies before making a claim in arbitration. The Company will not retaliate against Employee for filing a claim with an administrative agency or for exercising rights (individually or in concert with others) under Section 7 of the National Labor Relations Act.

Disputes that may not be subject to pre-dispute arbitration agreement as provided by the Dodd-Frank Wall Street Reform and Consumer Protection Act (Public Law 111-203) or other controlling federal statutes or lawful, enforceable federal Executive Order are excluded from the coverage of this Agreement.

## 4. Selecting The Arbitrator

The Arbitrator shall be selected by mutual agreement of the Company and the Employee. Unless the Employee and Company mutually agree otherwise, the Arbitrator shall be an attorney licensed to practice in the location where the arbitration proceeding will be conducted or a retired federal or state judicial officer who presided in the jurisdiction where the arbitration will be conducted. If the parties cannot agree to an Arbitrator, the arbitration will be held under the auspices of the American Arbitration Association ("AAA"), and the parties shall select an Arbitrator under the then current Employment Arbitration Rules ("AAA Rules") (the AAA Rules are available through the Company's Law Department or via the Internet at www.adr.org/employment). In all other respects, the arbitration shall be conducted pursuant to the provisions of this ARC Agreement. The appointed Arbitrator shall act under this Agreement with the same force and effect as if the parties had selected the arbitrator by mutual agreement. The location of the arbitration proceeding shall be no more than 45 miles from the place where the Employee last worked for the Company, unless each party to the arbitration agrees in writing otherwise.

## 5. Starting The Arbitration

All claims in arbitration are subject to the same statutes of limitation that would apply in court. The party bringing the claim must demand arbitration in writing and deliver the written demand by hand or first class mail to the other party within the applicable statute of limitations period. The demand for arbitration shall include identification of the parties, a statement of the legal and factual basis of the claim(s), and a specification of the remedy sought. Any demand for arbitration made to the Company shall be provided to the Company's Legal Department at:

Law Department
UHS of Delaware, Inc

2

367 South Gulph Road
King of Prussia, PA 19406

The arbitrator shall resolve all disputes regarding the timeliness or propriety of the demand for arbitration. A party may apply to a court of competent jurisdiction for temporary or preliminary injunctive relief in connection with an arbitrable controversy, but only upon the ground that the award to which that party may be entitled may be rendered ineffectual without such provisional relief.

## 6. How Arbitration Proceedings Are Conducted

Each party will have the right to take the deposition of two individual witnesses and any expert witness designated by another party. Each party also will have the right to propound requests for production of documents to any party and the right to subpoena witnesses and documents for the arbitration, and documents relevant to the case from third parties. Additional discovery may be had by mutual agreement of the parties or where the Arbitrator selected so orders pursuant to a request by either party. The Arbitrator will have the authority to hear and decide dispositive motions, and/or a motion to dismiss and/or a motion for summary judgment by any party and will set a briefing schedule for such motion(s) upon the request of either party. You and the Company agree to bring any dispute in arbitration on an individual basis only, and not on a class, collective, or private attorney general representative action basis. Accordingly,

(a) There will be no right or authority for any dispute to be brought, heard or arbitrated as a class action ("Class Action Waiver"). The Class Action Waiver shall not be severable from this Agreement in any case in which (1) the dispute is filed as a class action and (2) a civil court of competent jurisdiction finds the Class Action Waiver is unenforceable. In such instances, the class action must be litigated in a civil court of competent jurisdiction.

(b) There will be no right or authority for any dispute to be brought, heard or arbitrated as a collective action ("Collective Action Waiver"). The Collective Action Waiver shall not be severable from this Agreement in any case in which (1) the dispute is filed as a collective action and (2) a civil court of competent jurisdiction finds the Collective Action Waiver is unenforceable. In such instances, the collective action must be litigated in a civil court of competent jurisdiction.

(c) There will be no right or authority for any dispute to be brought, heard or arbitrated as a private attorney general representative action ("Private Attorney General Waiver"). The Private Attorney General Waiver does not apply to any claim an Employee brings in arbitration as a private attorney general solely on the Employee's own behalf and not on behalf of or regarding others. The Private Attorney General Waiver shall be severable from this Agreement in any case in which (1) the dispute is filed as a private attorney general action and (2) a civil court of competent jurisdiction finds the Private Attorney General Waiver is unenforceable. In such instances, the private attorney general action must be litigated in a civil court of competent jurisdiction.

Notwithstanding any other clause contained in this Agreement, any claim that all or part of the Class Action Waiver, Collective Action Waiver or Private Attorney General Waiver is invalid, unenforceable, unconscionable, void or voidable may be determined only by a court of competent jurisdiction and not by an arbitrator.

The Class Action Waiver, Collective Action Waiver and Private Attorney General Waiver shall be severable in any case in which the dispute is filed as an individual action and severance is necessary to ensure that the individual action proceeds in arbitration.

## 7. Paying For The Arbitration

Each party will pay the fees for his, her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law. However, in all cases where required by law, the Company will pay the Arbitrator's and arbitration fees. If under applicable law the Company is not required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned between the parties in accordance with said applicable law, and any disputes in that regard will be resolved by the Arbitrator.

## 8. The Arbitration Hearing And Award

3

The parties will arbitrate their dispute before the Arbitrator, who shall confer with the parties regarding the conduct of the hearing and resolve any disputes the parties may have in that regard. Within 30 days of the close of the arbitration hearing, any party will have the right to prepare, serve on the other party and file with the Arbitrator a brief. The Arbitrator may award any party any remedy to which that party is entitled under applicable law, but such remedies shall be limited to those that would be available to a party in his or her individual capacity in a court of law for the claims presented to and decided by the Arbitrator, and no remedies that otherwise would be available to an individual in a court of law will be forfeited by virtue of this Agreement. The Arbitrator will issue a decision or award in writing, stating the essential findings of fact and conclusions of law. Except as may be permitted or required by law, as determined by the Arbitrator, neither a party nor an Arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of all parties. A court of competent jurisdiction shall have the authority to enter a judgment upon the award made pursuant to the arbitration.

### 9. An Employee's Right To Opt Out Of Arbitration

**Arbitration is not a mandatory condition of Employee's employment at the Company, and therefore an Employee may submit a form stating that the Employee wishes to opt out and not be subject to this Agreement.** In order to Opt Out of Arbitration, the Employee must submit a signed and dated statement on a "Alternative Resolution for Conflicts Agreement Opt Out Form" ("Form") that can be obtained from the Company's local or corporate Human Resources Department or online at www.uhsinc.com/careers/ARC Program. In order to be effective, the signed and dated Form must be returned to the Human Resources Department within 30 days of the Employee's receipt of this Agreement. An Employee who timely opts out as provided in this paragraph will not be subject to any adverse employment action as a consequence of that decision and may pursue available legal remedies without regard to this Agreement. **Should an Employee not opt out of this Agreement within 30 days of the Employee's receipt of this Agreement, continuing the Employee's employment constitutes mutual acceptance of the terms of this Agreement by Employee and the Company.** An Employee has the right to consult with counsel of the Employee's choice concerning this.

### 10. Non-Retaliation

It is against Company policy for any Employee to be subject to retaliation if he or she exercises his or her right to assert claims under this Agreement. If any Employee believes that he or she has been retaliated against by anyone at the Company, the Employee should immediately report this to the Human Resources Department.

### 10. Enforcement Of This Agreement

This Agreement is the full and complete agreement relating to the formal resolution of employment-related disputes. Except as stated in paragraph 6, above, in the event any portion of this Agreement is deemed unenforceable, the remainder of this Agreement will be enforceable.

**AGREED:**

The Pavilion _____

**AGREED:**

**EMPLOYEE NAME PRINTED** _____

**EMPLOYEE SIGNATURE** _____

**Date:** _____

# EXHIBIT C



# Demand for Arbitration Form (continued)
Instructions for Submittal of Arbitration to JAMS

## TO RESPONDENT (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

Add more respondents on **page 6**.

| | |
|---|---|
| RESPONDENT NAME | The Pavilion Behavioral Health System |
| ADDRESS | 800 West Church Street |

| CITY | Champaign | STATE | Illinois | ZIP | 61820 |
|---|---|---|---|---|---|

| PHONE | | FAX | | EMAIL | |
|---|---|---|---|---|---|

### RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| REPRESENTATIVE/ATTORNEY | |
| FIRM/ COMPANY | Jane M. McFetridge, Sabreena El-Amin |
| ADDRESS | 150 North Michigan Ave., Suite 2500 |

| CITY | Chicago | STATE | Illinois | ZIP | 60601 |
|---|---|---|---|---|---|

| PHONE | (312)787-4949 | FAX | | EMAIL | sabreena.el-amin@jacksonlewis.com |
|---|---|---|---|---|---|

## FROM CLAIMANT

Add more claimants on **page 7**.

| | |
|---|---|
| CLAIMANT NAME | Bruce Melton |
| ADDRESS | 1804 Oliver Dr., Apartment 5 |

| CITY | Urbana | STATE | Illinois | ZIP | 61802 |
|---|---|---|---|---|---|

| PHONE | (217)417-0740 | FAX | | EMAIL | brucemelton180@hotmail.com |
|---|---|---|---|---|---|

### CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| REPRESENTATIVE/ATTORNEY | |
| FIRM/ COMPANY | |
| ADDRESS | |

| CITY | | STATE | | ZIP | |
|---|---|---|---|---|---|

| PHONE | | FAX | | EMAIL | |
|---|---|---|---|---|---|

# Demand for Arbitration Form (continued)

## Instructions for Submittal of Arbitration to JAMS

## MEDIATION IN ADVANCE OF THE ARBITRATION

☐ If mediation in advance of the arbitration is desired, please check here and a JAMS Case Manager will assist the parties in coordinating a mediation session.

## NATURE OF DISPUTE / CLAIMS & RELIEF SOUGHT BY CLAIMANT

**CLAIMANT HEREBY DEMANDS THAT YOU SUBMIT THE FOLLOWING DISPUTE TO FINAL AND BINDING ARBITRATION.**
**A MORE DETAILED STATEMENT OF CLAIMS MAY BE ATTACHED IF NEEDED.**

See attached List of Demands Documents:

**AMOUNT IN CONTROVERSY (US DOLLARS)**

03/12/2018

To: JAMS (Judge Epstein),

The key issuers involved in this litigation consists of my being Wrongfully Terminated, Harassed, Retaliated Against and Discriminated Against by my former employer the Pavilion Behavioral Health System and its Supervisory Staff.

I was originally hired as a cook for the Pavilion Behavioral Health System on June 26th of 2015, after Joe Sheehy purchased my contract from Express Employment Professional Temporary at the request of Director of Operations, Ray Reis. Since my hire, I had become injured while perform excessive manual labor, unlike the other employees which consisted of mostly female workers, myself and two older gentlemen who was not required or asked to do the work that I was asked to do.

After having worked for over a few months, I started to feel great pain shooting through my hands and eventually my back. I immediately expressed my concerns to the then Kitchen Manager (Lisa Kidwell) and also to the HR Director (Laurie Crabtree) but my concerns were ignored. After having spoken with someone whom was also a part of the management team about my issues, I was given a phone number to contact so that I could relay my concerns to a compliancy line in order to vent my frustrations about the neglect that was shown to me about the concerns of my issues by the Supervisory staff at the Pavilion.

I eventually went to the Doctor and was given restriction notes to prevent me from having to do all of the excessive manual labor that was requested of me however, the restriction notes had little to no effect to the work required and requested of me. This was the beginning of my being repeatedly harassed by the Supervisory Staff Members and eventually retaliated against with false accusations, along with Discrimination and Termination. At this point and time I turned to the assistance of an Attorney to help me with my issues because of the treatment that was being presented to me by now.

While being laid off from for two weeks, after having my second surgery done, I was finally given a return to work notice for January 5th 2017.  I immediately contacted HR Director Laurie Crabtree and was informed by her that I could not return back to work until a second background check was finished and she had all of the information. I then informed her that my short term disability was going to be over on the date that I was to return to work so I would have to start being paid by them again. She told me that they did not have to pay me a dime

and that she did not know who was going to pay me. At this I was still under the care of a doctor at this time and had not been released from the doctor to return back to work without restrictions. My Attorney eventually sent a letter to the Pavilion that they were still under obligation to pay my salary (Under the Matuzak vs. Illinois Workers Compensation Commission Act), but they ignored this fact.

On February 9th, I received a certified letter from Laurie Crabtree that they were not willing to give me another waiver at this time and that my employment had been terminated. I was not given a reason as to why they would not give me another waiver and was not contacted by anyone that represented the Pavilion. Before I was originally hired by the Pavilion, I informed Ray Reis of my entire criminal History and he told me that he was going to make sure that I would get hired. After that fact he also informed me that my record would not prevent me from being hired and so CEO (Joe Sheehy) purchased my contract from the Express Employment Agency in order for me to work there. I also had to have a background check done before I could be hired there anyway, which was done and I was approved to work there, so what changed.

These issues shows that I was discriminated against, retaliated against, harassed and wrongfully terminated. I am also prepared to retrieve the camera footage that is done at the Pavilion to show that the issues that I have brought forth are true and accurate as well.

As for the Pavilion and its strongest legal and factual points are undetermined by me. However, I will states that they are an At Will employer which means that they can terminate anyone at any time they see fit. However, exceptions to at-will employment doctrines do exist. Violation of these laws can incur strict legal ramifications for employers, such as being ordered to reinstate a previously terminated employee, payment of back or front wages, punitive damages and coverage of the employee's legal fees.

Do to the illegal and factual basis that I have presented in this document I am willing to except the following remedies for Bruce D. Melton due to the wrongful treatment, retaliation, and harassment that I endured, along with being wrongfully and if not also illegally terminated:

1. I request that I am fully reinstated immediately back to my position or that of just a dishwasher, along with the $1.00 raise that I was told by Ray Reis, I would be given until this situation started happening.
2. I request to be back paid from 1/5/2017 in the amount of $28,032 because I was still supposed to have been pain by the Pavilion and I was wrongfully terminated by them
3. I request to be paid punitive damages in the amount of $25,000, due to late fees from not being able to pay my bills on times for being wrongfully terminated. Also for pain

and suffering because, due to the stress of not know how I was going to help pay the bills, my wife lost our baby from stress, which I have a Doctors letter to prove the stress.

4. I also request that I will not be subjected to any more harassment and retaliation so that I can the job that I was originally hired to do.

I do feel that is a fair proposal that I am requesting due to the nature of what has occurred. I am willing to sign off on furthering this case in the Federal Court along with the Department of Human Rights if The Pavilion is willing to agree to my demands, otherwise I look forward to seeing them in court with my evidence them with theirs.

I am also including the requests that I originally made to the Pavilion and its Attorney's that was never discussed. I have tried repeatedly to engage in a fair conversation with them and have been turned down in every instance. I was treated horribly by them and I am due a just and fair outcome.


Bruce D. Melton

03/12/2018



# Demand for Arbitration Form (continued)
Instructions for Submittal of Arbitration to JAMS

## ARBITRATION AGREEMENT
This demand is made pursuant to the arbitration agreement which the parties made as follows. *Please cite location of arbitration provision and attach two copies of entire agreement.*

**ARBITRATION PROVISION LOCATION**

Please see attached complaint.

## RESPONSE
The respondent may file a response and counter-claim to the above-stated claim according to the applicable arbitration rules. *Send the original response and counter-claim to the claimant at the address stated above with two copies to JAMS.*

## REQUEST FOR HEARING
**REQUESTED LOCATION**   Champaign, IL

## ELECTION FOR EXPEDITED PROCEDURES (IF COMPREHENSIVE RULES APPLY)
See: *Comprehensive Rule 16.1*

☒   By checking the box to the left, Claimant requests that the Expedited Procedures described in JAMS Comprehensive Rules 16.1 and 16.2 be applied in this matter. Respondent shall indicate not later than seven (7) days from the date this Demand is served whether it agrees to the Expedited Procedures.

## SUBMISSION INFORMATION
**SIGNATURE**   *Bruce D. Melton*   **DATE** 6/14/2018

**NAME (PRINT/TYPED)**   *Bruce D. Melton*



**ARC**

**Alternative Resolution of Conflicts**

UHS recognizes that workplace disagreements may arise from time to time. Most UHS subsidiaries have a 3-tier program for resolution of workplace disputes, known as Alternative Resolution of Conflicts (ARC). ARC is an agreement to arbitrate disputes in the workplace. ARC is a contract between you, the employee, and your employer. ARC does not change any other terms and conditions of employment; it is a contract where you and your employer agree to resolve any covered legal disputes through mandatory arbitration instead of by way of court or jury trial. It is your responsibility to review the ARC Agreement. You are entitled to receive a copy of the ARC Agreement upon request.

ARC is a stand-alone legal document that completely covers the arbitration process, so most employee's questions can be answered by referring to provisions in the ARC Program. The following information and FAQs do not replace the ARC Program or supplement the ARC Program terms in anyway.

In the first of three Tiers, which is voluntary and not a prerequisite to arbitration under ARC, you will continue to bring any workplace concerns directly to your employer by following the procedures in the Dispute Resolution Policy as outlined in your Employee Handbook. This is considered Tier One, and we believe many concerns will be resolved at this level. If Tier One doesn't result in a resolution, you may choose to proceed to Tier Two: mediation. Mediation is a voluntary process where procedures and conversations are facilitated by a neutral third party mediator whose purpose is to help both you and your employer reach an agreeable resolution. Although we strongly encourage mediation, it is voluntary and not a prerequisite to arbitration under ARC. If a solution to your concerns is not resolved at Tier Two, then you proceed with Tier Three, mandatory arbitration. Arbitration is an alternative to court. Arbitration is presided over by an arbitrator who is a professional, independent, and impartial third party who listens to both sides, reviews evidence and renders a final, binding decision.

In short, Tier One provides you with an opportunity to directly resolve concerns directly with your employer. If necessary, Tier Two provides an opportunity for both parties to tell their stories to a listener who provides an objective view of the grievance and offers options to resolve the legal dispute. Finally, Tier Three provides both parties with a neutral decision maker who is empowered to end the dispute.

The following Q & A will help you understand the basics of the ARC program. If you have questions after reading these and the ARC Program document, please ask your supervisor or talk with your Human Resources representative.

Frequently asked questions.

**Q - Does the ARC Program change the nature of my at-will employment?**

A - No. Employees are still employed at-will unless otherwise provided by a union contract or law.

**Q - Do I have still have the right to an attorney?**

A - Yes.

**Q - What types of disputes are covered under this program?**

A - ARC covers legal disputes. It does not cover routine workplace disputes, unless they involve or lead to a legal dispute involving violation of law. Examples of issues which may be related to you and your employer are, but are not limited to: allegations of discrimination; disputes relating to wages, hours, or overtime; retaliation for exercising legal rights; defamation; infliction of emotional distress; invasion of privacy; wrongful discharge or wrongful termination; and, breach of contract. Additional information can be found in the ARC Agreement provided to new employees during orientation.

**Q - Are there any claims that cannot be brought under this program?**

A - Yes, the ARC Program lists claims that are not covered. For example, claims for workers' compensation or unemployment compensation benefits or state disability benefits, claims for benefits under any Company benefit plan, including those covered by the Employee Retirement Income Security Act of 1974 (ERISA), disputes under a Collective Bargaining Agreement, and claims that cannot be arbitrated under federal law, among others.

**Q - Can I opt-out of this program?**

A - Yes. Arbitration is not a mandatory condition of employment. Employees may opt of the Program by submitting a completed Opt-Out Notice Form [download here] within thirty days of either being hired or the Effective date of this Program. Employees who timely opt out of the Program will not be subject to any adverse employment action as a consequence of that decision and may pursue any available legal remedies. Employees who do not opt out of the Program within the applicable time frame will be bound by the ARC Agreement.

**Q - How do I initiate mediation or arbitration?**

A - You or your attorney must demand arbitration in writing and deliver the written demand by hand or first class mail to the other party within the applicable statute of limitations period to the UHS legal department.



## ARC ACKNOWLEDGEMENT FORM

The Pavilion is rolling out a new 3-tier program for resolution of workplace disputes, known as Alternative Resolution of Conflicts (ARC).  ARC is an agreement to arbitrate disputes in the workplace.  ARC is a contract between you, the employee, and The Pavilion.  ARC does not change any other terms and conditions of employment; it simply is a contract where you and The Pavilion agree to resolve any formal disputes through arbitration instead of litigation.

I acknowledge that I received a copy of The Pavilion's ARC Agreement and Opt-Out Form (enclosed).  I understand it is my responsibility to review the ARC Agreement.

I understand that Arbitration is not a mandatory condition of employment.  I understand that I may opt out of the ARC Program by submitting a completed Opt-Out Form in person, by fax, or mail to the Human Resources Department within thirty days of the date below.  I understand that if I opt out of the ARC Program, I will not be subject to any adverse employment action as a consequence of that decision and may pursue any available legal remedies.

**I FURTHER UNDERSTAND THAT IF I DO NOT OPT OUT OF THE ARC PROGRAM WITHIN THIRTY DAYS OF THE DATE INDICATED BELOW, I WILL BE BOUND BY THE ARC AGREEMENT.**

*Bruce Melton*
Print Name

*Bruce Melton*                          *9/14/2015*
Employee Signature                      Date

*Dennis Crabtree*
HR Representative

*The Pavilion is an Equal Opportunity Employer.*

## The Pavilion



**ARC**
Alternative
Resolution
of Conflicts

## ALTERNATIVE RESOLUTION FOR CONFLICTS ("ARC") AGREEMENT

The Pavilion recognizes that workplace disagreements may arise from time to time and has a 3-tier program for resolution of workplace disputes, known as Alternative Resolution of Conflicts ("ARC" or "Agreement"). ARC is an agreement to arbitrate disputes in the workplace. ARC is a contract between you, the employee (sometimes referred to as, "Employee", "You" or "I"), and The Pavilion. ARC does not change any other terms and conditions of employment; it is a contract where you and The Pavilion agree to resolve any covered legal disputes through mandatory arbitration instead of by way of court or jury trial. It is your responsibility to review the ARC Agreement. You are entitled to receive a copy of this Alternative Resolution For Conflicts Agreement upon request.

### 1. How This Agreement Applies

This Agreement is governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. and evidences a transaction involving commerce. Except as it otherwise provides, this Agreement applies to any past, present or future dispute arising out of or related to Employee's application for employment, employment and/or termination of employment with The Pavilion or one of its affiliates, subsidiaries or parent companies ("Company") and survives after the employment relationship terminates. Nothing contained in this Agreement shall be construed to prevent or excuse Employee (individually or in concert with others) from utilizing the Company's existing internal procedures for resolution of complaints, and this Agreement is not intended to be a substitute for the utilization of such procedures.

Except as it otherwise provides, this Agreement is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or before a forum other than arbitration. This Agreement requires all such disputes to be resolved only by an arbitrator through final and binding arbitration and not by way of court or jury trial. Such disputes include without limitation disputes arising out of or relating to interpretation or application of this Agreement.

Except as it otherwise provides, this Agreement also applies, without limitation, to disputes regarding the employment relationship, compensation, breaks and rest periods, seating, discrimination, termination, or harassment and claims arising under the Civil Rights Act of 1964, 42 U.S.C. § 1981, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Fair Credit Reporting Act, Uniformed Services Employment and Reemployment Rights Act , Employee Retirement Income Security Act (except for claims for employee benefits under any benefit plan sponsored by the Company and covered by the Employee Retirement Income Security Act of 1974 or funded by insurance), Genetic Information Non-Discrimination Act, and state statutes, if any, addressing the same or similar subject matters, and all other state statutory and common law claims.

### 2. Mediation

Prior to invoking arbitration, the parties are encouraged to use mediation for any covered claims, but mediation is not a mandatory step before arbitration. Mediation is an informal, voluntary and facilitated process for resolving disputes. Mediation sessions are attended by a neutral third party, called a mediator, whose purpose is to help the parties reach a resolution. The mediator will be mutually selected by the parties. The Employer will pay the cost of the mediation.  The Employee may be but is not required to be represented by counsel.

Mediation shall be held within thirty days of the parties' agreement to mediate the dispute. If the mediation fails, You and the Company must pursue the covered dispute only in arbitration and not in court. Arbitration of such disputes is mandatory under this Agreement.

1

### 3. Limitations On How This Agreement Applies

This Agreement does not apply to: (i) Workers' Compensation benefit claims (but workers' compensation discrimination and retaliation claims are covered under this Agreement); (ii) state unemployment or disability insurance compensation claims; (iii) claims for benefits under employee benefit plans covered by ERISA that contain an appeal procedure or other exclusive and/or binding dispute resolution procedure in the respective plan; (iv) claims against a contractor that may not be the subject of a mandatory arbitration agreement as provided by Section 8116 of the Department of Defense ("DoD") Appropriations Act for Fiscal Year 2010 (Pub. L. 111-118), Section 8102 of the Department of Defense ("DoD") Appropriations Act for Fiscal Year 2011 (Pub. L. 112-10, Division A), and their implementing regulations, or any successor DoD appropriations act addressing the arbitrability of claims; and (v) claims that the Dodd-Frank Wall Street Reform and Consumer Protection Act or other controlling federal statutes or lawful, enforceable federal Executive Orders bar from the coverage of mandatory pre-dispute arbitration agreements. This Agreement does not apply to any employee represented by a labor organization, or to the Company with respect to any such employee, except to the extent permitted in any applicable collective bargaining agreement or lawfully imposed by the Company when no collective bargaining agreement is in effect.

Regardless of any other terms of this Agreement, claims may be brought before and remedies awarded by an administrative agency if applicable law permits access to such an agency notwithstanding the existence of an agreement to arbitrate governed by the Federal Arbitration Act. Such administrative claims include without limitation claims or charges brought before the Equal Employment Opportunity Commission (www.eeoc.gov), the U.S. Department of Labor (www.dol.gov), the National Labor Relations Board (www.nlrb.gov), or the Office of Federal Contract Compliance Programs (www.dol.gov/esa/ofccp). Nothing in this Agreement shall be deemed to preclude or excuse a party from bringing an administrative claim before any agency in order to fulfill the party's obligation to exhaust administrative remedies before making a claim in arbitration. The Company will not retaliate against Employee for filing a claim with an administrative agency or for exercising rights (individually or in concert with others) under Section 7 of the National Labor Relations Act.

Disputes that may not be subject to pre-dispute arbitration agreement as provided by the Dodd-Frank Wall Street Reform and Consumer Protection Act (Public Law 111-203) or other controlling federal statutes or lawful, enforceable federal Executive Order are excluded from the coverage of this Agreement.

### 4. Selecting The Arbitrator

The Arbitrator shall be selected by mutual agreement of the Company and the Employee. Unless the Employee and Company mutually agree otherwise, the Arbitrator shall be an attorney licensed to practice in the location where the arbitration proceeding will be conducted or a retired federal or state judicial officer who presided in the jurisdiction where the arbitration will be conducted. If the parties cannot agree to an Arbitrator, the arbitration will be held under the auspices of the American Arbitration Association ("AAA"), and the parties shall select an Arbitrator under the then current Employment Arbitration Rules ("AAA Rules") (the AAA Rules are available through the Company's Law Department or via the Internet at www.adr.org/employment). In all other respects, the arbitration shall be conducted pursuant to the provisions of this ARC Agreement. The appointed Arbitrator shall act under this Agreement with the same force and effect as if the parties had selected the arbitrator by mutual agreement. The location of the arbitration proceeding shall be no more than 45 miles from the place where the Employee last worked for the Company, unless each party to the arbitration agrees in writing otherwise.

### 5. Starting The Arbitration

All claims in arbitration are subject to the same statutes of limitation that would apply in court. The party bringing the claim must demand arbitration in writing and deliver the written demand by hand or first class mail to the other party within the applicable statute of limitations period. The demand for arbitration shall include identification of the parties, a statement of the legal and factual basis of the claim(s), and a specification of the remedy sought. Any demand for arbitration made to the Company shall be provided to the Company's Legal Department at:

Law Department
UHS of Delaware, Inc

2

367 South Gulph Road
King of Prussia, PA 19406

The arbitrator shall resolve all disputes regarding the timeliness or propriety of the demand for arbitration. A party may apply to a court of competent jurisdiction for temporary or preliminary injunctive relief in connection with an arbitrable controversy, but only upon the ground that the award to which that party may be entitled may be rendered ineffectual without such provisional relief.

## 6. How Arbitration Proceedings Are Conducted

Each party will have the right to take the deposition of two individual witnesses and any expert witness designated by another party. Each party also will have the right to propound requests for production of documents to any party and the right to subpoena witnesses and documents for the arbitration, and documents relevant to the case from third parties. Additional discovery may be had by mutual agreement of the parties or where the Arbitrator selected so orders pursuant to a request by either party. The Arbitrator will have the authority to hear and decide dispositive motions, and/or a motion to dismiss and/or a motion for summary judgment by any party and will set a briefing schedule for such motion(s) upon the request of either party. You and the Company agree to bring any dispute in arbitration on an individual basis only, and not on a class, collective, or private attorney general representative action basis. Accordingly,

(a) There will be no right or authority for any dispute to be brought, heard or arbitrated as a class action ("Class Action Waiver"). The Class Action Waiver shall not be severable from this Agreement in any case in which (1) the dispute is filed as a class action and (2) a civil court of competent jurisdiction finds the Class Action Waiver is unenforceable. In such instances, the class action must be litigated in a civil court of competent jurisdiction.

(b) There will be no right or authority for any dispute to be brought, heard or arbitrated as a collective action ("Collective Action Waiver"). The Collective Action Waiver shall not be severable from this Agreement in any case in which (1) the dispute is filed as a collective action and (2) a civil court of competent jurisdiction finds the Collective Action Waiver is unenforceable. In such instances, the collective action must be litigated in a civil court of competent jurisdiction.

(c) There will be no right or authority for any dispute to be brought, heard or arbitrated as a private attorney general representative action ("Private Attorney General Waiver"). The Private Attorney General Waiver does not apply to any claim an Employee brings in arbitration as a private attorney general solely on the Employee's own behalf and not on behalf of or regarding others. The Private Attorney General Waiver shall be severable from this Agreement in any case in which (1) the dispute is filed as a private attorney general action and (2) a civil court of competent jurisdiction finds the Private Attorney General Waiver is unenforceable. In such instances, the private attorney general action must be litigated in a civil court of competent jurisdiction.

Notwithstanding any other clause contained in this Agreement, any claim that all or part of the Class Action Waiver, Collective Action Waiver or Private Attorney General Waiver is invalid, unenforceable, unconscionable, void or voidable may be determined only by a court of competent jurisdiction and not by an arbitrator.

The Class Action Waiver, Collective Action Waiver and Private Attorney General Waiver shall be severable in any case in which the dispute is filed as an individual action and severance is necessary to ensure that the individual action proceeds in arbitration.

## 7. Paying For The Arbitration

Each party will pay the fees for his, her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law. However, in all cases where required by law, the Company will pay the Arbitrator's and arbitration fees. If under applicable law the Company is not required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned between the parties in accordance with said applicable law, and any disputes in that regard will be resolved by the Arbitrator.

## 8. The Arbitration Hearing And Award

3

The parties will arbitrate their dispute before the Arbitrator, who shall confer with the parties regarding the conduct of the hearing and resolve any disputes the parties may have in that regard. Within 30 days of the close of the arbitration hearing, any party will have the right to prepare, serve on the other party and file with the Arbitrator a brief. The Arbitrator may award any party any remedy to which that party is entitled under applicable law, but such remedies shall be limited to those that would be available to a party in his or her individual capacity in a court of law for the claims presented to and decided by the Arbitrator, and no remedies that otherwise would be available to an individual in a court of law will be forfeited by virtue of this Agreement. The Arbitrator will issue a decision or award in writing, stating the essential findings of fact and conclusions of law. Except as may be permitted or required by law, as determined by the Arbitrator, neither a party nor an Arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of all parties. A court of competent jurisdiction shall have the authority to enter a judgment upon the award made pursuant to the arbitration.

### 9. An Employee's Right To Opt Out Of Arbitration

**Arbitration is not a mandatory condition of Employee's employment at the Company, and therefore an Employee may submit a form stating that the Employee wishes to opt out and not be subject to this Agreement.** In order to Opt Out of Arbitration, the Employee must submit a signed and dated statement on a "Alternative Resolution for Conflicts Agreement Opt Out Form" ("Form") that can be obtained from the Company's local or corporate Human Resources Department or online at www.uhsinc.com/careers/ARC Program. In order to be effective, the signed and dated Form must be returned to the Human Resources Department within 30 days of the Employee's receipt of this Agreement. An Employee who timely opts out as provided in this paragraph will not be subject to any adverse employment action as a consequence of that decision and may pursue available legal remedies without regard to this Agreement. **Should an Employee not opt out of this Agreement within 30 days of the Employee's receipt of this Agreement, continuing the Employee's employment constitutes mutual acceptance of the terms of this Agreement by Employee and the Company.** An Employee has the right to consult with counsel of the Employee's choice concerning this.

### 10. Non-Retaliation

It is against Company policy for any Employee to be subject to retaliation if he or she exercises his or her right to assert claims under this Agreement. If any Employee believes that he or she has been retaliated against by anyone at the Company, the Employee should immediately report this to the Human Resources Department.

### 10. Enforcement Of This Agreement

This Agreement is the full and complete agreement relating to the formal resolution of employment-related disputes. Except as stated in paragraph 6, above, in the event any portion of this Agreement is deemed unenforceable, the remainder of this Agreement will be enforceable.

**AGREED:**

The Pavilion _____

**AGREED:**

**EMPLOYEE NAME PRINTED** _____

**EMPLOYEE SIGNATURE** _____

**Date:** _____

4

# Demand for Arbitration Form (continued)

## Instructions for Submittal of Arbitration to JAMS

**Completion of this section is <u>required for all consumer or employment claims</u>.**

## CONSUMER AND EMPLOYMENT ARBITRATION

**Please indicate if this is a CONSUMER ARBITRATION. For purposes of this designation, and whether this case will be administered in California or elsewhere, JAMS is guided by *California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e)*, as defined below, and the JAMS Consumer and Employment Minimum Standards of Procedural Fairness:**

☐ **YES**, this **is** a CONSUMER ARBITRATION.

☑ **NO**, this **is not** a CONSUMER ARBITRATION.

"Consumer arbitration" means an arbitration conducted under a pre-dispute arbitration provision contained in a contract that meets the criteria listed in paragraphs (1) through (3) below. "Consumer arbitration" excludes arbitration proceedings conducted under or arising out of public or private sector labor-relations laws, regulations, charter provisions, ordinances, statutes, or agreements.

1. The contract is with a consumer party, as defined in these standards;
2. The contract was drafted by or on behalf of the non-consumer party; and
3. The consumer party was required to accept the arbitration provision in the contract.

"Consumer party" is a party to an arbitration agreement who, in the context of that arbitration agreement, is any of the following:

1. An individual who seeks or acquires, including by lease, any goods or services primarily for personal, family, or household purposes including, but not limited to, financial services, insurance, and other goods and services as defined in section 1761 of the Civil Code;
2. An individual who is an enrollee, a subscriber, or insured in a health-care service plan within the meaning of section 1345 of the Health and Safety Code or health-care insurance plan within the meaning of section 106 of the Insurance Code;
3. An individual with a medical malpractice claim that is subject to the arbitration agreement; or
4. An employee or an applicant for employment in a dispute arising out of or relating to the employee's employment or the applicant's prospective employment that is subject to the arbitration agreement.

In addition, JAMS is guided by its Consumer Minimum Standards and Employment Minimum Standards when determining whether a matter is a consumer matter.

**If Respondent disagrees with the assertion of Claimant regarding whether this IS or IS NOT a CONSUMER ARBITRATION, Respondent should communicate this objection in writing to the JAMS Case Manager and Claimant within seven (7) calendar days of service of the Demand for Arbitration.**

## EMPLOYMENT MATTERS

**If this is an EMPLOYMENT matter, Claimant must complete the following information:**

Private arbitration companies are required to collect and publish certain information at least quarterly, and make it available to the public in a computer-searchable format. In employment cases, this includes the amount of the employee's annual wage. The employee's name will not appear in the database, but the employer's name will be published. Please check the applicable box below:

☑ **Less than $100,000**  ☐ **$100,000 to $250,000**  ☐ **More than $250,000**  ☐ **Decline to State**

## WAIVER OF ARBITRATION FEES

**In certain states (e.g. California), the law provides that consumers (as defined above) with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of the arbitration fees.** In those cases, the respondent must pay 100% of the fees. Consumers must submit a declaration under oath stating the consumer's monthly income and the number of persons living in his or her household. Please contact JAMS at 1-800-352-5267 for further information. Note: this requirement is not applicable in all states.

---

# EXHIBIT D



IN THE MATTER OF:                          )
                                           )
Bruce Melton,                              )
                                           )
              Claimant                     )
                                           )
vs.                                        )     CASE NO. 1340016051
                                           )
The Pavilion Behavioral Health System,     )
                                           )
              Respondent.                  )
                                           )


# FINAL ARBITRATION AWARD

**Claimant**
Bruce D. Melton, pro se
1304 South Mattis Avenue
Champaign, Illinois 61821
(217) 417-0740

**Respondents Counsel**
Chad Layton
Segal, McCambridge, Singer & Mahoney
233 South Wacker Drive, Suite 5500
Chicago, Illinois 60606
(312) 645-7800

**Arbitrator**
James R. Epstein
JAMS
71 South Wacker Drive, Suite 2400
Chicago, Illinois 60606
(312) 655-0555

2

The undersigned arbitrator, having been designated in accordance with the Alternative Resolution for Conflicts ("ARC") Agreement, paragraph 4, dated September 14, 2015, and having conducted a hearing on October 29, 2019 in the Law Offices of Heyl, Royster, Voelker & Allen, 301 North Neil Street, Suite 505, Champaign, Illinois, and having examined the submissions, pleadings, allegations and proofs of the parties, finds, concludes and issues this Final Award as follows:

## PLEADINGS AND FACTS

Claimant, Bruce D. Melton ("Claimant," or "Mr. Melton") initiated this arbitration by filing a Demand for Arbitration on June 14, 2018. In his Demand, Mr. Melton alleged that Respondent, The Pavilion Behavioral Health System ("Respondent," or "Pavilion") and "its Supervisory Staff" "Wrongfully Terminated, Harassed, Retaliated and Discriminated Against" him. The arbitration was conducted under the JAMS Employment Arbitration Rules & Procedures. Respondent did not file a responsive pleading; however, pursuant to Rule 9(e) "Any claim or counterclaim to which no response has been served will be deemed denied." At the hearing Claimant testified, as did Laurie Crabtree, Respondent's Director of Human Resources. Documentary evidence was admitted into the record, including the deposition of Arnetha Truss. Both parties made opening statements and closing arguments.

The parties consented to modification of the hearing procedures as an accommodation to Mr. Melton, a non-lawyer, who was representing himself. In lieu of written pre-hearing and post-hearing briefs, the parties agreed to rely on oral

presentations, and instead of requiring Mr. Melton to ask himself questions when testifying and then respond to them, he was allowed to testify in direct and redirect examination without questions having been put.

Pavilion is a residential child care facility licensed by the State of Illinois Department of Children and Family Services ("DCFS"). As a licensing requirement, Pavilion is bound to obtain criminal background checks of prospective employees. Checks by both DCFS and the Federal Bureau of Investigation ("FBI") are required. Mr. Melton was considered for employment as a cook by Pavilion in 2015. The DCFS criminal background check revealed a number of arrests and convictions resulting in DCFS classifying him as ineligible for hire by Respondent. After reviewing the criminal history then available in the DCFS report Pavilion initiated an optional procedure asking DCFS to waive its prohibition and permit Respondent to hire Mr. Melton. DCFS granted a waiver, and Mr. Melton was allowed to be employed at Pavilion. Over the course of Mr. Melton's tenure of approximately one and a half years he received generally positive reviews. He was involved in a series of disputes with co-workers, and upon investigation by Human Resources Director Laurie Crabtree, some were resolved in his favor, and some were not. There were absolutely no complaints made of Mr. Melton from patients or residents of the facility. Mr. Melton also experienced several medical issues during his tenure. He suffered a back injury which was attributed to his work, and underwent two surgeries to correct carpal tunnel syndrome, which was judged to be unrelated to his work. He was granted medical leave for these conditions consistent with company policy.

In late 2016 DCFS contacted Pavilion and communicated that its department audit revealed that six Pavilion employees, including Mr. Melton, had not undergone the required background checks by the FBI. Those employees, again including Mr. Melton, were then subjected to the required FBI checks. This subsequent research revealed more arrests, charges and convictions that had not surfaced in the initial DCFS investigation. Based on the FBI report, DCFS again found Mr. Melton ineligible for employment at Respondent's facility. Once again, Pavilion had the option of seeking a waiver from DCFS, if it so chose. Mr. Melton and Ms. Crabtree communicated about the new items on the FBI criminal history report and Claimant asserted that he had taken a class on expungement of criminal records and was in the process of seeking to remove some of the items. Included in the new items were several arrests for domestic battery and one for criminal sexual abuse. Apparently, these charges did not result in criminal convictions. Ms. Crabtree related the new information to Respondent's corporate headquarters. The corporate human resources personnel asked Ms. Crabtree to compile a spreadsheet separating the charges originally known by Pavilion at the time of Mr. Melton's hire with those charges appearing for the first time in the FBI check. After she compiled the spreadsheet and conveyed it to corporate human resources and legal department personnel, they jointly determined with the local facility that Respondent would not submit another waiver application seeking permission to continue to employ Mr. Melton. By deciding not to seek waiver of the DCFS determination of Mr. Melton's ineligibility for employment at Pavilion, the DCFS finding stood, and Mr. Melton was required to be and was terminated from his position.

Mr. Melton contends that this termination was "wrongful" and that he was "Harassed, Retaliated and Discriminated Against." Respondent contends that it determined not to seek a waiver for Mr. Melton based on the nature of the newly revealed items on the FBI check, the need to safeguard the children residing in its facility, and that its decision was not made for purposes of harassment, retaliation or discrimination.

## ANALYSIS

As the claimant in this arbitration, Mr. Melton bears the legal burden to prove by a preponderance of the evidence that he was wrongfully terminated, or that he was "Harassed, Retaliated and Discriminated Against." Taking the broadest possible view of Mr. Melton's claims it appears that he is alleging that Respondent's decision not to seek a second waiver from DCFS was wrongful, retaliatory, harassing and/or discriminatory. He suggested at various points in the hearing that Ms. Crabtree's investigations of complaints he lodged on the human resources hotline either should not have been investigated by her, or that the outcomes of the investigations were tainted by improper motivations on her part.

As to the issue relating to the decision not to seek a second waiver from DCFS, I find no proof by a preponderance of the evidence that it was improper. Pavilion successfully sought the first waiver from DCFS in 2015, seeking permission to employ Mr. Melton despite knowing of a rather extensive criminal history, including a felony conviction for burglary that resulted in a penitentiary sentence. While Mr. Melton was not specific about whether his claim was for discrimination based on gender, age, race, religion or any specific characteristic, all of these characteristics (except age, which had

advanced one and a half years) were present when Respondent sought the relief of waiver

on his behalf in 2015. Therefore, it is unlikely that any of these factors influenced the

decision not to seek the second DCFS waiver. I saw no evidence that occurrences in his

tenure at Pavilion, or his medical issues or complaints by or against him, improperly

impacted Respondent's decision not to seek a second waiver from DCFS. The testimony

of Ms. Crabtree was that the motivation for the decision was the additional criminal

history information contained in the FBI report, specifically several charges of domestic

battery and one for criminal sexual abuse. As a state-licensed residential facility serving a

population of children, some of whom had experienced traumatic events, the existence of

these charges may well have motivated a different decision regarding seeking waiver by

Respondent despite a total absence of complaints by residents against Mr. Melton during

his tenure.

It is important to note that the decision of whether to seek a DCFS waiver is a

discretionary one; it is not, by any means, a required act. When a facility such as Pavilion

seeks a waiver for a person with a significant criminal history, it can make itself open to

claims of negligence should a violent event later occur. It is also noteworthy that when

Respondent first learned of the additional criminal history in the FBI background check,

it did not immediately decide the issue of whether to seek the second waiver from DCFS.

It could have simply looked at the DCFS notice of Mr. Melton's ineligibility for

employment and summarily terminated him. Instead, Ms. Crabtree sought Mr. Melton's

input as to the additional items and learned of his efforts to seek expungement, then

compiled the spreadsheet of criminal history, and conveyed the information and sought

and received input from corporate human resources and legal personnel. This tends to

indicate that improper motivation was not present from Ms. Crabtree or the Pavilion facility which is but a part of a larger corporate entity. In any event, I find that the evidence presented does not satisfy the burden of proving by a preponderance of the evidence that the discharge was wrongful or that Mr. Melton was subjected to harassment, retaliation or discrimination.

I also am unable to find that any of the other improprieties suggested by Mr. Melton were proved by a preponderance of the evidence. I am handicapped by the lack of specificity in the pleadings and the proofs as to the exact nature of these claims. As to the one specific complaint I am able to identify, that Ms. Crabtree investigated some complaints in which she was suggested to be at fault by Mr. Melton, again the lack of specificity makes it difficult to appreciate the existence of any evidence of "Harassment, Retaliation or Discrimination." Thus, I am unable to find that the burden of proof has been satisfied.

I cannot conclude without expressing my respect for Mr. Melton. He strikes me as a man who has striven greatly after a challenging start in life to become the man I saw throughout the arbitration: an earnest, mature adult who holds himself to a high standard as a parent and a hard worker. He conducted himself throughout the pre-hearing process and the hearing itself with complete respect for the process, the arbitrator and Mr. Melton's equally civil and professional opponent, Mr. Layton. This award should not be viewed by Mr. Melton, or anyone else, as suggesting anything to the contrary. In a proceeding such as this I am required to judge the evidence and the claims under a legal standard, and that is all that I have done.

## FINAL AWARD

I find in favor of Respondent, The Pavilion Behavioral Health System on the claims brought in this arbitration. This award resolves all of the claims submitted for decision in this proceeding.

DATED: **December 5, 2019**

**Hon. James R. Epstein (Ret.)**
JAMS Arbitrator

**PROOF OF SERVICE BY E-Mail**

Re: Melton, Bruce vs. Pavilion Behavioral Health System
Reference No. 1340016051

I, Brooke Buczkowski, not a party to the within action, hereby declare that on  December 5, 2019, I

served the attached Final Award on the parties in the within action by electronic mail at Chicago, ILLINOIS,

addressed as follows:

Mr. Bruce Melton
1304 S. Mattis
Champaign, IL   61821
Phone: 217-417-0740
brucemelton180@hotmail.com
  Parties Represented:
  Bruce Melton

Chad Layton Esq.
Rachel Laurel Esq.
Segal McCambridge Singer & Mahoney Ltd.
233 S. Wacker Dr.
Suite 5500
Chicago, IL   60606
Phone: 312-645-7800
clayton@smsm.com
rlaurel@smsm.com
  Parties Represented:
  Pavilion Behavioral Health System

I declare under penalty of perjury the foregoing to be true and correct. Executed at Chicago,

ILLINOIS on  December 5, 2019.

Brooke Buczkowski
JAMS
BBuczkowski@jamsadr.com

# EXHIBIT E

2:17-cv-02112-CSB-EIL # 41 Page 69 of 189
Arbitration - 10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

1                        ARBITRATION

2
     BRUCE D. MELTON,                )
3                                    )
          Plaintiff,                 )
4                                    )
               vs.                   )     No. 1340016051
5                                    )
     THE PAVILION BEHAVIORAL         )
6    HEALTH SYSTEM, JOE SHEEHY,      )
     JIM CAPONY[sic], RAY            )
7    REESE[sic], ADAM PUTVIN,        )
     LAURIE CRABTREE, DONNA          )
8    GADEKEN,                        )
                                     )
9         Defendants.                )
     ----------------------------

10

11

12                TRANSCRIPT OF PROCEEDINGS

13                   October 29, 2019
                        9:00 AM
14
        Law Offices of Heyl, Royster Voelker & Allen
15           301 North Neil Street, Suite 505
                  Champaign, Illinois
16

17
                     James R. Epstein
18                  Mediator/Arbitrator
           71 South Wacker Drive, Suite 2400
19              Chicago, IL  60606
                   312.655.0555
20            jepstein@jamsadr.com

21

22

23
               June Haeme:  CSR # 084-003038
24



```
1                         INDEX

2

    APPEARANCES:
3

    For the Plaintiff:
4           Bruce Melton, Pro Se
            1304 South Mattis Avenue
5           Champaign, IL  61821

6

    For the Defendants:
7           Chad Layton
            Attorney at Law
8           Segal, McCambridge, Singer & Mahoney
            233 South Wacker Drive, Suite 5500
9           Chicago, IL  60606
            312.645.7800
10          CLayton@smsm.com

11

    Also Present:
12          Laurie Crabtree
            Pavilion Behavioral Health System
13

14

15

16

17

18

19

20

21

22

23

24
```

2:17-cv-02112-CSB-EIL # 41   Page 71 of 189
Arbitration - 10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

```
 1                     INDEX OF EXAMINATION

 2   OPENING STATEMENTS
       BY MR. MELTON...............................   14
 3     BY MR. LAYTON...............................   16

 4   PLAINTIFF'S CASE IN CHIEF
     BRUCE MELTON
 5   DIRECT EXAMINATION BY MR. MELTON.............   31
     CROSS-EXAMINATION BY MR. LAYTON..............   59
 6   REDIRECT EXAMINATION BY MR. MELTON........... 147
     RECROSS-EXAMINATION BY MR. LAYTON........... 159
 7
     DEFENDANT'S CASE IN CHIEF
 8   LAURIE CRABTREE
     DIRECT EXAMINATION BY MR. LAYTON............. 166
 9   CROSS-EXAMINATION BY MR. MELTON.............. 249

10   CLOSING ARGUMENTS
       BY MR. MELTON............................... 269
11     BY MR. LAYTON............................... 276
       BY MR. MELTON............................... 299
12

13

14

15

16

17

18

19

20

21

22

23

24
```



2:17-cv-02112-CSB-EIL # 41 Page 72 of 189
Arbitration - 10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

1  (Commencing at 8:54 a.m.)
2  ARBITRATOR EPSTEIN: Good morning, all.
3  This is the arbitration hearing of Mr. Bruce Melton
4  versus the Pavilion Behavioral Health System, and
5  Mr. Melton is representing himself pro se. The
6  respondent is represented by Mr. Chad Layton who is
7  present. Also present is?
8  MS. CRABTREE: Laurie Crabtree.
9  ARBITRATOR EPSTEIN: And your position is?
10  MS. CRABTREE: I'm director of human
11  resources.
12  ARBITRATOR EPSTEIN: At?
13  MS. CRABTREE: At the Pavilion.
14  ARBITRATOR EPSTEIN: Okay, you're quite
15  welcome also. We're going to begin the hearing
16  shortly, but for purposes of the record, I want to
17  spread a record that we had a series of conferences,
18  the most recent last week with Mr. Melton and Mr.
19  Layton on the telephone. And given that Mr. Melton
20  is representing himself in this matter, we've made
21  some alteration to what people might think is the
22  normal method of proceeding, such that when Mr.
23  Melton would give testimony, rather than asking
24  himself a question and then answering the question,

Page 4

1  we are going to allow Mr. Melton just to make the
2  statements that he wishes to make.
3  And there may be a time when normally
4  there would be an objection to a question put by the
5  respondent. In lieu of that, if there becomes a
6  time when the area in which Mr. Melton is testifying
7  seems to Mr. Layton to be objectionable, I'm going
8  to allow him to object and state the grounds for his
9  objection. If and when that occurs, Mr. Melton, you
10  will stop your testimony and you may respond to the
11  objection.
12  MR. MELTON: Thank you, sir.
13  ARBITRATOR EPSTEIN: And then I would rule
14  on whether that objection would be overruled, in
15  which case you could continue with that line, or if
16  it was sustained, in which case you would not be
17  able to continue with that line.
18  MR. MELTON: Okay, yes, sir.
19  ARBITRATOR EPSTEIN: And so that is one
20  accommodation we've made, seems to make sense, and I
21  think both sides have agreed to that. Is that
22  right, Mr. Melton?
23  MR. MELTON: Yes, sir, Your Honor.
24  ARBITRATOR EPSTEIN: Mr. Layton?

Page 5

1  MR. LAYTON: Yes, judge.
2  ARBITRATOR EPSTEIN: And similarly, while
3  in many circumstances and in most circumstances I
4  ask the lawyers representing parties to submit
5  prehearing briefs, in this case, in view of the fact
6  that Mr. Melton is not a licensed attorney, I
7  thought it would be easier to have opening
8  statements made by each side, and the parties have
9  also agreed to that accommodation.
10  Similarly, oftentimes after the conclusion
11  of the testimony in the case, the lawyers take time
12  and file a post hearing brief. And in lieu of that,
13  in this instance we have agreed, that is, the two
14  parties have agreed that there will be closing
15  arguments made.
16  After the closing arguments, the hearing
17  will remain open for the court reporter to supply
18  each side and me with a transcript of the
19  proceedings at the hearing. And once that
20  transcript has been received, I would then declare
21  that hearing to be closed and I would then start to
22  prepare the written award as required by Paragraph 8
23  of the Arbitration Agreement. Is there any dispute
24  from either side as to that procedure. Mr. Melton?

Page 6

1  MR. MELTON: No, sir, Your Honor.
2  ARBITRATOR EPSTEIN: Mr. Layton?
3  MR. LAYTON: I have no dispute, judge.
4  The only I think addition that I would make, and I'm
5  not sure this will be necessary, but there are a
6  couple of legal points that are going to come up
7  during the hearing today and if we need to go until
8  tomorrow. If Your Honor has questions about the
9  points of law, I certainly would want to submit --
10  and I think the law is pretty clear on the issues
11  I'm going to argue, but if there's any doubt about
12  what the law says, I certainly would want to have
13  the opportunity to provide Your Honor with case law
14  on some of the specific legal points, and of course
15  Mr. Melton.
16  ARBITRATOR EPSTEIN: Well, if I ask any
17  question to either side, I would allow both sides to
18  respond to that. I would suggest that as we go
19  forward, if you in your argument want to raise these
20  legal points, simply provide the case name and
21  citation, and despite my young age, I'm able to find
22  those case law authorities with that type of --
23  MR. LAYTON: Absolutely, judge.
24  ARBITRATOR EPSTEIN: -- guidance, all

Page 7

2:17-cv-02112-CSB-EIL # 41 Page 73 of 189
Arbitration - 10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

1 right?
2     MR. LAYTON:  Absolutely.
3     ARBITRATOR EPSTEIN:  But I appreciate you
4 bringing that to my attention.  Before we begin with
5 the opening statements, is there anything that
6 either side would like to raise?
7     MR. MELTON:  I would, Your Honor.
8     ARBITRATOR EPSTEIN:  Sure.
9     MR. MELTON:  In lieu to this deposition, I
10 had sent documentation to Mr. Layton revealing that
11 I wanted to use the depositions in this arbitration,
12 and he in turn told me, informed me that he wishes
13 to use the depositions of Mr. Reis and Ms. Truss,
14 but he did not want to use the deposition of Ms.,
15 Ms. Laurie.  So I told him that I wanted to use all
16 of them.
17     So we bringing this to your attention now,
18 Your Honor, because I informed him before he sent
19 the folders and binders to you that I wanted to use
20 that.  He was supposed to send you all the
21 information.  And in lieu of you receiving -- in
22 lieu of us both receiving this, I never saw where he
23 sent you the depositions.
24     ARBITRATOR EPSTEIN:  I've received no

Page 8

1 depositions at this point.  The normal way that
2 matters proceed is where a witness is present and
3 able to testify, that that would stand as the
4 testimony.  However, in cross-examining the witness,
5 if the witness says something that varies from the
6 testimony at the deposition, then the proper method
7 to proceed is to confront the witness with the
8 deposition testimony which is at variance with what
9 the testimony was.
10     MR. MELTON:  Okay.
11     ARBITRATOR EPSTEIN:  In other words, in
12 those circumstances, if somebody says, for example,
13 in a given case, the stoplight was green and there
14 was a deposition testimony saying the stoplight is
15 red --
16     MR. MELTON:  Yes, sir.
17     ARBITRATOR EPSTEIN:  -- you then say, let
18 me show you your deposition on page 34 and ask you
19 to look at that.  When you gave that deposition, did
20 you testify under oath that the stoplight was
21 whatever.
22     MR. MELTON:  Yes, sir.
23     ARBITRATOR EPSTEIN:  And that way you
24 confront the witness with a prior inconsistent

Page 9

1 statement.
2     MR. MELTON:  Okay.
3     ARBITRATOR EPSTEIN:  So that will always
4 be available to any witness who testifies.
5     MR. MELTON:  Okay, yes, sir.
6     ARBITRATOR EPSTEIN:  Okay, does that
7 answer your question on that?
8     MR. MELTON:  Yes, sir, Your Honor.
9     ARBITRATOR EPSTEIN:  All right.  Anything
10 else from you, Mr. Melton, on that issue?
11     MR. MELTON:  No, sir, Your Honor.
12     ARBITRATOR EPSTEIN:  Anything, Mr. Layton?
13     MR. LAYTON:  I did have one additional
14 preliminary issue before we start with opening
15 statements, Your Honor.  And as you know, at the
16 outset of this case, it was last year we exchanged
17 requests for production.  Among my request for
18 production, I asked that Mr. Melton provide any
19 relevant documents to this case, including any
20 exhibits he intended on using at the arbitration.
21 This is about a year ago that we served this.
22     We've had four depositions that have
23 proceeded in this case.  Yet it was not until about
24 two weeks ago when we did our witness -- or excuse

Page 10

1 me, our exhibit exchange for the hearing today that
2 for the first time Mr. Melton provided brand-new
3 documents that I had never seen before that he
4 intends on using today during the arbitration.  And
5 the documents relate to some employment --
6 unemployment-related matters.
7     And you're also going to hear about Mr.
8 Melton's criminal background during the hearing
9 today, and Mr. Melton wants to submit to Your Honor
10 some documents relating to his criminal background
11 that were never provided to me at any point in time
12 during the course of discovery.  They were clearly
13 responsive to my production requests.  I've not had
14 the opportunity to cross-examine Mr. Melton about
15 these documents during his deposition which
16 proceeded some time ago.
17     So because of the late production, and you know full well, Your Honor,
18 late production, and you know full well, Your Honor,
19 if we were in a trial setting, under circumstances
20 like this, a judge would never allow in exhibits
21 that were produced at the last minute, especially
22 when there's been no reason for why these documents
23 were not previously produced.  So I have a motion,
24 an oral motion to bar Mr. Melton from using

Page 11



2:17-cv-02112-CSB-EIL # 41 Page 74 of 189
Arbitration - 10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

**Page 12**

1  documents that he didn't produce to me until about
2  two weeks ago.
3      ARBITRATOR EPSTEIN:  Well, I think you may
4  have overstated what judges, all judges would do,
5  because in circumstances like that, first of all,
6  every judge wants to decide the case on the facts
7  and the evidence that are available.  No judge wants
8  to see a circumstance where things that were
9  reasonably requested were not produced, but the next
10  step in deciding what to do would be to see what, if
11  any, prejudice would attach based upon the late
12  disclosure.
13      And so what I will do is if and when those
14  things are offered, when you make your objection,
15  you can explain to me the nature of your
16  prejudice --
17      MR. LAYTON:  Understood.
18      ARBITRATOR EPSTEIN:  -- and at that point
19  I will rule.  And if it seems like there has been
20  substantially no prejudice, then I may let it in,
21  and if I hear that there has been some severe
22  prejudice, then I may keep it out, but I'm not going
23  to prejudge those issues.
24      And there is -- also it makes good sense

**Page 13**

1  for advocates on both sides, and you're an advocate
2  if you're not a lawyer --
3      MR. MELTON:  Yes, sir.
4      ARBITRATOR EPSTEIN:  -- to understand that
5  on one level things may be objectionable, but that
6  doesn't necessarily mean that an objection should be
7  made.
8      MR. LAYTON:  Understood, judge.
9      ARBITRATOR EPSTEIN:  And so I think that
10  we can take it issue by issue at the time those
11  things arise.  But I'm glad you brought that to my
12  attention beforehand.  Anything else on your end,
13  Mr. Layton?
14      MR. LAYTON:  No, judge.
15      ARBITRATOR EPSTEIN:  Mr. Melton, anything
16  else?
17      MR. MELTON:  Is it possible that I comment
18  to what Mr. Layton is saying real quick?
19      ARBITRATOR EPSTEIN:  Well, there's an
20  axiom in law that when the arbitrator or the judge
21  has not granted the relief --
22      MR. MELTON:  Okay.
23      ARBITRATOR EPSTEIN:  -- that the other
24  side has asked for --

**Page 14**

1      MR. MELTON:  Yes.
2      ARBITRATOR EPSTEIN:  -- it's probably a
3  good time to stop talking, and then if and when he
4  makes an objection to something that you put in,
5  then I'll be happy to hear --
6      MR. MELTON:  Yes, sir, Your Honor.
7      ARBITRATOR EPSTEIN:  -- both sides.  All
8  right?
9      MR. MELTON:  Yes, sir.
10      ARBITRATOR EPSTEIN:  Okay.  So with that,
11  Mr. Melton, we'll be happy to hear any opening
12  statements that you wish to make.
13      MR. MELTON:  Yes, sir, Your Honor.  Today,
14  Your Honor, I find myself in this arbitration with
15  you due to being retaliated against by the Pavilion,
16  namely Laurie Crabtree and some of the upper
17  corporate staff, as far as -- and as well as being
18  wrongfully terminated because of my background,
19  which they knew I had one in the beginning, and it
20  seemed that when documentation, further
21  documentation was given, it was tooken more out of
22  context than should have been.
23      I had been employed by the Pavilion for
24  over a year and a half.  I had had minimal

**Page 15**

1  circumstances where I had been written up, but if
2  you look at my overall excellence ratings, every
3  review that I had received was above normal.  And it
4  seemed as if once I started to object to the
5  treatment that I was getting by the staff, I seem to
6  have been retaliated and treated hostilely by Ms.
7  Crabtree, Adam Putvin, Donna Gadeken and numerous
8  other employees of the Pavilion.
9      I had had numerous occasions to speak with
10  Ms. Crabtree about the mistreatment that I was
11  getting, and in some of my documentation, which will
12  show that she cast my troubles aside that I
13  explained to her, it seemed that I -- well, I have
14  medical issues and my medical issues were not
15  treated respectfully as the others' medical
16  attention was given.  And after I applied myself
17  continually, daily, never missing a day, never
18  having a mark for bad attendance, anything else
19  other than the few complaints that I had, which were
20  mostly unfounded, I didn't have any issues until I
21  had to file my complaints against Ms. Crabtree.
22      And I'm just here today, Your Honor, to
23  let the record show and the evidence show that Ms.
24  Crabtree went above and beyond her duties as HR

2:17-cv-02112-CSB-EIL # 41   Page 75 of 189
Arbitration - 10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

**Page 16**

1  director to get me terminated while not being
2  accurate in her statements that she made against me.
3      So that is pretty much my case, Your
4  Honor, just plain and simple, straight to the point,
5  and I just want the record to reflect what I say to
6  be accurate.
7      ARBITRATOR EPSTEIN:  Thank you, Mr.
8  Melton.  Mr. Layton, would you like to make an
9  opening statement?
10      MR. LAYTON:  Yes, judge.  Okay, Your
11  Honor, at the heart of this case, there's really one
12  critical issue here.  Mr. Melton was terminated by
13  the Pavilion on February 1st of 2017.  About a month
14  prior to this termination, the Pavilion learned that
15  Mr. Melton had been charged or convicted of more
16  than 40 criminal charges and convictions, judge.
17  Many of these charges and convictions involved
18  extremely serious criminal matters, including
19  battery, burglary, residential burglary, as well as
20  criminal sexual abuse.  Under the law, judge, and
21  under the circumstances of this case, the Pavilion
22  was well within its legal rights to terminate an
23  employee who had 40 criminal convictions and charges
24  at the time of his termination.

**Page 17**

1      Your Honor, the evidence is going to
2  establish that the Pavilion was legally justified
3  when it terminated Mr. Melton.  Mr. Melton uses a
4  lot of buzz words.  He says words like harassment
5  and retaliation and things like that.  And I am very
6  confident that when Your Honor hears the evidence
7  that supposedly support Mr. Melton's claims, you're
8  going to see that he was not, in fact, treated in
9  any manner that wasn't legally actionable by the
10  Pavilion.
11      Your Honor, I'd like to give you a little
12  bit of background about the Pavilion itself.  It's
13  actually located pretty close to where we are right
14  now.  The Pavilion is a licensed child care
15  facility.  It provides behavioral health and
16  addiction treatment services to patients and
17  residents there.  A lot of the patients that are
18  there are minors, they're children, they're very
19  young, up to 18, 19 years old, and they rely on the
20  important services that the Pavilion provides.
21      Now, in order to provide these services,
22  the Pavilion has to be licensed through the
23  Department of Children and Family Services, through
24  DCFS.  The Pavilion has to abide by specific legal

**Page 18**

1  standards in order to maintain its license, and
2  there's a statute known as the Illinois Child Care
3  Act that we're going to talk about, and DCFS and the
4  Pavilion have to comply with the legal requirements
5  of the Illinois Child Care Act.
6      One of those legal requirements, judge,
7  says that any person who's going to be employed in
8  certain roles at the Pavilion, they have to go
9  through a criminal background check.  The law
10  specifically says that DCFS and the Pavilion are
11  allowed to obtain and consider information relating
12  to a potential employee's criminal convictions as
13  well as that employee's criminal charges.
14      Mr. Melton fell into a role at the
15  Pavilion where he would have access and contact with
16  the youth residents there, and as a result of that,
17  judge, he had to undergo a criminal background check
18  in order to work at the Pavilion.
19      So Mr. Melton started working at the
20  Pavilion in June of 2015.  When he first started
21  working there, judge, he underwent a criminal
22  background check through DCFS pursuant to the
23  procedures, and at that time the report that came
24  back identified only 11 convictions for Mr. Melton.

**Page 19**

1      Now technically under the law, somebody
2  who presents to the Pavilion in this way, the
3  Pavilion can refuse to hire them, but there are
4  certain situations, and Mr. Melton when he was first
5  hired by the Pavilion fell into this situation,
6  where the Pavilion can request a waiver and say even
7  though an employee has some criminal background
8  matters, the Pavilion can request a waiver and say
9  we'd still like to hire this employee.  And in this
10  particular case, DCFS allowed Mr. Melton to begin
11  working at the Pavilion despite the convictions that
12  he had at the time when he was hired in 2015, okay?
13      When Mr. Melton was hired at the Pavilion,
14  judge, he was hired as a cook and he was responsible
15  for a lot of things you would expect a cook to do,
16  including preparing food, cleaning the kitchen,
17  unloading a delivery truck, serving food and other
18  tasks of that matter.  Now generally speaking, I
19  would agree with Mr. Melton, he was a satisfactory
20  worker, there's not an issue about his performance,
21  his work-related performance here, but there are
22  other issues that come up in this case, and the
23  reason for his termination is based on the criminal
24  matters that I mentioned at the outset of the case.

2:17-cv-02112-CSB-EIL # 41 Page 76 of 189
Arbitration 10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

Page 20

1 Now, when -- so Mr. Melton worked at the
2 Pavilion for a little over a year and a half.
3 During the course of his employment, he did have
4 several medical issues that came up that required
5 Mr. Melton to take leaves of absence for medical
6 treatment and even for three different surgeries.
7 Every time Mr. Melton went on one of these leaves of
8 absence for surgeries, some of which, judge, didn't
9 even relate -- involve work-related injuries,
10 Mr. Melton was granted the leave of absence that he
11 requested, the Pavilion held his job for him, they
12 didn't terminate him just because he took a medical
13 leave of absence, and Mr. Melton received all of the
14 applicable benefits that he was entitled to during
15 the times of his leave of absence.
16 Now, judge, you're also going to hear I
17 expect a lot of evidence about HR issues and HR
18 investigations relating to Mr. Melton. You're going
19 to hear about some inappropriate conduct by
20 Mr. Melton which he disputes but which nonetheless
21 are part of facts of this case. You're also going
22 to hear about a lot of complaints and issues that
23 Mr. Melton himself raised. There was a hot line
24 that was available to employees like Mr. Melton to

Page 21

1 call if they had any issues, and Mr. Melton took
2 advantage of this hot line and called and raised to
3 the attention of the corporate folks numerous
4 issues, and we'll get into the details when we get
5 into the specific evidence.
6 What you're going to see, judge, is
7 there's a pattern with what happened. Every time
8 Mr. Melton would call the hot line, there was a
9 report, an email report generated, and Laurie
10 Crabtree who's sitting next to me, as you know, was
11 assigned the responsibility of investigating the
12 issues raised by Mr. Melton.
13 The evidence is going to show you, judge,
14 that all of Mr. Melton's issues that he raised were
15 investigated by the Pavilion, they were all taken
16 seriously, and that appropriate steps were taken by
17 the Pavilion to address any issues that came up.
18 But by and large, Your Honor, and this is really an
19 important point, the vast majority of Mr. Melton's
20 issues that he raised with the hot line were
21 unfounded. They were -- there were no facts to
22 support what he was saying, and oftentimes
23 Mr. Melton was misunderstanding what was going on in
24 certain situations and took something to be a

Page 22

1 problem that really wasn't a problem. And I'm going
2 to talk about that in more detail as we get into the
3 evidence.
4 So now let's talk about the decision to
5 terminate Mr. Melton. So in late 2016, Your Honor,
6 DCFS, now this is DCFS, which of course is a
7 separate entity of the Pavilion, it's completely
8 separate and distinct, DCFS conducted an internal
9 audit of its paperwork and it identified several
10 employees who had not undergone an FBI criminal
11 background search. There were a few employees
12 working at the Pavilion who should have undergone
13 this background search through the FBI and they
14 didn't. So DCFS contacted Laurie Crabtree and said
15 here's a list of employees that need to undergo a
16 second criminal background check. Mr. Melton was
17 among those employees who had to undergo the second
18 FBI criminal background check, but Mr. Melton wasn't
19 the only one. So there were other people that had
20 to do this that work at the Pavilion.
21 So during this second criminal background
22 check, judge, the Pavilion for the first time
23 learned about a large number of additional criminal
24 charges and convictions that it did not previously

Page 23

1 know about when Mr. Melton was first hired. And the
2 timing here, judge, is really important because
3 you're going to hear Mr. Melton argue to you that
4 Laurie Crabtree just wanted to get rid of him, okay?
5 Well, the timing here will demonstrate to you,
6 judge, that Mr. Melton's accusations are just not
7 supported by the evidence.
8 So in December of 2016, it was December
9 24th of 2016, DCFS sends this letter to Mr. Melton,
10 and the Pavilion also got a letter as well, saying
11 that as a result of this FBI criminal background
12 check, Mr. Melton was barred from employment, he was
13 deemed legally ineligible to work at the Pavilion by
14 DCFS, so DCFS issued this barring letter, judge.
15 Now, the letter also states, as you'll
16 see, that the Pavilion had the option to pursue a
17 waiver for Mr. Melton, and we'll talk about that in
18 detail during the hearing, but what's important,
19 judge, is Mr. Melton contends that Laurie Pavilion
20 -- or excuse me, that Laurie Crabtree just wanted to
21 terminate Mr. Melton.
22 Well, the problem with Mr. Melton's
23 position, Your Honor, is that when Laurie Crabtree
24 received this letter on or around December 24th of

2:17-cv-02112-CSB-EIL # 41 Page 77 of 189
Arbitration - 10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

1 2016, she could have terminated Mr. Melton on the
2 spot. If Mr. Melton just wanted -- if Laurie
3 Crabtree, rather, just wanted to get rid of
4 Mr. Melton, she could have said, you know what, I
5 have this letter from DCFS, I want to get rid of
6 Mr. Melton, but that is not what happened.
7         Over the course of the next few weeks
8 after receiving this information, Laurie Crabtree
9 accepted additional information from Mr. Melton,
10 evaluated that information, consulted with corporate
11 HR and corporate legal, and a decision was made,
12 Your Honor, based on new information that the
13 Pavilion received at this time, a decision was made
14 that Mr. Melton could not continue to work at the
15 Pavilion given the extent of new information that we
16 learned about his criminal background.
17         So, judge, in terms of the evidence here
18 today, you're obviously going to hear live testimony
19 from Mr. Melton and Laurie Crabtree. The two
20 depositions that we'll submit to you, Your Honor,
21 one deposition is from Ray Reis. Mr. Reis was -- he
22 worked at the Pavilion when Mr. Melton was there for
23 part of the time. Mr. Reis was really the person
24 who facilitated hiring Mr. Melton, because I think

Page 24

1 he liked Mr. Melton to be honest with you, it seemed
2 like he did, and I think Mr. Reis recognized that
3 Mr. Melton appeared to be a good worker, so he was
4 hired. But Mr. Reis left the Pavilion in the spring
5 of 2016, so he doesn't have any information relating
6 to why we're here today regarding the calls that
7 Mr. Melton made to the hot line or the reasons
8 relating to Mr. Melton's termination. But this is
9 one of the depositions that Mr. Melton wanted, so we
10 proceeded with that deposition, and you of course
11 will receive a copy of that transcript.
12         The other transcript you're going to
13 receive, judge, is from Arnetha Truss.
14         ARBITRATOR EPSTEIN: I'm sorry?
15         MR. LAYTON: Her name is Arnetha,
16 A-R-N-E-T-H-A, Truss.
17         ARBITRATOR EPSTEIN: T-R-U-S-T?
18         MR. LAYTON: Excuse me, T-R-U-S-S.
19         ARBITRATOR EPSTEIN: Okay. Okay.
20         MR. LAYTON: So Ms. Truss worked for DCFS
21 during the relevant time frame. She was the DCFS
22 employee who was involved in evaluating Mr. Melton's
23 criminal convictions and his background, and she
24 obviously has no interest in this case, judge, she's

Page 25

1 not employed by the Pavilion, and Ms. Truss through
2 her deposition testimony is going to tell you that
3 the Pavilion was legally justified in considering
4 Mr. Melton's criminal charges and convictions and
5 was legally justified in not retaining and
6 terminating Mr. Melton back in 2017.
7         So, judge, I will say that, you know,
8 Mr. Melton appears to have three claims, we talked
9 about them during his deposition, and I think that
10 the three claims -- it's still not frankly entirely
11 clear to me what they are, but one of the claims
12 appears to me to be that he was wrongfully
13 terminated, judge, and the evidence is just not
14 going to support that the termination was wrongful.
15 As you well know, Mr. Melton has the burden of proof
16 today, and Mr. Melton has to establish that Laurie
17 Crabtree and the Pavilion acted with animus and with
18 a discriminatory intent when it terminated
19 Mr. Melton, and there's just no evidence of that.
20         You're going to hear some discussions
21 about accommodations for Mr. Melton who claims that
22 he was not accommodated, but at every turn when
23 Mr. Melton had medical issues and required medical
24 treatment, Your Honor, Mr. Melton was fairly and

Page 26

1 legally accommodated during his time at the
2 Pavilion.
3         I think Mr. Melton also contends that he
4 was terminated in retaliation for filing worker's
5 compensation claims, and I'll talk about it in more
6 detail with the evidence, judge. Those claims are
7 just going to be barred frankly as a matter of law
8 given the timing of when the claims were made and
9 when Mr. Melton's termination came, which is much,
10 much later after the worker's comp claims were
11 filed.
12         So, judge, you know, at the end of the
13 evidence, I am going to ask you to enter a judgment
14 finding in favor of the Pavilion on all counts. And
15 one of the things, judge, that we'll talk about
16 during the evidence is some employment policies that
17 governed the Pavilion's decision to terminate or not
18 terminate Mr. Melton when its decision was being
19 made. And one of the Pavilion -- one of the
20 policies at the Pavilion required the Pavilion to
21 evaluate whether the continued hiring of Mr. Melton
22 would call into question whether or not the Pavilion
23 was acting as a responsible human services
24 organization. In other words, given what the

Page 27

2:17-cv-02112-CSB-EIL # 41 Page 78 of 189
Arbitration - 10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

1 Pavilion learned about Mr. Melton, was it -- would
2 it have been responsible for them to continue
3 employing him? And the evidence and the law says
4 that the answer to that is no, judge.
5     So that's all I have for now, thank you.
6     ARBITRATOR EPSTEIN: Thank you. All
7 right, so we've heard the opening statements of both
8 parties. Now the time is for you, Mr. Melton, to
9 present your case in chief.
10    MR. MELTON: Yes, sir, Your Honor.
11    ARBITRATOR EPSTEIN: And so I know that
12 one component will be your testimony. Is that what
13 you'd like to begin with?
14    MR. MELTON: If it pleases the court, I
15 can start with my testimony. I have my paperwork
16 here that should be located in the binders that you
17 should have received, so --
18    MR. LAYTON: I was just about to mention,
19 so judge -- so you know, the judge hasn't been given
20 anything yet and my plan was to provide the judge
21 with everything today.
22    ARBITRATOR EPSTEIN: Yes.
23    MR. LAYTON: So, Your Honor, I've got
24 these two binders here --

Page 28

1 you have to do is you can direct me to the exhibits
2 you're referring to --
3     MR. MELTON: Yes, sir, Your Honor.
4     ARBITRATOR EPSTEIN: -- preferably by
5 number and by page as they're denoted in the
6 binders.
7     MR. MELTON: Yes, sir, Your Honor.
8     ARBITRATOR EPSTEIN: So before we do that,
9 there is an option in an arbitration for the parties
10 to ask for or waive or give up the swearing of
11 witnesses who testify. And while you're a lawyer
12 you don't have -- or you're an advocate you don't
13 have to be sworn, but when you are providing
14 testimony, unless the parties decide to waive that,
15 you need to be.
16    So what is your preference on this, Mr.
17 Layton? You want sworn or nonsworn?
18    MR. LAYTON: Well, I guess my reaction is
19 if Mr. Melton is going to want Laurie Crabtree --
20    ARBITRATOR EPSTEIN: No, I mean whatever
21 it is, it's for everybody.
22    MR. LAYTON: And I'm just -- I'm really
23 more asking Mr. Melton, if you'd like Laurie
24 Crabtree, then we should do both, but if you're

Page 30

1     ARBITRATOR EPSTEIN: Fine.
2     MR. LAYTON: -- which I think is the time
3 to provide you with those.
4     ARBITRATOR EPSTEIN: Fine. That's normal
5 practice. In other words, items that will be
6 provided as part of the hearing, judges or jurors
7 don't read before the hearing.
8     MR. MELTON: Before the hearing, yes, sir,
9 Your Honor.
10    ARBITRATOR EPSTEIN: And so that's why Mr.
11 Layton I assume --
12    MR. LAYTON: Yes.
13    ARBITRATOR EPSTEIN: -- properly did not
14 provide them until right now. So I've been given
15 two binders called Melton versus Pavilion
16 Arbitration Exhibits Parts 1 and 2.
17    And so I don't know whether you would like
18 to start with your testimony to give context to what
19 you would otherwise want me to see in the exhibits
20 or whether you want me to see the exhibits first.
21    MR. MELTON: Well, if Your Honor don't
22 mind, we can go through the exhibits as I get to
23 them.
24    ARBITRATOR EPSTEIN: That's fine, and all

Page 29

1 okay --
2     MR. MELTON: Both is fine with me, Your
3 Honor.
4     ARBITRATOR EPSTEIN: Okay, so then I will
5 ask you to raise your right hand.
6     MR. MELTON: Yes, sir, Your Honor.
7     (Mr. Bruce Melton was duly sworn.)
8     ARBITRATOR EPSTEIN: All right, so you may
9 proceed. Now, just reminding you what I said
10 before --
11    MR. MELTON: Yes, sir, Your Honor.
12    ARBITRATOR EPSTEIN: -- if there is an
13 objection, you stop where you are and we'll hear the
14 objection and your response to it before proceeding.
15    MR. MELTON: Yes, sir, Your Honor. Okay,
16 I'd like to start, Your Honor, by stating when I was
17 hired at the Pavilion, they did a background check
18 on me, and as Mr. Layton put it, they did the
19 background check, but I guess they failed to do an
20 FBI background check. But located in my work
21 history file is a document, and I'm going to find
22 that document for you, Your Honor.
23    ARBITRATOR EPSTEIN: And before you do, if
24 you know where the exhibits are --

Page 31



1    MR. LAYTON:  Yes, judge.
2    ARBITRATOR EPSTEIN:  -- you can help
3 shortcut that.
4    MR. LAYTON:  Absolutely.
5    MR. MELTON:  Okay, this document states to
6 the Pavilion to never -- after I've had my
7 background check done, to never send me to have
8 another background check done, so --
9    MR. LAYTON:  Can I -- and I don't want to
10 interrupt you, Mr. Melton, but I think you're
11 talking about Exhibit 83.
12    MR. MELTON:  Okay.  Yes, sir, Your Honor,
13 it's Exhibit 83.
14    ARBITRATOR EPSTEIN:  Okay, let me open the
15 book and get to Exhibit 83.  Okay, I see that.
16    MR. MELTON:  So in the process of stating
17 this during arbitration, we had Ms. Arnetha Truss
18 who stated that this document or -- was not for use
19 after they did the second background check because
20 in some kind of way it was not -- I guess it was not
21 for that matter, which I don't understand that, but
22 I had this in my file and it stated that for the
23 purposes that I wasn't supposed to be fingerprinted
24 again.

Page 32

1    So either way it go, I was -- I worked
2 there for a year and a half and I filed numerous
3 complaints against Ms. Laurie Crabtree, and as the
4 court will see, as Your Honor will find out, every
5 complaint that I filed against her, some way she was
6 the one who looked over those complaints.  So I'm
7 trying to figure out, Your Honor, how it was that I
8 filed a complaint against her and she was the
9 investigator of the complaint.  So as Mr. Layton
10 stated earlier, they were not a found basis, but she
11 was the one who did the investigation.
12    So anyway, Your Honor, I was terminated on
13 February 1st after being submitted a letter through
14 the mail, certified mail.
15    ARBITRATOR EPSTEIN:  That's 2017?
16    MR. MELTON:  2017, I'm sorry.
17    ARBITRATOR EPSTEIN:  It's all right.
18    MR. MELTON:  February 9th, 2017.
19    ARBITRATOR EPSTEIN:  You said February
20 1st.
21    MR. MELTON:  I was terminated on February
22 1st --
23    ARBITRATOR EPSTEIN:  Okay.
24    MR. MELTON:  -- but I received the

Page 33

1 certified letter on February 9th stating that I was
2 terminated as of February 1st.  In my termination, I
3 was not afforded the opportunity to speak -- before
4 my termination, to speak with Ms. Crabtree or have
5 any kind of contact with Ms. Crabtree, because every
6 time I went up there to take papers to her, she was
7 not available.
8    So I received this letter, certified
9 letter, and in the process of receiving that, she
10 never asked me for the keys.  She had written it in
11 the letter she wanted the keys, but I tried to go up
12 and she'd never ask for the keys.  I was not
13 supposed to go up on the Pavilion grounds, and I
14 still possess the keys right up until today.
15 However, she -- they state that my criminal history
16 was the reasons that I was terminated.
17    Your Honor, my convictions which are noted
18 on -- let me find the document here.  For my
19 convictions -- okay, if you look, when you get a
20 chance, Your Honor, at Document 84 in his list.
21    ARBITRATOR EPSTEIN:  I have that in front
22 of me.
23    MR. MELTON:  It would be the list of my
24 convictions, which they had obtained a copy of my

Page 34

1 convictions.  Not my criminal history, they had my
2 convictions, everything I was convicted of.  So if
3 you go to -- one second, Your Honor.  What I'm
4 attempting to find, Your Honor, is --
5    MR. LAYTON:  Which one?
6    MR. MELTON:  -- the second list of the
7 criminal content that she posted on my record, that
8 she posted sending it to DCFS.
9    MR. LAYTON:  No. 90, Mr. Melton, is that
10 the one?
11    MR. MELTON:  Is it 90?  Let me see.  No.
12 No, sir, that's not it.
13    MR. LAYTON:  Okay.  What's the time frame?
14    MR. MELTON:  It was when she decided to
15 terminate my employment.
16    MR. LAYTON:  Oh, the letter that was sent?
17    MR. MELTON:  It's a letter -- okay, I
18 think, yeah, right here, Your Honor.  No, that's not
19 it.
20    ARBITRATOR EPSTEIN:  Take your time.
21    MR. MELTON:  Okay, I found it.  It's in
22 Exhibit 101.  This is the second paper that she sent
23 to Arnetha Truss listing my convictions supposedly.
24 However, Your Honor, the stuff that she added onto

Page 35



2:17-cv-02112-CSB-EIL # 41    Page 80 of 189
Arbitration - 10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

**Page 36**

1  this document I was never convicted of, some of this
2  stuff. A lot of it I was.
3      ARBITRATOR EPSTEIN: Let me just make --
4  take a moment.
5      MR. MELTON: Yes, sir.
6      ARBITRATOR EPSTEIN: Go ahead.
7      MR. MELTON: Okay, Your Honor, like I
8  said, a lot of this stuff I was not convicted of.
9  Okay, in the process of Ms. Crabtree stating that
10  DCFS asked -- sent a letter over to have me do a
11  second background check because of my FBI history, I
12  want to show to the court that it was Ms. Crabtree
13  who in turn sent the letter to DCFS to have me do --
14  to get another background check.
15      MR. LAYTON: Judge, I have to object and
16  I'd like to see the basis for that. That's not --
17      ARBITRATOR EPSTEIN: Well, you can
18  cross-examine. There's nothing inappropriate about
19  him testifying as to that. You certainly are able
20  to cross-examine him on it.
21      MR. LAYTON: Yes, judge.
22      ARBITRATOR EPSTEIN: Overruled.
23      MR. LAYTON: Yes, judge.
24      MR. MELTON: Your Honor, if you can give

**Page 37**

1  me a second so I can find this document.
2      ARBITRATOR EPSTEIN: Sure.
3      MR. MELTON: I apologize, Your Honor.
4      ARBITRATOR EPSTEIN: No need to apologize.
5      MR. MELTON: I just have so many papers
6  here. Okay, that's not it. Well, first, Your
7  Honor -- I'm sorry, it's going to take me a second
8  to find it. I want Your Honor to go to employee
9  waiver request for purposes of employment. This is
10  the second copy, the second form that --
11      ARBITRATOR EPSTEIN: Are we looking still
12  at Exhibit 101?
13      MR. MELTON: No, this is 100.
14      ARBITRATOR EPSTEIN: Okay. Well, if you
15  start by telling me what the exhibit number is --
16      MR. MELTON: The number, okay.
17      ARBITRATOR EPSTEIN: -- that would be
18  helpful to me.
19      MR. MELTON: I apologize.
20      ARBITRATOR EPSTEIN: Now we're at Exhibit
21  100.
22      MR. MELTON: I want Your Honor to look at
23  the back of that page where Ms. Crabtree checked
24  denied clearance for employment dated 2/1/17.

**Page 38**

1      ARBITRATOR EPSTEIN: Wait a minute. I
2  see. That's the third page of the exhibit.
3      MR. MELTON: Yes, sir, Your Honor. I want
4  you to pay attention to the part, the top of that X
5  where it says, I have reviewed the criminal
6  background information with the individual, made the
7  following decisions and will notify the individual
8  of the same.
9      I want the court to know that Ms. Crabtree
10  never ever spoke with me about my criminal history
11  ever. The only time I had a conversation about my
12  criminal history was with Mr. Reis when I was first
13  offered employment with the Pavilion. I had a
14  conversation with Mr. Reis and explained to him my
15  full criminal history and I informed him of stuff
16  that I was getting expunged off of my record. Mr.
17  Reis informed me, which he denied in his deposition,
18  he informed me that, you know, he liked the way I
19  worked and that he was going to get me employed
20  there. He wanted me on his team.
21      So at that point, Mr. Reis got with Ms.
22  Crabtree and Mr. Sheehy and they bought my contract
23  from Express, Express Employment Professionals,
24  which is located -- she should have put it in here.

**Page 39**

1  Okay, it is under Exhibit 146.
2      ARBITRATOR EPSTEIN: Okay.
3      MR. MELTON: Okay, Your Honor. So having
4  said that, I want to go back to where Ms. Crabtree
5  stated that she had reviewed my criminal convictions
6  with me when, as I've stated earlier, I never even
7  had a chance to speak with Ms. Crabtree about my
8  convictions. When she informed me that I needed to
9  get a copy of my convictions, because otherwise she
10  could not have seen it unless I asked for it with
11  DCFS. Once I had got a copy of that, I wrote on
12  that copy, and you will see under -- give a minute.
13      MR. LAYTON: I think you're looking for
14  90, Mr. Melton.
15      MR. MELTON: 90? Okay, thank you, sir.
16  Yes, sir, that's it. You will look -- if you go to
17  the second page, at the top, this is before I was
18  terminated, I expressed to Ms. Crabtree that the
19  cases that he were referring to about the criminal
20  sexual assault, which I shouldn't have never been --
21  had in my background, all of those cases were
22  getting expunged off my record. And I made sure
23  that I posted it on this letter when I gave it to
24  her.



1  As I stated, I went to the office, and
2  every time I went to speak with her, she was never
3  in her office or available.  So I had this document
4  sent to her.  Still did not receive a call back from
5  her, and I tried to contact her and still was not
6  able to get in touch with her.
7        So having said that, Your Honor, I want to
8  -- I want to read this, which is under -- let me
9  see, okay.  Which I know Mr. Layton is going to go
10 into a lot of legal aspects that I may not have any
11 understanding about, but some of it I do.
12       Your Honor, I want to go into -- it's the
13 pre-employment inquiries and arrest and convictions
14 located in Exhibit 130, and it states as follows.
15 I'll wait until Your Honor gets there.
16       ARBITRATOR EPSTEIN:  Okay.
17       MR. MELTON:  It states federal law does
18 not prohibit employers from asking about your
19 criminal history, but federal law, EEO laws do
20 prohibit employers from discriminating when they use
21 criminal history information.  Using criminal
22 history information to make employment decisions may
23 violate Title 7 of the Civil Rights Act of 1964 as
24 amended.

Page 40

1        Now, Title 7 prohibits employers from
2  using policies or practices that screen individuals
3  based on criminal information --
4        ARBITRATOR EPSTEIN:  You know what?
5        MR. MELTON:  Criminal history information,
6  yes, you know all about that.
7        ARBITRATOR EPSTEIN:  No, no.  What I was
8  just going to say is the court reporter I'm sure is
9  really good, but people --
10       MR. MELTON:  Oh, I'm speaking -- I'm so,
11 so sorry.
12       ARBITRATOR EPSTEIN:  Excuse me, but people
13 have a tendency when they're reading to read quicker
14 than they normally speak, which makes the job
15 difficult, and we want to have an accurate record of
16 what you're reading.
17       MR. MELTON:  Yes, I apologize.
18       ARBITRATOR EPSTEIN:  So go ahead and do
19 the reading a little bit more slowly.
20       MR. MELTON:  I apologize.  Would you -- is
21 there a particular point you want me to pick up at?
22       (Requested portion of the deposition was
23 read by the court reporter.)
24       MR. MELTON:  If they significantly

Page 41

1  disadvantage Title 7 protected individuals, such as
2  African-Americans and Hispanics, and they do not
3  help the employer accurately decide if the person is
4  likely to be a responsible, reliable or safe
5  employee.  So I just wanted to give that point to
6  Your Honor.
7        Now, Your Honor, as Mr. Layton put it
8  earlier, DCFS has the authority to say whether or
9  not you're eligible or ineligible to work at the
10 Pavilion.  As he also stated, the documents did say
11 that I was ineligible to work unless the Pavilion
12 was to ask for a waiver.  The first waiver they
13 asked for, which was on -- one second, Your Honor.
14       ARBITRATOR EPSTEIN:  That was at the time
15 of your hire roughly.
16       MR. MELTON:  The time of my hire, yes,
17 sir, Your Honor.
18       ARBITRATOR EPSTEIN:  And as I understand
19 what you said, at the time of this more detailed
20 submission, they did not ask for a waiver.
21       MR. MELTON:  Yes, sir, Your Honor, they
22 did ask for a waiver.
23       ARBITRATOR EPSTEIN:  The second time?
24       MR. MELTON:  The second time.  And due to,

Page 42

1  I guess, Ms. Crabtree seeing my criminal history,
2  she decided at that time she was not going to give
3  me a waiver, which is what I -- the document that I
4  showed you when I asked Your Honor to read the top
5  part where she said she discussed my criminal
6  history with me.  It was under the X stated that she
7  did not want to give me a waiver at that time.  So
8  that was the second time.
9        I'll point Your Honor back to where that
10 was at.  That was under -- okay, here.  I think --
11       ARBITRATOR EPSTEIN:  100?
12       MR. MELTON:  I believe so, Your Honor.
13       MR. LAYTON:  Mr. Melton, what's the time
14 frame?
15       MR. MELTON:  This was -- yes, sir, Your
16 Honor, it's 100.  That's when she decided not to
17 give me clearance for a waiver.
18       ARBITRATOR EPSTEIN:  Right.  So what I'm
19 understanding this to mean, Mr. Melton, is that Ms.
20 Crabtree on behalf of the respondent in this case on
21 -- in the December 24th, 2016, letter, checked the
22 box that says that they're not seeking a waiver.  Is
23 that your understanding, sir?
24       MR. MELTON:  Yes, sir, Your Honor.

Page 43

2:17-cv-02112-CSB-EIL # 41 Page 82 of 189
Arbitration - 10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

**Page 44**

1  ARBITRATOR EPSTEIN:  Okay.  Okay, I've got
2  that.
3  MR. MELTON:  Okay, Your Honor.  Sorry,
4  looking for my next point here.  Okay, Your Honor,
5  during testimony, I asked Ms. Crabtree if she had
6  ever seen any of the documents about my criminal
7  history, which she stated that, you know, she never
8  did.  So under -- on -- okay, on page 10 and 11 of
9  Ms. Crabtree's deposition, I asked her had she ever
10  seen my criminal history in more detail.
11  MR. LAYTON:  I'm going to object, judge.
12  ARBITRATOR EPSTEIN:  Rather than -- the
13  objection as to bringing in the deposition testimony
14  is sustained.  I'm going to allow him to say what he
15  believes she said, and if there's an opportunity or
16  a necessity to later confront Ms. Crabtree with a
17  deposition, then that will be brought up at that
18  time.  So without referring to the deposition --
19  MR. MELTON:  Yes, sir, Your Honor.
20  ARBITRATOR EPSTEIN:  -- what is it that
21  you say she said about that?
22  MR. MELTON:  I asked her did she see in
23  more detail my criminal history, and at first under
24  the situation she said no.  And then when I

**Page 45**

1  presented her with further documentation, she stated
2  that, well, this wasn't part of your criminal
3  background, part of the initial documents that we
4  were looking for.  And then I asked her, okay, so
5  did you see it before I was hired, the more of my
6  criminal history?  Then she -- after overall, she
7  did admit that she seen it, but she didn't really
8  pay attention to it.
9  Having said that, Your Honor, I have, like
10  I stated, given Ms. Crabtree ample amount of
11  information about my criminal history, and I
12  explained to her, like I said, that I was having
13  everything expunged.  So Mr. --
14  ARBITRATOR EPSTEIN:  Wait.  Let me just
15  ask you a question.
16  MR. MELTON:  Yes, I'm sorry, yes, sir.
17  ARBITRATOR EPSTEIN:  What basis do you
18  have to believe that there could be expungement of
19  burglary convictions?
20  MR. MELTON:  No, Your Honor.  Well, let me
21  explain this to you because, Your Honor, you're very
22  wise on the law.  So to let you know, it could be
23  expunged if, one, you weren't convicted of it.
24  ARBITRATOR EPSTEIN:  Well, I asked about

**Page 46**

1  convictions.
2  MR. MELTON:  Yes, but I'm not trying to
3  dispute my convictions, Your Honor.
4  ARBITRATOR EPSTEIN:  Okay.
5  MR. MELTON:  That's not what I'm trying to
6  dispute.  All my convictions is on the sheet, the
7  document in 82 where I was convicted, so I'm not
8  trying to ex -- you know, talk about getting rid of
9  my convictions.  What I'm referring to is my
10  nonconvictions.
11  ARBITRATOR EPSTEIN:  What basis do you
12  have for believing that once you have criminal
13  history that includes convictions that you're
14  eligible to then expunge matters that there were
15  arrests but no convictions?
16  MR. MELTON:  Good question, Your Honor.
17  ARBITRATOR EPSTEIN:  Thanks.
18  MR. MELTON:  Well, Your Honor --
19  ARBITRATOR EPSTEIN:  Sometimes I come up
20  with them.
21  MR. MELTON:  Oh, well, I think you have a
22  lot of them.  Well, Your Honor, I'm from Champaign,
23  and they had an expungement class here where it
24  teaches you that if you weren't convicted of crimes

**Page 47**

1  you can get those crimes took off your record,
2  expunged or sealed.  And I had -- I'm not going to
3  lie to you, Your Honor.  As a youth, I had many
4  problems and I grew up in certain -- in a certain
5  neighborhood, so, you know, I experienced in a lot
6  of criminal activity.
7  Once I became an adult, I changed my whole
8  theory, even though I still had issues with the law.
9  I'm not saying that I became perfect all of a sudden
10  because I never did, I still have issues today, but
11  being a grown man now, I learned that, you know, it
12  was time for a change for me and as well as my kids.
13  I have a son biologically, and in the process, which
14  I'm going to show Your Honor, during all of this
15  criminal activity that is presented before you, the
16  court allowed me to adopt two children still with my
17  criminal history, with the aggravated criminal
18  sexual assault that Mr. Layton has brought up, but I
19  went -- we had this process at the church and they
20  spoke to us about how to go about getting things
21  expunged, sealed, off your record.  And I paid the
22  money.  I had to borrow it, but I paid it and got it
23  done.
24  I -- as Your Honor will see, in -- I have

2:17-cv-02112-CSB-EIL # 41   Page 83 of 189
Arbitration - 10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

**Page 48**

1 it right here somewhere, Your Honor. If Your Honor
2 look at Document 124 is the document -- Exhibit 124
3 is the document showing that in 1999, March 31st,
4 1999, I adopted, this is actually my second son,
5 DeAntre Melton, after those criminal histories that
6 he just explained. Where's my first son?
7    ARBITRATOR EPSTEIN: Okay, we'll stipulate
8 that he made the adoptions afterwards.
9    MR. LAYTON: Yes, judge.
10    ARBITRATOR EPSTEIN: He's agreed to that,
11 so you don't have to prove that.
12    MR. MELTON: Okay, yes, sir, Your Honor.
13 Okay, and I'm looking for -- and I know it's in
14 here. To go back to Your Honor's question -- okay,
15 here we go. Mr. Layton stated earlier about me
16 wanting to add additional information into my
17 criminal history or that he did not receive as of a
18 certain period of time. I'd like to point out to
19 Your Honor that during my deposition -- first of
20 all, on my paper I told -- on the document that we
21 have talking about my criminal history, I told and
22 informed -- in Exhibit 90, I informed that I was
23 getting my stuff expunged and sealed.
24    Mr. Layton said that I did not give him

**Page 49**

1 the documents at the appointed time. Your Honor,
2 when we had my deposition, I expressed to Mr. Layton
3 in front of the court reporter, which we were off
4 camera, we was off record, I asked him, Mr. Layton,
5 would you like a copy of the papers that were sent
6 to me about my criminal history? His remark was
7 that is not necessary.
8    ARBITRATOR EPSTEIN: You're anticipating
9 an objection which I haven't heard at this point.
10    MR. MELTON: Yes, sir.
11    ARBITRATOR EPSTEIN: So just --
12    MR. MELTON: Go ahead.
13    ARBITRATOR EPSTEIN: Yeah, at this point
14 go ahead.
15    MR. MELTON: Okay, I offered it to him
16 and --
17    ARBITRATOR EPSTEIN: What did the document
18 say?
19    MR. MELTON: The documents are located,
20 Your Honor, in Exhibit 158 through 162, and it
21 should be more than that, but these are the
22 documents that is expunging my record and clearing
23 me of those cases that I was never convicted of.
24    MR. LAYTON: And those were the documents

**Page 50**

1 that were the subject of my objection, judge.
2    ARBITRATOR EPSTEIN: Right. Okay. Well,
3 I don't see any prejudice in that, so I'm going to
4 respectfully overrule the objection and allow that
5 evidence in.
6    MR. MELTON: One second, Your Honor, I
7 apologize. Once again, I can't help it, but, Your
8 Honor, I was just raised that way. There's a
9 specific document that I'm looking for, Your Honor.
10    ARBITRATOR EPSTEIN: Take your time.
11    MR. MELTON: Thank you, Your Honor.
12    MR. LAYTON: Mr. Melton, what are you
13 looking for?
14    MR. MELTON: It's a document where Ms.
15 Crabtree sent to Ms. Truss.
16    MR. LAYTON: Was it the second letter or
17 the first one?
18    MR. MELTON: It was a letter stating that
19 I signed a document to have her check my
20 fingerprint, which I never signed a document, so I
21 just had it.
22    ARBITRATOR EPSTEIN: Is that the second
23 letter to DCFS you're referring to?
24    MR. MELTON: No, sir, Your Honor. This --

**Page 51**

1 Your Honor, I'll get back to this. This is -- I
2 want to go to Exhibit 102.
3    ARBITRATOR EPSTEIN: Okay.
4    MR. MELTON: Ready, Your Honor?
5    ARBITRATOR EPSTEIN: Yeah, I've seen it.
6    MR. MELTON: Okay. This is the document
7 that I received February 9th telling me that I was
8 terminated as of February 1st. As I stated earlier,
9 I never once -- not one time at all did Ms. Crabtree
10 reach out to me to at least allow me to explain my
11 criminal history to her, to inform her anything
12 about my criminal history.
13    I felt like at that time that I didn't
14 have -- Your Honor, I know it will be hard to
15 understand, but like I said earlier, I have a
16 criminal history and I know that, and I know some
17 people look on it as, well, you know, he's not going
18 to change, he's not going to do that, nothing, but I
19 believe that I have the right to at least defend my
20 background, and she never gave me that opportunity.
21 Never. Not one time. And I tried to reach out to
22 her to explain what I wrote on that letter to her.
23    Now, I asked Ms. Crabtree in the
24 deposition who was the person that terminated me,

2:17-cv-02112-CSB-EIL  #41  Page 84 of 189
Arbitration - 41  10/29/2019
**Bruce Melton vs. Pavilion Behavioral Health System, et al.**

1 and she said she did. She never once stated that it
2 was her and corporate. She said she terminated my
3 employment because of my criminal history.
4     I want Your Honor to understand that I
5 said I worked there for a year and a half. Never
6 once was there any issues, complaints, arguments
7 about me with kids. With staff members there was
8 problems, but with the facility itself, with the
9 people that worked in the facility -- I mean the
10 people that lived in the facility, never once were
11 there any complaints.
12     As I talked with Ms. Truss, I asked her
13 did she ever receive any complaints against me about
14 my involvement with the children and the adults that
15 worked there, and she said no.
16     So I was -- I'm trying to figure out why
17 if I had -- my merits were great. If I had good
18 merits, I never missed a day, never had problems
19 with any children. The only problems I had was with
20 a lady that worked there. Your Honor, I need to
21 explain this.
22     It was a woman that worked at the Pavilion
23 and her name was Yasmiene, I don't know her last
24 name, who informed, I take it, Ms. Crabtree that I

Page 52

1 took a picture of her behind and posted it on
2 Facebook. Now, I took a picture of Yasmiene because
3 I knew Yasmiene's husband. To be honest, Your
4 Honor, me and him had been in prison together. I
5 had seen them together. And I took the picture that
6 day, which they have a copy of it, so that my wife
7 could remember who she was because we saw them at
8 Walmart. And Yasmiene knew it. The picture itself
9 shows she was smiling. That's the only picture I
10 ever took of her.
11     She informed or somebody informed Ms.
12 Crabtree that I took a picture of her behind and
13 posted it on Facebook. However, Ms. Crabtree not
14 knowing one of the administrators that worked at the
15 Pavilion was one of my friends on Facebook, his name
16 is Joey King, he's a friend of mine, so I was going
17 to ask him to speak on my behalf about that not
18 being on my Facebook page, but it didn't even -- she
19 ended up finding out that it wasn't true, and
20 whatever happened after that, she never informed me
21 and didn't do -- I don't know what happened.
22     But my point in saying that is I've had
23 incidents with her and a couple other ladies that
24 worked in the cafeteria who blatantly lied on me,

Page 53

1 but that's a whole different thing, Your Honor. And
2 outside of those issues, I was a good employee. Oh,
3 I did have a write-up for stating in a meeting that
4 I was not going to do any excessive work because
5 they was putting somebody in the area I was working
6 in who didn't like to work, and a couple of those
7 people now are not even no longer there.
8     But either way it goes, Your Honor -- oh,
9 here it is, right here. I want to get to Exhibit
10 80. In this exhibit, Ms. Crabtree states that on
11 Tuesday, January 3rd, Exhibit 80, Bruce was given a
12 copy of the letter Laurie received from DCFS to give
13 to his attorney per her request. A statement that
14 Laurie would not finish a conversation is untrue as
15 he asked how he would be paid while he was -- while
16 he was off. And Laurie's response to Bruce was she
17 had emailed to her worker's comp contact.
18     Before that, she states that Ms. -- no,
19 how it goes? Okay, she stated that she gave my
20 attorney a copy of this request, but she states that
21 that day she called me and told me that she received
22 the notice and informed me that I also received a
23 letter from DCFS regarding the same issue and was in
24 contact with DCFS regarding that.

Page 54

1     Under the circumstances, Your Honor, DCFS
2 do not send me anything. They send it to the HR
3 director who in return calls the individual and
4 speaks with them about it. She never called me.
5 She never once attempted to call me. She never once
6 attempted to speak to me.
7     On -- I don't know if I spoke about this
8 already, Your Honor. Exhibit 82, I want to go back
9 to my criminal history because this is what all of
10 this is focussed on, my criminal history and being
11 terminated for that. A list of my convictions are
12 right here that Ms. Crabtree stated that she never
13 saw. She said she -- no, at first she said she
14 never saw it, but then when I brought it to her
15 again in the deposition, she stated, as I said
16 earlier, that she saw it, she just didn't use it.
17 She wasn't -- because it wasn't a part of the other
18 DCFS background, it was from another outside source
19 or something, but she has all my convictions, all my
20 convictions.
21     Your Honor, I also want to go to Mr.
22 Layton saying that you would see all the write-ups
23 that I wrote up on Ms. Crabtree and other
24 individuals at the job. I had I think a total of 11

Page 55

2:17-cv-02112-CSB-EIL # 41    Page 85 of 189
Arbitration - 10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

**Page 56**

1  conversations with the compliancy hot line, and as I
2  said earlier, Ms. Crabtree was the sole investigator
3  of all of them even though they were against her.
4  They all were.  Every one she did, they were all
5  against her.
6          Okay, where is that document?  That's what
7  I want to --
8          ARBITRATOR EPSTEIN:  Do you need a few
9  minutes to get organized?
10         MR. MELTON:  Please, Your Honor.
11         ARBITRATOR EPSTEIN:  Then why don't we
12 take a little break now for the court reporter.  And
13 would five minutes be enough for you?
14         MR. MELTON:  I will make it enough, Your
15 Honor.
16         ARBITRATOR EPSTEIN:  Okay, we're off the
17 record.
18         (Recess at 10:11 a.m. to 10:18 p.m.)
19         ARBITRATOR EPSTEIN:  All right, back on
20 the record.
21         MR. MELTON:  My question is after Mr.
22 Layton presents his case, will I be able to close
23 with another part of the case myself?
24         ARBITRATOR EPSTEIN:  Yes, you're able to

**Page 57**

1  rebut items that he brings up in his case.
2          MR. MELTON:  Okay, so I can't bring
3  anything else that I find, because there's some
4  stuff I can't find here.  I'm kind of -- I have so
5  much paperwork to go through and I just have
6  everything here and I'm having issues finding
7  certain things, so I didn't know if that was a
8  possibility.  If not, that's fine.
9          ARBITRATOR EPSTEIN:  Well, as I say, you
10 have a chance to rebut what he brings up in his case
11 in chief in what's called rebuttal after he rests.
12         MR. MELTON:  Okay.  Okay, Your Honor,
13 because right now I can't find a lot of stuff, so
14 I'm going to rest and let Mr. Layton take over.
15         ARBITRATOR EPSTEIN:  All right.  Well, in
16 that case, Mr. Layton has the opportunity to
17 cross-examine you now.
18         MR. LAYTON:  Well, so, judge, I'm -- I
19 just need, I guess, to ask this.  And I realize
20 we're in a pro se situation, Your Honor, but
21 rebuttal would obviously be pure rebuttal, and, you
22 know, if Mr. Melton is going to use a rebuttal to
23 reopen his case, which frankly I think that's what
24 he's going to do, and I -- and I know we want to be

**Page 58**

1  fair to Mr. Melton and I completely agree with that
2  and he's entitled his due process, but I mean that's
3  prejudicial to me.  You know, if he's going to open
4  up, reopen his case after I'm done with mine, am I
5  going to have the opportunity to reopen my case to
6  address new things that he will probably bring up?
7  And, you know --
8          ARBITRATOR EPSTEIN:  Your point is well
9  taken, Mr. Layton.  It seems to me that, first of
10 all, as we all know as lawyers, the rules of
11 procedure and evidence can be stretched more in an
12 arbitration than otherwise in a court of law.  I'm
13 used to being very strict about those things in a
14 court of law.  I want to avoid what can be probably
15 excessively referred to as a filibuster at this
16 point.  Anything that comes up that is not strict
17 rebuttal, if I allow it in, I would allow you the
18 opportunity to respond to it.
19         MR. LAYTON:  Thank you, judge.  Thank you,
20 judge.  I mean there's things -- okay, thank you
21 judge.  I don't need to belabor the point.
22         ARBITRATOR EPSTEIN:  Okay.  So Mr. Melton
23 at this point is subject to any cross-examination
24 that you would like to suggest.

**Page 59**

1          MR. LAYTON:  Thank you, judge.
2          CROSS-EXAMINATION BY
3          MR. LAYTON:
4      Q.  So, Mr. Melton, I'm going to be asking you
5  some questions --
6      A.  Yes, sir.
7      Q.  -- about the documents that I will refer
8  to obviously and will also have some questions --
9  you may need your deposition.  Do you have a copy of
10 your deposition transcript, Mr. Melton?
11     A.  Yes, I do.
12         MR. LAYTON:  Okay, judge, here's -- in
13 case you need it, here's a copy of Mr. Melton's.
14 This is his deposition and the exhibits.
15     Q.  Okay, Mr. Melton, whenever you're ready,
16 please let me know.
17     A.  I'm ready, go ahead.
18     Q.  Okay.  Mr. Melton, you are a convicted
19 felon, correct?
20     A.  Sure, yes, sir.
21     Q.  And you were in prison from 2010 until
22 2014, correct?
23     A.  No, sir, Your Honor, no, sir.
24     Q.  Okay.  You've been convicted of burglary,

2:17-cv-02112-CSB-EIL # 41 Page 86 of 189
Arbitration - 10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

**Page 60**

1  correct?

2     **A.  Yes, I have.**

3     Q.  You've been convicted of domestic battery?

4     **A.  Yes, I have.**

5     Q.  In addition to your numerous felony

6  convictions, you've also been arrested for lots of

7  additional criminal charges, correct?

8     **A.  Correct.**

9     Q.  And you've been arrested and charged with

10  serious crimes, including criminal sexual abuse,

11  correct?

12     **A.  Correct.**

13     Q.  And you would agree that these are serious

14  charges, right?

15     **A.  Correct.**

16     Q.  And you also understand, Mr. Melton, that

17  the Pavilion is a licensed child care facility.

18     **A.  Correct.**

19     Q.  And the Pavilion has a legal obligation to

20  take all reasonable steps to make sure they're

21  protecting the patients who use the facility,

22  correct?

23     **A.  Correct.**

24     Q.  And those patients include children,

**Page 61**

1  correct?

2     **A.  Correct.**

3     Q.  All right.  Mr. Melton, if you could

4  please turn to Exhibit No. 1 in your binder.

5  Arbitration Exhibit 1, I'm sure you recall this,

6  we discussed this during your deposition, this is

7  your application for -- part of your application for

8  employment, correct, when you were first hired?

9     **A.  Correct.**

10     Q.  Okay.  And it indicates --

11     ARBITRATOR EPSTEIN:  Go ahead.

12     MR. LAYTON:  Okay, judge, sorry.

13     Q.  It indicates that the Pavilion may

14  terminate or modify your employment relationship at

15  any time without prior notice, right?

16     **A.  Correct.**

17     Q.  You understood that the Pavilion was an

18  at-will employer.

19     **A.  Correct.**

20     Q.  It also states that the needs of the

21  company -- under item number 6 in Exhibit 1, the

22  needs of the company, meaning the Pavilion, may make

23  the following conditions mandatory:  overtime, shift

24  work, rotating work schedule or work location other

**Page 62**

1  than the location offered to you at the time of your

2  hire.  I accept these conditions of employment.

3     **A.  Correct.**

4     Q.  You agree with that?

5     **A.  Yes, sir.**

6     Q.  So you understood that if necessary the

7  Pavilion had the right to adjust your work schedule

8  and your assigned tasks if necessary to accommodate

9  the needs when you worked at the Pavilion.

10     **A.  Correct.**

11     Q.  Okay.  Under item number 11, it says I

12  understand that the company, meaning the Pavilion,

13  requires all staff to report sanctions, convictions,

14  suspensions, censures or revocations taken against

15  them by federal, state, local or other professional

16  entities.  Do you see that?

17     **A.  Yes, sir.**

18     Q.  So you understood that the Pavilion was

19  entitled to obtain information relating to your

20  criminal background, correct?

21     **A.  Yes, sir.**

22     Q.  So if you can turn to Exhibit No. 2,

23  Mr. Melton.  This is a document that Laurie Crabtree

24  sent to you dated June 15th of 2015.

**Page 63**

1     **A.  Yes.**

2     Q.  Okay.  And this is in conjunction with

3  when you were hired by the Pavilion, right?

4     **A.  Yes.**

5     Q.  And it says that you were hired, at the

6  top there, as a full-time cook, correct?

7     **A.  Correct.**

8     Q.  Okay.  And if you look on the second page

9  of Exhibit No. 2 at the top, it says your

10  compensation will be paid to you hourly at the rate

11  of $10.50, right?

12     **A.  Correct.**

13     Q.  You will be paid biweekly, correct?

14     **A.  Yes, sir.**

15     Q.  It says please also note that you may be

16  required to rotate shifts or be assigned to another

17  unit in the event of need changes throughout the

18  Pavilion, correct?

19     **A.  Correct.**

20     Q.  It goes on to say in the next paragraph

21  below, in accordance with your status, you will

22  accrue paid time off, or PTO, at a rate of 6.46

23  hours and 1.5 hours -- excuse me, 1.54 hours of

24  extended leave benefit, or ELB, per pay period,

2:17-cv-02112-CSB-EIL # 41 Page 87 of 189
Arbitration - 10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

1 right?
2    **A. Correct.**
3    Q. So Laurie Crabtree when you were first
4 hired is telling you about the benefits that you
5 were entitled to with your employment at the
6 Pavilion, right?
7    **A. Correct.**
8    Q. If you could turn to Exhibit 3, sir. This
9 is a document that describes your work
10 responsibilities as a cook at the Pavilion, right?
11    **A. Correct.**
12    Q. And it says here that there are physical
13 demands for your job and that you would need the
14 physical agility to manage dishwashing machine,
15 wheel carts, ovens, et cetera, push, pull and lift
16 up to 50 pounds, right?
17    **A. Correct.**
18    Q. And then there's a section that says
19 essential functions, and there's a list of 17
20 different essential functions that this document,
21 Exhibit No. 3, identifies as being part of your job
22 responsibilities.
23    **A. I believe so.**
24    Q. Do you have any hesitation about saying

Page 64

1    **A. Correct.**
2    Q. Okay. So if you could turn to Exhibit No.
3 8, Mr. Melton. Now, it indicates here, this is a
4 document at the very bottom that you signed on
5 September 14th of 2015, right?
6    **A. Correct.**
7    Q. And it indicates at the top, I acknowledge
8 that I have read and received a copy of the
9 hospital's employee handbook, correct?
10    **A. Correct.**
11    Q. Did you, in fact, read that handbook when
12 you received it?
13    **A. I did.**
14    Q. When you were first hired at the Pavilion,
15 part of your responsibilities included cooking,
16 right?
17    **A. Correct.**
18    Q. And you would also have interaction with
19 some of the children who were patients and residents
20 at the Pavilion?
21    **A. Correct.**
22    Q. But you were not responsible for driving a
23 car, correct?
24    **A. No, I wasn't, correct.**

Page 66

1 yes?
2    **A. No, sir.**
3    Q. Okay. And then if you look on the second
4 page of Exhibit 3, it indicates that your job will
5 include lifting at various levels and that you may
6 on some occasion need to lift as much as 50 pounds
7 or more.
8    **A. Correct.**
9    Q. And if you go on to the third page of
10 Exhibit No. 3, there's a list again of the physical
11 demands of your job, right?
12    **A. Correct.**
13    Q. It includes kneeling, crouching, stooping,
14 squatting, crawling, et cetera, right, Mr. Melton?
15    **A. Correct.**
16    Q. Okay. It also says push/pull over 25
17 pounds, right?
18    **A. Correct.**
19    Q. And you signed this document?
20    **A. I did.**
21    Q. So you had an understanding, Mr. Melton,
22 of course when you were first hired that your job at
23 the Pavilion was going to require you to do some
24 type of physical work and heavy lifting, correct?

Page 65

1    Q. Okay. So, Mr. Melton, if you could please
2 turn to Exhibit 13. So Exhibit 13, this is a
3 document dated, at the bottom on the right, you see
4 it's November 24th of 2015, right?
5    **A. Correct.**
6    Q. And you had been working at the Pavilion
7 for a little over five months at this time?
8    **A. Correct.**
9    Q. And this document here you'll agree is
10 signed by Laurie Crabtree, right?
11    **A. Correct.**
12    Q. And this is a document that indicates you
13 will be taking a leave of absence from November 24th
14 of 2015 until December 14th of 2015, right?
15    **A. Correct.**
16    Q. And if you go down further under comments,
17 it says shoulder surgery, right?
18    **A. Correct.**
19    Q. So this indicates that Laurie Crabtree was
20 approving for you a leave of absence for your
21 shoulder surgery, right?
22    **A. Correct.**
23    Q. Am I correct, sir, that after this leave
24 of absence you returned to work at the Pavilion?

Page 67



2:17-cv-02112-CSB-EIL # 41 Page 88 of 189
Arbitration - 10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

**Page 68**

1 A. Yes, I did, correct.

2 Q. So, in other words, you were not

3 terminated at the conclusion of this leave of

4 absence.

5 A. No, sir, I wasn't.

6 Q. Now, you also were diagnosed with carpal

7 tunnel syndrome when you worked at the Pavilion,

8 correct?

9 A. Correct.

10 Q. And you'll also agree, Mr. Melton, that

11 the Pavilion, based on information it received, made

12 a conclusion that your carpal tunnel syndrome was

13 not work-related, correct?

14 A. I guess they did, yes.

15 Q. Okay.

16 A. That's what they said, yes.

17 Q. Okay. So you ended up having surgery for

18 your -- well, two surgeries, but the first surgery

19 for your carpal tunnel syndrome, it was in 2000 --

20 the middle of 2016, correct?

21 A. Correct.

22 Q. Okay. So, Mr. Melton, if you could turn

23 to Exhibit 19 please? And actually, I'm sorry,

24 let's jump to Exhibit 20. This will expedite

**Page 69**

1 things. So this indicates that you were receiving

2 sick pay -- oh, sorry, are you ready?

3 A. I'm ready.

4 Q. Okay. This indicates you were receiving

5 sick pay from May 20th of 2016 until May 24th of

6 2016, right?

7 A. Yes.

8 Q. And you see at the top there, at the very

9 top, it says the Hartford --

10 A. I do.

11 Q. -- Maitland Claim Office, do you see that?

12 A. Yes, sir.

13 Q. And this document was signed by Laurie

14 Crabtree, right?

15 A. Yes, sir.

16 Q. So this document is confirming that you're

17 receiving sick pay in conjunction with some time off

18 for your carpal tunnel, correct?

19 A. Yes, sir.

20 Q. So if you go on to Exhibit 21.

21 A. I'm ready, go ahead.

22 Q. Okay, sorry. So under Exhibit 21, you'll

23 see at the very top it says Sedgwick, correct?

24 A. Correct.

**Page 70**

1 Q. Do you know what Sedgwick is?

2 A. They are the people that deals with your

3 health issues.

4 Q. Okay, they're claims managers.

5 A. Claims managers, yes.

6 Q. And they're a separate and distinct

7 company of course from the Pavilion.

8 A. Correct.

9 Q. So it indicates here that Sedgwick is

10 concluding, this relates to your carpal tunnel

11 syndrome, after careful consideration of all

12 available information, it is our opinion that your

13 claim for worker's compensation benefits is not

14 compensable. Do you see that?

15 A. Yes, sir.

16 Q. So now here, if you could please turn to

17 Exhibit No. 23, this is a letter that Laurie

18 Crabtree sent to you dated May 24th of 2016.

19 A. Correct.

20 Q. And it indicates -- and this is in

21 relation to your carpal tunnel syndrome, correct?

22 A. Correct.

23 Q. Now, it indicates that the Pavilion

24 received word from our worker's comp carrier that

**Page 71**

1 they were denying your worker's compensation claim,

2 right?

3 A. Correct.

4 Q. And it also indicates that you were

5 informed of the need to send you home because they

6 were unable to accommodate your work-related

7 restrictions, correct?

8 A. Correct.

9 Q. And information was provided to you about

10 how to open a claim for your leave of absence with

11 our leave administrator Sedgwick, and then Laurie

12 writes I've included another form for your use if

13 needed, right?

14 A. Correct.

15 Q. And it says, to date I have not received a

16 notification from Sedgwick to let us know that you

17 have opened your claim. So Laurie is letting you

18 know you should contact Sedgwick to open a claim.

19 A. Correct.

20 Q. Okay. It goes on to say, while on a leave

21 of absence, you will be paid your paid time off and

22 your current balance was 8.84 hours, right?

23 A. Correct.

24 Q. And your extended leave benefit, and the

2:17-cv-02112-CSB-EIL # 41 Page 89 of 189
Arbitration - 10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

Page 72

1  current balance was 10.48 hours, correct?
2  **A. Correct.**
3  Q. And you, in fact, received those benefits
4  from the Pavilion during your leave of absence.
5  **A. Yes, I did.**
6  Q. And it goes on to say, however you did
7  sign up for short-term disability when you signed up
8  for benefits, so you will be paid by that carrier,
9  which is the Hartford, once they have approved your
10 claim with them, right?
11 **A. Correct.**
12 Q. And Laurie goes -- also goes on to tell
13 you, when you call Sedgwick to open your leave of
14 absence claim, you will also want to let them know
15 that you have short-term disability and they will
16 contact Hartford to send you the information
17 regarding opening a claim, right?
18 **A. Correct.**
19 Q. Okay. And finally Laurie says, while on
20 unpaid leave of absence from the Pavilion, our
21 benefits administrator will send you a monthly
22 statement regarding the insurance premiums, right?
23 **A. Correct.**
24 Q. So Laurie at that time was providing you

Page 73

1  with information that would help you make sure you
2  obtain any benefits that you were entitled to during
3  your leave of absence, right?
4  **A. Correct.**
5  Q. And if you could turn to Exhibit 24
6  please. So, Mr. Melton, this indicates that you
7  were granted a leave of absence for your carpal
8  tunnel surgery on May 25th of 2016 and that you
9  would return on July 12th of 2016, right?
10 **A. Correct.**
11 Q. And that document -- excuse me, Exhibit 24
12 is signed by Laurie Crabtree?
13 **A. Correct.**
14 Q. So Laurie Crabtree approved your leave of
15 absence, right?
16 **A. Correct.**
17 Q. And when your leave of absence was done
18 and you had recovered from your carpal tunnel
19 surgery, you returned to work at the Pavilion.
20 **A. Correct.**
21 Q. And your job was waiting for you there.
22 **A. Correct.**
23 Q. In other words, you were not terminated
24 upon your return from your carpal tunnel surgery,

Page 74

1  correct?
2  **A. Correct.**
3  Q. And you will agree with me, Mr. Melton, at
4  least during the time when the carpal tunnel issues
5  arose, that because of your restrictions, you could
6  not do your job without the risk of getting injured,
7  right?
8  **A. Correct.**
9  Q. So if you had stayed at work during the
10 time that the carpal tunnel issue arose, you could
11 have gotten hurt more.
12 **A. Correct.**
13 Q. Okay. And there was a period of time,
14 Mr. Melton, when you also developed some back pain
15 when you were at the Pavilion, right?
16 **A. Correct.**
17 Q. And if you could turn to Exhibit No. 27.
18 Okay, so Exhibit No. 27, this is a document from
19 September of 2016 relating to your back pain, right?
20 **A. Correct.**
21 Q. And this indicates -- this is really a
22 medical document, and as you understand it, this
23 information was communicated to the Pavilion, right?
24 **A. Correct.**

Page 75

1  Q. And it indicates here on the document that
2  you were released to modified work, meaning that you
3  could work, albeit with restrictions, correct?
4  **A. Correct.**
5  Q. And there's a similar document -- actually
6  Exhibit No. 28, Mr. Melton, is a letter from Carle
7  which is where you were getting your medical
8  treatment, right?
9  **A. Correct.**
10 Q. And that's dated September 27th of 2016?
11 **A. Correct.**
12 Q. And it indicates that Bruce Melton was
13 seen for an appointment this morning in our office.
14 He is able to return to work following the
15 appointment today, right?
16 **A. Correct.**
17 Q. And then Exhibit No. 29 is another medical
18 document from October of 2016 relating to your back
19 issues, right?
20 **A. Correct.**
21 Q. And this document again indicates that you
22 are released to return to work, although there are
23 some restrictions that are listed here, correct?
24 **A. Correct.**



2:17-cv-02112-CSB-EIL # 41 Page 90 of 189
Arbitration - 10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

Page 76

1    Q.   And again, a little bit later, if you turn
2  to Exhibit 31, there's a document dated October --
3  it looks like it's the 30th or 31st -- excuse me,
4  the 31st of 2016, this document again relates to
5  your back pain that you were having?
6    A.   Correct.
7    Q.   And it also indicates that you were
8  released back to return to work with restrictions at
9  the time.
10   A.   Correct.
11   Q.   So, Mr. Melton, there's a document dated
12 exhibit -- excuse me, Document No. 33 and this is a
13 medical report from November 28th of 2016, correct?
14   A.   Correct.
15   Q.   And it indicates for you that this is a
16 fifth follow-up visit for this gentleman.  He has
17 been treated for low back pain in the past 66 days.
18 He has been placed in physical therapy, he has
19 progressed well, correct?
20   A.   Correct.
21   Q.   The document also says -- this medical
22 record says he does not appear to have any red
23 flags, right?
24   A.   Correct.

Page 77

1    Q.   It also indicates that you had completed
2  your physical therapy at the time, correct?
3    A.   Correct.
4    Q.   And again, it says that you are able to
5  return to work, but you do have some work
6  restrictions, correct?
7    A.   Correct.
8    Q.   So, Mr. Melton, I'd like to turn your
9  attention now to Exhibit No. 36.  So in December of
10 2016, the Pavilion switched your duties so that you
11 did not have to unload the truck, right?
12   A.   Correct.
13   Q.   Now, it indicates in this letter, during
14 this time, while you were on restricted duty due to
15 your worker's comp injury and unable to load the
16 food truck delivery, we are in need of changing your
17 work hours on Fridays to 10:00 a.m. to 6:30 p.m.,
18 correct?
19   A.   Correct.
20   Q.   And then this is a letter that, by the
21 way, was signed by Laurie Crabtree.
22   A.   Correct.
23   Q.   And it says this change in your schedule
24 is needed in order to better meet the needs of the

Page 78

1  patients and staff that we serve as well as meet the
2  restrictions to your job duties, correct?
3    A.   Correct.
4    Q.   And Ms. Crabtree also states for you, for
5  your benefit, the worker's comp policy at the
6  Pavilion, and it says reasonable efforts shall be
7  made to place an employee in an alternate duty --
8  excuse me, an alternative duty position on their
9  current shift.  However, the employee must be
10 available to work all shifts and any position that
11 can accommodate his/her restrictions, right?
12   A.   Right.
13   Q.   And it says here see full policy attached,
14 correct?
15   A.   Correct.
16   Q.   And it says -- in this letter from Laurie,
17 she says with this letter, we are letting you know
18 that upon your return from your medical leave that
19 is scheduled to begin on December 19th, we will
20 continue to accommodate your worker's comp
21 restrictions and the time for all your shifts will
22 be 10:00 a.m. to 6:30 p.m., right?
23   A.   Correct.
24   Q.   And then Laurie also states, we hope that

Page 79

1  this advanced notice will give you the opportunity
2  to make any arrangements that you need to your
3  personal schedule, correct?
4    A.   Correct.
5    Q.   So you agree, Mr. Melton, under these
6  circumstances, if you were unable to unload the
7  truck in December of 2016, the Pavilion had the
8  right to modify your work schedule to accommodate
9  your physical limitations, right?
10   A.   Correct.
11   Q.   Now, Mr. Melton, if you could please turn
12 to Exhibit 37.  And Exhibit 37 is another leave of
13 absence for a second carpal tunnel surgery, correct?
14   A.   Correct.
15   Q.   And this is -- if you look at the
16 document, it indicates that the leave of absence
17 would start on December 19th of 2016 and end on
18 December 28th of 2016, right?
19   A.   Correct.
20   Q.   And this document was signed by Laurie
21 Crabtree?
22   A.   Correct.
23   Q.   And this document reflects that Laurie
24 Crabtree and the Pavilion, in fact, approved this

2:17-cv-02112-CSB-EIL # 41 Page 91 of 189
Arbitration - 10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

1 request for a leave of absence --
2 A. Correct.
3 Q. -- when you made it, right?
4 A. Correct.
5 Q. Okay. So now I'm going to turn to a
6 different topic, Mr. Melton, and I would like to
7 start discussing some of the HR issues involving you
8 as well as your calls to the HR or to the hot line
9 that you touched on. So let me just turn to these
10 documents.
11 Mr. Melton, if you could turn to Exhibit
12 No. 51 please. So this is a write-up by the
13 Pavilion from March of 2016, correct?
14 A. Correct.
15 Q. And it indicates that you made a statement
16 that you're not going to do no extra work, correct?
17 A. Correct.
18 Q. And you obviously were written up for
19 this, right?
20 A. Correct.
21 Q. And if you turn to the second page on
22 Exhibit No. 51, I am correct, sir, I'm sure you'll
23 agree, that your signature appears at the top of
24 that document.

Page 80

1 A. Yes, it do.
2 Q. And there is what I will describe as a
3 long handwritten paragraph on that document, and
4 these are your notes, correct?
5 A. Correct.
6 Q. So, in other words, you took the
7 opportunity during this write-up in March of 2016 to
8 write up your version of what happened, correct?
9 A. I sure did.
10 Q. Okay. And you were allowed to do that,
11 right?
12 A. I -- yes.
13 Q. Because it's right here. You were allowed
14 to write that up, right?
15 A. I did it. They didn't tell me not to.
16 Q. Okay.
17 A. They didn't want me to, but I did it.
18 Q. Okay. You were allowed to write this up,
19 sir, correct?
20 A. Correct.
21 Q. Okay. So if you could turn, Mr. Melton,
22 to Exhibit No. 55. So this is a -- this is another
23 employee corrective action report against you,
24 correct?

Page 81

1 A. Correct.
2 Q. And this is from May of 2016. It was
3 signed by Laurie Crabtree on May 16th of 2016.
4 A. Correct.
5 Q. And it indicates under the report, it says
6 it was reported to human resources that on May 3rd
7 Bruce had an inappropriate conversation with a
8 coworker where it was noted that he yelled at his
9 coworker, correct?
10 A. Correct.
11 Q. This corrective action report also states
12 that this particular coworker also stated that Bruce
13 always yells at her and that she was intimidated by
14 him, right?
15 A. That's what this states.
16 Q. Correct. And it also states in this
17 report that another coworker noted that Bruce had
18 made inappropriate comments of a flirtatious nature
19 to her which made her feel uncomfortable and stated
20 she would not go in the cafeteria to get her food
21 unless other coworkers or patients were in there so
22 as not to have to talk to him other than to get her
23 food, correct?
24 A. That was a lie, but correct.

Page 82

1 Q. That's what this report says.
2 A. That's what Laurie wrote, so yes.
3 Q. Okay. And it says here on the second page
4 of this report, there's a note, and I believe this
5 is your handwriting but please correct me if I'm
6 wrong, it says employee Bruce Melton elected not to
7 sign, right?
8 A. I didn't write that; she wrote that.
9 Q. Okay, okay. And then it says -- you see
10 the employee comments, Mr. Melton? You see the box
11 at the top that says employee comments?
12 A. Yes, I do.
13 Q. All right. That's blank, correct?
14 A. Correct.
15 Q. Okay. So, Mr. Melton, this report was
16 made on May 16th of 2016, correct?
17 A. Yes.
18 Q. This report was signed and you were
19 written up.
20 A. It wasn't signed by me.
21 Q. I know that, I know that.
22 A. You just said it was signed, so --
23 Q. Well, this reflects here, it says -- this
24 document here says employee Bruce Melton elected not

Page 83



2:17-cv-02112-CSB-EIL # 41  Page 92 of 189
Arbitration - 10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

Page 84

1  to the sign.  Did I read that correctly?
2    **A.  My fault.  Yes, you did.**
3    Q.  Okay.  And what I want to make sure is
4  clear on the record, so you were written up for this
5  on May 16th of 2016, right?
6    **A.  Correct.**
7    Q.  And there was a coworker at the Pavilion
8  who accused you of inappropriate behavior, right?
9    **A.  I don't know.  That's what I was told.**
10   Q.  Well, this report says -- just let me
11  finish.
12   **A.  Yes, sir.**
13   Q.  This report says that a coworker was
14  accusing you of inappropriate behavior, right?
15   **A.  Yes, sir.**
16   Q.  And you were written up for that.
17   **A.  Yes, sir.**
18   Q.  And this is the same day, Mr. Melton, the
19  same day that you made your first call to the hot
20  line at the Pavilion, isn't it?
21   **A.  No, sir.**
22   Q.  Okay.  Mr. Melton, if you could please
23  turn to Exhibit No. 56.
24   **A.  Yes, sir.**

Page 85

1    Q.  Are you there?
2    **A.  I'm there.**
3    Q.  Okay.  So Exhibit No. 56 is a UHS report
4  concerning your hot line call, correct?
5    **A.  Correct.**
6    Q.  And it indicates on this report at the
7  very top that you made a call on May 16th of 2016,
8  right?
9    **A.  Correct.**
10   Q.  And this is the same day that you were
11  written up for the inappropriate comment --
12   **A.  Correct.**
13   Q.  -- that we discussed earlier, correct?
14   **A.  Correct.**
15   Q.  Now, you made calls to the hot line on
16  several occasions, right?
17   **A.  Correct.**
18   Q.  And when you made your initial call to the
19  hot line, for example, the person who was on the
20  other end of the phone line listened to everything
21  you had to say, correct?
22   **A.  Correct.**
23   Q.  That person asked you to repeat some of
24  the things that you said to make sure that they were

Page 86

1  accurate, right?
2    **A.  Correct.**
3    Q.  And what you found objectionable during
4  this initial call was the fact that Laurie and Adam
5  wrote it up and put it in your file, right?
6    **A.  Correct.**
7    Q.  Okay.  Now, there were also additional
8  issues that you brought to the attention of the hot
9  line and which were investigated by Laurie Crabtree,
10  correct?
11   **A.  Correct.**
12   Q.  All right.  So if you could turn to
13  Exhibit No. 58, Mr. Melton.
14   **A.  Uh-huh.**
15   Q.  And you see at the bottom it's dated July
16  19th of 2016?
17   **A.  Yes, sir.**
18   Q.  So this is a report, as you understand it,
19  that was prepared by Laurie Crabtree, correct?
20   **A.  Correct.**
21   Q.  And this related to an issue that you
22  brought to the attention of the Pavilion through the
23  hot line, correct?
24   **A.  Correct.**

Page 87

1    Q.  And it says here under the incident that
2  you are alleging that Adam Putvin was acting --
3    ARBITRATOR EPSTEIN:  That's P-U-T-V-I-N.
4    MR. LAYTON:  Thank you, judge.
5    Q.  That he was acting inappropriately towards
6  you, correct?
7    **A.  Correct.**
8    Q.  And it says that you came to see Laurie
9  Crabtree, the director of HR, on July 18th to
10  discuss your concerns and how Adam was treating you.
11   **A.  Correct.**
12   Q.  It initially says -- it says initially
13  Laurie stated that you needed to put your concerns
14  in writing, but a conversation ensued with regard to
15  your concerns and Laurie took notes regarding your
16  concerns, right?
17   **A.  Correct.**
18   Q.  So at the end of the meeting, Laurie told
19  Bruce he did not need to put your concerns -- you
20  did not need to put your concerns in writing because
21  Ms. Crabtree had taken notes during the
22  conversation.
23   **A.  Correct.**
24   Q.  And Laurie said that she would look into

2:17-cv-02112-CSB-EIL # 41 Page 93 of 189
Arbitration - 10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

1 your concerns, right?

2 **A. Yes, she did.**

3 Q. Okay. And then -- so if you turn to the

4 second page of Exhibit 58, there's a long

5 typewritten narrative on this page, correct?

6 **A. Correct.**

7 Q. And you understand that these are Laurie

8 Crabtree's notes that reflect Laurie's investigation

9 into the issue that you raised concerning Adam,

10 right?

11 **A. Correct.**

12 Q. Now, one of the things it talks about in

13 here is that you had stated that you were working

14 overtime during your shifts to complete all your

15 tasks while your coworkers are clocking out early

16 and not helping you to complete your tasks, right?

17 **A. Correct.**

18 Q. And it goes on to say, per the attached

19 time sheet, this statement is indeed true, right?

20 **A. Where is that again?**

21 Q. So it's at the bottom paragraph,

22 Mr. Melton.

23 **A. I don't see it.**

24     ARBITRATOR EPSTEIN: It's the beginning of

Page 88

1 the second line of the last paragraph.

2 Q. It says per the attached time sheet, this

3 statement, meaning your statement, is true, right?

4 **A. True.**

5 Q. Okay. So, in other words, you were

6 complaining to Laurie that your coworkers were

7 clocking out early and Laurie Crabtree is saying

8 that you're right, correct?

9 **A. True.**

10 Q. And it goes on to say, on the three shifts

11 that Bruce has worked, July 12th, 14th and 18th, you

12 clocked out at 6:38 p.m., 6:48 p.m. and 6:50 p.m.

13 respectively, right?

14 **A. Correct.**

15 Q. And your three coworkers have all clocked

16 out at 6:23 p.m., see time sheets attached in

17 yellow, right?

18 **A. Correct.**

19 Q. So Laurie is substantiating the issue that

20 you raised at the time.

21 **A. Correct. I'd like to state, though, that**

22 **you might be right about the first -- that might be**

23 **the first time I did file the incident report, but**

24 **that's it.**

Page 89

1 Q. Okay. And this goes on to say, Laurie

2 writes it's also worth noting that on the days that

3 Bruce is not working, these same coworkers are

4 clocking out after 6:30 p.m. Laurie goes on to say

5 that these concerns regarding working together as a

6 team to complete all duties and leaving on time will

7 be addressed with the department, correct?

8 **A. Correct. It never was until Ray took**

9 **over, but --**

10 Q. Laurie writes a conclusion in Exhibit 58,

11 it's on the third page, and it says that the

12 concerns that his, meaning your, coworkers are not

13 working as a team to complete all tasks together

14 resulting in him working over the appointed time may

15 have some validity and will be addressed with all

16 the dietary staff, all the dietary department staff,

17 correct?

18 **A. That's what the end of it says, yeah.**

19 Q. Okay. So if you could turn, Mr. Melton,

20 to Exhibit No. 21. And this is another issue that

21 you raised with the hot line, correct?

22     ARBITRATOR EPSTEIN: 21?

23     MR. LAYTON: Oh, I'm sorry, I misspoke.

24 61. Sorry about that.

Page 90

1 **A. 61? I don't see the complaint.**

2 Q. Well, this is an HR report, correct? 61?

3 **A. I'm reading it, I see what you're saying.**

4 Q. Okay.

5 **A. But it doesn't speak to what I initially**

6 **reported. It's just her report saying it is**

7 **unfounded.**

8 Q. Well, okay, let's talk about it then,

9 okay. It says here under incident, it says Bruce

10 Melton is alleging inappropriate behavior by several

11 coworkers, right?

12 **A. Uh-huh, correct.**

13 Q. Okay. And then it says under interviews,

14 it says there were interviews of Betty Dockery,

15 D-O-C-K-E-R-Y, Yasmiene Seets, Y-A-S-M-I-E-N-E, and

16 looks like S-E-E-T-S, Charles Ball, Adam Putvin and

17 Laurie Crabtree, correct?

18 **A. Correct.**

19 Q. And then if you turn to pages 3 and 4,

20 actually 3, 4 and 5, you see there are typewritten

21 summaries of Laurie Crabtree's investigations of the

22 people that were identified, right?

23 **A. If I may add, she never wrote what I**

24 **initially reported. Where is that stating what I**

Page 91



1 said about whoever did what?  It's not there.

2     Q.  So, Mr. Melton, my question to you, sir,

3 right now is these pages, there are -- there's

4 really two and then a very small part of a third

5 page that include Laurie Crabtree's notes concerning

6 her investigation into this issue.

7     **A.  Yes, sir, but it's still not stating what**

8 **I reported.  What did I report?  I don't even know**

9 **what I reported if I said something.  How can I**

10 **justify it if I don't even know what I said?**

11     ARBITRATOR EPSTEIN:  I think you just need

12 to answer the question that's put to you.

13     MR. MELTON:  Okay, Your Honor.

14     Q.  Okay.  So if you go onto the next page,

15 what is the second page so I'm not being confusing

16 here on the record, so the second page of Exhibit

17 61, it's Bates labeled Pavilion 3541, do you see

18 that?

19     **A.  Yes, sir, I got it.**

20     Q.  And it says -- so results of Laurie's

21 investigation.  It says that the allegations being

22 made by Bruce Melton aren't founded.  Do you see

23 that?

24     **A.  Yes, I do.**

Page 92

1     Q.  It says, in addition, Mr. Melton's notes

2 are not accurate as he is stating that his write-up

3 was for the alleged pictures that he had taken and

4 posted on Facebook.

5     So let me just stop right there.  You had

6 indicated that you were written up because you had

7 taken and posted pictures on Facebook.

8     **A.  That's what I was informed by Ms.**

9 **Crabtree.**

10     Q.  Okay, but it actually turns out you never

11 were written up for posting pictures on Facebook,

12 correct?

13     **A.  I guess that's what she said, but I know**

14 **what I was told.**

15     Q.  Okay, but you haven't seen any documents

16 in this case, any corrective action reports against

17 you concerning the allegation that you had posted

18 pictures on Facebook, right?

19     **A.  As of this moment, I don't see them.**

20     Q.  Okay.  And it says here that you were --

21 you were written up for inappropriate conversations

22 that you had with coworkers, which we talked about

23 before, correct?

24     **A.  Correct.**

Page 93

1     Q.  And it says at no time during the meeting

2 in May that resulted in the write-up were pictures

3 discussed with Mr. Melton.  That's what this report

4 says, correct?

5     **A.  Correct.**

6     Q.  Laurie goes on to write, the pictures were

7 not reported to Laurie Crabtree until July 12th when

8 Bruce returned from his medical leave, correct?

9     **A.  That's what the letter says, yes, correct.**

10     Q.  Now, you had also indicated that you were

11 forced to take time off of work earlier in the year

12 in May.

13     **A.  Correct.**

14     Q.  Okay, but Laurie writes here, in addition,

15 Bruce took time off as of May 20th to have surgery

16 on his hand and was not forced to take time off.

17 Did I read that correctly?

18     **A.  Where is that again?**

19     Q.  Sure.  It's the second page of Exhibit 21.

20 It says, Bruce took time off as of May 20th to have

21 surgery on his hand and was not forced to take time

22 off.  Did I read that correctly?

23     ARBITRATOR EPSTEIN:  It's the last

24 sentence under --

Page 94

1     **A.  Of 61 you mean, correct.**

2     Q.  Yes.  Did I say it wrong again?  Yes,

3 Exhibit 61, the second page.

4     **A.  Yes, correct.**

5     Q.  Okay.  And now if you could please turn to

6 Exhibit 64.  And it indicates here under incident

7 that's described at the top on Exhibit 64 -- well,

8 let me step back.  This is another report that

9 Laurie Crabtree prepared, correct?

10     **A.  Correct.**

11     Q.  And it indicates that Bruce Melton is

12 reporting unfair treatment by Adam Putvin and Donna

13 Gadeken, and that's spelled G-A-D-E-K-E-N, by having

14 to do the most amount of work in the dietary

15 department and being paid the least.  Did I say that

16 correctly?

17     **A.  Correct.**

18     Q.  And you'll see on the second page there is

19 a summary, a further summary from Laurie Crabtree of

20 her investigation into this issue?

21     **A.  Correct.**

22     Q.  And then on the last page, you see it says

23 results of investigation?

24     **A.  Correct.**

Page 95



2:17-cv-02112-CSB-EIL    # 41    Page 95 of 189
Arbitration - 10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

1    Q.   And it goes on to say the results of this
2    investigation show that neither Adam Putvin, Joe
3    Sheehy, which is S-H-E-E-H-Y, or Laurie Crabtree
4    were aware of any previous agreement between Bruce
5    Melton and Ray Reis, R-E-I-S, with regards to his
6    salary.  Mr. Melton is not being asked to perform
7    any duties outside of his job description and is not
8    being asked to identify any duties above and beyond
9    what his coworkers are asked to do.  Did I read that
10   correctly?
11   **A.   You read it correctly.**
12   Q.   So this conclusion by Laurie Crabtree that
13   says you are not asked to perform any duties above
14   and beyond what your coworkers were doing, that's
15   correct, right?  Or no, no, let me rephrase that.
16        When Laurie Crabtree concludes that you're
17   not asked to do any duties outside of your job
18   duties, your assigned job duties, that is correct,
19   right?
20   **A.   When she asked -- you said, I'm sorry,**
21   **when she asked me --**
22   Q.   I think I'm not phrasing it right.  If
23   Laurie Crabtree is concluding that you were not
24   asked to perform any duties outside of your job

Page 96

1    description, that is accurate.
2    **A.   Wrong.**
3    Q.   Okay.  All right, Mr. Melton, if you could
4    turn to page 125 of your deposition please.
5        MR. MELTON:  I have a question for Your
6    Honor.
7        MR. LAYTON:  Can I complete my -- I'm
8    sorry, Mr. Melton.
9        MR. MELTON:  Well, it's about these
10   depositions.  You told me that I wasn't allowed to
11   use depositions now, so I'm trying to understand.
12       ARBITRATOR EPSTEIN:  Let me explain this
13   again.
14       MR. MELTON:  Yes, sir, please, because I'm
15   sorry I --
16       ARBITRATOR EPSTEIN:  That's okay.  Just
17   understand the purpose of taking these depositions
18   is to have you answer questions that are important
19   for a case.
20       MR. MELTON:  Okay.
21       ARBITRATOR EPSTEIN:  And what he's doing
22   now, I assume, is trying to confront you with a
23   prior inconsistent statement for what your testimony
24   was today, which you are allowed to do --

Page 97

1        MR. MELTON:  Yes, sir.
2        ARBITRATOR EPSTEIN:  -- with your
3    witnesses also.
4        MR. MELTON:  Yes, sir.
5        ARBITRATOR EPSTEIN:  If I'm wrong about
6    what he's trying to do, I'll rule appropriately.
7        MR. MELTON:  No problem, I understand.  So
8    go ahead, I'm sorry, I apologize.
9        ARBITRATOR EPSTEIN:  It's okay.  No reason
10   to apologize.
11   BY MR. LAYTON:
12   Q.   So, Mr. Melton, I want to ask you
13   specifically about page 125 on your deposition.  If
14   you don't mind letting me know when you're there.
15   **A.   I'm there.**
16   Q.   Okay.  And starting on line 6, so here's
17   the question:  So is it accurate for this document
18   to state that you were not asked to perform any
19   duties outside of your job description?  Answer:
20   Not outside of the job description?  Question:  So
21   what I said is correct?  Answer:  Correct.
22       Did I read that correctly?
23   **A.   Where was that again?  I'm looking at --**
24   **what did you say?**

Page 98

1        ARBITRATOR EPSTEIN:  At page 125, lines 6
2    through 11.
3    **A.   6 through 11, okay.**
4    Q.   Mr. Melton, you look like you're still
5    reading.
6    **A.   Go ahead.  I -- that's what this says,**
7    **yes, correct.**
8    Q.   Okay, that was my question, thank you.  So
9    we can go back to the exhibit binder then.
10       If you could please turn to Exhibit 67.
11   So this is an investigation report that Laurie
12   Crabtree prepared, correct?
13   **A.   Correct.**
14   Q.   And you'll see at the bottom there's a
15   handwritten note that says emailed October 18th of
16   2016.  Do you see that?
17   **A.   Yes, sir.**
18   Q.   Now, it says here that Bruce Melton is
19   alleging that Donna Gadeken, G-A-D-E-K-E-N, is
20   picking on you by not signing you up for a food
21   service sanitation class.  Isn't that what it says?
22   **A.   Correct.**
23   Q.   And just so there's some context on the
24   record, in order for you to do your work, you needed

Page 99

2:17-cv-02112-CSB-EIL # 41 Page 96 of 189
Arbitration - 10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

**Page 100**

1 to have a food sanitation license, right?

2   **A. The problem, if I may answer it this way,**

3 **is that I was a cook and then they switched me over**

4 **to a kitchen work -- to a dietary aide worker which**

5 **is not a cook. You don't need a license to be -- to**

6 **work in the kitchen, you need a license to cook and**

7 **prepare meals. So being a dishwasher, an aide, I**

8 **didn't really need the necessary license, but they**

9 **preferred that we did have it.**

10   Q. Okay. You wanted to make sure that you

11 had the license, right?

12   **A. I wanted to, yes, sir.**

13   Q. Because it was part of your job.

14   **A. Somewhat I mean.**

15   Q. Okay. Okay, I understand what you're

16 saying. So your -- what you're saying, according to

17 this complaint, is that Donna is picking on you by

18 not signing you up for the food service sanitation

19 class, right? That's what this says?

20   **A. Can I make a comment to that?**

21   Q. Sir, is that what this document --

22   **A. That's what this is leading to.**

23   Q. Okay, so then let's talk about the rest of

24 the document.

**Page 101**

1   **A. Yes, sir.**

2   Q. So you'll agree that Laurie Crabtree

3 conducted an investigation into this matter?

4   **A. Correct.**

5   Q. And it says here that Bruce Melton is a

6 food service worker in our dietary department,

7 correct?

8   **A. Correct.**

9   Q. It says that Bruce currently holds a food

10 service sanitation license that expires on December

11 8th of 2016, right?

12   **A. Correct.**

13   Q. It goes on to say, we currently have four

14 cooks/food service workers that have let their food

15 sanitation certificates expire, and Donna Gadeken,

16 the interim dietary manager, is working to get these

17 staff into a food sanitation class to take their

18 test due to their certification being expired,

19 correct?

20   **A. Correct.**

21   Q. So your -- according to this document,

22 your license did not expire until December 8th of

23 2016, right?

24   **A. Correct.**

**Page 102**

1   Q. And then at the very end of the document

2 it says Bruce has been signed up to attend the food

3 sanitation class that will be held in November,

4 correct?

5   **A. Correct.**

6   Q. And then if you turn to the third page,

7 Mr. Melton, of that exhibit, which again is No. 67,

8 that's a copy of your license and it indicates that

9 the expiration is December 8th of 2016, correct?

10   **A. Correct.**

11   Q. Now, Mr. Melton, your supervisor at the

12 Pavilion understood that you needed a food

13 sanitation license to perform your job, right?

14   **A. Correct. To some degree.**

15   Q. Okay. If you could turn to Exhibit No.

16 70. So this is another issue that you reported to

17 the hot line, correct?

18   **A. That's correct.**

19   Q. And it indicates here according to the

20 incident -- well, let me step back. This is another

21 incident report that Laurie Crabtree prepared?

22   **A. Correct.**

23   Q. It says that in August it was reported

24 that Sharif, S-H-A-R-I-F, Goodson, G-O-O-D-S-O-N,

**Page 103**

1 was spreading rumors that Bruce Melton had taken

2 pictures of the butts of coworkers and had posted

3 them on Facebook, correct? That's what this says.

4   **A. Correct.**

5   Q. Okay. And just for the record, you never

6 actually did that.

7   **A. Never did what, I'm sorry?**

8   Q. You never posted pictures like that on

9 Facebook.

10   **A. No, I did not.**

11   Q. Okay, and I understand that. I don't want

12 the record to be confusing about that, but according

13 to this document, there was an allegation that you

14 -- about rumors that you had done this, right?

15   **A. Correct.**

16   Q. So you -- this report indicates that Bruce

17 approached Laurie last week and again on Tuesday

18 November 8th of 2016 wanting to know the outcome of

19 Laurie's investigation and specifically wanted to

20 know what type of corrective action Sharif had

21 received for the situation, correct?

22   **A. Correct.**

23   Q. Okay. So under the investigation, Laurie

24 Crabtree wrote that Laurie Crabtree completed an



1 investigation into this matter in August and it was
2 determined that no pictures existed and that Sharif
3 Goodson stated he did not spread any rumors of this
4 nature. That's what this says, right?
5    **A.  Correct.**
6    Q.  It says Bruce came to Laurie a week ago
7 asking for the outcome of this investigation as it
8 related to Sharif and stated he wanted to know what
9 had been done, right?
10    **A.  Correct.**
11    Q.  And you were not told what type of action
12 had been taken concerning Mr. Sharif, correct?
13    **A.  Correct.**
14    Q.  And it goes on to state that Bruce was not
15 satisfied that he would not be able to know what, if
16 any, action had been taken against Sharif, correct?
17    **A.  Correct.**
18    Q.  And the report further says on Exhibit 70
19 on the second page, Bruce was not happy when he was
20 told that he would not be made aware of any type of
21 disciplinary action that was given to Sharif as the
22 result of that or any investigation, correct?
23    **A.  Correct.**
24    Q.  Okay, if you could please turn to Exhibit

Page 104

1 75. Let me know when you're there.
2    **A.  I'm there, I'm sorry.**
3    Q.  You look like you're reading and I want to
4 make sure you're there.
5    **A.  No, I'm there, sorry.**
6    Q.  Okay, so Exhibit No. 75, this is a report
7 prepared by Laurie Crabtree concerning an issue that
8 you raised, correct?
9    **A.  Correct.**
10    Q.  And it says here, the principal allegation
11 is that Bruce feels that he is being asked to do
12 tasks that do not follow his restrictions and being
13 mistreated due to these restrictions, correct?
14    **A.  Correct.**
15    Q.  And then if you go -- it indicates there
16 were interviews, several interviews under the
17 interview section, right?
18    **A.  Correct.**
19    Q.  And then if you go on the second page,
20 there's a narrative that was prepared by Laurie
21 Crabtree concerning her investigation into this?
22    **A.  Correct.**
23    Q.  So if you go one, two, three, four, the
24 fourth line down on the second page of Exhibit 75,

Page 105

1 there's a sentence that starts when Kat, and that's
2 K-A-T, asked Bruce, do you see that?
3    **A.  Yep, sure do.  Sorry, yes.**
4    Q.  Okay.  It says when Kat asked Bruce to
5 make the sack lunches, he told her that Yasmiene
6 could do it, and Kat stated she was behind in
7 prepping her meals and Kat wanted him, meaning you,
8 to do it.  Did I read that correctly?
9    **A.  That's what it says, yes.**
10    Q.  Okay.  It goes on to say Bruce comes in at
11 five o'clock on Fridays to help unload the food
12 delivery truck.  Due to his work injury, he is not
13 able to unload the food truck but helps out in the
14 kitchen by cutting up fruit, putting fruit, salads,
15 et cetera, into single serve containers.  His duties
16 the rest of the week involve serving the meals and
17 washing the pans in our dish room (loading and
18 unloading the dish machine) and putting the clean
19 items back where they belong (all of these duties
20 are within his work restrictions).  Did I read this
21 correctly?
22    **A.  You read it, yes, you did.  Sorry, yes,**
23 **you did.**
24    Q.  And then at the bottom of the report it

Page 106

1 says what was stated by Laurie is that all of the
2 dietary staff need to help each other and that Bruce
3 and Selena -- Serlena, S-E-R-L-E-N-A, need to stay
4 within their restrictions due to their injuries,
5 correct?
6    **A.  Correct.**
7    Q.  Okay.  And if you look on the third page
8 under the results of Laurie Crabtree's
9 investigation, Mr. Melton, do you see that?
10    **A.  I do.**
11    Q.  Okay.  It says Bruce's duties for four out
12 of five days that he works is to wash pans in the
13 dish room, correct?
14    **A.  Correct.**
15    Q.  And it says he was asked to help wash pans
16 on Friday, November 18th of 2016, and he refused
17 stating those are not his duties to do on that day.
18 Bruce was asked to make two sack lunches and these
19 duties would fall into his regular duties as well.
20 Did I read that correctly?
21    **A.  Correct.**
22    Q.  If you could turn to Exhibit 80, Mr.
23 Melton.  Are you there?
24    **A.  I'm there.**

Page 107



1   Q.  Okay.  So Exhibit 80, this is another
2  report that was prepared by Laurie Crabtree,
3  correct?
4      A.  Correct.
5      Q.  Okay.  Now, you were -- you had raised an
6  issue, and it says here, according to Exhibit 80,
7  Bruce is alleging that he is not able to return to
8  work due to a letter that was received by DCFS and
9  is concerned about how he will be paid, correct?
10     A.  Correct.
11     Q.  So this relates to the time frame when you
12  had to undergo the second FBI criminal background
13  check, right?
14     A.  Correct.
15     Q.  And it says -- according to this report
16  from Laurie Crabtree, it says on November 2nd Laurie
17  Crabtree received notification from DCFS regarding
18  their request, meaning DCFS's request, that some of
19  the Pavilion staff needed to be re-fingerprinted
20  (see attached envelope), and Bruce Melton was one of
21  these staff, correct?
22     A.  That's what it says, yes.
23     Q.  So if you could just go back to the third
24  page for a second of Exhibit 80.  And you'll see

1  that's a photocopy of an envelope, correct?
2      A.  Correct.
3      Q.  And in the upper left-hand part of the
4  envelope, the return address indicates Illinois
5  Department of Children and Family Services, right?
6      A.  Correct.
7      Q.  Which means this is an envelope that DCFS
8  put in the mail, right?
9      A.  That's what it states.
10     Q.  Okay.  And you'll see here there are --
11  there is some handwritten names, one, two, three,
12  four, five, six handwritten names on this envelope,
13  correct?
14     A.  But that didn't come from DCFS, correct.
15     Q.  I'm sorry, what did you say?
16     A.  Those are handwritten names.  Usually
17  names will come inside the document not written on
18  the document.
19     Q.  Well, Mr. Melton, you understand the page
20  that we're looking at here, the third page of
21  Exhibit 80 --
22     A.  Yes, sir.
23     Q.  -- this is just a photocopy of an
24  envelope, right?

1      A.  Correct.
2      Q.  Okay.  And you see that your name is at
3  the top there.
4      A.  Correct.
5      Q.  It says Bruce, right?
6      A.  Correct.
7      Q.  But there are a total of one, two, three,
8  four, five, six employees listed there, correct?
9      A.  Correct.
10     Q.  Now, it goes on -- if you go back to the
11  first page of Exhibit 80, it says on December
12  27th -- under investigation, it says on December
13  27th of 2016, Laurie received a letter from DCFS
14  stating that the FBI fingerprint search on Bruce
15  Melton resulted in a notice of criminal conviction
16  that could be a bar from employment.  Do you see
17  that?
18     A.  Correct.
19     Q.  It says at this time Mr. Melton is
20  ineligible to work at our facility unless he
21  requests a waiver for this conviction, correct?
22     A.  Correct.
23     Q.  It also says in this report -- this report
24  also states Laurie called Mr. Melton the same day

1  that she received the notice and he informed her
2  that he had also received a letter from DCFS
3  regarding the same issues and was in contact with
4  DCFS regarding this.  Did I read that correctly?
5      A.  That's correctly read, but it's a false
6  statement.
7      Q.  Okay, so what -- okay, let's talk about
8  that.
9      A.  Yes, sir.
10     Q.  So Laurie Crabtree writes in her report
11  Laurie Crabtree called Mr. Melton the same day that
12  she received the notice and he, meaning you --
13     A.  Yes, sir.
14     Q.  -- informed Laurie Crabtree that you had
15  also received a letter regarding the same issue and
16  that you were in contact with the DCFS.  That's what
17  this says, right?
18     A.  That's what it says, but I --
19     Q.  But you're saying that Laurie Crabtree
20  lied when she wrote that.
21     A.  Correct.
22     Q.  Okay.  So it says that Mr. Melton is
23  currently on a leave of absence for a
24  nonwork-related surgery.  So at the time you were



2:17-cv-02112-CSB-EIL  # 41  Page 99 of 189
Arbitration - 10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

1  off for your carpal tunnel surgery, correct?
2     A.  Correct.
3     Q.  Okay.  And as we discussed, that was based
4  on a leave of absence that had been approved by
5  Laurie Crabtree.
6     A.  Correct.
7     Q.  This report also states that you have
8  current restrictions on work duties due to a
9  work-related injury to your back, right?
10    A.  Correct.
11    Q.  A question was raised by Bruce on how he
12  would be paid for his time off as Bruce insisted
13  that worker's comp should pay as he is still on
14  restrictions due to his back injury, and Laurie
15  informed you that she would check with the loss
16  control manager to determine this and get back to
17  you, right?
18    A.  Correct.
19    Q.  It indicates in this report that Laurie
20  contacted Kevin Harris and he informed Laurie that
21  this time off would not be covered by worker's comp
22  since the reason you were off work is not due to a
23  worker's comp injury, correct?
24    A.  Correct.

Page 112

1     Q.  So, in other words, at the moment in time
2  when DCFS had indicated that you were ineligible for
3  employment because of your background check, at that
4  point you could not go back and work at the
5  Pavilion, right?
6     A.  She wouldn't let me, correct.
7     Q.  Oh, okay, so let's make sure we understand
8  that.  Is it your understanding or your testimony
9  here today after DCFS sent a letter to you in late
10 December of 2016 saying you were ineligible to work
11 at the Pavilion, are you saying that Laurie Crabtree
12 had the discretion and could have let you that day
13 come back and work?
14    A.  She -- what I'm saying to address the
15 situation is she could, she could have gave me a
16 temporary waiver to complete this, but if I may
17 finish since you asked me the question --
18    Q.  Okay, go ahead.
19    A.  So she could have gave me a temporary
20 waiver until all of this was completed, even though
21 it wasn't her discretion that she had to.  And
22 underneath what you was asking, if I may, I'm not
23 going to take up too long, but you were asking --
24 well, no, I'll just answer that, go ahead.

Page 113

1     Q.  Where does it state that Laurie Pavilion
2  -- or excuse me, Laurie Crabtree had the authority
3  to grant you a temporary waiver, where does it say
4  that, after DCFS sent a note saying that you were
5  ineligible?  Where does it say that?
6     A.  It doesn't say that particularly, but it
7  doesn't say that she can't.  That DCFS gave her a
8  letter saying that I was ineligible to work there
9  unless I was given a waiver.  So by her giving -- I
10 could have got a waiver, which she did the first
11 time, gave me a waiver to work there.
12    Q.  Well, let's be real specific, Mr.
13 Melton --
14    A.  Yes, sir.
15    Q.  -- okay?  Is it your understanding that
16 the Pavilion grants a waiver?
17    A.  It's my understanding --
18    Q.  I'm just asking for a yes or no.  Is it
19 your understanding that the Pavilion has the
20 authority to grant a waiver?
21    A.  That's just not a yes or no answer, sir.
22    Q.  Okay, answer this.
23    A.  No.
24    Q.  I'm asking you to tell me who has the

Page 114

1  authority to issue a waiver.
2     A.  Okay, Laurie has the authority to request
3  a waiver from DCFS.
4     Q.  Okay, so the answer to my question, which
5  is does the Pavilion itself have the authority to
6  approve a waiver, the answer to that is no.
7     A.  That's what you say, so --
8         ARBITRATOR EPSTEIN:  Okay, next question.
9         MR. LAYTON:  Thanks, judge.  Thanks,
10 judge.
11    Q.  Okay, so if you go on to the next page,
12 Mr. Melton, in Exhibit 80, you see at the top it
13 says results of investigation?
14    A.  Uh-huh, yes, sir.
15    Q.  And it states here that Bruce Melton is
16 currently off work due to being ineligible to work
17 in our facility due to an issue with his background
18 check.  Did I read that correctly?
19    A.  Yes, you did.
20    Q.  It also states, until this issue is
21 resolved, Bruce cannot work, correct?
22    A.  Correct.
23    Q.  Okay.
24        MR. LAYTON:  I was actually going to

Page 115

2:17-cv-02112-CSB-EIL # 41 Page 100 of 189
Arbitration   10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

1  suggest a short break because I'm going to switch to
2  a different topic, if you think it's appropriate.
3      ARBITRATOR EPSTEIN:  We can break for a
4  few minutes, but let's keep it to five if that's all
5  right.
6      MR. LAYTON:  Two minutes or whatever.
7      ARBITRATOR EPSTEIN:  Okay.
8      MR. MELTON:  A break is fine with me, Your
9  Honor.
10     (Recess at 11:26 a.m. to 11:32 a.m.)
11 BY MR. LAYTON:
12     Q.  Mr. Melton, can you please turn to Exhibit
13 103?  This is a notice from the EEOC, correct?
14     A.  Correct, I'm sure about that.
15     Q.  So you filed -- you filed a claim with the
16 Equal Employment Opportunity Commission, correct?
17     A.  Correct.
18     Q.  And when you filed that document, you also
19 sent documentation to the EEOC relating to your
20 claim against the Pavilion?
21     A.  Correct.
22     Q.  And you also spoke to somebody from the
23 EEOC on the phone, right?
24     A.  Correct.

Page 116

1  the middle of 103.
2      A.  Oh, okay.  Yes, sir, I'm sorry, it does.
3      Q.  That's all right, okay.  All right, so,
4  Mr. Melton, let's turn to the Pavilion.  You agree,
5  Mr. Melton, just generally speaking, the Pavilion
6  needed to make sure they were doing everything that
7  they reasonably could to protect the kids that live
8  there, correct?
9      A.  I agree to that, yes, sir.
10     Q.  Okay.  And you also -- as part of your
11 duties, you did have some contact with kids at the
12 facility, right?
13     A.  I did.  Yes, I did.
14     Q.  So if you could turn to Exhibit 81.
15     MR. LAYTON:  So it's in the second binder,
16 judge.
17     ARBITRATOR EPSTEIN:  Great.  Go ahead.
18     Q.  All right.  So, Mr. Melton, according to
19 Exhibit 81, this relates to the fact that you
20 adopted two children through DCFS, right?
21     A.  Correct.
22     Q.  Now, these documents are dated 1998 and
23 1999, right?
24     A.  Correct.

Page 118

1      Q.  In fact, you had several hours of
2  discussions with the EEOC and you answered all the
3  questions that they had, right?
4      A.  Correct.
5      Q.  And there was not any factual information
6  -- at least to the best of your recollection, there
7  weren't any facts you withheld from the EEOC.
8      A.  No, probably some stuff I just didn't
9  mention to them, but yeah, you're correct.
10     Q.  But you gave them at least everything in
11 your mind that you thought you should give them.
12     A.  Correct.
13     Q.  And you cooperated with the EEOC to the
14 best of your abilities.
15     A.  Correct.
16     Q.  And after the EEOC conducted its
17 investigation, it made the determination that based
18 upon its investigation the EEOC is unable to
19 conclude that the information obtained establishes
20 violations of the statute, correct?
21     A.  Could you tell us where we could find that
22 at?
23     Q.  Yeah, absolutely.  It's on Exhibit 103.
24     ARBITRATOR EPSTEIN:  The checked box in

Page 117

1      Q.  And you'll agree with me, sir, and we'll
2  talk about this in more detail later, some of your
3  criminal charges and convictions came after these
4  documents dated 1998 and 1999.
5      A.  The convictions that you're -- the
6  criminal history that she was referring to happened
7  before then.  The criminal sexual assault and all
8  that happened before I adopted those kids.
9      Q.  Mr. Melton, my question is this.  After
10 1998 and 1999, were you ever charged or convicted of
11 a crime?
12     A.  Yes, I was.
13     Q.  Okay.  Now, in order for you to adopt
14 these kids, Mr. Melton, you had to go through a
15 criminal background check.
16     A.  Yes, I did.
17     Q.  And in order to do that, you were
18 fingerprinted through DCFS.
19     A.  Correct.
20     Q.  All right.  So, in other words, at the
21 time that you did these adoptions, your fingerprints
22 were on -- became on file with DCFS.
23     A.  My fingerprints are supposed to stay on
24 file permanently because of adopting.

Page 119

2:17-cv-02112-CSB-EIL # 41 Page 101 of 189
Arbitration 10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

Page 120

1    Q.  Okay.  So if you could turn to Exhibit 82.
2    Now, this is a report that was prepared in
3    conjunction with when you first started working at
4    the Pavilion through the temp agency and it was --
5    it's dated -- if you look at the second page of
6    Exhibit 82, it says the report was completed on May
7    27th of 2015, right?
8        A.  I'm trying to find it.  The report --
9        Q.  It's sort of small.  It's towards the
10   bottom.  Mr. Melton, here [indicating].
11       A.  I see it.  No, I got it.  It's just you --
12   I thought it was in the big letters.  It's the small
13   print.  Yeah, I see it.
14       Q.  Okay.  So this is a report that was --
15   this was run by the Pavilion, correct?
16       A.  If I may say, I thought you said that this
17   was run by the temp agency.
18       Q.  Okay, let me ask a different question.
19   This report was done at the request of the Pavilion
20   when you first started working there through the
21   temp agency.
22       A.  I don't know.
23       Q.  Okay.  Well, let me ask a different
24   question.  Do you see at the very top where it says

Page 121

1    Sterling?
2        A.  Yes, sir.  Yes, sir.
3        Q.  Did you see -- do you see the letters DCFS
4    stamped on this document at the top?  The answer is,
5    no, they're not there, but --
6        A.  No, sir.
7        Q.  In case you're wondering.  So this is a
8    separate background search that was done separate
9    from what DCFS had you do when you were first hired
10   at the Pavilion, right?
11       A.  Correct, correct.
12       Q.  And you said -- and you talked about this
13   on your direct examination, but you said that this
14   information was included in your employment file at
15   the Pavilion when you were first hired.
16       A.  Correct.
17       Q.  So it's your contention that in addition
18   to the DCFS report that was done in 2015, that the
19   Pavilion was also aware of the information in this
20   report from Sterling that was done in 2015, correct?
21       A.  Correct.
22       Q.  So, Mr. Melton, I don't know if you've
23   taken the time to do this, but this Sterling report,
24   Exhibit 82, includes some criminal convictions and

Page 122

1    charges that actually overlap with the items that
2    are on the 2015 DCFS report --
3        A.  Okay.
4        Q.  -- okay?  So what I want to do is talk to
5    you about the items in the Sterling report that are
6    not on the DCFS report.
7        A.  Yes, sir.
8        Q.  Okay.  All right.  And again, both reports
9    are from 2015 when you were first starting to work
10   at the Pavilion.  So if you could turn, Mr. Melton,
11   to the third page, okay, and it's Bates labeled
12   Pavilion 3020 which is part of Exhibit 82.  Let
13   me know when you're there.
14       A.  You said the third page?
15       Q.  The third page, yes.
16       A.  I'm there.
17       Q.  Okay.  Now, you see it's the -- at the
18   bottom half, it says Case No. 04-CF-002189, do you
19   see that?
20       ARBITRATOR EPSTEIN:  It's the second one
21   under verified data.
22       MR. MELTON:  On the second page?
23       ARBITRATOR EPSTEIN:  No, third page.
24       MR. MELTON:  On the third page.

Page 123

1        Q.  Here, Mr. Melton.  It's right here
2    [indicating].
3        MR. LAYTON:  Judge, can I have permission
4    to approach Mr. Melton to expedite this?
5        ARBITRATOR EPSTEIN:  Sure.
6        A.  Oh, you said 00219?
7        ARBITRATOR EPSTEIN:  Mr. Melton, I'll tell
8    you what he's going to do.  He's going to, if you
9    don't mind, stand next to you and give you -- point
10   it out to you --
11       MR. MELTON:  Okay.
12       ARBITRATOR EPSTEIN:  -- because I know
13   you're struggling a little bit to find what he's
14   talking about because you have a problem with your
15   earpiece on your glasses.
16       MR. MELTON:  Yes, yes.
17       MR. LAYTON:  And I'm having trouble seeing
18   the small print myself, but --
19   BY MR. LAYTON:
20       Q.  Okay.  So, Mr. Melton, is it all right if
21   I stand here?
22       A.  Yes.
23       Q.  Okay, so it's the third page, this one
24   right -- this one right here [indicating].

2:17-cv-02112-CSB-EIL # 41 10/29/2019 Page 102 of 189

Arbitration
Bruce Melton vs. Pavilion Behavioral Health System, et al.

**Page 124**

1     **A. Okay, gotcha.**

2     Q. So that one right there, it indicates --

3 and again this is from the Sterling report.

4     **A. Okay.**

5     Q. Okay. It indicates that you were

6 convicted of a misdemeanor, right?

7     **A. Correct.**

8     Q. And then it says -- at the bottom, it says

9 violation of bail bond, right?

10     **A. Correct.**

11     Q. Okay, so let's go to the next page. And

12 in the middle here is the one I want to ask you

13 about. This one right here [indicating].

14     **A. Okay.**

15     Q. Okay. It indicates here there is another

16 conviction and it says petty offense, right?

17     **A. Correct.**

18     Q. It says possessed prohibited public

19 property, bus, right?

20     **A. Correct.**

21     Q. And then if you go to the one below that,

22 there's another misdemeanor conviction, right?

23     **A. Correct.**

24     Q. And it says driving on a revoked license,

**Page 126**

1     **A. Correct.**

2     Q. And this document here -- and if you want

3 me to go through each one, I will, but this document

4 lists 11 convictions that were identified at that

5 time, right?

6     **A. Correct.**

7     Q. Now, Mr. Melton, there was a separate

8 report that was done through an FBI background check

9 in late 2016, right?

10     **A. Correct.**

11     Q. And you'll agree with me, and we'll get to

12 that document soon, but the document generated by

13 the FBI search has additional information about your

14 criminal background that is not included on Exhibit

15 84.

16     **A. Correct.**

17     Q. In other words, when the FBI ran its

18 criminal background check and that information was

19 provided to the Pavilion in late 2016, the Pavilion

20 learned new information about your criminal

21 background in 2016.

22     **A. They learned about all of my criminal**

23 **history.**

24     Q. Okay. So, Mr. Melton, if you could turn

**Page 125**

1 right?

2     **A. Correct.**

3     Q. And then if you go below that, and then it

4 continues on the next page, it indicates that there

5 was another misdemeanor conviction, right?

6     **A. Correct.**

7     Q. And again, that one says driving on a

8 revoked license?

9     **A. Correct.**

10     Q. And then there's another one below that,

11 another misdemeanor conviction for driving on a

12 revoked license, right?

13     **A. Correct.**

14     Q. Okay. So, Mr. Melton, if you could please

15 now turn to Exhibit 84. Now, this here says -- this

16 is a document, it's dated June 29th of 2015,

17 correct?

18     **A. Correct.**

19     Q. And it says DCFS at the top?

20     **A. Correct.**

21     Q. So this document, Exhibit No. 84, this is

22 the document that was prepared in conjunction with

23 the criminal background check that was done through

24 DCFS, right?

**Page 127**

1 to Exhibit 85. So you see this document is dated

2 July 17th of 2015?

3     **A. Yes, I do.**

4     Q. And this is from the department -- it's

5 from DCFS, right?

6     **A. Correct.**

7     Q. And it says Central Office of Licensing,

8 Background Check Unit?

9     **A. Correct.**

10     Q. So if you go to the bottom there or the

11 bottom half of the page, it says sex offender

12 registry clearance date and there's a date of June

13 24th of 2015, right?

14     **A. Correct.**

15     Q. And it also says SACWIS clearance date

16 dated June 24th of 2015, right?

17     **A. Correct.**

18     Q. And then it says Illinois State Police

19 clearance date dated July 16th of 2015.

20     **A. Correct.**

21     Q. And then it says Federal Bureau of

22 Investigation clearance date, right?

23     **A. Correct.**

24     Q. And that's blank.



2:17-cv-02112-CSB-EIL # 41   Page 103 of 189
Arbitration   10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

1   A.  Correct.
2   Q.  So at that time in July of 2015 this was
3  blank because you had not yet undergone a background
4  check for the FBI.
5   A.  Correct.
6   Q.  Okay.  So I want to make sure something is
7  clear on the record, Mr. Melton.
8   A.  Yes, sir.
9   Q.  So if you could please turn to Exhibit 83.
10   A.  Uh-huh.
11   Q.  So this is a document from DCFS, right?
12   A.  Correct.
13   Q.  It says the following individual's
14  information is on file in the DCFS fingerprint
15  database, right?
16   A.  Correct.
17   Q.  And this document, it's dated June of
18  2015, so it would have been after the adoptions we
19  talked about before.
20   A.  I would have already adopted my kids, yes.
21   Q.  Okay.  So, in other words, at the time
22  this document was prepared by DCFS, your
23  fingerprints were already on file with DCFS.
24   A.  Correct.

Page 128

1   Q.  And it says here, please do not send the
2  individual to be printed again, right?
3   A.  Correct.
4   Q.  Meaning you didn't need to have another
5  set of fingerprints submitted to DCFS.
6   A.  Correct.
7   Q.  Is it your position in this case,
8  Mr. Melton, that this document means you never had
9  to undergo another criminal background check ever
10  again when you worked at the Pavilion?
11   A.  To my understanding, that's what I
12  believed.
13   Q.  Okay.  So if you could please turn,
14  Mr. Melton, to Exhibit No. 88.  All right, so this
15  is a document dated December 24th of 2016, correct?
16   A.  Correct.
17   Q.  It says the FBI fingerprint search
18  resulted in the identification of a conviction which
19  bars you from employment with any licensed child
20  care facility in Illinois.  Did I read that
21  correctly?
22   A.  I'm sorry, what part?
23   Q.  The very top.
24   A.  Yeah, the very -- yeah, it does.

Page 129

1   Q.  Okay, and so according to this letter from
2  DCFS, it indicates that you were barred from
3  employment with a child care facility in Illinois,
4  correct?
5   A.  Correct.
6   Q.  And if you could please turn to Exhibit
7  No. 89.  Now, this is a letter dated December 24th
8  of 2016 and it goes on to say -- this is a letter
9  that was sent to the Pavilion, correct?
10   A.  Correct.
11   Q.  It says the FBI fingerprint search for
12  criminal history resulted in the following
13  determination regarding the above-named individual
14  and their employment with a licensed child care
15  facility, right?
16   A.  Correct.
17   Q.  And it says that you are ineligible,
18  correct?
19   A.  Correct.
20   Q.  It goes on to say there is a conviction
21  that is a bar to employment, right?
22   A.  Correct.
23   Q.  However, the bar may be able to be waived
24  for the purpose of employment with a licensed child

Page 130

1  care facility, correct?
2   A.  Correct.
3   Q.  The individual in question can request a
4  copy of the criminal background information received
5  from the FBI and share it with you, meaning the
6  Pavilion, in order for you to assess and make a
7  recommendation to deny or grant a waiver, correct?
8   A.  Correct.
9   Q.  Okay.  So, Mr. Melton, during your time
10  when you worked at the Pavilion, you never
11  specifically told Laurie Crabtree that you had been
12  arrested for criminal sexual abuse, correct?
13   A.  Correct.
14   Q.  And you agree that the Pavilion was not
15  legally obligated to request a waiver for you in
16  2016, right?
17   A.  Correct.
18   Q.  And let's talk about, Mr. Melton, Exhibit
19  No. 90.  So Exhibit No. 90 here, this is the results
20  from the FBI criminal background check that was
21  conducted on you in late 2016, right?
22   A.  Correct.
23   Q.  And there's a cover letter dated January
24  6th of 2017 from DCFS, so DCFS is sending you this

Page 131



2:17-cv-02112-CSB-EIL # 41   Page 104 of 189
Arbitration   10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

1 report from the FBI.
2   **A.   Correct.**
3   Q.   So this report that DCFS is sending you,
4 this was at your request, right?
5   **A.   Correct.**
6   Q.   And it was after you had received the
7 other notice that we looked at, which is Exhibit 88,
8 where DCFS told you that you were barred from
9 employment at the Pavilion.
10   **A.   I received it from Laurie.**
11   Q.   Okay.  Can you turn to Exhibit 88 please?
12 Do you see that?
13   **A.   Yes, I do.**
14   Q.   And it says DCFS at the very top, correct?
15   **A.   Yes, I do.**
16   Q.   And you see where it's addressed to you?
17   **A.   Yes, I stand corrected.  This is the one**
18 **they sent me, yes, correct.**
19   Q.   Okay, so the point is DCFS sent you a
20 letter advising you that you were barred from
21 employment, right?
22   **A.   Correct.**
23   Q.   Okay.  So after DCFS told you you were
24 barred from employment, you asked DCFS to provide

Page 132

1 you with the report that is attached as Exhibit 90,
2 right?
3   **A.   Correct.**
4   Q.   And you ended up -- you provided this
5 report to Laurie Crabtree, correct?
6   **A.   Correct.**
7   Q.   And at the time the intention was that
8 this report could potentially be used to request a
9 waiver for you, correct?
10   **A.   Correct.**
11   Q.   You provided this to Laurie and you were
12 under the impression that Laurie would evaluate this
13 information, right?
14   **A.   Correct.**
15   Q.   And you obviously wanted to provide Laurie
16 with as much information as you had at the time,
17 correct?
18   **A.   Correct.**
19   Q.   So if you look through this, Mr. Melton,
20 and this is -- there's several pages to this
21 document, but I'm actually going to ask you to flip
22 to the very last page of Exhibit 90.  And you see
23 there's a number 28 that says arrested or received
24 at the top?

Page 133

1   **A.   Correct.**
2   Q.   So this is -- this page here, which is
3 Plaintiff Exhibit 123 -- or excuse me, it's Bates
4 labeled Plaintiff 123, it's the last page in Exhibit
5 90, this document from the FBI reflects that you
6 were arrested 28 different times according to this
7 report, right?
8   **A.   Correct.**
9   Q.   And for just this report, for example, for
10 this single arrest that's the 28th arrest, this one
11 lists five charges, right?
12   **A.   Correct.**
13   Q.   One of the charges, number 4, is
14 aggravated battery police officer/fire, do you see
15 that?
16   **A.   Correct.**
17   Q.   Okay.  So this document from the FBI, if
18 you count them up, and if we need to I can, this
19 document actually identifies 46 different charges
20 and convictions if you count up all the different
21 charges.
22   **A.   Could be.**
23   Q.   Okay.  And you agree, Mr. Melton, if you
24 turn to the front page of this, the very first page

Page 134

1 -- and actually I misspoke, the second page of
2 Exhibit 90, it says your name.  That's you, right,
3 Bruce Melton?
4   **A.   Correct.**
5   Q.   Okay.  And these -- the charges that are
6 in here, these were charges that were made against
7 you, correct?
8   **A.   Some of them, yes.  Most of them, yes.**
9   Q.   Well, Mr. Melton, you indicate -- these
10 are your handwritten notes on here, correct?
11   **A.   Correct.**
12   Q.   Okay.  And there are some -- well, why
13 don't we talk about these one at a time, okay?  It
14 looks like we need to do that.  So if you could turn
15 to what's Bates labeled Plaintiff 117, do you see
16 that?
17   **A.   Yes, sir.**
18   Q.   Okay.  So under the first one, it
19 indicates that you were arrested and charged with
20 battery and disorderly conduct, correct?
21   **A.   Correct.**
22   Q.   And then if you go down to second -- well,
23 let me ask you this.  You'll agree with me,
24 according to this page, you didn't write anything

Page 135



2:17-cv-02112-CSB-EIL # 41 Page 105 of 189
Arbitration 10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

Page 136

1 next to entry number 1, correct?
2 **A. I wrote it for the whole paragraph saying**
3 **being expunged.**
4 Q. Okay. Well, this here, you wrote being
5 expunged next to item number 2, correct?
6 **A. Once again, I wrote it for the whole, the**
7 **whole thing.**
8 Q. Okay, but what I'm asking you is the term,
9 and that's your handwriting, "being expunged" is
10 written next to number 2, correct?
11 **A. Correct.**
12 Q. And, Mr. Melton, I -- and this indicates
13 you were charged with battery, correct?
14 **A. Yes, sir.**
15 Q. Because you were charged with battery,
16 right?
17 **A. Yes, I was.**
18 Q. Okay. And then if you go down to the
19 third one, there's another charge. It says you were
20 charged with disorderly conduct and aggravated
21 assault, correct?
22 **A. Correct.**
23 Q. And you were charged with those crimes,
24 sir?

Page 136

Page 137

1 **A. I was charged, yes.**
2 Q. Okay. At the time that you provided this
3 paperwork to Laurie Crabtree, did you provide Laurie
4 Crabtree with any documents stating that any of your
5 criminal charges or convictions had actually been
6 expunged?
7 **A. I never spoke with Laurie.**
8 Q. Let me ask my question again, sir. Well,
9 actually that's not true, but --
10 ARBITRATOR EPSTEIN: Don't argue with the
11 witness please.
12 MR. LAYTON: I'm sorry, judge, I'm sorry.
13 Q. Mr. Melton, my question is this. Did you
14 ever provide Laurie Crabtree with any documents
15 confirming that any of your charges or convictions
16 had been expunged?
17 **A. I couldn't because I hadn't received them.**
18 Q. Okay. And did you ever provide Laurie
19 Crabtree with any documents confirming that any of
20 your charges or convictions had ever been dismissed?
21 **A. I couldn't because I hadn't received them.**
22 Q. Okay. So if you go down to item number 4,
23 it indicates that you were arrested for aggravated
24 battery, correct?

Page 137

Page 138

1 **A. Correct.**
2 Q. And item number 5 indicates that you were
3 charged with aggravated battery again, correct?
4 **A. Correct.**
5 Q. And item number 6 indicates that you were
6 charged with residential burglary and resisting
7 arrest, correct?
8 **A. Correct.**
9 Q. And item number 7 indicates that you were
10 charged with burglary, correct?
11 **A. Correct.**
12 Q. Under item number 8, it indicates you were
13 charged with burglary, correct?
14 **A. Correct.**
15 Q. Under item number 9, there's another
16 charge and -- there's several charges. One of them
17 is criminal damage to motor vehicle, correct?
18 **A. Correct.**
19 Q. Another one is criminal sexual abuse,
20 correct?
21 **A. Correct.**
22 Q. There's another one, item number 10, that
23 says you were charged with criminal trespass to
24 land, correct?

Page 138

Page 139

1 **A. Correct.**
2 Q. Under item number 12 on the next page,
3 there's a charge for domestic violence?
4 **A. Correct.**
5 Q. And under item number 13, there's a charge
6 for home invasion?
7 **A. Correct.**
8 Q. And under item 14, there's a charge for
9 residential burglary, correct?
10 **A. Correct.**
11 Q. Under item 15, there's a charge for
12 unlawful restraint, correct?
13 **A. Correct.**
14 Q. Under item 17, there's a charge for
15 domestic battery?
16 **A. Correct.**
17 Q. Under item 18, there are four charges,
18 correct?
19 **A. Correct.**
20 Q. And there's -- one of them is DUI, driving
21 on a suspended license, right?
22 **A. Correct.**
23 Q. Under item 19, you were charged with
24 domestic battery and criminal trespass to state

Page 139



2:17-cv-02112-CSB-EIL # 41   Page 106 of 189
Arbitration   10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

1 land?

2    A.   Correct.

3    Q.   Item 20, you were charged with domestic
4 battery again.

5    A.   Correct.

6    Q.   Item 21, you were charged with domestic
7 battery again.

8    A.   Correct.

9    Q.   Item 22, you were charged with criminal
10 trespass to state land.

11    A.   Correct.

12    Q.   Number 23, you were again charged with
13 criminal trespass?

14    A.   Correct.

15    Q.   Okay.  Items 24 and 25, you were charged
16 with driving on a suspended license.

17    A.   Correct.

18    Q.   Item number 26, which goes onto the next
19 page, you were charged with residential burglary.

20    A.   Correct.

21    Q.   And item number 27, you were driving --
22 another charge for driving on a revoked license,
23 right?

24    A.   Suspended or revoked, correct.

Page 140

1    Q.   Okay.  And you were charged with those
2 items, sir, correct?

3    A.   Correct.

4    Q.   Okay.  And some of these charges resulted
5 in convictions, correct?

6    A.   Correct.

7    Q.   And, for example, if you go back to page 8
8 of 9 in the exhibit, you were charged with
9 residential burglary, right?

10    A.   Correct.

11    Q.   And you see it says seven years underneath
12 the residential burglary charge, correct?

13    A.   Yes, it does.

14    Q.   Okay.  In fact, Mr. Melton, you were in
15 prison from 2010 until 2014, correct?

16    A.   Wrong.

17    Q.   Mr. Melton, can you please turn to page 13
18 in your deposition?

19    A.   I sure can.

20    Q.   And I'm going to start at line number 9.

21    A.   Uh-huh.

22    Q.   Please let me know when you're there.

23    A.   Uh-huh.

24    Q.   Are you there?

Page 141

1    A.   Yes.

2    Q.   Okay.  So starting at line number 9,
3 Question:  Okay.  Were you also involved in a car
4 accident in April of 2012?  Answer:  No.  Would you
5 like to know why I say that or can I give you the
6 reason why I tell you that?  Because in April of
7 2012 I was in prison.  All of 2012.  From 2010 to
8 2014 I was in prison.

9        Did I read that correctly?

10    A.   You read it correctly, but I misspoke.  I
11 went to prison in 2011.

12    Q.   Okay.  Well -- so you were in prison from
13 2011 until 2014.

14    A.   Correct.

15    Q.   Okay.  Now, Mr. Melton, looking at Exhibit
16 No. 90, the FBI report that we spent so much time
17 talking about -- let me grab one thing, Mr. Melton.
18 Isn't it true that you personally handed this report
19 to Laurie Crabtree?

20    A.   No.

21    Q.   Okay.

22    A.   I put it in her cubicle.

23    Q.   Okay.  So Mr. --

24        MR. LAYTON:  This is a little bit unusual,

Page 142

1 judge, but I think it will -- it's important to
2 bring up.  I'm actually going to hand Mr. Melton
3 Laurie Crabtree's deposition testimony.

4        ARBITRATOR EPSTEIN:  Why?

5        MR. LAYTON:  I'll tell you why.

6        MR. MELTON:  I have a copy.

7        ARBITRATOR EPSTEIN:  Wait.  Go ahead.

8        MR. LAYTON:  Because he admitted in her
9 deposition -- there's a prior inconsistent
10 statement.  He admitted in her deposition that he
11 personally handed this document to Laurie Crabtree.

12        ARBITRATOR EPSTEIN:  Okay, you can
13 confront him with that.

14        MR. LAYTON:  Okay.

15        ARBITRATOR EPSTEIN:  All right, I'm glad
16 you fronted it.  Go ahead.

17 BY MR. LAYTON:

18    Q.   You've got Laurie Crabtree's deposition?

19    A.   Yes, I do.

20    Q.   Mr. Melton, it's on page 10.

21        MR. LAYTON:  Would you like a copy, judge?

22        ARBITRATOR EPSTEIN:  (Shakes head).

23        MR. LAYTON:  Okay.

24    A.   Page 18, okay.

Page 143



2:17-cv-02112-CSB-EIL # 41 Page 107 of 189
Arbitration 10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

1   Q.   Okay.  So if you could turn to page 10 and
2   look at line 14.
3   **A.   Under which -- oh, you said page 10, I'm**
4   **sorry.**
5   Q.   Page 10, yeah.  Let me know when you're
6   there.
7   **A.   Okay.**
8   Q.   Okay, so starting at line 14 it says
9   Question:  Okay -- and this is -- just so there's
10  context on the record, Mr. Melton, this is you
11  asking Laurie Crabtree questions during her
12  deposition.
13  **A.   Okay.**
14  Q.   Starting at line 14, Question:  Okay, now
15  we can do that.  Do you remember me sending this
16  document to you after I had it done stating exactly
17  that same record?  Answer from Laurie:  Did you send
18  it to me or did you bring it by?  Question from you:
19  I gave it to you personally.  Answer from Laurie:
20  You handed it to me?  Question from you:  Yes, I
21  handed you the exact document.
22       Did I read that correctly?
23  **A.   Yes, you did.**
24  Q.   Okay.  So, Mr. Melton, if you could turn

Page 144

1   to Exhibit 102 please.
2   **A.   Okay.  And I might have misspoke on that,**
3   **I apologize, but go ahead.  Exhibit 4?**
4       **ARBITRATOR EPSTEIN:  102.**
5   Q.   102.
6   **A.   Okay.**
7   Q.   All right.  And, Mr. Melton, this is a
8   letter dated February 1st of 2017, correct?
9   **A.   Correct.**
10  Q.   And this is from Laurie Crabtree, right?
11  **A.   Correct.**
12  Q.   And it says here Laurie Crabtree is
13  telling you that last November DCFS required that
14  you and other employees be re-fingerprinted in order
15  to update their records, correct?
16  **A.   Correct.**
17  Q.   When the FBI portion of your background
18  check was completed, we received a letter from DCFS
19  stating that you were ineligible for employment with
20  us due to a conviction that was a bar to employment,
21  correct?
22  **A.   Correct.**
23  Q.   The letter further states that you could
24  request a copy of the criminal background

Page 145

1   information from the FBI and share it with us so
2   that we could made, and I think that should be make,
3   a determination as to whether we would request a
4   waiver on your behalf, correct?
5   **A.   Correct.**
6   Q.   So after reviewing the documentation that
7   you provided, it has been determined that we are not
8   in a position to pursue a waiver in order for you to
9   continue your employment with the Pavilion, correct?
10  **A.   Correct.**
11  Q.   And it goes on to state that your
12  employment will be terminated effective February 1st
13  of 2017, right?
14  **A.   Correct.**
15  Q.   And that was -- that was when you were
16  finally terminated at the Pavilion, correct?
17  **A.   Correct.**
18  Q.   Okay.
19       MR. LAYTON:  Judge, subject to whatever
20  rebuttal Mr. Melton may have, I can rest my
21  examination of Mr. Melton at this time.
22       ARBITRATOR EPSTEIN:  All right.  Now, you
23  have a chance, Mr. Melton, to make further testimony
24  on anything that he has examined you on.

Page 146

1       MR. MELTON:  Okay, yes, sir, Your Honor.
2   Okay, Your Honor, I have a lot that I want to
3   question over here and I really don't know how to
4   begin.  However, I want to go back to my criminal
5   history that I handed Laurie about my criminal
6   history.  I want to state that --
7       ARBITRATOR EPSTEIN:  That's Exhibit 90,
8   right?
9       MR. MELTON:  Exhibit 90, yes, sir.
10  Exhibit 90.  I want to state that I had informed
11  Laurie that -- well, on here, that I was going to
12  get my criminal history expunged, most of it.  Went
13  through a class to get this stuff tooken off my
14  record, so I did.
15       Mr. Layton is talking a lot about
16  everything that was said and done that me and Ms.
17  Laurie Crabtree never had a conversation about any
18  or most of all of that.  How can I put this, Your
19  Honor?
20       Mr. Layton has spoken of my write-ups that
21  I wrote up, but he didn't speak of all of them that
22  I wrote up.  He spoke of certain ones, but he didn't
23  speak of the issues of the ones I wrote up against
24  Laurie that she looked over herself, which she

Page 147

2:17-cv-02112-CSB-EIL # 41 10/29/2019 Page 108 of 189
Arbitration
**Bruce Melton vs. Pavilion Behavioral Health System, et al.**

1 wasn't supposed to, and the corporate office wasn't
2 supposed to let her do that, which I don't
3 understand that part.
4       As far as my criminal history is
5 concerned, all of this stuff that he's referring to,
6 the sexual harassment and -- yeah, sexual
7 harassment, abuse, whatever, if you look on the
8 dates, they are dated in 1991 in Exhibit 9.
9       ARBITRATOR EPSTEIN:  90.
10       MR. MELTON:  90, I'm sorry.  Where am I?
11 Okay, Exhibit 90, number 9 states that this was
12 supposed to have occurred on December 12th, 1991.
13 At that time -- well, after that is when I adopted
14 my children in 1999, 1999 and 2000 I believe.  I
15 adopted them one year after the other.  He refers to
16 my criminal history of me going to prison 2010,
17 which it was 2011, to 2014.  I went because of
18 resisting arrest, and just like he did, the court
19 looked at my prior history and deemed that, you
20 know, well, he resisted, which it was a misdemeanor,
21 but they turned it to a felony, which they had an
22 option to do that.
23       ARBITRATOR EPSTEIN:  Well, I happen to --
24       MR. MELTON:  I'm sorry.

Page 148

1       ARBITRATOR EPSTEIN:  Resisting arrest
2 doesn't qualify for a seven year sentence.
3       MR. MELTON:  Can I say something, Your
4 Honor?
5       ARBITRATOR EPSTEIN:  Sure.  I'm just
6 telling you --
7       MR. MELTON:  I know.
8       ARBITRATOR EPSTEIN:  -- look, I sat in
9 criminal court, so I know what the statute says, but
10 I'll hear whatever you want to say.
11       MR. MELTON:  Okay, thank you, Your Honor.
12 I know you know what the statute says, but just for
13 the record, I'm not trying to tell Your Honor what
14 he knows, because you're a judge, I'm not.  However,
15 if you have a criminal history, they can upgrade
16 your class based on whatever they choose to do, and
17 they upgraded my resisting arrest to a felony
18 resisting arrest.  All the other cases that I had,
19 aggravated, fleeing and eluding, all this stuff,
20 they dismissed that.  They gave me the aggravated --
21 I mean the resisting arrest, which if Your Honor
22 will look into that case, you'll see it's on the
23 last page of 9 -- 91.
24       It states that I had aggravated,

Page 149

1 aggravated fleeing and eluding; insurance, operating
2 uninsured; driving license revoked or suspended;
3 aggravated battery police firearm, whatever that
4 means; resisting a peace officer.  I was charged
5 with number 5, resisting a peace officer, and in my
6 state police Bureau of Identification and
7 expungement and dismissal papers, it states in here
8 that all of those other cases were dismissed.  All
9 of these cases that I said were going to be
10 dismissed in here is in here.  And I explained to --
11 I explained that to you.
12       The reason -- why am I here today?  My
13 reason for being here is because Ms. Crabtree
14 wrongfully used this against me.  And she had a
15 right to look at it, I had a right not to give it to
16 her, but in my trying to do the right thing, I gave
17 it to her, and she has that option to look at it and
18 decide whatever she want, but at the same time she
19 does not have the right to hold me accountable for
20 stuff that happened in my past before I even got --
21 I mean I take that back.  I should be held
22 accountable for my actions, so I don't argue with
23 that, but for stuff that I wasn't convicted of, why
24 should I be held accountable for that?

Page 150

1       My thing is if you knew the convictions
2 that I had and you weigh them against the criminal
3 history that I had, you will see that my criminal
4 history does not outweigh my convictions at all.
5 She had the right -- she had the right to decide
6 what she want, but Ms. Crabtree decided on her own
7 that she wanted to terminate my employment after, as
8 I said, I have filed numerous complaints against
9 her, not other individuals, which Mr. Layton would
10 like to have brought up.  I am referring to her.
11 She knows what she has done.  And in her deposition
12 is statements that will show some of this stuff that
13 I'm saying.  But at the end of the day, I was
14 wrongfully terminated for the wrong reasons.
15       She, at least in my opinion, had the
16 opportunity to call me in and ask me, which it
17 states that that's what she's supposed to do, ask me
18 and talk to me about my criminal history.  She never
19 did that.  I never even spoke to her about my
20 criminal history.  I spoke with Mr. Reis who in turn
21 says he don't remember, he just knew I said one
22 thing about one criminal history that was dismissed
23 or something to that effect, which is not true, and
24 I don't understand why that is not, you know,

Page 151

2:17-cv-02112-CSB-EIL  # 41  10/29/2019  Page 109 of 189
Arbitration
Bruce Melton vs. Pavilion Behavioral Health System, et al.

1  understood.  She never called me.  We never talked
2  about anything.  I could have explained all this to
3  her, and she had the proper tools in front of her to
4  say, well, Mr. Melton, you know --
5  ARBITRATOR EPSTEIN:  You know what, you're
6  -- pretty much what you're doing is making your
7  argument.
8  MR. MELTON:  I'm sorry, sir.
9  ARBITRATOR EPSTEIN:  And you'll have the
10  opportunity to make any argument --
11  MR. MELTON:  To do that.
12  ARBITRATOR EPSTEIN:  -- you want to do,
13  but this is where we're talking about testimony --
14  MR. MELTON:  Okay, Your Honor.
15  ARBITRATOR EPSTEIN:  -- that you want to
16  offer.
17  MR. MELTON:  Yes, Your Honor, it was --
18  where is that?
19  ARBITRATOR EPSTEIN:  But I understand
20  there's an emotional component to it, so don't worry
21  about it.  Just let's keep it on --
22  MR. MELTON:  Keep it professional, yes,
23  sir.  Mr. Layton, here we go, went to my deposition
24  about me doing the work that everyone was asked to

Page 152

1  do.  Your Honor, I want to present to you that no
2  one in the kitchen, no one in the kitchen was asked
3  to unload a big old truck by themselves.  And I
4  wasn't even asked.  They informed me to unload this
5  truck by myself.  No one did it but me.
6  My deposition, page 126, where the
7  question states:  Go ahead, you're -- no, I'm sorry.
8  It says -- let me go up, right.  Okay, all right, so
9  how are you going --
10  ARBITRATOR EPSTEIN:  Let me just
11  interrupt.
12  MR. MELTON:  Yes, sir.
13  ARBITRATOR EPSTEIN:  You can tell me what
14  happened --
15  MR. MELTON:  But not read.
16  ARBITRATOR EPSTEIN:  -- but not from the
17  deposition, unless he confronts you with something
18  about that and the deposition is inconsistent, then
19  you can explain it, okay?
20  MR. MELTON:  Okay.
21  ARBITRATOR EPSTEIN:  But you can tell me
22  all you want to tell me about the incident itself
23  having --
24  MR. MELTON:  Okay.

Page 153

1  ARBITRATOR EPSTEIN:  -- to do with --
2  MR. MELTON:  The truck.
3  ARBITRATOR EPSTEIN:  -- the truck.
4  MR. MELTON:  Yes, sir.  Okay, Your Honor,
5  I was hired as we all stated, as he stated earlier,
6  as a cook, and then I was pretty much demoted to a
7  kitchen worker.  At that point, Ray Reis determined,
8  since I was the biggest and the only pretty much guy
9  in the kitchen, that I was to unload this truck.
10  Ms. Crabtree states that everybody did the same
11  work.  That's not true.  But at the same time, like
12  I said, I was the only male in the kitchen.  None of
13  those women helped me unload that truck, none of
14  them helped me put it up, I did this on a continual
15  basis every Friday by myself, so I ended up getting
16  back pain.
17  When I was out on workman's comp, I was
18  supposed to go back to work.  I was given a return
19  to work document, which is in here, if you let me
20  find it real quick, on January the 5th, and that's
21  when Ms. Crabtree told me that you will not be able
22  to come back to work until your criminal history is
23  complete.
24  So I got this letter right here.  The

Page 154

1  attorney that I had for my case at that time drafted
2  a note to Ms. Crabtree and to her -- to the
3  insurance company stating -- see if I can find it.
4  Well, anyway, he was stating to them that under this
5  certain law -- okay, here it is.  It states that as
6  of February 1st, the date of your client's wrongful
7  termination of Mr. Melton, according to the Illinois
8  Appellate Court, the employer must pay TTD benefits
9  even if the employee is terminated, regardless of
10  the reason, until the employee has reached maximum
11  medical improvement.  It's M-A-T-U-S-Z-C-Z-A-K
12  versus Illinois Workers' Compensation Commission,
13  214 Ill. App. 2d 130532 WC.
14  So I brought this to Ms. Crabtree who
15  informed me that, you know, since you're off from --
16  for this, for your background, we won't pay you.
17  Okay, but I was released to come back to work.  I
18  have bills.  Who's going to pay my bills?  That
19  doesn't concern her, okay.  Well, my attorney
20  drafted this letter and they never returned or
21  responded to this letter, never heard of anything
22  back to this letter, but she did inform me that they
23  were refusing to pay me anything.
24  So I was off work for over a month without

Page 155

2:17-cv-02112-CSB-EIL # 41 Page 110 of 189
10/29/2019
Arbitration
Bruce Melton vs. Pavilion Behavioral Health System, et al.

1 any employment due to her and whoever she spoke to
2 not paying me even though it was -- the lawyer gave
3 them a law which they were supposed to pay me.
4     MR. LAYTON:  What was the exhibit number
5 for that letter, Mr. Melton?
6     MR. MELTON:  The exhibit number is -- I'm
7 sorry about that, I apologize.
8     MR. LAYTON:  I should have asked you
9 earlier.
10     MR. MELTON:  I was just rushing and
11 talking without thinking.  It is -- actually did I
12 pass it?  Yeah, here it is.  It is Exhibit 145.
13     MR. LAYTON:  Thank you.
14     MR. MELTON:  Now, Ms. Crabtree has --
15 well, let me change that.  I worked in the kitchen
16 and I did my responsibilities.  They worked -- to
17 me, did more work -- I was given -- let me just say
18 it.  I was given doctor's notes to not lift
19 anything, not to twist, not to turn, not to move,
20 not to do any of the above, but they still had me
21 washing dishes, which I wasn't supposed to be
22 twisting and turning.
23     Now, I have the medical notes here which
24 I'm going to provide Your Honor with.  Okay,

Page 156

1 states that they had the right, they did have a
2 right to terminate my employment, but not for
3 discrimination, discriminating purposes and unlawful
4 intentions.
5     Your Honor, during when I first got
6 terminated, I had to -- like I said, I didn't have
7 any employment.  I applied for unemployment.  Nine
8 times out of ten when you apply for unemployment, if
9 the employer has a basis to terminate your work,
10 then you will not receive unemployment.  But, Your
11 Honor, as my letter states, which Mr. Layton is
12 going to object eventually anyway because he said it
13 came late, but I was late under all the paperwork
14 that he sent me, I have mounds and mounds of
15 paperwork.
16     ARBITRATOR EPSTEIN:  Okay, just get to the
17 point on this.
18     MR. MELTON:  Okay, sorry, Your Honor.
19 Once I can find this.  I just saw it.  Okay, here it
20 is.  Exhibit 162 is the notice of a telephone
21 hearing where the Pavilion tried to deny me rights
22 for my unemployment.  However, during my conference
23 call, after they reported that I was unable to work
24 because of my injury, the conference people called

Page 158

1 first -- let me see.  I'll give you this first, Your
2 Honor, it's 163.  This is the cleaning list that
3 they gave me after the doctor specifically told them
4 that I'm not supposed to be bending, lifting,
5 twisting, turning -- I'm not talking too fast, am I?
6 -- bending, twisting, turning or anything, and they
7 gave me this list knowing that it was against what
8 the doctor's order was.  Let me go back here.  And
9 that is Exhibit 136.
10     ARBITRATOR EPSTEIN:  You said 163 before.
11 Are you --
12     MR. MELTON:  163 is -- no, sir.  136 is
13 for that.  And for my -- for the letter is -- I just
14 gave it to Mr. Layton.  Mr. Layton, would you know
15 what the letter --
16     ARBITRATOR EPSTEIN:  145 you said to him
17 on one thing.
18     MR. MELTON:  Oh, okay, here we go.
19     MR. LAYTON:  Yes, 145.
20     MR. MELTON:  Yes, sir, 145.
21     ARBITRATOR EPSTEIN:  Okay.
22     MR. MELTON:  And I just had it.  Did I go
23 -- just saw that.  A moment, Your Honor.  Okay,
24 yeah, and furthermore, just for Your Honor, he

Page 157

1 the Pavilion and they didn't even answer the phone
2 and I was granted my unemployment.
3     But when all said and done, I mean I just
4 know -- I know that I did do my best to present
5 myself best to Ms. Crabtree in order to get this
6 situation tooken care of properly.  Like I said, she
7 did not contact me.  I went up there to talk with
8 her.  And in my deposition today, some things may be
9 inconsistent with what I'm saying, and that's my
10 fault, I take full blame of that because the dates
11 and everything are not accurate, but, Your Honor,
12 it's the truth is what it is, and all I can do is
13 tell the truth.  She just bogus, she bogus -- no, I
14 apologize.  She wrongfully retaliated against me,
15 terminated me through those processes.  And that's
16 it.
17     ARBITRATOR EPSTEIN:  Thank you, sir.  Any
18 further questions based on that?
19     MR. LAYTON:  Just a second here, judge.
20 Just a couple of things, Mr. Melton.
21     RECROSS-EXAMINATION BY
22     MR. LAYTON:
23     Q.  You talked about unloading the truck.
24 Unloading the truck, that was part of your duties.

Page 159

2:17-cv-02112-CSB-EIL # 41 Page 111 of 189
Arbitration 10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

1    A.  No, sir.
2    Q.  The task of unloading the truck at the
3 Pavilion, did that task fall within the scope of
4 your employment tasks, yes or no?
5    A.  No, it was not in my -- it was not -- my
6 duties were to lift 50 pounds or 60 pounds, not to
7 unload a full, a big truck.
8    Q.  Okay.  So the task of you unloading the
9 truck was completely outside of your employment
10 tasks --
11    A.  Yes, it was.
12    Q.  -- that's what you're saying.  Okay, sir,
13 isn't it true that when Mr. Reis asked you to unload
14 the truck and did not give you any help, you did not
15 consider that to be part of your discrimination
16 claim; isn't that true?
17    A.  Yes, I did, because I asked him all the
18 time for help.
19    Q.  Okay.  If you could turn to page 50 in
20 your deposition, sir.
21    A.  Yes, sir.
22    Q.  Okay.  So page 50, sir, starting at line
23 1, please let me know when you're there.
24    A.  Okay.

Page 160

1    Q.  Are you there?
2    A.  I'm here.
3    Q.  Okay.  So Question:  But I am asking you a
4 specific question, so are you saying that part of
5 your discrimination claim is the fact that Mr. Reis
6 asked you to unload a truck and didn't give you
7 help?  Answer:  No, that is not the case.  Question:
8 Then what part of that -- I'm specifically just
9 asking you about the issue with your unloading the
10 truck.  How were you discriminated against?  Answer:
11 I didn't say I as[sic] actually discriminated
12 against by the truck.  That is how I hurt my back,
13 unloading that truck.
14       Did I read that correctly?
15    A.  Yes, you did.
16    Q.  Okay.
17    A.  But did you go on further to state that
18 when it happened --
19    Q.  Mr. Melton, I will object.
20    A.  Okay, okay.
21    Q.  You've answered my question, sir.
22    A.  Yes, sir.
23    ARBITRATOR EPSTEIN:  It's coming in later
24 if he wants to do it, so why don't we just get it --

Page 161

1    MR. LAYTON:  Sure.
2    ARBITRATOR EPSTEIN:  -- out now?
3    MR. LAYTON:  That's fine, judge.
4    ARBITRATOR EPSTEIN:  If you want to read
5 something else from there, go ahead.
6    MR. MELTON:  I'm sorry, Your Honor, it's
7 just that --
8    ARBITRATOR EPSTEIN:  If you --
9    MR. MELTON:  I don't need to read it.
10 Don't even worry about it.
11    ARBITRATOR EPSTEIN:  Okay, all right.
12    MR. MELTON:  That's fine, that is fine.
13    MR. LAYTON:  Okay, all right.
14 BY MR. LAYTON:
15    Q.  So you were telling us around the time
16 that the DCFS letter came to you in December 2016
17 you were on a leave of absence for your carpal
18 tunnel surgery, right?
19    A.  Correct.
20    Q.  And you said that you were scheduled to
21 return to work on January 5th of 2017, right?
22    A.  Correct.
23    Q.  And Laurie told you not to come back to
24 work because of these issues relating to your

Page 162

1 background, right?
2    A.  Correct.
3    Q.  Okay.  So item number -- or Exhibit No.
4 136 was a task list that you mentioned.
5    A.  Uh-huh, yes, sir.
6    Q.  When was this task list prepared?
7    A.  This was prepared after I had my back
8 injury.
9    Q.  Okay.
10    MR. LAYTON:  That's all I have based on
11 that, judge.
12    ARBITRATOR EPSTEIN:  Okay.  All right, so
13 now we have concluded your testimony.  Is there any
14 other evidence that you want to produce in your case
15 in chief?
16    MR. MELTON:  I just had something on my
17 mind.  Your Honor, Mr. Layton just asked me a
18 question and I'm trying to exactly remember what it
19 was.
20    ARBITRATOR EPSTEIN:  Just now about the
21 task list?
22    MR. MELTON:  It was before the task list.
23 Is it possible you could read that to me?
24    ARBITRATOR EPSTEIN:  Do you remember what

Page 163



2:17-cv-02112-CSB-EIL # 41   10/29/2019   Page 112 of 189
Arbitration
Bruce Melton vs. Pavilion Behavioral Health System, et al.

1 the other line of inquiry was?  It was nothing I
2 wrote down, I'll tell you that.
3       MR. MELTON:  Your Honor, you have a lot --
4       MR. LAYTON:  Must not have been very
5 compelling, judge.
6       ARBITRATOR EPSTEIN:  I obviously didn't
7 think so at the time.
8       MR. LAYTON:  I asked you about Ray, Mr.
9 Reis, asking you to unload the truck, if that was
10 part of your discrimination claim, and then we
11 looked at your dep, your deposition.
12       MR. MELTON:  Okay.  Well, I just wanted to
13 state for the record that unloading the truck, it
14 was all these people in the kitchen.  If that was a
15 requirement of me, why wouldn't it be a requirement
16 of everyone in the kitchen to unload this truck, but
17 it never fell on anyone in the kitchen but me.
18       ARBITRATOR EPSTEIN:  I think that --
19       MR. MELTON:  But that's not --
20       ARBITRATOR EPSTEIN:  -- I took your point.
21 Is there any other evidence in terms of --
22       MR. MELTON:  Oh, Lord have mercy, Your
23 Honor.  I can't, I can't --
24       ARBITRATOR EPSTEIN:  Well, it's up to the

Page 164

1 Lord, but I'll have mercy.  I want you to tell me if
2 there's anything else you want to present by way of
3 evidence.
4       MR. MELTON:  Okay, just give me a second
5 here.  I have something I want --
6       ARBITRATOR EPSTEIN:  Yeah, okay.
7       MR. MELTON:  I'll find it.  It was --
8 let's see here.  Where did I -- you know what, Your
9 Honor, not at this time.
10       ARBITRATOR EPSTEIN:  Okay, so you rest
11 your case in chief?
12       MR. MELTON:  Yes, sir.
13       ARBITRATOR EPSTEIN:  All right.  Let's go
14 off the record for just a moment.
15       (Discussion off the record.)
16       ARBITRATOR EPSTEIN:  All right, I want
17 everyone back here by 1:15 --
18       MR. MELTON:  Okay.
19       ARBITRATOR EPSTEIN:  -- okay, ready to go.
20       MR. MELTON:  Yes, sir, Your Honor.
21       MR. LAYTON:  Yes.
22       (Recess at 12:31 p.m. to 1:14 p.m.)
23       ARBITRATOR EPSTEIN:  All right, Mr.
24 Layton, you may call a witness.

Page 165

1       MR. LAYTON:  Thank you, judge.  I would
2 like to call Laurie Crabtree.
3       ARBITRATOR EPSTEIN:  All right.  Ms.
4 Crabtree, if you would raise your right hand please.
5       (Ms. Laurie Crabtree was duly sworn.)
6       ARBITRATOR EPSTEIN:  Thank you.  You may
7 proceed.
8       DIRECT EXAMINATION BY
9       MR. LAYTON:
10    Q.   Good afternoon, Ms. Crabtree.  You've
11 already introduced yourself, so if you could please
12 tell us, where do you currently work?
13    A.   I currently am employed with the Pavilion
14 Behavioral Health Facility.
15       ARBITRATOR EPSTEIN:  I know he's sitting
16 right next to you, but we all have to hear what
17 you're saying.
18    A.   Okay, sorry.
19    Q.   How long have you worked at the Pavilion?
20    A.   Next month, it will be 13 years.
21    Q.   And during your 13 years at the Pavilion,
22 can you please describe what your title is with
23 them?
24    A.   I've been the director of human resources

Page 166

1 the entire time.
2    Q.   Okay.  And generally speaking, as the HR
3 director, what are your duties and responsibilities?
4    A.   I do all the hiring -- the interviewing,
5 the hiring, the terminations, the ongoing that's
6 involved with all the hiring.  Any employee
7 disputes, I handle all those, the investigations.
8 Anything that would be HR-related, that falls under
9 my umbrella.
10    Q.   Okay.  And is the -- can you tell me a
11 little bit about the residents, including the
12 children who are residents, tell me a little bit
13 about them who are at the Pavilion and use their
14 services.
15    A.   Sure.  We have a total of 106 beds that
16 we're licensed for, and of those 106 beds, 34 of
17 those are residential.  These are kids that are
18 wards of the state through the Illinois DCFS, so
19 they're all wards of Illinois, and they come to live
20 with us because they have been determined through
21 the DCFS system that they need to be in a
22 residential program.
23       They may have had abuses from family, from
24 outside sources, they may have done things of their

Page 167



2:17-cv-02112-CSB-EIL  #41  10/29/2019  Page 113 of 189
Arbitration
Bruce Melton vs. Pavilion Behavioral Health System, et al.

1 own nature as well, but it's been determined that
2 they can't live in their home, so they live with --
3 they are under the care of DCFS and need to be in a
4 residential program to have some structure to their
5 lives. So they come to our facility so we can
6 provide that structure and hopefully get them to the
7 point where they can either step down to another
8 type of facility, go back home to families or back
9 into foster care.
10 Q. What are the ages or age ranges of the
11 children who are residents and rely on services at
12 the Pavilion?
13 A. For the DCFS residents, we're licensed
14 from ages 10 to 19.
15 Q. And you mentioned license. So is it
16 correct to state that the Pavilion is a licensed
17 child care facility?
18 A. Yes, it is.
19 Q. Can you explain for the judge what that
20 means please?
21 A. We are licensed through DCFS, which means
22 that they have a strict program that we have to
23 follow as far as keeping the license, whether it be
24 the programs that we offer for these children, the

Page 168

1 types of services that we provide, and then also the
2 employees that we have there in our facility.
3 Q. And the fact that the Pavilion is a
4 licensed child care facility through DCFS, how does
5 that impact employee hiring?
6 A. We run background checks on all the
7 employees that work in the residential program
8 because we need to make sure that there are certain
9 backgrounds that they would be allowed to be around
10 our children.
11 Q. What if you or somebody at the Pavilion
12 refused to conduct a criminal background search of
13 an employee or potential employee that was required
14 by DCFS? What could potentially happen?
15 A. We could lose our license and not be able
16 to have these children be in our facility any
17 longer.
18 Q. All right. And can you tell us, please, a
19 little bit about the employee population at the
20 Pavilion. How many employees do you have?
21 A. We 242 employees.
22 Q. And do you employ minorities at the
23 Pavilion?
24 A. Yes, we do. Of that 242, approximately 37

Page 169

1 percent are minorities.
2 Q. Okay. And would that include
3 African-Americans?
4 A. Yes.
5 Q. Okay, thank you.
6 MR. LAYTON: So you know, I'm going to try
7 to expedite some of this, judge, just kind of in the
8 interest of time and to --
9 Q. Okay, there was an employee handbook that
10 was provided to all employees; is that correct?
11 A. That's correct.
12 Q. Including Mr. Melton?
13 A. Correct.
14 Q. And does that employee handbook -- and for
15 the record, it's marked as Exhibit No. 7 in the
16 trial arbitration exhibits. Does that handbook
17 generally describe the paid time off and extended
18 leave benefits that employees are entitled to?
19 A. It gives a general overview, yes.
20 Q. Okay. Why don't we talk about Mr.
21 Melton's hiring at the Pavilion. So as you recall,
22 Mr. Melton was hired by the Pavilion in June of
23 2015, correct?
24 A. Yes.

Page 170

1 Q. Did Mr. Melton have to undergo a criminal
2 background check when he was first hired?
3 A. Yes, he did.
4 Q. And can you please explain for the record
5 why it was required for Mr. Melton to undergo a
6 criminal background check when he was first hired?
7 A. All of our employees undergo a background
8 check through a company called Sterling, and then on
9 top of that, those that work on the residential
10 program have to be background checked through DCFS
11 in order to maintain our licensure and to make sure
12 that we're not hiring anybody that wouldn't be able
13 to be around that population. So we do -- so for
14 Mr. Melton's purpose, he would have had two
15 background checks conducted as standard operating
16 procedure for our facility.
17 Q. Okay. And what was Mr. Melton hired to
18 do? What were his duties and responsibilities?
19 A. He was hired as a cook, so he would have
20 been responsible for cooking the meals, preparing
21 the meals, delivering them to the units, serving the
22 patients that would come through the line in the
23 cafeteria.
24 Q. Okay. And we looked at Exhibit 3 earlier,

Page 171




2:17-cv-02112-CSB-EIL  # 41  Page 114 of 189
Arbitration  10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

**Page 172**

1 and just for reference's sake, this document you'll
2 agree indicates that Mr. Melton -- that heavy
3 lifting would be part of his job in the dietary
4 department at the Pavilion, right?
5    **A.  Correct.**
6    Q.  So did you have yourself an understanding
7 of what Mr. Melton's duties and responsibilities
8 were when he worked at the Pavilion?
9    **A.  It would be based on what was on the job**
10 **description, yes.**
11    Q.  Okay.  And would it be fair to say that
12 part of Mr. Melton's duties included unloading the
13 truck at the Pavilion?
14    **A.  Yes.**
15    Q.  Okay.  So there were times when Mr. Melton
16 took some leaves of absence when he was employed at
17 the Pavilion; is that correct?
18    **A.  Correct.**
19    Q.  And let me just step back just to finish
20 that up about Mr. Melton's duties.  Based on your
21 understanding, Ms. Crabtree, was it your
22 understanding that it was made clear with Mr. Melton
23 that heavy lifting would be part of his job when he
24 was first hired?

**Page 173**

1    **A.  Yes, because it's stated in the job**
2 **description that he signed that there would be heavy**
3 **lifting involved.**
4    Q.  Okay.  All right, thank you.  So let's
5 turn to Mr. Melton's leaves of absence, all right?
6 So before we get to Mr. Melton, can you generally
7 describe -- I presume that the Pavilion has
8 employees who have to take leaves of absence for
9 medical reasons from time to time.
10    **A.  Oh, sure, yes.**
11    Q.  And generally speaking, can you explain to
12 the judge, please, what the policy and procedure is
13 for an employee who wants to take a leave of
14 absence?
15    **A.  We have an outside company that we use**
16 **that monitors all of our leaves, and so the person**
17 **would come to me, say that I need to take a leave,**
18 **and I would give them the paperwork with the phone**
19 **number on it.  They would call Sedgwick and open a**
20 **claim with Sedgwick, and then Sedgwick would send**
21 **them paperwork as far as information that needs to**
22 **go to the doctor that the doctor would complete and**
23 **then send back to Sedgwick, and it would be up to**
24 **Sedgwick to determine whether they approved the**

**Page 174**

1 leave or not based on the information they received
2 back from the doctor.
3    Q.  Okay.  So speaking for the Pavilion and
4 not for Sedgwick, but speaking for the Pavilion, was
5 it consistent with the Pavilion's policies to allow
6 employees to take leaves of absence and return to
7 work?
8    **A.  Absolutely.**
9    Q.  And if an employee requested and then took
10 a leave of absence for a surgery or for a medical
11 reason, would you terminate that employee simply for
12 taking a leave of absence?
13    **A.  No, we would not.**
14    Q.  So what about an employee, generally
15 speaking, if they're under the care of a doctor and
16 they have work-related restrictions from the doctor
17 saying there are limitations on their abilities to
18 work, how are those things handled at the Pavilion?
19 How do you make sure you follow restrictions like
20 that?
21    **A.  When an employee has a nonwork-related**
22 **injury and they have restrictions, we ask that they**
23 **not return to work until they're able to return**
24 **without restrictions.  If it's a work-related**

**Page 175**

1 **injury, we do accommodate those restrictions and**
2 **find them jobs within the hospital that would meet**
3 **those restrictions.**
4    Q.  Okay.  So -- and if an employee has to
5 take time off under the first scenario that you
6 described, would that employee be allowed to --
7 would they be entitled to certain benefits?
8    **A.  They would have their paid time off, and**
9 **also the extended leave benefit, they'd be paid**
10 **under that.**
11    Q.  Okay.  Now in this particular case, let's
12 talk about Mr. Melton specifically.  Do you recall
13 that Mr. Melton had some medical issues that arose
14 during his employment with the Pavilion?
15    **A.  Yes, I do.**
16    Q.  And what was your role when it came to
17 complying with some of the doctor-ordered
18 restrictions and making sure they were followed at
19 the Pavilion?
20    **A.  Are you talking about the nonwork-related?**
21    Q.  Well, let's set -- you know what?  Why
22 don't we get into the specifics.  I'll get to the
23 specifics --
24    **A.  Okay.**



2:17-cv-02112-CSB-EIL # 41 Page 115 of 189
10/29/2019
Arbitration
Bruce Melton vs. Pavilion Behavioral Health System, et al.

1 Q. -- when we talk about that, so let me ask
2 you this. Generally speaking, what was your role in
3 supervising Mr. Melton's work in the dietary
4 department?
5 A. I didn't have a role in it other than if
6 there was a concern.
7 Q. Okay.
8 A. I was not his direct supervisor.
9 Q. Understood. But if somebody raised a
10 concern, including Mr. Melton, about some
11 employment-related tasks in the dietary department,
12 can you describe generally speaking what you would
13 do?
14 A. Sure. When Mr. Melton did come to me or
15 others would come to me about concerns that they --
16 of their duties, I went to the kitchen and I went
17 and talked to the other employees. I also talked to
18 the dietary manager, too, because I told them we
19 need to make sure that we're following these
20 restrictions.
21 Q. Okay. And we'll talk about some of the
22 documents specifically here in a few minutes. So in
23 June of 2015, and I'm happy to pull it up for you,
24 but Mr. Melton took a leave of absence in June of

Page 176

1 2000 -- excuse me, strike that.
2 In November of 2015, Mr. Melton took a
3 leave of absence for shoulder surgery, right?
4 A. Correct.
5 Q. And he was off work for a leave of absence
6 from November 24th until December 14th of 2015,
7 right?
8 A. Uh-huh, yes.
9 Q. And that was unrelated to his work.
10 A. Correct.
11 Q. So he had the shoulder surgery, and
12 according to Exhibit No. 13, it states Mr. Melton
13 received PTO of 69.81 and extended leave benefit of
14 16.94, correct?
15 A. Correct.
16 Q. So, in other words, these are Mr. Melton's
17 benefits that he would have received during his
18 leave of absence for his shoulder surgery.
19 A. Correct.
20 Q. When Mr. Melton returned from his shoulder
21 surgery after recovering, did the Pavilion terminate
22 him?
23 A. No, we did not.
24 Q. Okay. So you held his job for him.

Page 177

1 A. Yes.
2 Q. And he actually came back and continued to
3 work.
4 A. Correct.
5 Q. All right. All right, now Mr. Melton also
6 developed carpal tunnel syndrome, correct?
7 A. Correct.
8 Q. And according to Exhibit No. 25, which I'm
9 happy to pull up if we need to, that claim by
10 Mr. Melton, that was denied by Sedgwick, correct?
11 A. Correct.
12 Q. And that was determined to be unrelated to
13 his work.
14 A. Correct, that we had sent him to
15 occupational medicine to be evaluated by our doctors
16 to determine if it was work-related or not, and they
17 determined that it was not work-related.
18 Q. Okay. And there was a report that was
19 prepared on May 5th of 2016, and this is Exhibit No.
20 18, and it indicates -- and you know, Ms. Crabtree,
21 this is a new one that we haven't looked at, so if
22 you don't mind grabbing this binder here and looking
23 at Exhibit 18.
24 So at that point in time, it says the

Page 178

1 chief complaint is bilateral hand pain, parentheses,
2 carpal tunnel syndrome and trigger fingers. Do you
3 see that?
4 A. Yes, I do.
5 Q. And if you could please turn to -- if you
6 look on the bottom right, it's page 4 of 5. And you
7 see at the top it says plan and discussion, do you
8 see that?
9 A. Yes.
10 Q. It says at this point in time it is very
11 difficult for me to determine the sole causation of
12 his trigger fingers as well as his carpal tunnel
13 syndrome. Do you see that?
14 A. Yes.
15 Q. And it goes on to state that he, meaning
16 Mr. Melton, does have an established history of
17 diabetes which is a risk factor for developing
18 carpal tunnel syndrome. Also other risk factors,
19 including arthritis and age factors, unfortunately
20 he does have these risk factors as well. Do you see
21 that?
22 A. Yes, I do.
23 Q. And can you please state for the record at
24 the very bottom who signed this report?

Page 179



2:17-cv-02112-CSB-EIL # 41 10/29/2019 Page 116 of 189
Arbitration
Bruce Melton vs. Pavilion Behavioral Health System, et al.

1    A.  This is the doctor at occupational
2 medicine that he went to see.
3    Q.  And it looks like, according to this
4 document, this was sent to Sedgwick, correct?
5    A.  Correct.
6    Q.  And it appears that Sedgwick denied the
7 worker's compensation based on this document.
8    A.  Yes.
9    Q.  Okay.  So even though the claim was denied
10 by worker's compensation, if you can turn to Exhibit
11 24, Mr. Melton was granted a leave of absence,
12 right?
13    A.  Correct.
14    Q.  Okay.  And during this time -- so it was
15 from May 25th until July 12th of 2016, right?
16    A.  Yes.
17    Q.  And can you please state for the record
18 who signed and approved this leave of absence?
19    A.  I signed this document.
20    Q.  Okay.  Which means you were approving the
21 leave of absence at that time; is that fair?
22    A.  The leave of absence still would have been
23 approved through Sedgwick.
24    Q.  Okay.

Page 180

1    A.  This is our payroll form that puts in our
2 payroll system when he took the leave and then when
3 he returned from the leave.
4    Q.  Okay, so it was ultimately up to Sedgwick
5 to approve the leave?
6    A.  Correct.
7    Q.  But there was nothing that the Pavilion
8 did to prevent Mr. Melton from taking this leave of
9 absence.
10    A.  Correct.
11    Q.  All right.  And if you could please turn
12 to Exhibit 26.  Now, this says Mr. Melton -- this is
13 a letter from Carle dated -- Carle Hospital dated
14 July 7th of 2016, right?
15    A.  Yes.
16    Q.  And this indicates that Mr. Melton had
17 right hand surgery on June 22nd of 2016, right?
18    A.  Yes.
19    Q.  And it says he may return to work without
20 restriction on July 12th of 2016, right?
21    A.  Correct.
22    Q.  And it goes on to say he may need limited
23 lifting, pushing, pulling until six weeks after
24 surgery, correct?

Page 181

1    A.  Correct.
2    Q.  Okay.  So did Mr. Melton eventually return
3 to work?
4    A.  Yes, he did.
5    Q.  And so the Pavilion held his job for him.
6    A.  Yes, we did.
7    Q.  So obviously Mr. Melton was not terminated
8 when he took this leave of absence that ended in
9 July of 2016.
10    A.  No.
11    Q.  Now, there's a handwritten note here, do
12 you see that?
13    A.  That's my handwriting.
14    Q.  And it says here may need help with truck,
15 correct?
16    A.  Correct.
17    Q.  So, in other words, at that point, given
18 that Mr. Melton was coming back from carpal tunnel
19 surgery, why would he potentially need help with the
20 truck?
21    A.  Because of the lifting, because of the
22 note saying he may need some help with lifting, had
23 some limited lifting.  So in order to accommodate
24 him and to help him when the truck day was, I made a

Page 182

1 note to say he may need help with truck day.
2    Q.  Okay.  And so why -- okay, that covers
3 that I think.  So let's go back to Exhibit No. 23,
4 and I'm just going to step back for a minute.  So
5 during -- this is a letter that you sent to
6 Mr. Melton on May 24th of 2016, right?
7    A.  Correct.
8    Q.  And this is in conjunction with the time
9 that he took off for work because of his carpal
10 tunnel syndrome.
11    A.  Yes.
12    Q.  Now, would it be fair to say during this
13 time frame Mr. Melton's duties would have required
14 him to use his hands?
15    A.  Yes.
16    Q.  Would you want Mr. Melton to engage in any
17 work that would have risked him further injuring his
18 hands?
19    A.  No.
20    Q.  Would you have wanted him to do anything
21 at work that would have exacerbated his carpal
22 tunnel syndrome?
23    A.  No.
24    Q.  Okay.  So as a result of that, there

Page 183



2:17-cv-02112-CSB-EIL #41 Page 117 of 189
10/29/2019
Arbitration
Bruce Melton vs. Pavilion Behavioral Health System, et al.

1 really wasn't anything for Mr. Melton to do at that
2 time?
3   **A. Correct.**
4   Q. But can you please explain, what was the
5 purpose of this letter that you sent to Mr. Melton?
6   **A. Well, the letter was sent to him to let**
7 **him know that we can accommodate or he would -- the**
8 **worker's comp claim for carpal tunnel was not**
9 **approved, so while we can't approve that, he would**
10 **not be able to work during that time frame. So I**
11 **was also letting him know while he was off we would**
12 **pay him his PTO and his ELB until that ran out.**
13 **Once that ran out, then he would be able to use**
14 **short-term disability because he had signed up for**
15 **that when he signed up for benefits, and I was**
16 **giving him information on how to access that and be**
17 **able to use the short-term disability.**
18   Q. Okay, so let's break that down. So first
19 of all, you're telling Mr. Melton about his benefits
20 that are available, right?
21   **A. Correct, yes.**
22   Q. You're also telling Mr. Melton that you
23 cannot accommodate him because of his carpal tunnel
24 syndrome, correct?

Page 184

1   **A. Yes.**
2   Q. And that's because anything that
3 Mr. Melton would have done at the time could
4 potentially have exacerbated his injury.
5   **A. Absolutely.**
6   Q. Okay. But you did say he was granted a
7 leave of absence.
8   **A. Yes.**
9   Q. In other words, this condition, the carpal
10 tunnel condition in May of 2016, it was accommodated
11 by granting him a leave of absence.
12   **A. Yes.**
13   Q. Okay. And I think I said this, but just
14 to make sure it's on the record, Mr. Melton of
15 course returned to work -- I did say it, I don't
16 need to cover it.
17   So why don't we turn to Exhibit 35. So --
18 or excuse me, Exhibit 3 -- yeah, 35. So Mr. Melton
19 underwent --
20   ARBITRATOR EPSTEIN: Are we at 35?
21   MR. LAYTON: Yes, 35, judge, sorry.
22   Q. Mr. Melton underwent a second carpal
23 tunnel surgery, correct?
24   **A. Yes.**

Page 185

1   Q. And according to Exhibit 35, this is a
2 request for Mr. Melton to be paid his benefits
3 during this carpal tunnel leave of absence in
4 December of 2016?
5   **A. This is for short-term disability.**
6   Q. Excuse me, thank you for correcting me.
7 So can you please explain specifically what this
8 document is for?
9   **A. Absolutely. This is a document that is**
10 **sent to me from the Hartford asking for when was the**
11 **last day that he worked, how much we would pay him,**
12 **how many days we would pay him as far as how many**
13 **PTO hours and ELB hours that he had accumulated, and**
14 **then once we were done paying him, then they would**
15 **know when they would pick up and start paying him**
16 **short-term disability.**
17   Q. Okay. So does this document indicate that
18 the Mr. Melton would be receiving either short-term
19 disability or extended leave benefits during the
20 time he was off work for a leave of absence?
21   **A. It does not say that he would get it**
22 **because it's not an approval notice.**
23   Q. Okay.
24   **A. It's just saying that after 12/27 we would**

Page 186

1 **no longer be paying him --**
2   Q. Understood.
3   **A. -- and he would be eligible for short-term**
4 **disability if they approved it.**
5   Q. And then it was up to the Hartford to
6 make --
7   **A. Correct.**
8   Q. -- that decision.
9   **A. Correct.**
10   Q. And is it your understanding -- or strike
11 that. So you recall Mr. Melton also had some back
12 problems when he worked at the Pavilion?
13   **A. Yes.**
14   Q. And this appeared that it was caused by
15 his work at the Pavilion, right?
16   **A. Yes.**
17   Q. And he, Mr. Melton, went to doctor visits
18 and therapy appointments for this?
19   **A. Yes.**
20   Q. And is it your understanding that that was
21 covered by worker's compensation insurance?
22   **A. Yes.**
23   Q. Okay. So if you could please turn to
24 Exhibit 29. So this indicates that on October 9th

Page 187



2:17-cv-02112-CSB-EIL # 41   Page 118 of 189   10/29/2019
Arbitration
Bruce Melton vs. Pavilion Behavioral Health System, et al.

1 of 2016 there's an indication that Mr. Melton is
2 having low back pain?
3    **A.   Yes.**
4    Q.   And you see there's a box that says not
5 released to any form of work?
6    **A.   Yes.**
7    Q.   Do you see that?
8    **A.   Uh-huh.**
9    Q.   And again, I guess I should step back.
10 Can you please explain to the judge what this
11 document is for?
12    **A.   This document is an illness/injury report**
13 **that we receive if an employee has a work-related**
14 **injury.  If they go to convenient care or**
15 **occupational medicine or the emergency room, this**
16 **form is completed and then given to me so that we**
17 **know, if they have restrictions, what those are, if**
18 **they're taken off of work or if they're released**
19 **back to work without restrictions.**
20    Q.   Okay.  And this document of course --
21 there's a box that says not released to any form of
22 work, do you see that?
23    **A.   Yes.**
24    Q.   Is that box checked?

Page 188

1    **A.   No.**
2    Q.   So there's a box that says released to
3 modified work; is that correct?
4    **A.   Yes.**
5    Q.   So can you please explain what that means?
6    **A.   That means that he would be released as of**
7 **10/9, which is the date of this document, he would**
8 **be released with the restrictions that were noted**
9 **below, the lift/pull/push of 10 pounds, avoid**
10 **bending/twisting neck, back or waist.  They**
11 **typically will circle the appropriate body part.**
12    Q.   Okay.
13    **A.   Avoid static chronic bent postures to the**
14 **spine and then also to see protocol in the back for**
15 **back.**
16    Q.   So Mr. Melton is capable of working but
17 just with restrictions.
18    **A.   Correct.**
19    Q.   And this continued into November and
20 December of 2016; is that fair?
21    **A.   Yes.**
22    Q.   Can you please explain, when you would
23 receive documents like this, how did you make sure
24 that the Pavilion would comply with whatever the

Page 189

1 work restrictions were that were identified in a
2 document like this?
3    **A.   I would let the manager know what the**
4 **restrictions were so that we would -- they knew what**
5 **they were, so that we could be following those**
6 **restrictions.**
7    Q.   Okay.  And how would you do that?  How
8 would you let the manager know?
9    **A.   I would send an email, but I would also**
10 **have a conversation in person with them.**
11    Q.   Okay.  Was Mr. Melton ever fired because
12 he took a leave of absence for a surgery?
13    **A.   No.**
14    Q.   So now these documents indicate that
15 Mr. Melton had taken a leave of absence in late 2016
16 because he had a second carpal tunnel surgery,
17 correct?
18    **A.   Yes.**
19    Q.   Okay.  So looking at Exhibit 89, so this
20 is the second binder.  Done with this one.  So in
21 Exhibit 89 it indicates -- this is a letter dated
22 December 24th of 2016?
23    **A.   Yes.**
24    Q.   And this was sent from DCFS to you,

Page 190

1 correct?
2    **A.   Correct.**
3    Q.   And what -- so what is the first sentence
4 in this letter stating, can you please indicate for
5 the record?
6    **A.   Stated FBI fingerprint search for criminal**
7 **history resulted in the following --**
8        ARBITRATOR EPSTEIN:  You're doing the same
9 thing that Mr. Melton did.
10    **A.   Yes, okay.**
11        ARBITRATOR EPSTEIN:  If you could slow
12 down what you're reading please.
13    **A.   Oh, I'm sorry.  The FBI fingerprint search**
14 **for criminal history resulted in the following**
15 **determination regarding the above-named individual**
16 **and their employment with a licensed child care**
17 **facility.**
18    Q.   Okay.  And it says that Mr. Melton at that
19 point in time was ineligible.
20    **A.   Correct.**
21    Q.   Okay.  So at that moment when you received
22 this letter in which DCFS is designating Mr. Melton
23 as ineligible for employment, could you -- on that
24 day that you received the letter, could you allow

Page 191



2:17-cv-02112-CSB-EIL # 41   Page 119 of 189
Arbitration    10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

1  Mr. Melton to work that day?
2      A.  Absolutely not.
3      Q.  All right.  And what potentially could
4  happen if you would have allowed Mr. Melton to work
5  even though you had this letter from DCFS saying
6  that he was ineligible?
7      A.  We could lose our license and no longer be
8  able to have these children on our facility.
9      Q.  So you recall, Ms. Crabtree, that
10  Mr. Melton -- I'm going to switch gears for a minute
11  now.  You recall that there were some HR issues and
12  some calls to the hot line that Mr. Melton made,
13  right?
14      A.  Yes.
15      Q.  Okay.  So when HR issues would arise, if
16  HR complaints arise, what was your role in
17  investigating issues on behalf of the Pavilion?
18      A.  I was the person in charge of doing the
19  investigations.  The issue would come into the
20  hospital and it would go to the CEO, and then the
21  CEO would designate me as the person to do the
22  investigation.
23      Q.  Okay.  And generally speaking, what was
24  your process when conducting investigations?  What

1  would you do?
2      A.  I would call in the people that were
3  involved in the investigation, have a conversation
4  with them, get the names of the witnesses, have
5  conversations with the witnesses, put together my
6  results from my investigation, and then hand that
7  off to the CEO to review.
8      Q.  Okay.  And what would happen -- what would
9  happen next with your report?
10      A.  The CEO would review it and then it would
11  get forwarded back to the corporate compliance hot
12  line which would include the HR counterpart there in
13  the corporate offices.
14      Q.  Okay.  So when you would conduct an
15  investigation into any HR-related matter on behalf
16  of the Pavilion, the CEO would receive a copy of
17  your report?
18      A.  Yes.
19      Q.  And your report would go to corporate HR.
20      A.  Correct.
21      Q.  Okay.  And we talked about some of
22  Mr. Melton's calls to the hot line.  Can you explain
23  what the hot line is?
24      A.  We have a corporate compliance hot line

1  that any employee can use to call if they have
2  concerns with how things are ran at the hospital.
3  They have the opportunity to call and make a hot
4  line call.  They give them the information, and then
5  the compliance officer then forwards it on to the
6  CEO to investigate, and that's when I would get
7  involved because the CEO would send them, the
8  investigations, to me.
9      Q.  Okay.  Okay, what if -- generally
10  speaking, what if you have an employee making a
11  complaint about another employee and you
12  investigated it and reached a conclusion?  Does the
13  complaining employee have a right to know the
14  specific disciplinary action that was taken against
15  the accused employee?
16      A.  That's all confidential.  They would not
17  be privy to that information.
18      Q.  And why is that confidential?
19      A.  It's an HR policy.  You -- it's something
20  that we do investigations on staff.  We don't let
21  other people know what kind of corrective actions
22  any employee has.
23      Q.  Okay.  So why don't we talk about some
24  specifics relating to Mr. Melton and I'm going to

1  actually refer to some exhibits here.
2      A.  Okay.
3      Q.  I'm looking -- I think I'm back to the
4  first binder and we're looking at Exhibit 52.  So
5  Exhibit 52, can you please explain for the record
6  what this is?
7      A.  This is a handwritten note from one of the
8  employees, from Donna Gadeken, G-A-D-E-K-E-N, who
9  was the interim dietary manager at that time, that
10  she overheard Bruce yelling at another coworker in
11  the kitchen.
12      Q.  Okay.  And Donna brought this to your
13  attention?
14      A.  Yes.
15      Q.  And did this note end up in Mr. Melton's
16  HR file?
17      A.  Yes, it did.
18      Q.  Okay.  Would it have been appropriate for
19  you to ignore this note from Donna?
20      A.  No.
21      Q.  Okay.  And then it -- it indicates here at
22  the top, Donna is saying, today on May 3rd of 2016 I
23  heard Bruce yell at Betty about not putting a dish
24  through the dish machine, and then Donna said to him



2:17-cv-02112-CSB-EIL # 41    Page 120 of 189
10/29/2019
Arbitration
Bruce Melton vs. Pavilion Behavioral Health System, et al.

1  that she was on light duty, meaning Betty was on
2  light duty, right?
3      **A.   Yes, yes.**
4      Q.   So does this indicate that Donna is trying
5  to respect the fact that Betty was on light duty at
6  the time?
7      **A.   Yes.**
8      Q.   Okay.  So if you could turn to Exhibit No.
9  53.  And can you explain what these are?
10     **A.   These are my handwritten notes from the**
11  **investigation -- from an investigation with concerns**
12  **about Bruce.**
13     Q.   Okay.  And can you explain, what were the
14  concerns about Bruce that were brought to your
15  attention?
16     **A.   I had an employee tell me that they felt**
17  **that Bruce was too touchy-feely with them, that he**
18  **always wanted to hug them and that she had told him**
19  **no.  They felt that Bruce, it's in quotes, preaches**
20  **to them, kind of tells them what they need to do.**
21  **He's making inappropriate comments to them.**
22     Q.   And then what's below that preaching part?
23  What does your note say about Mr. Melton there?
24     **A.   Walking down the hall?**

Page 196

1      Q.   Yeah.
2      **A.   Walking down the hall, an employee was**
3  **wearing leather black pants and his comment was**
4  **"those jeans fit you tight," and she felt**
5  **uncomfortable with those comments.**
6      Q.   Okay.  And then what about at the very
7  bottom, what does that say?
8      **A.   If he's in the kitchen and no one else is**
9  **there, this employee would not go in the kitchen**
10  **because they were -- didn't like to be around him if**
11  **there wasn't anybody else around.**
12     Q.   Okay.  And then if you could please turn
13  to Exhibit 54.  And can you explain what these notes
14  are?
15     **A.   These are more of my notes concerning the**
16  **same investigation.**
17     Q.   Concerning the same incident with
18  Mr. Melton?
19     **A.   Yes.**
20     Q.   Okay.  And what do these notes reflect
21  regarding Mr. Melton, at least the accusations
22  against him?
23     **A.   That he was making inappropriate comments**
24  **to other staff, to other coworkers.**

Page 197

1      Q.   Okay.  And you indicate Yasmiene was
2  saying what about Mr. Melton?
3      **A.   He was too touchy-feely.**
4      Q.   All right.  So if you could turn to
5  Exhibit 55.  So can you please explain what this is?
6      **A.   This is our corrective action report where**
7  **Bruce was given a final written warning.**
8      Q.   So you were writing Bruce up at least in
9  part because of the behavior that you just described
10  from the notes that we just looked at.
11     **A.   Correct.**
12     Q.   Would it have been appropriate for you to
13  ignore the complaints that were brought to your
14  attention by Mr. Melton's coworkers?
15     **A.   No, it would not.**
16     Q.   Okay.  The fact that you documented this
17  and wrote Mr. Melton up for this behavior, is that
18  consistent with your policies?
19     **A.   Yes, it is.**
20     Q.   And if you look on the next page, Ms.
21  Crabtree, so you signed this, right?
22     **A.   I signed it, yes.**
23     Q.   And you signed it May 16th of 2016,
24  correct?

Page 198

1      **A.   Yes.**
2      Q.   And then it says that employee Bruce
3  Melton elected not to sign.  Is that true?
4      **A.   That's what's written here.**
5      Q.   If Mr. Melton had wanted to add anything
6  to the employee comment section, would you have
7  allowed that?
8      **A.   Absolutely.**
9      Q.   Okay.  And this indicates Mr. Melton chose
10  not to do that.
11     **A.   Correct.**
12     Q.   All right.  So the next exhibit, 56, this
13  is the first hot line call Mr. Melton made, correct?
14     **A.   Yes.**
15     Q.   And Mr. Melton was complaining about the
16  fact that he had been written up for the behavior
17  that we just talked about, right?
18     **A.   Yes.**
19     Q.   Would it have been appropriate for you to
20  have ignored the harassment complaint that
21  Mr. Melton made?
22     **A.   I can never ignore a harassment complaint.**
23     Q.   Would it have been appropriate for you to
24  not write it up and document it?

Page 199



2:17-cv-02112-CSB-EIL # 41   Page 121 of 189
Arbitration   10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

1   A.   No.
2   Q.   So if you could turn to Exhibit 56.
3      ARBITRATOR EPSTEIN:  I thought you were on
4   56.
5   Q.   Sorry, 58.  I was looking at my note here.
6   We're on 58.  So this is -- this is one of your HR
7   reports, correct?
8   A.   Correct.
9   Q.   And can you just explain for the judge
10  what this report is, how you would go about
11  generating a report like this.
12  A.   This is our corporate compliance hot line
13  report form that we fill out and send back into
14  corporate.  So when there is a hot line call that is
15  made, we document, we do our investigation, and then
16  we fill out this report and send that all back into
17  corporate.
18  Q.   Okay, and I just want to make sure this is
19  clear.  So when you complete a report, just like the
20  one we're looking at that's marked as Exhibit 58,
21  what do you do with the report?
22  A.   I send it to the CEO to review, and then
23  once he has approved it, then it goes on to -- back
24  to our corporate offices.

1   Q.   I see.  So this isn't something you hide
2   away in your files.
3   A.   No.
4   Q.   Okay.  So this report indicates that
5   Mr. Melton was making an allegation against Adam
6   Putvin, right?
7   A.   Yes.
8   Q.   And who's Adam?
9   A.   He was our CFO at the time.
10  Q.   Okay, and I'm sure you remember, we talked
11  about this during Mr. Melton's direct examination,
12  but one of the complaints that Mr. Melton made was
13  that some of the coworkers were clocking out and not
14  helping him, right?
15  A.   Yes.
16  Q.   And you in your report agree that
17  Mr. Melton was right.
18  A.   Yes.
19  Q.   And you indicate that these concerns
20  regarding working together as a team to complete all
21  duties and leaving on time will be addressed with
22  the department, right?
23  A.   Yes.
24  Q.   In other words, you acknowledged

1   Mr. Melton's point and you indicated what action
2   would be taken to address it.
3   A.   Correct.
4   Q.   Okay.  So there's also a discussion
5   regarding Mr. Melton's issue concerning Adam and it
6   related to Mr. Melton's job responsibilities,
7   correct?
8   A.   Yes.
9   Q.   And it says here, it's on the second page
10  of Exhibit 58, and it's the second -- starts in the
11  second paragraph.  It indicates that on July 14th
12  Bruce took a picture of a task list that was posted
13  in the kitchen and went to Adam asking him if he was
14  supposed to follow the list.  Now can you explain
15  who Adam was or who Adam is?
16  A.   He was the CFO.
17  Q.   He was the CFO, so he's a finance guy.
18  A.   Correct.
19  Q.   Okay, so why is Mr. Melton going to a
20  finance person to ask him about his job duties?
21  A.   He was kind of overseeing the department
22  at that point because our director of plant
23  operations, Ray Reis, was no longer there.
24  Q.   Okay.

1   A.   So he was kind of overseeing the
2   department and had the staff reporting to him if
3   they had questions or concerns.
4   Q.   So was it a temporary situation for Adam
5   to be overseeing that?
6   A.   Yes.
7   Q.   So Adam stated -- when Bruce asked about
8   his tasks, Adam stated he was not sure and would
9   look into it and get back to Bruce regarding this.
10  And then Adam asked you for a copy of the job
11  description for Bruce's position and proceeded to
12  give this job description to Bruce, and you note
13  that that job description is attached to your
14  report.
15  A.   Uh-huh.
16  Q.   Bruce signed a copy of his job description
17  when he was originally hired and during his annual
18  evaluation from January, right?
19  A.   Yes.
20  Q.   It says when Bruce gave the job
21  description, Adam also stated that the job
22  description superceded a task list that was posted
23  in the dietary department, right?
24  A.   Yes.



2:17-cv-02112-CSB-EIL # 41   Page 122 of 189
Arbitration   10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

**Page 204**

1  Q.  Okay.  So during this action/interaction
2  when Adam gave Bruce the job description, Bruce
3  asked if this was a new job description and Adam
4  responded it wasn't, right?
5  **A.  Yes.**
6  Q.  And then it goes on to talk about some
7  additional information, but let me just jump ahead.
8  So you investigated this, and under the results on
9  the third page of Exhibit 58, you indicate that the
10  allegation that Bruce is being treated unfairly by
11  Adam is unfounded, correct?
12  **A.  Correct.**
13  Q.  And you also state the concern that his
14  coworkers are not working as a team to complete all
15  tasks together resulting in him working over his
16  appointed time may have some validity and will be
17  addressed with all dietary staff, department staff,
18  right?
19  **A.  Correct.**
20  Q.  So Mr. Melton raised another issue, and if
21  we look at Exhibit 61, this is another report that
22  Mr. Melton made, right?
23  **A.  Yes.**
24  Q.  And Mr. Melton is alleging inappropriate

**Page 205**

1  behavior by several coworkers?
2  **A.  Yes.**
3  Q.  And it looks like you conducted some
4  interviews?
5  **A.  Yes.**
6  Q.  So you obviously didn't ignore what
7  Mr. Melton was raising.
8  **A.  No.**
9  Q.  And if you look at the, you know, the
10  third, fourth and fifth page of Exhibit 61, can you
11  explain what these are?
12  **A.  These are my notes from the investigation**
13  **with those employees.**
14  Q.  So these notes reflect that you
15  investigated -- you conducted investigations and
16  interviewed Betty, Yasmiene, Y-A-S-M-I-E-N-E.
17  Charles Ball and Sharif and Adam, right?
18  **A.  Yes.**
19  Q.  Then you also indicate -- there's a
20  section Laurie Crabtree which indicates some
21  additional information that you provide.
22  **A.  Yes.**
23  Q.  Okay.  So what was your conclusion
24  following this investigation?

**Page 206**

1  **A.  That his allegations were unfounded.**
2  Q.  Okay.  So at this point you thought these
3  were unfounded, and it says here Mr. Melton's notes
4  are not accurate as he is stating that his write-up
5  was for the alleged pictures he had taken and posted
6  on Facebook when in fact the write-up was for
7  inappropriate conversations that he had with
8  coworkers.
9  **A.  Correct.**
10  Q.  So Mr. Melton, the issue he was raising
11  was not factually accurate.
12  **A.  Correct.**
13  Q.  Okay.  And then if you could turn to
14  Exhibit 64.  Can you please describe what this is?
15  **A.  This is another investigation report from**
16  **a hot line call that Bruce made.**
17  Q.  Okay.  And in this one, the principal
18  allegation, Mr. Melton's reporting unfair treatment
19  by Adam Putvin and Donna Gadeken by having to do the
20  most amount of work in the dietary department and
21  being paid the least, do you see that?
22  **A.  Yes.**
23  Q.  So you conducted an investigation again,
24  correct?

**Page 207**

1  **A.  Correct.**
2  Q.  And that's summarized here in the three
3  pages of your report.
4  **A.  Yes.**
5  Q.  And there are -- for this, there are some
6  also exhibits attached to this report?
7  **A.  Yes.**
8  Q.  And it says here on the first page of
9  Exhibit 64 under investigation, it says in March of
10  2016 Mr. Melton approached Ray Reis, director of
11  operations, and asked for a pay increase.  See
12  attached note.  This request was denied at the time.
13  In April of 2016, Mr. Melton then approached Joe
14  Sheehy, that's S-H-E-E-H-Y, CEO, and asked for a pay
15  increase, see attached note, which was denied.  Ray
16  Reis retired from the Pavilion as of April 22nd of
17  2016.  If there was any agreement between Mr. Melton
18  and Mr. Reis regarding Mr. Melton's pay, this was
19  never discussed with either Laurie Crabtree,
20  director of human resources, or Joe Sheehy, CEO.
21  Correct?
22  **A.  Correct.**
23  Q.  Did -- when Ray Reis worked at the
24  Pavilion, did Ray Reis himself, without consulting

2:17-cv-02112-CSB-EIL # 41    Page 123 of 189
Arbitration    10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

**Page 208**

1  with anybody, have the authority to grant an
2  approval or a wage increase for any employee?
3    **A.  He would need approval from the CEO.**
4    Q.  Okay.  So Joe Sheehy --
5    **A.  Yes.**
6    Q.  -- would have to approve it, okay.  And
7  then if you go on to the second page, there's
8  further notes that you make about Mr. Melton washing
9  dishes and his responsibilities, correct?
10    **A.  Yes.**
11    Q.  And you say here at the bottom of the
12  first paragraph on the second page of Exhibit 64,
13  this explanation will serve to show that Mr. Melton
14  is not being asked to do any more work than what the
15  other dietary staff are being asked to do.  Did I
16  read that correctly?
17    **A.  Yes.**
18    Q.  And it says here, it says our food truck
19  delivery comes in on Friday and Bruce does help to
20  unload the truck, but all dietary staff assist in
21  putting these items away in the dietary department
22  in a collaborative team effort.
23    **A.  Yes.**
24    Q.  And that was the result of your

**Page 209**

1  investigation.
2    **A.  Yes.**
3    Q.  Okay.  And under the results on the third
4  page, you indicate that the results of this
5  investigation show that neither Adam Putvin, Joe
6  Sheehy or Laurie Crabtree were aware of any previous
7  agreements between Bruce Melton and Ray Reis with
8  regard to his salary, right?
9    **A.  Correct.**
10    Q.  And then you go on to say Mr. Melton is
11  not being asked to perform any duties outside of his
12  job description and is not being asked to do any
13  duties above and beyond what his coworkers are asked
14  to do.
15    **A.  Correct.**
16    Q.  That was your finding at the time?
17    **A.  Yes.**
18    MR. MELTON:  Excuse me, Your Honor, if it
19  is possible, can I use the bathroom?
20    ARBITRATOR EPSTEIN:  Sure, absolutely.
21  We'll take a recess.
22    (Recess at 2:00 p.m. to 2:03 p.m.)
23    ARBITRATOR EPSTEIN:  Please proceed.
24    MR. LAYTON:  Thank you, judge.

**Page 210**

1  BY MR. LAYTON:
2    Q.  Turning to Exhibit 67.  So this document
3  reflects an investigation into an allegation by
4  Bruce Melton that Donna Gadeken was picking on him,
5  right?
6    **A.  Well, this is saying that he wasn't**
7  **scheduled for his class for food service.**
8    Q.  So it says Donna Gadeken -- Mr. Melton is
9  alleging that Donna Gadeken is picking on him by not
10  signing him up for the food service sanitation
11  class.
12    **A.  Yes.**
13    Q.  And I really don't need to belabor this,
14  but would it be fair to say that this allegation by
15  Mr. Melton really was a misunderstanding of what was
16  going on?
17    **A.  Yes.**
18    Q.  So Mr. Melton was, in fact, signed up to
19  complete this class before his license expired in
20  December of 2016.
21    **A.  Yes.**
22    Q.  And this report at the bottom here, it
23  indicates it's dated October of 2016.
24    **A.  His license didn't expire until December,**

**Page 211**

1  **so we were getting other staff done prior to that**
2  **because they were already expired.**
3    Q.  Yes, of course, but Mr. Melton is raising
4  this allegation two months before his license even
5  expires.
6    **A.  Correct.**
7    Q.  And jumping ahead to Exhibit 70.  This is
8  a report that you prepared kind of as a follow-up.
9  So there had been a report that Sharif was spreading
10  some rumors about Mr. Melton, correct?
11    **A.  Yes.**
12    Q.  And then Mr. Melton raised a complaint
13  with you during this time frame reflected in Exhibit
14  70 that he wanted to know what had happened with
15  your investigation into Sharif.
16    **A.  Correct.**
17    Q.  Okay.  So it says here under
18  investigation, Bruce came to Laurie a week ago
19  asking for the outcome of this investigation as it
20  related to Sharif and stated he wanted to know what
21  had been done, right?
22    **A.  Correct.**
23    Q.  Would it have been -- well, did you tell
24  Mr. Melton what action, if any, had been taken

2:17-cv-02112-CSB-EIL    # 41    Page 124 of 189    10/29/2019

Arbitration
Bruce Melton vs. Pavilion Behavioral Health System, et al.

1 concerning Sharif?
2  **A.   I did not give him any specifics, no.**
3  Q.   Okay.  And why is that?
4  **A.   Because it's not -- it wasn't any of his**
5  **concern.  It was a private matter.  All employee**
6  **issues are private matters and we don't share with**
7  **other employees what those are.  He was told that it**
8  **had been handled.**
9  Q.   Okay, Mr. Melton was.
10 **A.   Yes.**
11 Q.   So you explained to Mr. Melton that you
12 had addressed the issue concerning Sharif.
13 **A.   Yes.**
14 Q.   And Mr. Melton was not entitled to learn
15 any confidential information about what specifically
16 you did.
17 **A.   Correct.**
18 Q.   And then here it says Bruce was not
19 satisfied that he would not be able to know what, if
20 any, action had been taken against Sharif, right?
21 **A.   That's correct.**
22 Q.   So here is -- here's one of the reports we
23 actually did not talk about with Mr. Melton.  No, I
24 take that back, we did talk about it.

1 injuries.  Did I read that correctly?
2  **A.   That's correct.**
3  Q.   So you're providing a reminder to make
4  sure everybody respects Mr. Melton's work-related
5  restrictions.
6  **A.   Yes.**
7  Q.   At the time, of course, in November of
8  2016 Mr. Melton was on leave for his back or not --
9  let me restate that, he was not on leave.  During
10 this time, he had work-related restrictions because
11 of his back.
12 **A.   Correct.**
13 Q.   So he could work, but he couldn't do
14 certain things so he wouldn't make his back worse.
15 **A.   Correct.**
16 Q.   So this report here says, towards the top
17 here, Bruce comes in at five o'clock on Fridays to
18 help unload the truck, the food truck delivery.  Due
19 to his work injury, he's not able to unload the
20 truck but helps out in the kitchen by cutting up
21 fruit, putting fruit, salads, et cetera, into single
22 serve containers, correct?
23 **A.   Yes.**
24 Q.   All right.  And that fell within his work

1      So this relates to an allegation in
2  November of 2016, and Mr. Melton says -- the
3  principal allegation is Bruce feels he's being asked
4  to do tasks that do not follow his restrictions and
5  he's being mistreated due to these restriction; is
6  that right?
7  **A.   What number is that?**
8  Q.   That's No. 75.
9  **A.   Okay, yes.**
10 Q.   And you conducted an investigation again.
11 **A.   Yes.**
12 Q.   And you indicate in your investigation
13 that the duties that Mr. Melton was being asked to
14 do fell within his work restriction, correct?
15 **A.   Correct.**
16 Q.   And they also -- would it be fair to say
17 the tasks he was doing at this time fell within the
18 scope of his job duties?
19 **A.   Yes.**
20 Q.   Now going towards the bottom here in your
21 report, it says what was stated by Laurie is that
22 all the dietary staff need to help each other and
23 that both Bruce and Serlena, S-E-R-L-E-N-A, needed
24 to stay within the restrictions due to their

1 restrictions?
2  **A.   Yes.**
3  Q.   Okay.  His duties the rest of the week
4  involve serving the meals and washing the pans in
5  our dish room (loading and unloading the dish
6  machine) and putting clean items back where they
7  belong.  All these duties are within his work
8  restrictions, right?
9  **A.   Correct.**
10 Q.   Okay.  Okay, so if we could turn to
11 Exhibit 77, and this is the one that we did not
12 address with Mr. Melton.  Okay, so this report
13 indicates that Bruce Melton states he has been
14 having issues with Cathleen Davis and Laurie
15 Crabtree, correct?
16 **A.   Yes.**
17 Q.   Bruce was asked to change the schedule on
18 Fridays to better suit the needs of the department
19 while he is on restricted work due to a worker's
20 comp injury and Bruce feels he's being targeted due
21 to this request, right?
22 **A.   Yes.**
23 Q.   Okay.  So let me, I'm just going to flip
24 -- let's see.  So in this binder, if you could keep



2:17-cv-02112-CSB-EIL # 41    10/29/2019    Page 125 of 189
Arbitration
Bruce Melton vs. Pavilion Behavioral Health System, et al.

1  your thumb on that page, so if you could turn to
2  Exhibit No. 36.  So Exhibit 36, this is the letter
3  that you sent to Mr. Melton on December 12th of
4  2016, right?
5      A.  Correct.
6      Q.  And this is the time frame when Mr. Melton
7  was on work restrictions because of his back.
8      A.  Correct.
9      Q.  He couldn't unload the truck at this time.
10     A.  Correct.
11     Q.  Okay.  So you're telling Mr. Melton in
12  this letter that you wanted to change his work
13  schedule because you wanted to accommodate his work
14  restrictions and to meet the needs of the
15  department.
16     A.  Yes.
17     Q.  Okay.  And you also explained to
18  Mr. Melton that under Pavilion policy the employee
19  must be available to work all shifts and any
20  position that can accommodate his or her
21  restrictions.  Did I read that correctly?
22     A.  Yes.
23     Q.  So was it within your rights as you
24  understood them pursuant to the Pavilion's policies,

Page 216

1  was it right -- was it within your rights to have
2  Mr. Melton switch the jobs he was doing or the
3  shifts he was working on in order to meet his work
4  restrictions and the needs of your department?
5      A.  Yes, because on Fridays he was coming in
6  at five o'clock to unload the truck.  He couldn't
7  unload the truck because of his restrictions, so we
8  wanted to move his time to come in at ten o'clock so
9  that he could do other duties as assigned.  This
10  would give him the opportunity to -- we didn't need
11  him to come in at five o'clock.  There weren't any
12  things that we could have him do at five o'clock in
13  the morning.
14     Q.  Okay, so you're telling Mr. Melton we're
15  going to change your schedule because of this.
16     A.  Yes.
17     Q.  All right.  And if we go to Exhibit No. 77
18  that we were just looking at, this is Mr. Melton
19  complaining about the schedule change, right?
20     A.  Yes.
21     Q.  And he's saying -- and you write this in
22  your report.  You say Bruce feels he's being
23  targeted due to this request, correct?
24     A.  Yes.

Page 217

1      Q.  Okay, so that was Mr. Melton's complaint.
2      A.  Yes.
3      Q.  And when you prepared this report, this
4  report would have gone to the CEO?
5      A.  Yes.
6      Q.  Okay, and then also would have gone to
7  corporate, the corporate HR department.
8      A.  My corporate HR person and also the
9  corporate compliance hot line individual.
10     Q.  Okay.  All right.  Okay, and if you go to
11  the second page of Exhibit 77, towards the middle it
12  says Laurie wrote a letter addressed to Bruce which
13  was dated December 12th of 2016 which you just
14  talked about, do you see that?
15     A.  Yes.
16     Q.  And then further down it says it should be
17  noted that Laurie discussed this letter with Polly
18  Costantini, C-O-S-T-A-N-T-I-N-I, of corporate HR
19  prior to writing it, right?
20     A.  Correct.
21     Q.  Okay.  And then at the bottom you wrote
22  please note we have moved other staff that have
23  worker's comp injuries and work restrictions to
24  other departments and other shifts in order to meet

Page 218

1  the needs of the facility and to help the employees
2  work their FTE status, right?
3      A.  Correct.
4      Q.  What is FTE status?
5      A.  Full-time employee.
6      Q.  And let's turn to the next page, so the
7  third page of Exhibit 77.  It says the Pavilion was
8  within its rights to ask an employee to change their
9  schedule to accommodate their work restrictions to
10  better meet the needs of the hospital per the
11  worker's compensation alternative duty/restricted
12  duty program policy.  Did I read that correctly?
13     A.  Yes.
14     Q.  And there was also an issue that
15  Mr. Melton brought to your attention, Exhibit 80,
16  and this relates to the time frame when DCFS had
17  deemed Mr. Melton ineligible to work, right?
18     A.  Yes.
19     Q.  And you conducted an investigation into
20  the issues raised by Mr. Melton.
21     A.  Correct.
22     Q.  And you prepared this report.
23     A.  Yes.
24     Q.  Okay.  And you say in the conclusion, the

Page 219



2:17-cv-02112-CSB-EIL # 41    Page 126 of 189
Arbitration    10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

1 results of your investigation, Mr. Melton is
2 currently off work due to being ineligible to work
3 in our facility due to an issue with his background
4 check, correct?
5     A.  Correct.
6     Q.  And it says until this issue is resolved
7 Bruce cannot work, right?
8     A.  That's correct.
9     Q.  Okay.  So I'd like to talk about
10 Mr. Melton's --
11        ARBITRATOR EPSTEIN:  Excuse me, PTO stands
12 for?
13        THE WITNESS:  Paid time off.
14        ARBITRATOR EPSTEIN:  I knew what it was,
15 but I didn't know what it stood for.  Thank you.
16        THE WITNESS:  You're welcome.
17 BY MR. LAYTON:
18     Q.  So if you could turn to Exhibit 82.  I
19 want to discuss some issues relating to Mr. Melton's
20 criminal background.
21     A.  Okay.
22     Q.  So can you please explain to the judge
23 what Exhibit 82 is?
24     A.  This is the background check that -- the

Page 220

1 results that we receive from Sterling that all
2 employees within the hospital have to go through.
3     Q.  Okay.  Is this -- this particular
4 document, Exhibit 82, is this part of the DCFS
5 criminal background checks that we've been talking
6 about?
7     A.  It is not.
8     Q.  Do you --
9     A.  It's separate.
10     Q.  This is separate, okay.  Do you ever send
11 this document to DCFS?
12     A.  No.
13     Q.  Does DCFS do its own background check?
14     A.  DCFS does their own thing, they pay for it
15 as well, so they -- we send -- we only send those
16 employees that would be around our residential kids
17 to get fingerprinted because the state pays for that
18 fingerprint.
19     Q.  Okay.  And I'm sure you recall when I was
20 cross-examining Mr. Melton I talked about the fact
21 that there are some charges that are listed in
22 Exhibit 82 that are not on the DCFS background
23 report that was done in 2015, correct?
24     A.  Correct.

Page 221

1     Q.  And, for example, if there are additional
2 criminal background items relating to a driver's
3 license, was that really relevant to Mr. Melton's
4 ability to work at the Pavilion?
5     A.  This would not, no.
6     Q.  Okay.  And you heard me talk about
7 misdemeanors and petty offenses.  Would those
8 charges be relevant to Mr. Melton's ability to work
9 at the Pavilion?
10     A.  No.
11     Q.  So Exhibit No. 83, what is your
12 understanding of what this document is?
13     A.  This is a document from DCFS.  Whenever we
14 have background checks that we do through the DCFS
15 system, I go into their website, plug in their name,
16 their date of birth, the last four of their social,
17 and then I get results back saying whether we need
18 to send that employee in to get fingerprinted or
19 not.  What this form is saying is that he would not
20 need to be fingerprinted because he's already in
21 their system.
22     Q.  Okay.  So let's be real clear on the
23 record for Exhibit 83.  And this is dated June 15th
24 of 2015, correct?

Page 222

1     A.  Correct.
2     Q.  Does this document -- does this document
3 mean that in June of 2015 Mr. Melton is excused from
4 undergoing a criminal background check?
5     A.  No, it just says that he does not need to
6 be fingerprinted because they already have his
7 fingerprints in their database.
8     Q.  Okay, and there's no point in --
9     A.  They don't want to pay for a second
10 fingerprint.
11     Q.  And there would be no need to if they've
12 already got them.
13     A.  Correct.
14     Q.  Okay.  This document, Exhibit 83, does
15 this document state that Mr. Melton is excused from
16 ever having to go for a criminal background check
17 ever?
18     A.  No.  All it's saying is he does not need
19 to be fingerprinted again at that time.
20     Q.  Okay.  So if you could turn to Exhibit 84.
21 Can you please explain for the record what this is?
22     A.  This is the form, it's called a BCU, that
23 DCFS sends back to me showing the background check
24 information and the results of the background check

Page 223



2:17-cv-02112-CSB-EIL # 41    Page 127 of 189<br>
Arbitration   10/29/2019<br>
Bruce Melton vs. Pavilion Behavioral Health System, et al.

1 that they had conducted on Mr. Melton.

2     Q.   Okay, and this document indicates that

3 there are 11 criminal convictions, correct?

4     **A.   Correct.**

5     Q.   And is this the document that would be

6 relied on solely by DCFS concerning Mr. Melton and

7 his criminal background?

8     **A.   Correct.**

9     Q.   Okay.   Looking at Exhibit 85, this is a

10 document that confirms, at least in 2015, Mr. Melton

11 did not undergo an FBI background check at this

12 time.

13     **A.   Correct.   This is the results of us**

14 **completing that BCU form requesting a waiver, they**

15 **granted the waiver, and this is the document that**

16 **they sent to me to show that he was able to work**

17 **with our kids or be alone with our children.**

18     Q.   Okay.   And if you could turn to Exhibit

19 No. 86.   And this is a letter that you sent to DCFS

20 dated July 8th of 2015, correct?

21     **A.   Correct.**

22     Q.   And can you just generally explain what

23 was the purpose of this letter?

24     **A.   This letter would go in conjunction with**

1 the background check, Exhibit 84, because usually

2 when I get a result back, there may be one or two

3 hits on the background check, and I can write

4 directly on the form.   Due to the number of issues

5 that had come up, I did a letter, which on the

6 second page of Exhibit 84, it says please see

7 attached letter.   This is the letter that I had

8 completed answering all the questions on the

9 background check form.

10     Q.   Okay.   So would it be fair to say that

11 you're essentially asking DCFS for approval and

12 permission to allow Mr. Melton to work at the --

13     **A.   Yes, we're asking for a waiver to be**

14 **granted so he can work in our facility.**

15     Q.   So you had learned -- and I just want to

16 take this a step at a time, but you had learned in

17 2015 that Mr. Melton did have some criminal

18 convictions in his past.   Why were you agreeable to

19 asking for a waiver from DCFS at this time?

20     **A.   Because we felt that with the role that he**

21 **was in, that he would be -- these issues weren't a**

22 **bar from employment.**

23     Q.   Okay.   You felt comfortable requesting the

24 waiver from DCFS.

1     **A.   Yes.**

2     Q.   Now can you please just generally describe

3 the waiver process?   How does that occur and who

4 ultimately approves or grants a waiver?

5     **A.   We fill out the form.   Then we send -- I**

6 **send it to my licensing rep, Arnetha Truss, and then**

7 **she forwards it onto the state, and then the state**

8 **would review it and the state gives us the okay or**

9 **denial for the background check, and then the**

10 **approval would be that form.**

11     Q.   Okay.   All right.   Would it be fair to

12 say, though, that the Pavilion has the legal right

13 to exercise discretion as to whether or not it wants

14 to request a waiver?

15     **A.   Yes.**

16     Q.   So you're not legally obligated to ask for

17 a waiver --

18     **A.   No.**

19     Q.   -- for an employee.

20     **A.   No.**

21     Q.   So let's go to Exhibit 87 please.   And can

22 you please explain what this document is?

23     **A.   This is a copy of the envelope that I**

24 **received from DCFS with inside of it were the**

1 documents for these six individuals requesting for

2 the FBI clearance to be redone, so this is the

3 envelope that I had received.   I gave the forms to

4 each of these employees, and they had to go get

5 fingerprinted again so that DCFS could send it in to

6 the FBI clearance and have them run that background

7 check on them.

8     Q.   Okay, so let's take this a step at a time.

9 So what is the second page of Exhibit 87?

10     **A.   That is the receipt that Bruce turned in**

11 **to me after he went to get fingerprinted.**

12     Q.   Okay.

13     **A.   So you'll see where it says agency name,**

14 **it's DCFS historical reprint, FBI only, so they were**

15 **only running the FBI section.**

16     Q.   So this was in November of 2016; is that

17 fair?

18     **A.   Yes, he got fingerprinted on November**

19 **10th, 2016.**

20     Q.   And you can see on Exhibit 87 it's

21 postmarked November 2nd of 2016?

22     **A.   Yes.**

23     Q.   And I'm sorry, so whose handwriting is

24 this on the front?



2:17-cv-02112-CSB-EIL # 41 Page 128 of 189
Arbitration 10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

1   A.   That's my handwriting.
2   Q.   And those are six employees at the
3 Pavilion?
4   A.   Correct.
5   Q.   And all six of those employees had to go
6 through a criminal background check?
7   A.   Correct.
8   Q.   And who is it specifically, what
9 department was requiring this background check?
10   A.   Well, DCFS was requiring it because they
11 did not have the FBI portion --
12   Q.   Okay.
13   A.   -- of the background check completed.
14   Q.   So, in other words, DCFS is telling the
15 Pavilion these six employees, including Mr. Melton,
16 have to undergo this criminal background check.
17   A.   Correct.
18   Q.   Did you on your own unilaterally decide
19 that Mr. Melton all of a sudden needed to have a
20 criminal background check in November of 2016?
21   A.   No.  It was the result of this document
22 being sent to me.
23   Q.   Okay.  So if DCFS is telling you that you
24 need to send Mr. Melton and other employees for a

Page 228

1 then he brought that in to me.
2   Q.   Okay.  So when you called Mr. Melton after
3 you received the document that we've marked as
4 Exhibit 89, can you explain what you told
5 Mr. Melton?
6   A.   I explained to him that he needed to call
7 the phone number on the -- for the information that
8 he was given, that he needed to request the FBI
9 background check information, and then bring that
10 information in to me.
11   Q.   And did Mr. Melton say anything to you at
12 the time that you can recall?
13   A.   He said, okay, I'll do it, he agreed to do
14 it.
15   Q.   Okay.  So if you could turn to Exhibit No.
16 90.  And can you please explain what this record or
17 what this document is?
18   A.   This is the results of that background
19 check through the FBI system that resulted in him
20 being ineligible to work at our facility.
21   Q.   Okay.  And is it -- is it true that you
22 came into possession of this document?
23   A.   Yes, he brought this to me.
24   Q.   Okay.  And when you say he brought this to

Page 230

1 criminal background check, is that something you
2 could ignore?
3   A.   No.
4   Q.   What would happen if you ignored that
5 request and refused to agree to or abide by it?
6   A.   We would lose our license.  We wouldn't be
7 able to have the children in our facility.
8   Q.   Okay.  So if you could turn to Exhibit 90
9 -- excuse me, Exhibit 89.  Okay, and this was a
10 document -- who sent this document to you?
11   A.   DCFS.
12   Q.   And this is dated December 24th of 2016.
13   A.   Correct.
14   Q.   And it indicates at that time that
15 Mr. Melton is ineligible to work at the Pavilion.
16   A.   Correct.
17   Q.   So once you received this document, you
18 had the right to request a waiver on behalf of
19 Mr. Melton.
20   A.   I had to -- well, when I got this letter,
21 I called Mr. Melton and said I received this letter
22 from DCFS.  He had to call and get the results of
23 the FBI background check.  I couldn't get those,
24 that information.  He had to call, get that, and

Page 229

1 you, who do you mean?
2   A.   Bruce brought it to me in my office.
3   Q.   And your office at the Pavilion.
4   A.   Correct.
5   Q.   Okay.  When Mr. Melton brought this to you
6 in your office at the Pavilion, did you have a
7 discussion of any kind with Mr. Melton about Exhibit
8 90?
9   A.   He reviewed some of the charges with me
10 and was telling me that he was in the process of
11 getting these expunged.
12   Q.   Okay.  And Mr. Melton, you'll agree with
13 me, made some handwritten notes on Exhibit 90 --
14   A.   Yes.
15   Q.   -- throughout the document?
16   A.   Yes.
17   Q.   What did Mr. Melton tell you about these
18 handwritten notes during the course of your
19 discussion about Exhibit 90?
20   A.   He said that he had filed the paperwork
21 and was in the process of getting these expunged.
22   Q.   Okay.  At that time, did Mr. Melton tell
23 you that any of these arrests, charges or
24 convictions in Exhibit 90 had actually been

Page 231



2:17-cv-02112-CSB-EIL # 41   Page 129 of 189
Arbitration   10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

Page 232

1 expunged?

2    **A.  No.**

3    Q.  Okay.  Did Mr. Melton provide you with any

4 court-approved paperwork at this time that confirmed

5 for you that any of these charges had been

6 dismissed?

7    **A.  No.**

8    Q.  At that time, did Mr. Melton tell you he

9 had any other information that he wanted you to

10 consider?

11    **A.  No.**

12    Q.  So when you received Exhibit No. 90, what

13 did you do with this document?

14    **A.  I took this information.  I called my**

15 **corporate HR and got them involved to see what was**

16 **our next course of action.**

17    Q.  Okay, and can you describe what you did?

18    **A.  At that point, their recommendation was to**

19 **do a spreadsheet to show what the original 11**

20 **charges were and then these new additional charges,**

21 **because there were additional charges above and**

22 **beyond the first 11, and kind of look at what they**

23 **were, if they were duplicates of the other charges,**

24 **and kind of figure out what was additional with**

Page 233

1 these new charges.

2    Q.  Okay.  And can you turn to Exhibit 99?  Is

3 this the spreadsheet you mentioned?

4    **A.  This is my spreadsheet, yes.**

5    Q.  Okay.  So can you please explain what is

6 listed on the left?

7    **A.  The left-hand side is the new charges or**

8 **the FBI -- the charges from the FBI background, and**

9 **the charges on the right were the original DCFS**

10 **background.**

11    Q.  Okay.  So all the information that's

12 listed on the right, the right column -- this goes

13 onto two pages.

14    **A.  Correct.**

15    Q.  Okay.  So the information that's on the

16 right side of these two pages, that was the

17 information that was available to you in 2015 when

18 Mr. Melton was hired.

19    **A.  Correct.**

20    Q.  And on the left, this is now new

21 information, some of which is new information that

22 was available to you in late 2016 or early 2017.

23    **A.  Correct.**

24    Q.  Okay.  So let's just talk about a couple

Page 234

1 of them.  You know, for example, there's an

2 indication on January 12th of 2015, do you see it

3 says domestic battery?

4    **A.  Yes.**

5    Q.  And that was information that was new to

6 you in 2017 for Mr. Melton?

7    **A.  Correct.**

8    Q.  If you go to the right, it says NA for

9 this date.  What does that mean?

10    **A.  Means it was not included on the first**

11 **DCFS background check.**

12    **ARBITRATOR EPSTEIN:  Wait.  What's the**

13 **date you said?**

14    MR. LAYTON:  So that was January 12th of

15 2005.

16    ARBITRATOR EPSTEIN:  You said '15.

17    MR. LAYTON:  Oh, if I did, I misspoke.

18 Thank you, that was -- yeah, I misspoke, so let me

19 restate it, okay?

20    ARBITRATOR EPSTEIN:  No, I understand it

21 now.  I thought you had misspoken.

22    MR. LAYTON:  No, I think what I said

23 2015 -- at least my intention was to say that -- let

24 me restart again.

Page 235

1    ARBITRATOR EPSTEIN:  Go ahead.

2 BY MR. LAYTON:

3    Q.  Okay.  When you first hired Mr. Melton in

4 June of 2015, this domestic battery entry, was that

5 information available to you?

6    **A.  No.**

7    Q.  Okay.  But this domestic battery charge,

8 this was available to you in 2017.

9    **A.  Correct.**

10    Q.  And if you go down to the next entry,

11 there's another domestic battery for 2004.  Was that

12 information available to you when Mr. Melton was

13 first hired?

14    **A.  No, it was not.**

15    Q.  But this was new information that was

16 available to you in 2017.

17    **A.  Correct.**

18    Q.  And there's a third one, correct,

19 underneath that?

20    **A.  Yes.**

21    Q.  And it says NA for this date, so this is

22 new information to you in 2017.

23    **A.  Correct.**

24    Q.  Okay.  And there's another one down from



2:17-cv-02112-CSB-EIL # 41 Page 130 of 189
Arbitration 10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

1 2004, so another domestic battery charge. It says
2 NA for this date in 2015, right?
3    A.  Correct.
4    Q.  You're learning about yet another domestic
5 battery incident involving Mr. Melton in 2017.
6    A.  Correct.
7    Q.  Okay. If you go down further, there's one
8 that says in October of '94 for residential
9 burglary, correct?
10    A.  Correct.
11    Q.  And it says NA for this date for
12 Mr. Melton?
13    A.  Yes.
14    Q.  And there's even one from '91, and I
15 realize it's old, it says criminal sexual abuse, do
16 you see that?
17    A.  Yes.
18    Q.  And that was not available to you in 2015.
19    A.  Correct.
20    Q.  Now if you go to the top, so there's a
21 charge here from August of 2010, and it says
22 aggravated battery of a police officer, correct?
23    A.  Yes.
24    Q.  And that was information -- was that

Page 236

1 counterpart in corporate, and then we also had
2 corporate legal involved in the investigation as
3 well. And the decision was made from the corporate
4 side and also our facility that we were not going to
5 pursue a waiver based on these additional criminal
6 charges that were brought against Mr. Melton.
7    Q.  Okay. And Mr. Melton was eventually
8 terminated.
9    A.  Correct.
10    Q.  Now this document, Exhibit 90, the
11 document from DCFS -- actually let me step back even
12 before that. So you were first notified by DCFS
13 probably a day or two after December 24th of 2016,
14 you were first notified then that Mr. Melton was not
15 eligible for employment.
16    A.  Correct.
17    Q.  Okay, but it wasn't until February 1st
18 that you after what you discussed made the decision
19 to terminate Mr. Melton.
20    A.  Correct.
21    Q.  Okay. So if you could turn to Exhibit 100
22 and just could you explain what this document is?
23    A.  This is the waiver form that we would have
24 completed for these additional documentations for

Page 238

1 information available to you in 2015 when Mr.
2 Mr. Melton was first hired?
3    A.  No, it was not.
4    Q.  Okay, but that was new information that
5 was available to you in 2017.
6    A.  Correct.
7    Q.  So if you go through these -- Ms.
8 Crabtree, if you go through all of the entries on
9 the left, let the record reflect there's actually 48
10 different entries on the left side concerning
11 information that was available to you in 2017,
12 correct?
13    A.  Yes.
14    Q.  And it's true that some of the information
15 was -- some of Mr. Melton's criminal background
16 information was available in 2015, but certainly all
17 48 of these charges and convictions were not
18 available until 2017.
19    A.  Correct.
20    Q.  All right. So you got information, new
21 information about Mr. Melton's criminal background.
22 What did you do in order to complete your evaluation
23 and make a decision?
24    A.  I forwarded this spreadsheet on to my HR

Page 237

1 the FBI background checks.
2    Q.  Okay. And what did you do at this time?
3    A.  I filled it out as far as we didn't -- we
4 were asking to deny clearance for employment.
5    Q.  Now it says there's a date -- on Exhibit
6 100, there's a date of December 24th of 2016. Is
7 that the date when DCFS sent this to you?
8    A.  That's the date it was sent to me.
9    Q.  And then it says here, it says please see
10 attached letter.
11    A.  Yes.
12    Q.  And if you will turn to Exhibit No. 101.
13    A.  That's my letter that I wrote with regards
14 to all of the different charges.
15    Q.  Okay. And who did you send this letter
16 to?
17    A.  This went back to DCFS.
18    Q.  Okay. Why did you send this letter?
19    A.  I was required to. I was required to send
20 this back to DCFS to let them know that we would not
21 be seeking clearance on Mr. Melton.
22    Q.  Okay. So if you could go -- if you could
23 go to the third page of Exhibit 101, if you see
24 paragraph number 5.

Page 239



2:17-cv-02112-CSB-EIL    # 41    10/29/2019    Page 131 of 189
Arbitration
Bruce Melton vs. Pavilion Behavioral Health System, et al.

1    ARBITRATOR EPSTEIN:  I'm sorry, where?
2    MR. LAYTON:  So Exhibit 101 on the third
3    page, it's paragraph number 5.
4    **A.  Okay.**
5    Q.  Can you please read -- so there's a
6    question that says what are the specific duties and
7    responsibilities for the targeted position of
8    employment and how does the offense that led to the
9    convictions relate to his or her fitness to conduct
10   those duties and responsibilities.  Can you please
11   read your answer for us, Ms. Crabtree?
12   **A.  Sure.  Mr. Melton's position is a food**
13   **service worker in our dietary department.  We are a**
14   **residential facility.  Part of his job**
15   **responsibilities would be to take meal carts to the**
16   **units on which the residents live and deliver the**
17   **meals personally to the residents.**
18   **Mr. Melton's offenses include domestic**
19   **battery convictions, and some of our residents are**
20   **victims of battery which would pose a threat to**
21   **their treatment if they were made aware of Mr.**
22   **Melton's background and convictions.  The residents'**
23   **well-being, safety and treatment plans and**
24   **therapeutic environment are paramount.  Even a small**

Page 240

1    **risk of these residents falling victim to battery**
2    **cannot be tolerated in light of their treatment and**
3    **diagnoses.**
4    **Mr. Melton's long-term history of domestic**
5    **battery convictions cannot be reconciled with his**
6    **role interacting with residents in our residential**
7    **treatment facility.**
8    **ARBITRATOR EPSTEIN:  I have a question.**
9    THE WITNESS:  Yes.
10   ARBITRATOR EPSTEIN:  When you talked about
11   the contents of Exhibit 99 and you did this what you
12   call a spreadsheet --
13   THE WITNESS:  Yes.
14   ARBITRATOR EPSTEIN:  -- showing new
15   information received from the FBI background check
16   that you did not have from the DCFS fingerprint
17   background check from 2015, did you notate whether
18   any of the so-called new information from the FBI
19   was for convictions or simply for arrests?
20   THE WITNESS:  I just noted whatever was on
21   the form.  I didn't note whether they were a
22   conviction or an arrest.
23   ARBITRATOR EPSTEIN:  So is it fair to say
24   that the decision was based on a lack of

Page 241

1    differentiation between arrests and convictions?
2    THE WITNESS:  The decision was made based
3    on the charges against him.
4    ARBITRATOR EPSTEIN:  The charges that were
5    originally brought, not whether there was a
6    conviction from those charges.
7    THE WITNESS:  Correct.
8    ARBITRATOR EPSTEIN:  Okay.
9    BY MR. LAYTON:
10   Q.  And based on this information that we just
11   looked at, Ms. Crabtree, you agree ultimately you
12   made the decision to terminate Mr. Melton, correct?
13   **A.  Correct.**
14   Q.  Okay.  And if you could turn to page 102.
15   **A.  Okay.**
16   Q.  It says here on page 102, after reviewing
17   the document -- this is your termination letter to
18   Mr. Melton, correct?
19   **A.  Correct.**
20   **ARBITRATOR EPSTEIN:  You said page.  You**
21   mean Exhibit --
22   MR. LAYTON:  Exhibit 102, yes, judge,
23   thank you.
24   Q.  After reviewing the documentation you

Page 242

1    provided, it has been determined that we are not in
2    a position to pursue a waiver in order for you to
3    continue your employment with the Pavilion.  Your
4    employment will be terminated effective February
5    1st, 2017, correct?
6    **A.  Correct.**
7    Q.  Okay.  And can you please explain for the
8    record -- well, let me take a step back.  Okay, at
9    this point in time, am I correct in stating that
10   Mr. Melton was deemed ineligible for employment by
11   DCFS?
12   **A.  Yes.**
13   Q.  Okay.  And am I also correct in stating
14   that you did not have a legal obligation at that
15   time to request a waiver?
16   **A.  No.**
17   Q.  In other words, based simply on the fact
18   of his criminal convictions and the notice from
19   DCFS, Mr. Melton could have been terminated at that
20   time.
21   **A.  Yes.**
22   Q.  Okay.  And I want to get to the point that
23   the judge was just discussing with you.
24   ARBITRATOR EPSTEIN:  Largely, that's just

Page 243

2:17-cv-02112-CSB-EIL # 41   10/29/2019   Page 132 of 189
Arbitration
Bruce Melton vs. Pavilion Behavioral Health System, et al.

1 something we'll discuss in argument, but you can
2 certainly ask the witness anything that you want to
3 say on that.
4      MR. LAYTON:  Yes, judge, thank you.
5    Q.  So let's take a look at -- and I want this
6 to be clear on the record.  At the time that the
7 decision was made to terminate Mr. Melton, you were
8 basing that decision on the convictions and the
9 charges.
10   **A.  Correct.**
11   Q.  Okay.  I think it's clear the charges and
12 the convictions for the most part involve serious
13 crimes.
14   **A.  Correct.**
15   Q.  All right.  So if you could turn to
16 Exhibit 95.
17      ARBITRATOR EPSTEIN:  Excuse me?
18      MR. LAYTON:  95, judge.
19      ARBITRATOR EPSTEIN:  Okay.
20   Q.  Okay.  This is Exhibit 95.  You'll see at
21 the top it says Child Care Act of 1969, do you see
22 that?
23   **A.  Yes.**
24   Q.  It says here, the department shall require

Page 244

1 that each child care facility licensed applicant, as
2 part of the application process, and each employee
3 and volunteer of a child care facility or
4 nonlicensed service provider, as a condition of
5 employment, authorize an investigation to determine
6 if such applicant, employee or volunteer has ever
7 been charged with a crime and, if so, the
8 disposition of those charges, correct?
9    **A.  Yes.**
10   Q.  So up -- and it says here -- so the
11 department I will represent to you refers to DCFS.
12 So this law says, as you understand it, that you are
13 going to receive and consider information regarding
14 criminal charges.
15   **A.  Correct.**
16   Q.  Okay.  And it says here, if you go down a
17 little bit further on Exhibit 95, it says the
18 Department of State Police shall provide information
19 concerning any criminal charges and their
20 dispositions, do you see that?
21   **A.  Yes.**
22   Q.  So that says the police have to provide
23 this information.
24   **A.  Correct.**

Page 245

1    Q.  Okay.  And if you can please turn to
2 Exhibit No. 96.  So this document, can you please
3 explain what this document is?
4    **A.  This is our policy on employee background**
5 **screening.**
6    Q.  And where did this policy come from?
7    **A.  This is a corporate policy that is handed**
8 **out to all the different facilities that they own.**
9    Q.  Okay.  And if you could turn to the third
10 page on Exhibit 96.  Do you see item number 5?
11   **A.  Yes.**
12   Q.  It says -- it says, as a general rule, the
13 company, meaning the Pavilion, will not refuse to
14 consider a viable candidate simply on the basis of
15 an arrest that did not result in a conviction, okay?
16 Depending on state law, this may be reported as
17 dispositions of not guilty, nolle pros or nolle
18 prosequi, adjudication withheld, dismissed,
19 diversion, expunged, first offender program,
20 conditional probation, nolo contendere, no
21 information filed, adjudication withheld, retired,
22 deferred adjudication, prosecution or disposition
23 other than conviction.  Do you see that?
24   **A.  Yes.**

Page 246

1    Q.  So this policy says you're allowed --
2 you're required to consider criminal charges that
3 don't result in conviction.
4    **A.  Right.**
5    Q.  Okay.  It says if a candidate has an
6 arrest or charge that resulted in any of these or
7 similar dispositions, the individual's eligibility
8 for employment will be reviewed on a case by case
9 basis.  And did you do that for Mr. Melton?
10   **A.  Yes, we did.**
11   Q.  And it says the factors to be reviewed
12 will include whether the charge is related to the
13 job duties of the position for the candidate, the
14 nature and gravity of the charges.  For Mr. Melton,
15 did you consider the nature and gravity of the
16 charges?
17   **A.  Absolutely.**
18   Q.  Okay.  It also says whether the
19 candidate's on probation or parole, but that did not
20 apply to Mr. Melton, right?
21   **A.  No.**
22   Q.  So then it says on the next page of
23 Exhibit 96, you're supposed to evaluate whether the
24 number or nature of the charges suggests reasonable

Page 247



2:17-cv-02112-CSB-EIL   # 41   Page 133 of 189
Arbitration   10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

1 questioning of the company as a responsible human
2 services organization if the candidate is employed.
3 Do you see that?
4    A.  Yes, I do.
5    Q.  How did that factor into the decision to
6 ultimately terminate Mr. Melton?
7    **A.  We looked at the number of arrests and**
8 **charges that he had against him and what the types**
9 **were, and then we determined that due to the number**
10 **of charges that he had, the types of the charges and**
11 **the types of population that we have with our kids**
12 **being that vulnerable population, we decided that we**
13 **couldn't have him employed in our facility.**
14    Q.  Okay.  Would it have been -- in your view,
15 would it have been consistent with your obligation
16 for the Pavilion to act as a responsible human
17 services organization to continue hiring Mr. Melton?
18    **A.  No, it would not.**
19       MR. LAYTON:  Just checking my notes.  I
20 think I may be done, judge.
21       ARBITRATOR EPSTEIN:  Certainly.  Take your
22 time.
23       MR. LAYTON:  All right, judge, based on
24 that, I have nothing further.

Page 248

1       ARBITRATOR EPSTEIN:  Cross-examination.
2       MR. MELTON:  Thank you, Your Honor.
3       CROSS-EXAMINATION BY
4       MR. MELTON:
5    Q.  First of all, I want to go back to the
6 last document that Mr. Layton was reading.  Exhibit
7 96 where he read as a general rule the company will
8 not refuse to consider a viable candidate, but I
9 want to skip that part and go down to what he
10 skipped over.  You see Exhibit 96?
11    **A.  Uh-huh.**
12    Q.  Okay.  At the bottom --
13       ARBITRATOR EPSTEIN:  That means yes,
14 right?
15       THE WITNESS:  Yes, I'm sorry.
16    Q.  At the bottom of that exhibit, where he
17 failed to read was, it stated whether the charges
18 related to the job duties of the position for which
19 the candidate has applied.  Also the nature and
20 gravity of the charges.  Furthermore, it goes on to
21 state how recently the incident occurred.
22       So did you take into account how recent my
23 criminal history was or was it just that you saw the
24 cases and made your decision based on just seeing

Page 249

1 the initial cases?
2    **A.  We looked at everything.  We looked at the**
3 **number of cases, we looked at the time frame, we**
4 **looked at the types of cases and determined based on**
5 **that that we couldn't have you employed with us any**
6 **longer.**
7    Q.  Okay.  I want to go back now.  You said
8 that part of my job description was to unload the
9 truck.  I want to go to Exhibit 3 and -- well, I
10 would like for you to look at Exhibit 3 and Exhibit
11 6 and find in those exhibits where it states that my
12 job considers me to unload trucks.
13    **A.  It would fall into the other duties as**
14 **assigned.**
15    Q.  Okay, so other duties assigned will
16 consist of me by myself unloading a big truck.
17    **A.  It would consist of anybody unloading the**
18 **truck.**
19    Q.  Okay, Ms. Crabtree, what kind of --
20    **A.  -- in this position.**
21    Q.  Okay, sorry.  May I ask you, outside of
22 myself while I was unloading the truck, who helped
23 or assisted me in unloading the truck?
24    **A.  I was under the impression that Adam**

Page 250

1 **Putvin also helped come in on Fridays and unload the**
2 **truck.  Ray Reis also helped unload the truck.**
3    Q.  Okay.  And would you happen to know what
4 time frame this was?
5    **A.  During the time that you were employed**
6 **there.**
7    Q.  Okay.
8    **A.  I wasn't there to witness it, so I don't**
9 **know.**
10    Q.  Okay.  Let me see here.  You stated that
11 you did not use petty offenses against me; is that
12 correct?
13    **A.  As far as what?**
14    Q.  As far as -- yeah, I apologize, Exhibit --
15 Exhibit 86.
16    **A.  Okay.  What do you mean by petty offenses?**
17    Q.  A petty offense, if I'm accurate, is I
18 believe a misdemeanor.
19       ARBITRATOR EPSTEIN:  It's even less than a
20 misdemeanor.  There are three classifications, just
21 so everyone knows.  There are felonies at the
22 highest, there are misdemeanors below that, and
23 there are petty offenses which are below
24 misdemeanors.

Page 251



2:17-cv-02112-CSB-EIL # 41   Page 134 of 189
Arbitration   10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

**Page 252**

1    A.  Okay.

2    Q.  So a petty offense, for example -- and

3 please correct me if I'm wrong, judge -- is

4 trespassing too.

5    ARBITRATOR EPSTEIN:  Rather than

6 describing what they are --

7    MR. MELTON:  Okay.

8    ARBITRATOR EPSTEIN:  -- that just gets us

9 into a --

10    MR. MELTON:  Yes, sir.

11    ARBITRATOR EPSTEIN:  -- muddy area.

12    MR. MELTON:  Okay.

13    ARBITRATOR EPSTEIN:  Have to get out

14 statute books and --

15    MR. MELTON:  All that, yes, sir.

16 BY MR. MELTON:

17    Q.  Okay.  So my question, then, is you used

18 everything in my criminal history, everything to

19 apply to the decision whether you gave me a waiver.

20    A.  We looked at all the charges.

21    Q.  Okay, okay.  I have a question, Ms.

22 Crabtree.  Mr. Layton asked you, he referred to the

23 right -- the communications I had with the

24 compliancy line.  In the policy of the compliancy

**Page 253**

1 line, if anyone has been written up for any issues,

2 is it appropriate for that person, whether it be

3 anyone or you, to investigate a write-up concerning

4 that individual?

5    A.  I'm not sure I'm clear on what you're

6 asking.

7    ARBITRATOR EPSTEIN:  I think what he's

8 asking is if a complaint was filed about behavior

9 that included your behavior, would it be appropriate

10 for you to investigate that?

11    A.  It would be up to the CEO to determine.

12 If he asked me to do the investigation, I have to do

13 the investigation.  It wasn't my decision on who did

14 the investigation; it came from the CEO.

15    Q.  Okay.  Okay, one second please.  Ms.

16 Crabtree -- Ms. Crabtree, I'm sorry, you stated that

17 the date that I initially handed you my criminal

18 history, that you and I had a conversation about my

19 criminal history; is that correct?

20    A.  We had a conversation about the paperwork

21 that you handed in to me.

22    Q.  So did we go into detail and did I explain

23 to you about each case in my criminal history?

24    A.  No.  You noted that you were getting

**Page 254**

1 certain things expunged from your record.

2    Q.  Correct, but did I specifically talk with

3 you about my criminal history?

4    A.  Not to my recollection.

5    Q.  Did you ask me anything about my criminal

6 history?

7    A.  Not that I'm aware of.

8    Q.  Okay.  Ms. Crabtree, could you tell me how

9 long, if you know, and I really -- no, don't even

10 worry about that.

11    Ms. Crabtree, I worked for the Pavilion a

12 year and a half, a little over a year and a half

13 before I was terminated, correct?

14    A.  Yes.

15    Q.  In that time frame of me working for the

16 Pavilion, how many times did you get a complaint

17 about me from any of the patients, children's

18 parents or any person that was affiliated with the

19 Pavilion but not working for the Pavilion?

20    A.  I didn't receive anything.

21    Q.  Okay, so I didn't have any problems with

22 the patients.

23    A.  None that were reported to me.

24    Q.  Okay, none that was reported to you.

**Page 255**

1    A.  Correct.

2    Q.  Okay.

3    A.  If they were reported to somebody else,

4 they didn't make it to me.

5    Q.  Okay.  So do you know of anything being

6 reported to somebody else?

7    A.  Like I said, if it wasn't reported to me,

8 I'm not aware of anything.

9    Q.  Okay, okay.  Something else.  Here we go.

10 Oh, I do have a question for you.  You stated that

11 it was totally DCFS that suggested to you that I

12 have another background check.  So you didn't have

13 anything to do with suggesting that I needed to

14 be -- I needed to have another background check,

15 right?  Correct?

16    A.  Absolutely not.  I received the document

17 from DCFS with the envelope with the other six --

18 all six employees in it and had to follow those

19 instructions.

20    Q.  Okay.

21    A.  I didn't reach out to them to start an

22 investigation.

23    Q.  Okay.  Okay, Ms. Crabtree, you stated that

24 since I had my -- the document that was given, or



2:17-cv-02112-CSB-EIL   #41   Page 135 of 189

Arbitration   10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

1  put in my file I should say, stating that I was not
2  to ever be -- never be fingerprinted again for a
3  background check, that document, you know what
4  document we're referring to?  As a matter of fact,
5  it is --
6      ARBITRATOR EPSTEIN:  Mr. Melton, I have
7  seen that and read that document during this hearing
8  three times --
9      MR. MELTON:  Get to the point.
10     ARBITRATOR EPSTEIN:  -- and it doesn't say
11  what you say it says.  It just says basically don't
12  have to send him for another fingerprint --
13     MR. MELTON:  Correct.
14     ARBITRATOR EPSTEIN:  -- which can be
15  interpreted either as we don't want to ever check
16  him again, which is what you're contending, or it
17  could be on the other hand, as the respondent is
18  contending, don't bother, we already have his
19  fingerprints on file; if we want to check them, we
20  can check them.
21     MR. MELTON:  And --
22     ARBITRATOR EPSTEIN:  So that's been made
23  clear over and over again.
24     MR. MELTON:  I'm not going with that, Your

Page 256

1  Honor.
2      ARBITRATOR EPSTEIN:  Okay.
3      MR. MELTON:  I'm not going with that,
4  sorry.
5  BY MR. MELTON:
6      Q.  Where I'm going with this is, so if I was
7  deemed not to have to have another fingerprint, why
8  was I subject to get fingerprinted again?
9      A.  Because DCFS sent me a document that said
10  that an FBI background check hadn't been completed
11  and you needed to go back and get it done.
12     Q.  Okay.
13     A.  It was sent to me from DCFS.
14     Q.  Okay.
15     A.  So I had to follow their order or risk
16  losing our license.
17     Q.  I'm not arguing with that.  All I'm
18  suggesting is if they said that they already had my
19  fingerprints, I don't know why I would have to go
20  get fingerprinted again, but that's irrelevant,
21  okay.
22     ARBITRATOR EPSTEIN:  I agree with you, it
23  is.
24     MR. MELTON:  Your Honor, I'm new to this.

Page 257

1      ARBITRATOR EPSTEIN:  Hey, you're doing a
2  good job.
3      MR. MELTON:  No, I'm not.
4      ARBITRATOR EPSTEIN:  No, you really are.
5      MR. MELTON:  I'm trying though, Your
6  Honor.  I'm not.
7  BY MR. MELTON:
8      Q.  Okay.  I want to go to Exhibit 7 if you
9  don't mind.  This is new, Your Honor.  Okay, would
10  you care to read that for us please?
11     ARBITRATOR EPSTEIN:  The whole thing?
12     MR. MELTON:  No, sir.  No, sir.  The first
13  part --
14     A.  What page?
15     Q.  Oh, I'm sorry.  Page 3208.
16     A.  And which part would you like me to read?
17     Q.  The first part if you don't mind.
18     ARBITRATOR EPSTEIN:  And just so it's
19  clear for the record, this is the employee handbook.
20     A.  It is the policy of the Pavilion to
21  provide equal opportunity in employment to all
22  employees and applicants for employment.  No person
23  will be discriminated against in employment on the
24  basis of his or her race, religion, color, sex, age,

Page 258

1  national origin, disability, pregnancy, military
2  status or any other characteristic protected by
3  applicable federal, state or local law.
4      Q.  Thank you.  Okay.  So, Ms. Crabtree, you
5  state today that my termination was under -- oh, how
6  do I want to put this?  My termination was done in a
7  correct fashion.
8      A.  Yes, it was.
9      Q.  Okay.  I want to switch something for a
10  minute here.  Well, I'm not going to switch.  I just
11  want to know, Ms. Crabtree, during this process that
12  we have been enduring, have you ever or the Pavilion
13  ever made a monetary offer to me to end this case?
14     MR. LAYTON:  I'm going to object to that.
15     ARBITRATOR EPSTEIN:  Sustained.
16     MR. MELTON:  Sustained, sorry.
17     ARBITRATOR EPSTEIN:  It's okay.  You can
18  ask, I rule.  It's okay.
19     MR. MELTON:  Yes, sir.  Well, how can I
20  put this?
21     ARBITRATOR EPSTEIN:  See, under the law,
22  anything done in discussions of possible settlements
23  are inadmissible.
24     MR. MELTON:  Admissible, okay.

Page 259

2:17-cv-02112-CSB-EIL # 41    Page 136 of 189
Arbitration   10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

1    ARBITRATOR EPSTEIN:  So whether there was
2 or there wasn't any such discussion, I'm not
3 supposed to hear.
4    MR. MELTON:  Yes, sir, sorry about that.
5 BY MR. MELTON:
6    Q.   Okay.  Ms. Crabtree, I'd like to ask you,
7 upon terminating me -- I think I asked this, Your
8 Honor, I don't know -- did you have a discussion
9 with me about terminating me?
10   A.   Like a conversation?
11   Q.   Yes.
12   A.   I don't believe I did.  I sent you a
13 letter.
14   Q.   Do you remember how you sent the letter?
15   A.   Certified, return receipt.
16   Q.   Yes, ma'am.  Okay, after I was terminated,
17 do you recall me reaching out to discuss, have
18 discussions with you and not returning my call?
19   A.   No, I don't.
20   Q.   Okay.  Well, there was something else.
21 One second please.
22    ARBITRATOR EPSTEIN:  Take your time, sir.
23   Q.   Oh, that's what it was.
24    MR. MELTON:  I'm slow at this, Your Honor,

Page 260

1 but I'm going to get it.  One day I might be a
2 lawyer.
3    ARBITRATOR EPSTEIN:  Okay.
4    MR. MELTON:  Even with my background.
5    ARBITRATOR EPSTEIN:  You're doing -- I'll
6 say it again, you're doing a fine job, so go ahead.
7 BY MR. MELTON:
8    Q.   Under -- okay, where is this?  I would
9 like for us to look -- oh, okay, here we go.
10 Exhibit 89, this document was read by Mr. Layton,
11 and this document does say that I'm ineligible for
12 employment, correct?
13   A.   Yes, it does.
14   Q.   Okay.  But Mr. Layton failed to read the
15 rest of it.  Could you read right under ineligible
16 what the rest of that says for us please?
17    ARBITRATOR EPSTEIN:  Can you tell me just
18 what you --
19    MR. MELTON:  What I think, yes, sir.
20    ARBITRATOR EPSTEIN:  What do you want
21 her -- you can read it in there and ask her whether
22 that's in the letter.
23    MR. MELTON:  Yes, sir, Your Honor.
24    ARBITRATOR EPSTEIN:  Okay.

Page 261

1    Q.   Okay, it says there is a conviction that
2 is a bar to employment.  However, the bar may be
3 able to be waived for the purpose of employment
4 within a licensed child care facility.
5    ARBITRATOR EPSTEIN:  And that's in that
6 letter?
7    A.   Yes.
8    MR. MELTON:  I'm sorry, that was a --
9    A.   It is, yes.
10    ARBITRATOR EPSTEIN:  It's okay.
11   Q.   I was -- when I first was hired, you
12 presented me with a waiver to work there, correct?
13   A.   When you were first hired, I received a
14 letter from DCFS with background check information
15 on there that we had to request a waiver in order
16 for you to continue to work with us, yes.
17   Q.   So you did request a waiver.
18   A.   Yes.
19   Q.   Okay.  The second background check, was
20 there anything in it that said that I was not able
21 at all to work in the Pavilion or any licensed
22 facility?
23   A.   It was the types of charges that you had,
24 the battery charges.

Page 262

1    ARBITRATOR EPSTEIN:  Now you're asking
2 about the letter itself?
3    MR. MELTON:  Yes, sir.
4    ARBITRATOR EPSTEIN:  I think the question
5 you're asking is would it have been possible, if
6 they exercised their discretion to do so, for them
7 to ask for a second waiver, is that what --
8    MR. MELTON:  Pretty much --
9    ARBITRATOR EPSTEIN:  -- you're asking?
10    MR. MELTON:  -- yes, sir, Your Honor.
11   A.   We could have if we wanted to, yes.
12   Q.   Yes.  So if you wanted to, you could have.
13   A.   Yes.
14   Q.   Okay.
15    MR. MELTON:  I'm going to close, Your
16 Honor.
17    ARBITRATOR EPSTEIN:  Okay, thank you.  Any
18 redirect?
19    MR. LAYTON:  You know, judge, not based on
20 that, so --
21    ARBITRATOR EPSTEIN:  Okay.  And so I would
22 ask you whether there's any other evidence that you
23 want to introduce in this hearing?
24    MR. LAYTON:  Judge, the only other

Page 263



2:17-cv-02112-CSB-EIL # 41 Page 137 of 189
10/29/2019
Arbitration
Bruce Melton vs. Pavilion Behavioral Health System, et al.

**Page 264**

1  evidence I would have is just some of the deposition
2  testimony from Arnetha Truss who testified on behalf
3  of DCFS. I guess what I would suggest, judge, if
4  this is okay with everybody, there's a couple things
5  that will probably take me two minutes to read into
6  the record that I think are important for you to
7  hear, and it's my intention to submit the entire
8  transcript for your review. I don't know that I
9  need to go through the whole transcript now.
10      ARBITRATOR EPSTEIN: All right, that's
11  fine, go ahead. And if there's anything else -- I
12  mean if it's agreeable as a procedure with you,
13  Mr. Melton, he can highlight what he'd like to out
14  of it. If there are certain parts you know you want
15  to highlight now, I'll be happy to hear the ones you
16  want to highlight, but I will tell you that as part
17  of submission I will read the entire thing if
18  everyone agrees.
19      MR. MELTON: I agree to it, Your Honor.
20      ARBITRATOR EPSTEIN: Okay.
21      MR. LAYTON: Thank you, judge. So I'm
22  reading from the deposition of Arnetha Truss who has
23  worked -- at the time of her deposition, she had
24  worked as a child care specialist for DCFS for 13

**Page 265**

1  years and was responsible for licensing of different
2  facilities including the Pavilion.
3      Ms. Truss acknowledged that there are
4  children who are residents and patients at the
5  Pavilion. She indicated it's a licensed child care
6  institution, which is on page 12. And on page 13,
7  that the Pavilion -- children who are residents at
8  the Pavilion require a high level of care, so they
9  have a lot of behavior issues, mental health issues
10  and they require that level of care.
11      So Ms. Truss talked about the reason that
12  Mr. Melton had to undergo the second criminal
13  background check, and this I think will address
14  something you asked about, judge. On page 19, why
15  did you have to do a redo -- why did you have to
16  redo criminal background checks? We went through an
17  audit with the FBI and they required everyone have
18  FBI prints in the system.
19      In other words, judge, this deposition
20  will reflect that the FBI, the Federal Bureau of
21  Investigations, told DCFS that DCFS had to arrange
22  for an additional background check for several
23  employees, including Mr. Melton, and the FBI wanted
24  their own set of fingerprints obtained from

**Page 266**

1  Mr. Melton and that was communicated to DCFS. And
2  according to Ms. Truss, DCFS could not refuse an
3  instruction from the FBI. So the reason Mr. Melton
4  had to undergo a second fingerprint --
5      ARBITRATOR EPSTEIN: You're now arguing
6  based on that.
7      MR. LAYTON: Sorry, judge.
8      ARBITRATOR EPSTEIN: I heard what you
9  read.
10      MR. LAYTON: All right, sorry.
11      ARBITRATOR EPSTEIN: I know what you're
12  going to argue, that's fine.
13      MR. LAYTON: All right, sorry about that.
14  I'm getting ahead of myself. Okay, and on page 33,
15  Ms. Truss is asked if the Pavilion is telling you
16  that the most recent FBI report was providing new
17  information about Mr. Melton's criminal background.
18  Correct. And it's your understanding that the
19  Pavilion -- based on the new information that was in
20  the criminal background search from the FBI, the
21  Pavilion elected not to request a waiver for
22  Mr. Melton. That is correct. It would be fair to
23  say, as far as you understand, that the Pavilion was
24  well within its legal rights not to request a waiver

**Page 267**

1  for Mr. Melton. That is correct.
2      Okay. So I want to make this clear on the
3  record. On page 54, we touched upon it earlier with
4  some of the documents, but the FBI criminal
5  background search identified convictions and charges
6  for Mr. Melton. Correct. I think we've established
7  but just so this is clear, as far as you understand
8  it, the Pavilion was within its legal rights to
9  consider all the convictions and all the charges
10  when the Pavilion elected not to request a waiver
11  for Mr. Melton. Correct.
12      ARBITRATOR EPSTEIN: I'm sorry, without
13  knowing what her foundation is, whether she's an
14  expert on employment law rather than just licensure,
15  I'm not sure what relevance that opinion testimony
16  of Ms. Truss has, but you can read it if you wish.
17      MR. LAYTON: I understand, judge, and that
18  was just being offered based on her position with
19  DCFS and her role in licensing, so I understand
20  exactly what your point is, so --
21      ARBITRATOR EPSTEIN: Okay.
22      MR. LAYTON: And with that judge, I have
23  nothing further.
24      ARBITRATOR EPSTEIN: Okay. Anything

2:17-cv-02112-CSB-EIL # 41 Page 138 of 189
10/29/2019
Arbitration
Bruce Melton vs. Pavilion Behavioral Health System, et al.

1 other, any other evidence?

2  MR. LAYTON: No, judge.

3  ARBITRATOR EPSTEIN: You rest your case in

4 chief?

5  MR. LAYTON: Yes, judge.

6  ARBITRATOR EPSTEIN: Anything in rebuttal

7 that you need to bring up?

8  MR. MELTON: I just wanted to say one

9 thing, Your Honor, just simple, that the FBI, which

10 I never saw the report from the FBI stating I need

11 another fingerprint, but regardless of anything, I

12 adopted two children, the FBI have my fingerprints.

13  ARBITRATOR EPSTEIN: That's your closing

14 argument.

15  MR. MELTON: But that's it, I'm sorry.

16  ARBITRATOR EPSTEIN: And if you want to

17 rest in rebuttal, then you can make your argument to

18 me right now.

19  MR. MELTON: No, sir, I have to get this

20 right, but I'm done.

21  ARBITRATOR EPSTEIN: Go ahead.

22  MR. MELTON: No.

23  ARBITRATOR EPSTEIN: You want to make an

24 argument?

Page 268

1  MR. MELTON: No.

2  ARBITRATOR EPSTEIN: Okay. Any argument?

3  MR. LAYTON: I have a closing argument.

4  ARBITRATOR EPSTEIN: Yeah, go ahead.

5  MR. LAYTON: Are you waiving your closing

6 argument?

7  MR. MELTON: No, I mean --

8  ARBITRATOR EPSTEIN: He can reserve

9 rebuttal. He can waive opening and closing and

10 reserve rebuttal. This is a closing argument. Or

11 you can make your closing argument, he can answer,

12 and then you can rebut after that. It's either way

13 you want to do it. I've seen it done both ways.

14  MR. MELTON: Okay, so this is where we

15 come to the end of it.

16  ARBITRATOR EPSTEIN: Right.

17  MR. MELTON: Okay, yeah, I'd like to state

18 my argument.

19  ARBITRATOR EPSTEIN: Go ahead.

20  MR. MELTON: I would like to state that,

21 you know, I worked at the Pavilion, once again, for

22 a year and a half, over a year and a half

23 proficiently. Like I said, I never missed a day,

24 never had any incidents with any of the patients,

Page 269

1 anybody outside of individuals who honestly did not

2 tell the truth on what I did, but I can handle that,

3 I have tough leather.

4  So I just want Your Honor to note that Ms.

5 Crabtree, what I felt she done was totally wrongful.

6 Title, chapter -- Title 7, is that -- Title 7 or

7 whatever states that it is illegal for you to use my

8 background in certain instances, but DCFS -- I mean

9 the Pavilion has a right to deem whether you are fit

10 to work with children, I understand that, and I

11 respect that in them. They supposed to make sure

12 the children are first.

13  And in my years of being where I come

14 from, Your Honor, I -- 2010, December of 2010, I got

15 my bachelor's degree right before I went to prison

16 in 2011 for an ignorant incident that really I

17 shouldn't even have been a part of, but I was and I

18 had to pay my dues for that. But after I paid my

19 dues, I got out, turned a new leaf, and went to work

20 for the Pavilion through a temporary agency. I was

21 excited. Went there -- never missed a day through

22 that. I did everything I was supposed to do. I

23 thought I did everything I was supposed to do, but

24 apparently I didn't.

Page 270

1  I spoke with Mr. Reis about my whole

2 criminal history, he knew everything even though

3 he's not HR but he was chief of security, who asked

4 me to give him the information so that when he went

5 in front of Ms. Crabtree and Joe Sheehy that he

6 would be able, you know, to stand up for me to get

7 me hired into this company. And he did that and I

8 appreciated that.

9  Like I said, I worked there. I had no

10 incidents outside of the ending of my employment

11 there where all kind of things came up and

12 correlated against me. And then I filed complaints

13 after complaints after complaints, and all of my

14 complaints went to Ms. Crabtree, even the complaints

15 against her, which I don't understand how that

16 happened, but it did. And I'm not saying that she

17 isn't the person that should be checking complaints.

18 That's her job. The only thing I'm asking is that I

19 be treated fair. I don't want anything more than

20 what I'm owed. I don't want nothing except for

21 what's due me. Due process is what I'm asking for.

22  I don't want to be seeming like I'm trying

23 to hold something over the Pavilion's head. Your

24 Honor, I've never tried to do that, never had -- any

Page 271



2:17-cv-02112-CSB-EIL  # 41  Page 139 of 189    10/29/2019
Arbitration
**Bruce Melton vs. Pavilion Behavioral Health System, et al.**

Page 272

1   issue that I had with the Pavilion, I didn't go
2   snapping on Laurie about it. I followed the chain
3   of command. I filed a complaint. And most
4   complaints I guess they thought wasn't deemed
5   appropriate, but that's what the line, the hot line,
6   is there for, me to file my complaint. I did that.
7           And I feel in retrospect of me doing that
8   I got retaliated against, because Ms. Crabtree never
9   spoke to me about my complaints, but she made
10  investigations on her part and her submission for my
11  complaint. I don't understand why, after being what
12  I was deemed a valuable employee, I had to go
13  through these difficult times. I even received
14  bravo cards, Your Honor, and a bravo card, it states
15  that you are a good employee and you've done an
16  excellent job, I received that, but I never was
17  treated as that.
18          I had -- I had disability issues, which
19  Your Honor will go back over this information and
20  look at that, and during those issues I had
21  restrictions on my back. But during my
22  restrictions, they still had me washing carts,
23  washing walls. I wasn't supposed to be bending.
24  They had me washing and lifting pots. I wasn't even

Page 273

1   supposed to be doing that. And I explained that to
2   Adam Sheehy -- not Adam Sheehy, Adam Putvin, and
3   even in turn went to speak to Laurie about this.
4   Kat posted up job descriptions for me, and she knew
5   that I had these issues, but she still posted them.
6   I asked her about that. In return, I spoke with
7   Laurie and Laurie gave Kat, who's the kitchen
8   manager, information about me that she wasn't
9   supposed to. And I'm sorry I didn't bring that up
10  in this case, but Ms. Crabtree know that I'm telling
11  the truth.
12          Now I'm not speaking on something that's
13  not relevant. Everything that I'm saying is
14  relevant, it's true, and anything that Mr. Layton
15  choose to come forward with, everything he's saying
16  is not accurate, that's all I can say.
17          So I just want Your Honor to know that I'm
18  not trying to hold the Pavilion hostage. I'm not
19  trying to ask for more than what I think I'm
20  deserving of. I just believe that I deserve
21  something. I changed my life, I changed everything
22  I had to. Why do I still have to be penalized?
23  Even when I gave them the Illinois paper stating
24  that I had all these convictions erased -- oh,

Page 274

1   that's what I wanted to tell you, Your Honor.
2           MR. LAYTON: I'm going to object to that.
3   I'm going to --
4           ARBITRATOR EPSTEIN: What's the objection?
5           MR. LAYTON: The objection is it sounds
6   like Mr. Melton is saying he provided the Pavilion
7   with documents indicating that his convictions were
8   erased. That is not true and there's certainly no
9   evidence of that.
10          ARBITRATOR EPSTEIN: Well, I've heard the
11  evidence in the case.
12          MR. LAYTON: Okay.
13          ARBITRATOR EPSTEIN: And I'll consider the
14  evidence, and to the extent that either side's
15  arguments cite things that have not been introduced
16  into evidence, they will be disregarded.
17          MR. MELTON: Yes, sir, Your Honor. Okay,
18  Your Honor, I just wanted to say also that during my
19  deposition with Mr. Layton, I informed Mr. Layton
20  after -- no, I take that back.
21          ARBITRATOR EPSTEIN: Wait, wait. The
22  conversations between you and Mr. Layton are --
23  first of all, there's no evidence of any of that.
24          MR. MELTON: Okay.

Page 275

1           ARBITRATOR EPSTEIN: And whatever you told
2   Mr. Layton during the course of this arbitration,
3   this preamble to the arbitration and discovery,
4   that's not properly before me at this time.
5           MR. MELTON: Okay. Well, the reason I
6   brought that up, Your Honor, is because Mr. Layton
7   contends that I didn't offer my expungement papers
8   at an appropriate time, but I did. I told him and
9   he told me they weren't necessary.
10          ARBITRATOR EPSTEIN: Okay. Well, let's
11  just move on.
12          MR. MELTON: Okay. Either way it goes,
13  Your Honor, I mean I've gave to you exactly where I
14  stand and how I feel about this case, and it's up to
15  Your Honor to decide what he thinks, and whatever
16  you think, I'm understanding of it. It's not, you
17  know, nothing that I won't overcome. I just hope
18  Your Honor will take into account that if you look
19  over all the evidence, if you were ever to read all
20  of this paperwork, you will see it is truly amazing
21  how this case come about when it could have been so
22  easily prevented.
23          So having said that, Your Honor, I close.
24          ARBITRATOR EPSTEIN: I appreciate that,

2:17-cv-02112-CSB-EIL    # 41    Page 140 of 189
Arbitration    10/29/2019
**Bruce Melton vs. Pavilion Behavioral Health System, et al.**

1 Mr. Melton. Mr. Layton, any argument you would like
2 to make?
3    MR. LAYTON: Yes, judge.
4    ARBITRATOR EPSTEIN: Go right ahead.
5    MR. LAYTON: Thank you. So, Your Honor, I
6 think that the heart of this case revolves around
7 the circumstances that led to Mr. Melton's
8 termination. And I think what's critical to bear in
9 mind is the fact that the Pavilion learned a great
10 deal of new information about Mr. Melton when an FBI
11 criminal background search was done.
12    Now, this is not what I would describe,
13 Your Honor, as a normal employment situation or a
14 normal employer. We have a facility that has a
15 heightened security obligation, that is, a
16 heightened obligation under the law in terms of
17 ensuring the protection and well-being of the
18 children that are residents and patients at the
19 facility.
20    So when you have a situation involving the
21 evaluation of somebody's criminal convictions and
22 criminal charges, I think the types of issues that
23 are involved in a normal employment situation are
24 different than what's appropriate here.

1 the licensing applicant as a condition of
2 employment, and authorize an investigation to
3 determine if the applicant has ever been charged
4 with a crime and, if so, the disposition of those
5 charges, you're arguing with the later citation in
6 the same paragraph, the Department of State Police
7 shall provide information concerning any criminal
8 charges in their deposition. That by implication,
9 even when those do not result in convictions, that
10 that is something which can be properly considered
11 by the -- by the entity in deciding in this
12 particular case whether to seek a waiver.
13    And I assume you have researched for legal
14 authority by case law whether there is a specific
15 statement in case law that in the exercise of this
16 discretion they are specifically and expressly
17 entitled to consider charges that did not result in
18 convictions or not.
19    MR. LAYTON: So, judge, I will tell you
20 the answer is, yes, I did research that specific
21 point and there's not any case law --
22    ARBITRATOR EPSTEIN: I am not surprised.
23    MR. LAYTON: And there's not any case law
24 that talks about that, but I'm glad that you brought

1    And, Your Honor, I cited to this law
2 during the course of my examination of Ms. Crabtree,
3 but under the law of Illinois, and in this
4 particular case, the Pavilion was legally entitled
5 to consider the charges that were brought against
6 Mr. Melton. That is what the law says and there's
7 good reason for that, judge.
8    The reason is because of the children that
9 are, you know, residents at this facility.
10 Naturally the law and the Pavilion have a heightened
11 obligation to make sure that they are taking all
12 reasonable steps to make sure that appropriate
13 protections are in place. And how do you do that?
14 You look at criminal convictions, and under the law
15 you're entitled to look at criminal charges as well.
16 And the law specifically says, and I will cite to
17 it, judge, just so it's clear here, it's Exhibit --
18 Arbitration Exhibit 95.
19    ARBITRATOR EPSTEIN: No, I'm looking right
20 at it. I looked at it when you went through it
21 before.
22    MR. LAYTON: Okay.
23    ARBITRATOR EPSTEIN: I guess my question
24 to you is the fact that the department shall require

1 that point up.
2    ARBITRATOR EPSTEIN: Well, I was intending
3 to.
4    MR. LAYTON: Yes, and I'm glad that you
5 brought that point up, judge, because, you know, you
6 can see this is a child -- the Child Care Act of
7 1969. The references to the department, which is
8 DCFS, it specifically talks about charges and their
9 disposition of those charges, judge. And in looking
10 at this, if -- I think, as you certainly are more
11 familiar with than I am, Your Honor, we have to take
12 the legislature at their word and assume that the
13 language that the legislature used was intentional.
14    So below this, judge, below this section
15 that we're talking about, there's a discussion about
16 information concerning convictions of a licensed
17 applicant. In other words, this law here, Exhibit
18 95, talks about charges and convictions. So this
19 law by its express language says that the Pavilion
20 was obligated or was allowed to and required to, in
21 my view, judge, to consider convictions as well as
22 any criminal charges that were brought against
23 Mr. Melton.
24    So to put it more directly, judge, if the


**WORLDWIDE LITIGATION SERVICES**
(312) 528-9111 | info@worldwidelit.com

2:17-cv-02112-CSB-EIL    # 41    10/29/2019    Page 141 of 189
Arbitration
Bruce Melton vs. Pavilion Behavioral Health System, et al.

1 question is was the Pavilion within its legal rights
2 to consider charges that were raised against
3 Mr. Melton, yes, absolutely. That's exactly what
4 this law says. And why was that? Because of the
5 heightened duty that they have for the children
6 residents at the Pavilion.
7       If you want -- if Mr. Melton wanted to
8 point to some other law, you know, if somebody's
9 doing employment at a law firm or a factory or
10 something like that, judge, I think you're dealing
11 with a different situation when it comes to whether
12 or not an employer can evaluate criminal charges
13 that do not result in actual convictions. That's a
14 different situation.
15       And if you have sort of a general body of
16 law that talks about arrests, that's one thing, but
17 as you well know, Your Honor, from your experience,
18 when you have a specific statute as we do here, with
19 Exhibit No. 95 we have a specific statute that talks
20 about charges, that authorizes and expressly states
21 that the DCFS is supposed to get access to charges,
22 and of course this would be part of any information
23 that would be used to evaluate the retention of an
24 employee under these circumstances. This more

1 specific statute would certainly overrule any
2 general legal propositions that Mr. Melton is
3 offering.
4       ARBITRATOR EPSTEIN: And I take it also
5 you've researched whether anyone ever challenged the
6 constitutionality of this particular statute.
7       MR. LAYTON: I've not seen anything like
8 that, judge, absolutely, so there's no issues there.
9       ARBITRATOR EPSTEIN: So here is a
10 circumstance where let's assume with the presumption
11 of innocence, it's pretty easy for somebody to
12 allege something against someone. And if there's no
13 conviction, either because there's been a trial or
14 because there's been a dismissal or because the
15 complaining witness who filed the charges later
16 tells the prosecuting authority, all right, I went
17 too far on this, this wasn't really what went on, or
18 I'm sorry, I want to withdraw it, that without
19 further clarification, when that person who was
20 charged was applying for this type of a job, that
21 without really any recourse whatsoever, that person
22 could be denied employment just based in a given
23 situation on those unfair circumstances. That's
24 what we're talking about. And, you know, that's

1 what concerns me and why I'm asking you this
2 question.
3       MR. LAYTON: Yes.
4       ARBITRATOR EPSTEIN: Now I know what the
5 statute says and I've been to Springfield. I know
6 what occasions a lot of these concerns. People look
7 at one aspect and the aspect is a compelling one.
8 It's a circumstance where do we want children put in
9 jeopardy? The answer for everybody in the state is
10 no, no, no. The question is whether this is
11 tailored appropriately to that or not. And if there
12 hasn't been a challenge based on that, then --
13       MR. LAYTON: That's correct, that is
14 correct, judge. And let me, you know, say this,
15 just for purposes of the record. I have no idea
16 what the discussion was in the legislature that led
17 to this, what debate took place, but, judge, what
18 we're talking about here are the nuts and bolts of
19 practically running a facility that provides
20 important services to children, okay?
21       Laurie Crabtree and her colleagues have to
22 make decisions and they make decisions based on the
23 facts and they make decisions based on the law. And
24 as far as Laurie Crabtree understands it -- and I'll

1 get to why in a second. As far as Laurie Crabtree
2 understands this in her role as the HR director,
3 this is what the law says. The law says that we're
4 supposed to consider these charges, judge, okay? On
5 the flip side of this, okay --
6       ARBITRATOR EPSTEIN: No, it says you're
7 entitled to get that.
8       MR. LAYTON: Well, that is true, judge,
9 but I -- okay, then that may, if they're entitled to
10 this information --
11       ARBITRATOR EPSTEIN: The implication
12 certainly is that they should put that into their
13 decision-making process in hiring somebody.
14       MR. LAYTON: Of course. And I would argue
15 what would be the point of a law like this saying
16 that they're entitled to this information if they're
17 not allowed to consider it. That would be
18 completely pointless, of course, to have a law like
19 that. And I will say, you know, Your Honor, if
20 we're talking about hypotheticals, okay, and you are
21 presented with a situation, and forget about
22 Mr. Melton. Mr. Melton, you've gotten to know him
23 and he seems like a nice person and --
24       ARBITRATOR EPSTEIN: And so do you.

2:17-cv-02112-CSB-EIL # 41 Page 142 of 189
Arbitration, 10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

Page 284

1    MR. LAYTON: Well, thank you.
2    ARBITRATOR EPSTEIN: And so does Ms.
3 Crabtree, so that's fine.
4    MR. LAYTON: Thank you. We've gotten
5 along during this case, judge. But when you look at
6 this case on paper and the Pavilion has to make
7 decisions, you know, the flip side is, and this is
8 what I was just about to get to, there's this policy
9 here that the Pavilion has based on this law that
10 we've been looking at, Exhibit 95, and other
11 considerations.
12    So the Pavilion has to say, they're faced
13 with someone who has this type of criminal
14 background and there's -- Laurie Crabtree is
15 supposed to say whether the number or nature of the
16 charges -- now it says charges, judge, not
17 convictions, okay?
18    ARBITRATOR EPSTEIN: And just so we're
19 clear, and I -- the issue is teed up for me clearly
20 from what both sides have said. You and I both
21 understand as lawyers that the fact that it's put in
22 a policy doesn't have the force of law. The
23 policy --
24    MR. LAYTON: Yes.

Page 285

1    ARBITRATOR EPSTEIN: -- may have been
2 created in good faith in reliance on what that law
3 must mean in their minds, but that doesn't give them
4 clearance to do something if the law doesn't permit
5 it, and -- but I understand that that was done in
6 that way --
7    MR. LAYTON: I'm so glad --
8    ARBITRATOR EPSTEIN: -- for a reason.
9    MR. LAYTON: I am so glad you asked that,
10 judge.
11    ARBITRATOR EPSTEIN: Well, I'm glad you're
12 glad.
13    MR. LAYTON: I'm going to tell you why,
14 I'm going to tell you why, okay? So in your -- and
15 of course I agree with you and of course you're
16 exactly right.
17    Now, this policy -- Laurie Crabtree was
18 supposed to ask under this policy whether the number
19 or nature of the charges would suggest a reasonable
20 questioning of the company, the Pavilion, as a
21 reasonable -- responsible human services
22 organization. So this is what Laurie Crabtree has
23 in front of her when she's making this decision.
24    Your point about this policy not being a

Page 286

1 point or force of law, I completely agree with you.
2 Obviously in my view this [indicating] is the force
3 of law that authorized the justification for Mr.
4 Melton's termination.
5    ARBITRATOR EPSTEIN: And you're pointing
6 to Exhibit 95.
7    MR. LAYTON: Yes, I am, but, judge, let me
8 say this, let me say this, okay? At all relevant
9 times -- and I know you know this. At all relevant
10 times, the Pavilion has been an at-will employer.
11 They could terminate Mr. Melton for any reason
12 whatsoever as long as it's not discriminatory, okay,
13 as long as it's not discriminatory. But today
14 Mr. Melton has the burden of proof. Mr. Melton has
15 to establish that Laurie Crabtree acted with some
16 kind of animus when she terminated Mr. Melton, okay?
17    So setting aside whether or not the policy
18 has the force of law, judge, this policy was part of
19 Laurie Crabtree's consideration. This policy and
20 everything else we've talked about was part of
21 Laurie Crabtree's consideration when the decision
22 was made to terminate Mr. Melton. In other words,
23 Laurie Crabtree and her colleagues at the Pavilion
24 evaluated whether or not under these circumstances

Page 287

1 and under this policy it was with -- would be in
2 keeping with the Pavilion's duty to act as a
3 responsible human services organization to continue
4 hiring Mr. Melton.
5    And I would say, judge, those facts right
6 there clearly establish a lack of animus of any kind
7 under these circumstances. And I would say the
8 facts do not support that Mr. Melton has sustained
9 his burden of proving that there was any animus or
10 discriminatory intent or anything along those lines
11 by Laurie Crabtree or anybody at the Pavilion. And
12 you know full well, I know you do, judge, it is up
13 to Mr. Melton to prove that at this point in time
14 and he -- the evidence does not support that.
15    So our position is the termination was
16 legally justified for the reasons we've discussed,
17 and there is no evidence of any kind of any animus
18 of any kind against Laurie Crabtree. So I'm going
19 to take a look at my notes, judge. I drafted --
20    ARBITRATOR EPSTEIN: Take your time.
21    MR. LAYTON: -- this closing and I'm not
22 going to repeat things that are unnecessary to
23 repeat.
24    (Discussion off the record.)

2:17-cv-02112-CSB-EIL  # 41  Page 143 of 189
Arbitration  10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

MR. LAYTON:  So, judge, Mr. Melton used some buzz words that are not supported by the evidence.  He said he was harassed.  He said that he was retaliated against because he made complaints against Laurie Crabtree.  And we went through the details of these, judge.  And, you know, Mr. Melton did make numerous calls to the hot line, and the record establishes that these calls to the hot line would go to somebody in corporate who would contact the Pavilion, and Laurie Crabtree would be designated as the person to investigate these matters.

So the vast majority of them involved issues raised by Mr. Melton that did not directly trigger complaints against Laurie Crabtree, and I'm going to talk about that in a minute.  Most of them were about coworkers and about being wrongfully accused by fellow coworkers.  The record reflects that Laurie Crabtree conducted a thorough investigation; that all of Mr. Melton's issues that he raised with the hot line were taken seriously, a report was prepared, interviews were done and a conclusion was reached.

You know, in terms of animus, judge, you

Page 288

know, there were a couple of points about Mr. Melton complained his coworkers weren't helping him.  Well, Ms. Crabtree looked into that, said, you know what, Mr. Melton is right, the dietary staff needs to help Mr. Melton out.  There were complaints that Mr. Melton made about his coworkers clocking out early and things like this.  Well, Ms. Crabtree acknowledged that and said, hey, yes, you're right, let's fix this kind of stuff.

So, in other words, Ms. Crabtree is not out to get Mr. Melton despite what he would have you believe.  She conducted this investigation into all these issues that were raised and reached these conclusions based on the information that was available.

Now there were a couple of complaints that Mr. Melton made against Laurie Crabtree, and the question came as to whether or not it was appropriate for Laurie to conduct the investigation, judge, and I'll just comment on what those issues were.

The first issue that Mr. Melton complained about was when he was written up for harassing behavior.  He was written up by Laurie Crabtree

Page 289

because he was accused by a coworker of engaging in flirtatious behavior with him.  So he called the hot line to complain that Laurie Crabtree wrote him up.  So this assignment would have gone to the CEO at the Pavilion and then Laurie Crabtree looked into it.  You heard Laurie Crabtree testify that she investigated it, prepared a report, the report went to the CEO as all these reports did, and then they would go to corporate.

So Mr. Melton is complaining that Laurie Crabtree was investigating an issue in which Mr. Melton complains that Laurie Crabtree wrote him up for engaging in inappropriate behavior.  Well, judge, Laurie Crabtree was doing her job.  She documented this behavior.  You saw the notes, judge, and you saw the conclusion that was reached based on the notes.  I should say, judge -- here it is.

So, judge, it's not really actionable to register a complaint against somebody who is simply doing their job, which is what Laurie Crabtree was doing when she investigated this issue that was raised by Mr. Melton.  And I should point out, Your Honor, that when this came up, this document came, when this came up -- and it was Exhibit No. 55.

Page 290

So this is the corrective action report against Mr. Melton for engaging in the flirtatious behavior.  Ms. Crabtree did exactly the right thing in writing this up, which any HR person in the country would do, it's a hundred percent appropriate.  Mr. Melton chose not to document anything, and this was signed -- this was signed by the supervisor, judge.  There was a supervisor that signed this document.

So it's not like Laurie Crabtree is off on her own conducting the investigations with no one else's involvement at the Pavilion.  Laurie's report would go to the CEO.  If the CEO saw anything inappropriate in the report on Laurie's behalf, that would be investigated.  And then it goes to corporate HR.  If they saw anything inappropriate on Laurie's behalf, that would be investigated as well.

So when Mr. Melton is complaining that Laurie Crabtree was doing her job, that is not actionable, judge.  That is simply not legally actionable because Laurie Crabtree investigated that particular issue.  And I think that's a constant theme that runs through a lot of these things with Mr. Melton.  He raises some issues, judge, that are

Page 291

2:17-cv-02112-CSB-EIL # 41 Page 144 of 189
Arbitration 10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

Page 292

1  not supported by the evidence and that just frankly
2  are not legally actionable.
3       You know, judge, what the evidence
4  demonstrated -- and this is important, this is
5  really important. What the evidence demonstrated is
6  that Mr. Melton often had his facts wrong when he
7  raised the different issues with HR. You know, he
8  complained that he was -- he complained to HR that
9  he was written up for improperly posting a picture
10  on Facebook. That's not true. He never was written
11  up for that. He had his facts mixed up. He was
12  written up for something else.
13       Mr. Melton complained to HR that he never
14  received a pay raise, but there's no evidence of any
15  kind that he was actually approved to get a pay
16  raise that he supposedly never received.
17       Mr. Melton called and raised an issue that
18  there were some coworkers who were allowed to renew
19  their food service license before he was, and this
20  was a complaint. Well, Mr. Melton misunderstood
21  what was going on. The Pavilion was allowing other
22  workers to get their food service license renewed
23  before Mr. Melton's because theirs expired first.
24  Mr. Melton brought this complaint up in October of

Page 293

1  2016.
2       ARBITRATOR EPSTEIN: I know, and in
3  December -- I really was listening.
4       MR. LAYTON: Okay, judge, okay. And, you
5  know, Mr. Melton complained when he wasn't told the
6  results of an HR investigation into another
7  employee. Well, there's -- he's not entitled to
8  learn that information.
9       So the issues raised by Mr. Melton relate
10  to issues that are not legally actionable, and they
11  frankly relate to issues that are consistent with
12  the law and consistent with the -- I mean the
13  Pavilion has legal rights here, too, and they have
14  policies that they're allowed to enforce.
15  Mr. Melton made a big to-do out of the fact that his
16  -- his schedule was changed in December of 2016.
17  Well, the Pavilion is within its rights to change
18  the schedule of employees like Mr. Melton if they
19  have to do it, and you saw the letter, judge. We're
20  accommodating Mr. Melton's back issues, so we're
21  trying -- we're changing his schedule for that
22  reason and we're also trying to meet the needs of
23  the department, which is an important part of
24  Laurie's job as well as the job of Mr. Melton's

Page 294

1  supervisors.
2       So, you know, judge, Mr. Melton's claims,
3  they all fail. They are not supported by the
4  evidence or the law. You know, the evidence
5  establishes that Mr. Melton was terminated for a
6  reason that was legitimate, that was
7  nondiscriminatory, and that was consistent with the
8  law and the policies that we discussed. The fact
9  that it was consistent with the policies, judge,
10  establishes a lack of any type of discriminatory
11  intent by the Pavilion.
12       I think it's important, judge, that -- I
13  mean I think this is clear, judge, but just because
14  I want to make sure I'm being thorough --
15       ARBITRATOR EPSTEIN: You will not be
16  accused otherwise.
17       MR. LAYTON: Thank you, judge, thank you.
18  When these circumstances arose with Mr. Melton in
19  late 2016, okay, DCFS sent a letter to Laurie
20  Crabtree and Mr. Melton. He could have been
21  terminated on the spot. The Pavilion could have
22  said, I'm sorry, we are terminating you because of
23  this letter from DCFS, okay? And I'm bringing this
24  up for a reason, judge.

Page 295

1       Laurie Crabtree said she called
2  Mr. Melton, bring me what you have, I'm going to
3  evaluate it. If Laurie Crabtree had any animus
4  against Mr. Melton and wanted to get rid of him,
5  that December 24th letter from DCFS saying he was
6  barred from employment was the perfect opportunity
7  to do it. The perfect opportunity. If she finally
8  wanted to get rid of this guy, she could say I've
9  got this letter, you are now terminated because of
10  what DCFS is telling me, but that's not what
11  happened, judge.
12       Laurie Crabtree called Mr. Melton and
13  said, Mr. Melton, this is what's going on, can you
14  please bring me your paperwork and I want to take a
15  look at it and I want to consider whether or not we
16  can pursue a waiver. This is clear evidence of zero
17  animus and zero discriminatory intent by the
18  Pavilion. Clearly.
19       So Laurie accepted the information.
20  Mr. Melton came in and handed the documents that we
21  looked at, he handed them to Laurie Crabtree and
22  talked to Laurie Crabtree about these documents,
23  explained that some of the documents were being
24  expunged, some of the matters were being expunged or



2:17-cv-02112-CSB-EIL    # 41    Page 145 of 189
Arbitration    10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

1  dismissed.  Mr. Melton never provided any
2  documentation at that time or ever to the Pavilion
3  saying this stuff has actually been dismissed or
4  expunged.  Never did that.  So there's no evidence
5  of that of any kind.  And you know --
6      ARBITRATOR EPSTEIN:  But your argument is,
7  even if they had been, you were entitled to consider
8  the fact of the charges alone.
9      MR. LAYTON:  Well, yes.  Yes, judge.
10     ARBITRATOR EPSTEIN:  Okay, so I get that
11 argument.
12     MR. LAYTON:  Yes, but I will say this,
13 judge.  If Mr. Melton had tendered documents showing
14 that he had -- that these things had actually been
15 expunged or dismissed, Ms. Crabtree would have
16 considered that information, but that's not -- we
17 would have a different case here, but that's not the
18 case, that's not the case.
19     So, judge, I guess Mr. Melton, just to
20 comment on -- it's still not clear to me what
21 credible evidence there is that Mr. Melton was
22 harassed in any way, and there's really nothing to
23 support any type of a harassment or a retaliation
24 claim of any kind against Mr. Melton.

Page 296

1      And I will say this, judge.  In terms of
2  accommodation, it's really not clear to me what
3  Mr. Melton's argument is about failure to
4  accommodate.  On a factual level, judge, the
5  evidence established that he was granted leaves of
6  absence when he needed them, that the Pavilion
7  received documents about his work restrictions, that
8  that was respected, and I think there were times,
9  judge, when Mr. Melton, for example, when he had his
10 carpal tunnel issue, the Pavilion could not give
11 Mr. Melton any work-related restrictions at that
12 time without risking further injury.  So how did the
13 Pavilion accommodate him?  They gave him a leave of
14 absence.  And under the law, that is, that is
15 considered to be -- that is considered to be an
16 appropriate accommodation.
17     But Mr. Melton, judge, really hasn't even
18 established that he's entitled to ADA protection
19 here, and there's a lot of case law that talks about
20 if somebody has sort of a short-term or temporary
21 medical issue, that does not qualify for ADA
22 protection.  You know, for example --
23     ARBITRATOR EPSTEIN:  Anything further on
24 that?

Page 297

1      MR. LAYTON:  No, judge.  I guess, judge,
2  I've got some case law to mention, unless you don't
3  need me to do that.
4      ARBITRATOR EPSTEIN:  I think I'm fine,
5  thank you.
6      MR. LAYTON:  Okay.  Judge, based on
7  everything -- I'm not going to rehash anything else.
8  Based on everything, judge, I think the evidence
9  supports a judgment in favor of the Pavilion on all
10 counts.
11     ARBITRATOR EPSTEIN:  Thank you.
12     MR. LAYTON:  Thank you.
13     ARBITRATOR EPSTEIN:  Any final words from
14 you, Mr. Melton, in rebuttal?  I'm happy to hear
15 what you want to say.
16     MR. MELTON:  Yes, sir, just trying to find
17 this one document and I won't keep you long, Your
18 Honor.
19     ARBITRATOR EPSTEIN:  No, tell me what you
20 want to tell me.
21     MR. MELTON:  I just -- okay, it should be
22 right here.
23     ARBITRATOR EPSTEIN:  Can you tell me what
24 you're specifically looking for?  Maybe I can be of

Page 298

1  assistance or Mr. Layton could be.
2      MR. MELTON:  I'm looking for the document
3  where my former attorney sent to the Pavilion
4  stating after I was terminated that they still owed
5  me compensation, and I think I -- well, I did read a
6  case law to Your Honor about that.  I was terminated
7  while I was under workman's comp with the Pavilion.
8  I had been released to go back to work January 5th
9  and --
10     ARBITRATOR EPSTEIN:  I remember the
11 letter.
12     MR. MELTON:  Yeah, but my point is I was
13 released to go back to work and they wouldn't let me
14 come back to work, which I guess they had a right
15 to, but I still was due to be paid under those
16 circumstances, and as I said, the law -- he put the
17 law that stated that on there, but I never once
18 received anything.  And Mr. Layton states that my
19 write-ups -- I'm not going to say write-ups, my
20 things with the compliancy line were inadequate.
21 But my thing, the compliancy line is to hear any
22 complaint that you have regardless if it's in their
23 mind good or not, so to speak, Your Honor.
24     All I did was file my complaint.  They had

Page 299

2:17-cv-02112-CSB-EIL # 41    Page 146 of 189
Arbitration    10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

1  the decision to listen to it or not.  And when I
2  filed my complaint against Ms. Crabtree, regardless
3  of whatever the case may be, she was not supposed to
4  investigate her own investigation; that I just don't
5  see how that is possible; but then again I don't
6  know anything about work law and all of that, but I
7  do believe that to be so.
8       So having said that, my thing is I just --
9  she knows, and my point, what happened.  She
10  terminated me, didn't talk to me, and didn't let me
11  know anything.  I didn't get paid, none of that, and
12  I believe that was wrong.
13       So the rest of that falls on Your Honor to
14  make his decision.  Like I said, whatever Your
15  Honor's decision is, I have no choice but to abide
16  by it and I'm fine with it, but I got to the point
17  where I was at least heard.  Even though my -- my
18  complaints and issues fell short on the Pavilion's
19  ears, at least I was heard by Your Honor, so I'm
20  fine with that.  I rest.
21       ARBITRATOR EPSTEIN:  You have been heard
22  and I appreciate your participation as well as the
23  participation of the people on the other side of the
24  table.  You all behaved in an appropriate, civil and

Page 300

1  professional way and I appreciate that.  I
2  appreciate the effort in putting together these
3  exhibits together, singly marking them saved a lot
4  of duplication, and your reference to them was
5  appropriate throughout.  There was cooperation in
6  helping each other find documents.  That's in the
7  finest traditions of our profession and I appreciate
8  that.
9       So what will happen is I will leave the
10  hearing open for the sole purpose of receiving the
11  transcript from the court reporter.  I've given her
12  an address to send my copies.  I assume you're going
13  to order copies also?
14       MR. LAYTON:  Yes, judge.
15       ARBITRATOR EPSTEIN:  And once I've
16  received them, I'll get working on the award, which
17  I will do in written form in compliance with
18  Paragraph 8 of the Arbitration Agreement.
19       MR. MELTON:  Yes, sir, Your Honor.
20       ARBITRATOR EPSTEIN:  Thank you all and
21  we'll terminate for the day.
22       MR. LAYTON:  Thank you, judge.
23       MR. MELTON:  Thank you, sir.
24       (Adjourned at 3:50 p.m.)

Page 301



2:17-cv-02112-CSB-EIL # 41    10/29/2019    Page 147 of 189
Arbitration
Bruce Melton vs. Pavilion Behavioral Health System, et al.

```
 1   STATE OF ILLINOIS     )
                           )SS
 2   COUNTY OF FORD        )

 3
             I, June Haeme, a Notary Public in and for
 4   the County of Ford, State of Illinois, do hereby
     certify that the following arbitration was taken at
 5   the law offices of Heyl, Royster, Voelker & Allen,
     301 North Neil Street, Suite 505, Champaign,
 6   Illinois, on October 29, 2019.
             That the said arbitration was taken down
 7   in stenograph notes and afterwards reduced to
     typewriting under my instruction and that the
 8   transcript is a true record of the testimony given.
             I do further certify that I am a
 9   disinterested person in this cause of action; that I
     am not a relative, or otherwise interested in the
10   event of this action, and am not in the employ of
     the attorneys for either party.
11           IN WITNESS WHEREOF, I have hereunto set my
     hand and affixed my notarial seal this 11th day of
12   November, 2019.

13

14
                           /s/ June Haeme
15                         _____
                           JUNE HAEME, CSR
16                         NOTARY PUBLIC

17

18   "OFFICIAL SEAL"
     June Haeme
19   Notary Public, State of Illinois
     My Commission Expires:
20   September 28, 2020

21

22

23

24
```



2:17-cv-02112-CSB-EIL # 41 Page 148 of 189
Arbitration 10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

**WORD INDEX**

**< $ >**
**$10.50** 63:*11*

**< 0 >**
**00219** 123:*6*
**04-CF-002189** 122:*18*
**084-003038** 1:*20*

**< 1 >**
**1** 29:*16* 37:*24* 61:*4, 5, 21* 136:*1* 160:*23*
**1.5** 63:*23*
**1.54** 63:*23*
**1:14** 165:*22*
**1:15** 165:*17*
**10** 44:*8* 138:*22* 143:*20* 144:*1, 3, 5* 168:*14* 189:*7, 9*
**10.48** 72:*1*
**10:00** 77:*17* 78:22
**10:11** 56:*18*
**10:18** 56:*18*
**100** 37:*13, 21* 43:*11, 16* 238:*21* 239:6
**101** 35:22 37:*12* 239:*12, 23* 240:2
**102** 51:2 145:*1, 4, 5* 242:*14, 16, 22*
**103** 116:*13* 117:*23* 118:*1*
**106** 167:*15, 16*
**10th** 227:*19*
**11** 18:*24* 44:*8* 55:*24* 62:*11* 99:*2, 3* 126:*4* 224:*3* 232:*19, 22*
**11:26** 116:*10*
**11:32** 116:*10*
**117** 135:*15*
**11th** 302:*11*
**12** 139:2 186:*24* 265:*6*
**12:31** 165:22
**123** 134:*3, 4*
**124** 48:2, 2
**125** 97:*4* 98:*13*

**99:***1*
**126** 153:*6*
**12th** 73:*9* 89:*11* 94:7 148:*12* 180:*15* 181:*20* 216:*3* 218:*13* 234:2, *14*
**13** 67:2, 2 139:*5* 141:*17* 166:*20, 21* 177:*12* 264:*24* 265:*6*
**130** 40:*14*
**1304** 2:*4*
**130532** 155:*13*
**1340016051** 1:*4*
**136** 157:*9, 12* 163:*4*
**14** 3:2 139:*8* 144:2, *8, 14*
**145** 156:*12* 157:*16, 19, 20*
**146** 39:*1*
**147** 3:*6*
**14th** 66:*5* 67:*14* 89:*11* 177:*6* 202:*11*
**15** 139:*11* 234:*16*
**158** 49:*20*
**159** 3:*6*
**15th** 62:*24* 222:*23*
**16** 3:*3*
**16.94** 177:*14*
**162** 49:*20* 158:*20*
**163** 157:2, *10, 12*
**166** 3:*8*
**16th** 82:*3* 83:*16* 84:*5* 85:*7* 127:*19* 198:*23*
**17** 37:*24* 64:*19* 139:*14*
**17th** 127:*2*
**18** 17:*19* 139:*17* 143:*24* 178:*20, 23*
**18th** 87:*9* 89:*11* 99:*15* 107:*16*
**19** 17:*19* 68:*23* 139:*23* 168:*14* 265:*14*
**1964** 40:*23*
**1969** 244:*21* 279:7
**1991** 148:*8, 12*
**1998** 118:22 119:*4, 10*

**1999** 48:*3, 4* 118:*23* 119:*4, 10* 148:*14, 14*
**19th** 78:*19* 79:*17* 86:*16*
**1st** 16:*13* 33:*13, 20, 22* 34:2 51:*8* 145:*8* 146:*12* 155:*6* 238:*17* 243:*5*

**< 2 >**
**2** 29:*16* 37:*24* 62:22 63:*9* 136:*5, 10*
**2:00** 209:22
**2:03** 209:22
**20** 68:*24* 140:*3*
**2000** 68:*19* 148:*14* 177:*1*
**2004** 235:*11* 236:*1*
**2005** 234:*15*
**2010** 59:*21* 141:*15* 142:*7* 148:*16* 236:*21* 270:*14, 14*
**2011** 142:*11, 13* 148:*17* 270:*16*
**2012** 142:*4, 7, 7*
**2014** 59:22 141:*15* 142:*8, 13* 148:*17*
**2015** 18:*20* 19:*12* 62:*24* 66:*5* 67:*4, 14, 14* 120:*7* 121:*18, 20* 122:2, *9* 125:*16* 127:2, *13, 16, 19* 128:2, *18* 170:*23* 176:*23* 177:2, *6* 221:*23* 222:*24* 223:*3* 224:*10, 20* 225:*17* 233:*17* 234:2, *23* 235:*4* 236:2, *18* 237:*1, 16* 241:*17*
**2016** 22:5 23:*8, 9* 24:*1* 25:*5* 43:*21* 68:*20* 69:*5, 6* 70:*18* 73:*8, 9* 74:*19* 75:*10, 18* 76:*4, 13* 77:*10* 79:*7, 17, 18* 80:*13* 81:*7* 82:*2, 3* 83:*16* 84:*5* 85:*7* 86:*16* 99:*16* 101:*11, 23*

**102:***9* 103:*18* 107:*16* 110:*13* 113:*10* 126:*9, 19, 21* 129:*15* 130:*8* 131:*16, 21* 162:*16* 178:*19* 180:*15* 181:*14, 17, 20* 182:*9* 183:6 185:*10* 186:*4* 188:*1* 189:*20* 190:*15, 22* 195:22 198:*23* 207:*10, 13, 17* 210:*20, 23* 213:2 214:*8* 216:*4* 218:*13* 227:*16, 19, 21* 228:*20* 229:*12* 233:22 238:*13* 239:6 293:*1, 16* 294:*19*
**2017** 16:*13* 26:6 33:*15, 16, 18* 131:*24* 145:*8* 146:*13* 162:*21* 233:22 234:6 235:*8, 16, 22* 236:5 237:*5, 11, 18* 243:*5*
**2019** 1:*13* 302:6, *12*
**2020** 302:*20*
**20th** 69:*5* 94:*15, 20*
**21** 69:*20, 22* 90:*20, 22* 94:*19* 140:*6*
**214** 155:*13*
**22** 140:*9*
**22nd** 181:*17* 207:*16*
**23** 70:*17* 140:*12* 183:*3*
**233** 2:*8*
**24** 73:*5, 11* 140:*15* 180:*11*
**2400** 1:*18*
**242** 169:*21, 24*
**249** 3:*9*
**24th** 23:*9, 24* 43:*21* 67:*4, 13* 69:*5* 70:*18* 127:*13, 16* 129:*15* 130:*7* 177:*6* 183:*6* 190:22 229:*12* 238:*13* 239:6 295:5
**25** 65:*16* 140:*15*

2:17-cv-02112-CSB-EIL # 41    10/29/2019    Page 149 of 189
Arbitration
Bruce Melton vs. Pavilion Behavioral Health System, et al.

178:8
**25th**  73:8  180:15
**26**  140:18  181:12
**269**  3:10
**27**  74:17, 18  140:21
186:24
**276**  3:11
**27th**  75:10  110:12,
13  120:7
**28**  75:6  133:23
134:6  302:20
**28th**  76:13  79:18
134:10
**29**  1:13  75:17
187:24  302:6
**299**  3:11
**29th**  125:16
**2d**  155:13
**2nd**  108:16  227:21

**< 3 >**
**3**  64:8, 21  65:4, 10
91:19, 20  171:24
185:18  250:9, 10
**3:50**  301:24
**301**  1:15  302:5
**3020**  122:12
**30th**  76:3
**31**  3:5  76:2
**312.645.7800**  2:9
**312.655.0555**  1:19
**31st**  48:3  76:3, 4
**3208**  258:15
**33**  76:12  266:14
**34**  9:18  167:16
**35**  185:17, 18, 20, 21
186:1
**3541**  92:17
**36**  77:9  216:2, 2
**37**  79:12, 12  169:24
**3rd**  54:11  82:6
195:22

**< 4 >**
**4**  91:19, 20  134:13
137:22  145:3  179:6
**40**  16:16, 23
**46**  134:19
**48**  237:9, 17

**< 5 >**

**5**  91:20  138:2
150:5  179:6
239:24  240:3
246:10
**50**  64:16  65:6
160:6, 19, 22
**505**  1:15  302:5
**51**  80:12, 22
**52**  195:4, 5
**53**  196:9
**54**  197:13  267:3
**55**  81:22  198:5
290:24
**5500**  2:8
**56**  84:23  85:3
199:12  200:2, 4
**58**  86:13  88:4
90:10  200:5, 6, 20
202:10  204:9
**59**  3:5
**5th**  154:20  162:21
178:19  299:8

**< 6 >**
**6**  61:21  98:16
99:1, 3  138:5
250:11
**6.46**  63:22
**6:23**  89:16
**6:30**  77:17  78:22
90:4
**6:38**  89:12
**6:48**  89:12
**6:50**  89:12
**60**  160:6
**60606**  1:19  2:9
**61**  90:24  91:1, 2
92:17  95:1, 3
204:21  205:10
**61821**  2:5
**64**  95:6, 7  206:14
207:9  208:12
**66**  76:17
**67**  99:10  102:7
210:2
**69.81**  177:13
**6th**  131:24

**< 7 >**

**7**  40:23  41:1  42:1
138:9  170:15
258:8  270:6, 6
**70**  102:16  104:18
211:7, 14
**71**  1:18
**75**  105:1, 6, 24
213:8
**77**  215:11  217:17
218:11  219:7
**7th**  181:14

**< 8 >**
**8**  6:22  66:3
138:12  141:7
301:18
**8.84**  71:22
**8:54**  4:1
**80**  54:10, 11  107:22
108:1, 6, 24  109:21
110:11  115:12
219:15
**81**  118:14, 19
**82**  46:7  55:8
120:1, 6  121:24
122:12  220:18, 23
221:4, 22
**83**  32:11, 13, 15
128:9  222:11, 23
223:14
**84**  34:20  125:15, 21
126:15  223:20
225:1, 6
**85**  127:1  224:9
**86**  224:19  251:15
**87**  226:21  227:9, 20
**88**  129:14  132:7, 11
**89**  130:7  190:19, 21
229:9  230:4  261:10
**8th**  101:11, 22
102:9  103:18
224:20

**< 9 >**
**9**  138:15  141:8, 20
142:2  148:8, 11
149:23  189:7
**9:00**  1:13
**90**  35:9, 11  39:14,
15  48:22  131:19, 19
133:1, 22  134:5

135:2  142:16
147:7, 9, 10  148:9,
10, 11  229:8  230:16
231:8, 13, 19, 24
232:12  238:10
**91**  149:23  236:14
**94**  236:8
**95**  244:16, 18, 20
245:17  277:18
279:18  280:19
284:10  286:6
**96**  246:2, 10  247:23
249:7, 10
**99**  233:2  241:11
**9th**  33:18  34:1
51:7  187:24

**< A >**
**a.m**  4:1  56:18
77:17  78:22
116:10, 10
**abide**  17:24  229:5
300:15
**abilities**  117:14
174:17
**ability**  222:4, 8
**able**  5:17  7:21  9:3
36:19  40:6  56:22,
24  75:14  77:4
104:15  106:13
108:7  130:23
154:21  169:15
171:12  174:23
184:10, 13, 17  192:8
212:19  214:19
224:16  229:7
262:3, 20  271:6
**above-named**
130:13  191:18
**absence**  20:5, 8, 10,
13, 15  67:13, 20, 24
68:4  71:10, 21
72:4, 14, 20  73:3, 7,
15, 17  79:13, 16
80:1  111:23  112:4
162:17  172:16
173:5, 8, 14  174:6,
10, 12  176:24  177:3,
5, 18  180:11, 18, 21,
22  181:9  182:8



2:17-cv-02112-CSB-EIL # 41 10/29/2019 Page 150 of 189
Arbitration
Bruce Melton vs. Pavilion Behavioral Health System, et al.

185:7, *11* 186:*3, 20*
190:*12, 15* 297:6, *14*
**Absolutely** 7:*23*
8:2 32:*4* 117:*23*
174:8 185:5 186:*9*
192:2 199:8
209:*20* 247:*17*
255:*16* 280:*3* 281:8
**abuse** 16:*20* 60:*10*
131:*12* 138:*19*
148:7 236:*15*
**abuses** 167:*23*
**accept** 62:2
**accepted** 24:9
295:*19*
**access** 18:*15*
184:*16* 280:*21*
**accident** 142:*4*
**accommodate** 62:8
71:*6* 78:*11, 20*
79:8 175:*1* 182:*23*
184:7, *23* 216:*13, 20*
219:9 297:*4, 13*
**accommodated**
26:22 27:*1* 185:*10*
**accommodating**
293:*20*
**accommodation**
5:*20* 6:*9* 297:2, *16*
**accommodations**
26:*21*
**account** 249:22
275:*18*
**accountable** 150:*19,*
*22, 24*
**accrue** 63:*22*
**accumulated** 186:*13*
**accurate** 16:2, *6*
41:*15* 86:*1* 93:2
97:*1* 98:*17* 159:*11*
206:*4, 11* 251:*17*
273:*16*
**accurately** 42:*3*
**accusations** 23:*6*
197:*21*
**accused** 84:8
194:*15* 288:*18*
290:*1* 294:*16*
**accusing** 84:*14*
**acknowledge** 66:7

**acknowledged**
201:*24* 265:*3* 289:8
**Act** 18:*3, 5* 40:*23*
244:*21* 248:*16*
279:*6* 287:2
**acted** 26:*17* 286:*15*
**acting** 27:*23* 87:2, 5
**action** 81:*23* 82:*11*
93:*16* 103:*20*
104:*11, 16, 21*
194:*14* 198:6
202:*1* 204:*1*
211:*24* 212:*20*
232:*16* 291:*1*
302:9, *10*
**actionable** 17:*9*
290:*18* 291:*20, 21*
292:2 293:*10*
**actions** 150:*22*
194:*21*
**activity** 47:6, *15*
**actual** 280:*13*
**ADA** 297:*18, 21*
**ADAM** 1:7 15:7
86:*4* 87:2, *10* 88:*9*
91:*16* 95:*12* 96:2
201:5, *8* 202:5, *13,*
*15, 15* 203:*4, 7, 8, 10,*
*21* 204:2, *3, 11*
205:*17* 206:*19*
209:5 250:*24*
273:2, *2, 2*
**add** 48:*16* 91:*23*
199:*5*
**added** 35:*24*
**addiction** 17:*16*
**addition** 7:*4* 60:*5*
93:*1* 94:*14* 121:*17*
**additional** 10:*13*
22:*23* 24:9 48:*16*
60:7 86:7 126:*13*
204:7 205:*21*
222:*1* 232:*20, 21, 24*
238:5, *24* 265:*22*
**address** 21:*17* 58:6
109:*4* 113:*14*
202:2 215:*12*
265:*13* 301:*12*
**addressed** 90:7, *15*
132:*16* 201:*21*

204:*17* 212:*12*
218:*12*
**Adjourned** 301:*24*
**adjudication** 246:*18,*
*21, 22*
**adjust** 62:7
**administrator** 71:*11*
72:*21*
**administrators**
53:*14*
**Admissible** 259:*24*
**admit** 45:7
**admitted** 143:8, *10*
**adopt** 47:*16* 119:*13*
**adopted** 48:*4*
118:*20* 119:8
128:*20* 148:*13, 15*
268:*12*
**adopting** 119:*24*
**adoptions** 48:8
119:*21* 128:*18*
**adult** 47:7
**adults** 52:*14*
**advanced** 79:*1*
**advantage** 21:2
**advising** 132:*20*
**advocate** 13:*1* 30:*12*
**advocates** 13:*1*
**affiliated** 254:*18*
**affixed** 302:*11*
**afforded** 34:*3*
**African-Americans**
42:2 170:*3*
**afternoon** 166:*10*
**age** 7:*21* 168:*10*
179:*19* 258:*24*
**agency** 120:*4, 17, 21*
227:*13* 270:*20*
**ages** 168:*10, 14*
**aggravated** 47:*17*
134:*14* 136:*20*
137:*23* 138:*3*
149:*19, 20, 24* 150:*1,*
*3* 236:*22*
**agility** 64:*14*
**ago** 10:*21, 24* 11:*16*
12:2 104:*6* 211:*18*
**agree** 19:*19* 58:*1*
60:*13* 62:*4* 67:*9*
68:*10* 74:*3* 79:*5*
80:*23* 101:2 118:*4,*

9 119:*1* 126:*11*
131:*14* 134:*23*
135:*23* 172:2
201:*16* 229:*5*
231:*12* 242:*11*
257:22 264:*19*
285:*15* 286:*1*
**agreeable** 225:*18*
264:*12*
**agreed** 5:*21* 6:9, *13,*
*14* 48:*10* 230:*13*
**Agreement** 6:*23*
96:*4* 207:*17* 301:*18*
**agreements** 209:7
**agrees** 264:*18*
**ahead** 36:6 41:*18*
49:*12, 14* 59:*17*
61:*11* 69:*21* 98:8
99:6 113:*18, 24*
118:*17* 143:7, *16*
145:*3* 153:7 162:*5*
204:7 211:7 235:*1*
261:6 264:*11*
266:*14* 268:*21*
269:*4, 19* 276:*4*
**aide** 100:*4, 7*
**albeit** 75:*3*
**allegation** 93:*17*
103:*13* 105:*10*
201:*5* 204:*10*
206:*18* 210:*3, 14*
211:*4* 213:*1, 3*
**allegations** 92:*21*
206:*1*
**allege** 281:*12*
**alleged** 93:*3* 206:5
**alleging** 87:*2* 91:*10*
99:*19* 108:7
204:*24* 210:9
**Allen** 1:*13* 302:5
**allow** 5:*1, 8* 7:*17*
11:*20* 44:*14* 50:*4*
51:*10* 58:*17, 17*
174:5 191:*24*
225:*12*
**allowed** 18:*11*
19:*10* 47:*16* 81:*10,*
*13, 18* 97:*10, 24*
169:9 175:6 192:*4*
199:7 247:*1*



Arbitration
2:17-cv-02112-CSB-EIL # 41 Page 151 of 189
10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

279:*20* 283:*17*
292:*18* 293:*14*
**allowing** 292:*21*
**alteration** 4:*21*
**alternate** 78:*7*
**alternative** 78:*8*
219:*11*
**amazing** 275:*20*
**amended** 40:*24*
**amount** 45:*10*
95:*14* 206:*20*
**ample** 45:*10*
**animus** 26:*17*
286:*16* 287:*6, 9, 17*
288:*24* 295:*3, 17*
**annual** 203:*17*
**answer** 10:*7* 28:*4*
92:*12* 97:*18* 98:*19,*
*21* 100:*2* 113:*24*
114:*21, 22* 115:*4, 6*
121:*4* 142:*4*
144:*17, 19* 159:*1*
161:*7, 10* 240:*11*
269:*11* 278:*20*
282:*9*
**answered** 117:*2*
161:*21*
**answering** 4:*24*
225:*8*
**anticipating** 49:*8*
**anybody** 171:*12*
197:*11* 208:*1*
250:*17* 270:*1*
287:*11*
**anyway** 33:*12*
155:*4* 158:*12*
**apologize** 37:*3, 4, 19*
41:*17, 20* 50:*7*
98:*8, 10* 145:*3*
156:*7* 159:*14*
251:*14*
**App** 155:*13*
**apparently** 270:*24*
**appear** 76:*22*
**APPEARANCES**
2:*1*
**appeared** 25:*3*
187:*14*
**appears** 26:*8, 12*
80:*23* 180:*6*
**Appellate** 155:*8*

**applicable** 20:*14*
259:*3*
**applicant** 245:*1, 6*
278:*1, 3* 279:*17*
**applicants** 258:*22*
**application** 61:*7, 7*
245:*2*
**applied** 15:*16*
158:*7* 249:*19*
**apply** 158:*8* 247:*20*
252:*19*
**applying** 281:*20*
**appointed** 49:*1*
90:*14* 204:*16*
**appointment** 75:*13,*
*15*
**appointments**
187:*18*
**appreciate** 8:*3*
275:*24* 300:*22*
301:*1, 2, 7*
**appreciated** 271:*8*
**approach** 123:*4*
**approached** 103:*17*
207:*10, 13*
**appropriate** 21:*16*
116:*2* 189:*11*
195:*18* 198:*12*
199:*19, 23* 253:*2, 9*
272:*5* 275:*8*
276:*24* 277:*12*
289:*19* 291:*6*
297:*16* 300:*24*
301:*5*
**appropriately** 98:*6*
282:*11*
**approval** 186:*22*
208:*2, 3* 225:*11*
226:*10*
**approve** 115:*6*
181:*5* 184:*9* 208:*6*
**approved** 72:*9*
73:*14* 79:*24* 112:*4*
173:*24* 180:*18, 23*
184:*9* 187:*4*
200:*23* 292:*15*
**approves** 226:*4*
**approving** 67:*20*
180:*20*
**approximately**
169:*24*

**April** 142:*4, 6*
207:*13, 16*
**ARBITRATION**
1:*1* 4:*3* 6:*23* 8:*11*
10:*20* 11:*4* 14:*14*
29:*16* 30:*9* 32:*17*
58:*12* 61:*5* 170:*16*
275:*2, 3* 277:*18*
301:*18* 302:*4, 6*
**Arbitrator** 1:*18*
4:*2, 9, 12, 14* 5:*13,*
*19, 24* 6:*2* 7:*2, 16,*
*24* 8:*3, 8, 24* 9:*11,*
*17, 23* 10:*3, 6, 9, 12*
12:*3, 18* 13:*4, 9, 15,*
*19, 20, 23* 14:*2, 7, 10*
16:*7* 25:*14, 17, 19*
28:*6, 11, 22* 29:*1, 4,*
*10, 13, 24* 30:*4, 8, 20*
31:*4, 8, 12, 23* 32:*2,*
*14* 33:*15, 17, 19, 23*
34:*21* 35:*20* 36:*3,*
*6, 17, 22* 37:*2, 4, 11,*
*14, 17, 20* 38:*1* 39:*2*
40:*16* 41:*4, 7, 12, 18*
42:*14, 18, 23* 43:*11,*
*18* 44:*1, 12, 20*
45:*14, 17, 24* 46:*4,*
*11, 17, 19* 48:*7, 10*
49:*8, 11, 13, 17* 50:*2,*
*10, 22* 51:*3, 5* 56:*8,*
*11, 16, 19, 24* 57:*9,*
*15* 58:*8, 22* 61:*11*
87:*3* 88:*24* 90:*22*
92:*11* 94:*23* 97:*12,*
*16, 21* 98:*2, 5, 9*
99:*1* 115:*8* 116:*3,*
*7* 117:*24* 118:*17*
122:*20, 23* 123:*5, 7,*
*12* 137:*10* 143:*4, 7,*
*12, 15, 22* 145:*4*
146:*22* 147:*7*
148:*9, 23* 149:*1, 5, 8*
152:*5, 9, 12, 15, 19*
153:*10, 13, 16, 21*
154:*1, 3* 157:*10, 16,*
*21* 158:*16* 159:*17*
161:*23* 162:*2, 4, 8,*
*11* 163:*12, 20, 24*
164:*6, 18, 20, 24*
165:*6, 10, 13, 16, 19,*

*23* 166:*3, 6, 15*
185:*20* 191:*8, 11*
200:*3* 209:*20, 23*
220:*11, 14* 234:*12,*
*16, 20* 235:*1* 240:*1*
241:*8, 10, 14, 23*
242:*4, 8, 20* 243:*24*
244:*17, 19* 248:*21*
249:*1, 13* 251:*19*
252:*5, 8, 11, 13*
253:*7* 256:*6, 10, 14,*
*22* 257:*2, 22* 258:*1,*
*4, 11, 18* 259:*15, 17,*
*21* 260:*1, 22* 261:*3,*
*5, 17, 20, 24* 262:*5,*
*10* 263:*1, 4, 9, 17, 21*
264:*10, 20* 266:*5, 8,*
*11* 267:*12, 21, 24*
268:*3, 6, 13, 16, 21,*
*23* 269:*2, 4, 8, 16, 19*
274:*4, 10, 13, 21*
275:*1, 10, 24* 276:*4*
277:*19, 23* 278:*22*
279:*2* 281:*4, 9*
282:*4* 283:*6, 11, 24*
284:*2, 18* 285:*1, 8,*
*11* 286:*5* 287:*20*
293:*2* 294:*15*
296:*6, 10* 297:*23*
298:*4, 11, 13, 19, 23*
299:*10* 300:*21*
301:*15, 20*
**area** 5:*6* 54:*5*
252:*11*
**argue** 7:*11* 23:*3*
137:*10* 150:*22*
266:*12* 283:*14*
**arguing** 257:*17*
266:*5* 278:*5*
**argument** 7:*19*
152:*7, 10* 244:*1*
268:*14, 17, 24* 269:*2,*
*3, 6, 10, 11, 18* 276:*1*
296:*6, 11* 297:*3*
**ARGUMENTS** 3:*10*
6:*15, 16* 52:*6*
274:*15*
**Arnetha** 25:*13, 15*
32:*17* 35:*23* 226:*6*
264:*2, 22*



2:17-cv-02112-CSB-EIL    # 41    Page 152 of 189
Arbitration    10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

**A-R-N-E-T-H-A**
25:16
**arose** 74:5, 10
175:13 294:18
**arrange** 265:21
**arrangements** 79:2
**arrest** 40:13
134:10, 10 138:7
148:18 149:1, 17, 18,
21 241:22 246:15
247:6
**arrested** 60:6, 9
131:12 133:23
134:6 135:19
137:23
**arrests** 46:15
231:23 241:19
242:1 248:7 280:16
**arthritis** 179:19
**aside** 15:12 286:17
**asked** 10:18 13:24
34:10 36:10 39:10
42:13 43:4 44:5, 9,
22 45:4, 24 49:4
51:23 52:12 54:15
85:23 96:6, 8, 9, 13,
17, 20, 21, 24 98:18
105:11 106:2, 4
107:15, 18 113:17
132:24 152:24
153:2, 4 156:8
160:13, 17 161:6
163:17 164:8
203:7, 10 204:3
207:11, 14 208:14,
15 209:11, 12, 13
213:3, 13 215:17
252:22 253:12
260:7 265:14
266:15 271:3
273:6 285:9
**asking** 4:23 30:23
40:18 59:4 104:7
113:22, 23 114:18,
24 136:8 144:11
161:3, 9 164:9
186:10 202:13
211:19 225:11, 13,
19 239:4 253:6, 8
263:1, 5, 9 271:18,

21 282:1
**aspect** 282:7, 7
**aspects** 40:10
**assault** 39:20 47:18
119:7 136:21
**assess** 131:6
**assigned** 21:11
62:8 63:16 96:18
217:9 250:14, 15
**assignment** 290:4
**assist** 208:20
**assistance** 299:1
**assisted** 250:23
**assume** 29:11
97:22 278:13
279:12 281:10
301:12
**attach** 12:11
**attached** 78:13
88:18 89:2, 16
108:20 133:1
203:13 207:6, 12, 15
225:7 239:10
**attempted** 55:5, 6
**attempting** 35:4
**attend** 102:2
**attendance** 15:18
**attention** 8:4, 17
13:12 15:16 21:3
38:4 45:8 77:9
86:8, 22 195:13
196:15 198:14
219:15
**Attorney** 2:7 6:6
54:13, 20 155:1, 19
299:3
**attorneys** 302:10
**at-will** 61:18 286:10
**audit** 22:9 265:17
**August** 102:23
104:1 236:21
**authorities** 7:22
**authority** 42:8
114:2, 20 115:1, 2, 5
208:1 278:14
281:16
**authorize** 245:5
278:2
**authorized** 286:3
**authorizes** 280:20

**available** 10:4 12:7
20:24 34:7 40:3
70:12 78:10
184:20 216:19
233:17, 22 235:5, 8,
12, 16 236:18 237:1,
5, 11, 16, 18 289:15
**Avenue** 2:4
**avoid** 58:14 189:9,
13
**award** 6:22 301:16
**aware** 96:4 104:20
121:19 209:6
240:21 254:7 255:8
**axiom** 13:20

**< B >**
**bachelor's** 270:15
**back** 18:24 26:6
37:23 39:4 40:4
43:9 48:14 51:1
55:8 56:19 74:14,
19 75:18 76:5, 8, 17
95:8 99:9 102:20
106:19 108:23
110:10 112:9, 14, 16
113:4, 13 141:7
147:4 150:21
154:16, 18, 22
155:17, 22 157:8
161:12 162:23
163:7 165:17
168:8, 8 172:19
173:23 174:2
178:2 182:18
183:3, 4 187:11
188:2, 9, 19 189:10,
14, 15 193:11 195:3
200:13, 16, 23 203:9
212:24 214:8, 11, 14
215:6 216:7
222:17 223:23
225:2 238:11
239:17, 20 243:8
249:5 250:7
257:11 272:19, 21
274:20 293:20
299:8, 13, 14
**background** 11:8,
10 14:18 17:12
18:9, 17, 22 19:7

22:11, 13, 16, 18, 21
23:11 24:16 25:23
31:17, 19, 20 32:7, 8,
19 36:11, 14 38:6
39:21 45:3 51:20
55:18 62:20
108:12 113:3
115:17 119:15
121:8 125:23
126:8, 14, 18, 21
127:8 128:3 129:9
131:4, 20 145:17, 24
155:16 163:1
169:6, 12 171:2, 6, 7,
10, 15 220:3, 20, 24
221:5, 13, 22 222:2,
14 223:4, 16, 23, 24
224:7, 11 225:1, 3, 9
226:9 227:6 228:6,
9, 13, 16, 20 229:1,
23 230:9, 18 233:8,
10 234:11 237:15,
21 239:1 240:22
241:15, 17 246:4
255:12, 14 256:3
257:10 261:4
262:14, 19 265:13,
16, 22 266:17, 20
267:5 270:8
276:11 284:14
**backgrounds** 169:9
**bad** 15:18
**bail** 124:9
**balance** 71:22 72:1
**Ball** 91:16 205:17
**bar** 11:24 110:16
130:21, 23 145:20
225:22 262:2, 2
**barred** 23:12 27:7
130:2 132:8, 20, 24
295:6
**barring** 23:14
**bars** 129:19
**based** 12:11 19:23
24:12 41:3 68:11
112:3 117:17
149:16 159:18
163:10 172:9, 20
174:1 180:7 238:5
241:24 242:2, 10
243:17 248:23

249:24  250:4
263:19  266:6, 19
267:18  281:22
282:12, 22, 23  284:9
289:14  290:16
298:6, 8
**basically**  256:11
**basing**  244:8
**basis**  33:10  36:16
45:17  46:11
154:15  158:9
246:14  247:9
258:24
**Bates**  92:17  122:11
134:3  135:15
**bathroom**  209:19
**battery**  16:19  60:3
134:14  135:20
136:13, 15  137:24
138:3  139:15, 24
140:4, 7  150:3
234:3  235:4, 7, 11
236:1, 5, 22  240:19,
20  241:1, 5  262:24
**BCU**  223:22  224:14
**bear**  276:8
**beds**  167:15, 16
**beginning**  14:19
88:24
**behalf**  43:20  53:17
146:4  192:17
193:15  229:18
264:2  291:14, 17
**behaved**  300:24
**behavior**  84:8, 14
91:10  198:9, 17
199:16  205:1
253:8, 9  265:9
289:24  290:2, 13, 15
291:3
**BEHAVIORAL**  1:5
2:12  4:4  17:15
166:14
**belabor**  58:21
210:13
**believe**  43:12  45:18
51:19  64:23  83:4
148:14  251:18
260:12  273:20
289:12  300:7, 12

**believed**  129:12
**believes**  44:15
**believing**  46:12
**belong**  106:19
215:7
**bending**  157:4, 6
189:10  272:23
**benefit**  63:24  71:24
78:5  175:9  177:13
**benefits**  20:14  64:4
70:13  72:3, 8, 21
73:2  155:8  170:18
175:7  177:17
184:15, 19  186:2, 19
**bent**  189:13
**best**  117:6, 14
159:4, 5
**better**  77:24
215:18  219:10
**Betty**  91:14  195:23
196:1, 5  205:16
**beyond**  15:24  96:8,
14  209:13  232:22
**big**  120:12  153:3
160:7  250:16
293:15
**biggest**  154:8
**bilateral**  179:1
**bills**  155:18, 18
**binder**  61:4  99:9
118:15  178:22
190:20  195:4
215:24
**binders**  8:19  28:16,
24  29:15  30:6
**biologically**  47:13
**birth**  222:16
**bit**  17:12  41:19
76:1  123:13
142:24  167:11, 12
169:19  245:17
**biweekly**  63:13
**black**  197:3
**blame**  159:10
**blank**  83:13  127:24
128:3
**blatantly**  53:24
**body**  189:11  280:15
**bogus**  159:13, 13
**bolts**  282:18

**bond**  124:9
**book**  32:15
**books**  252:14
**borrow**  47:22
**bother**  256:18
**bottom**  66:4  67:3
86:15  88:21  99:14
106:24  120:10
122:18  124:8
127:10, 11  179:6, 24
197:7  208:11
210:22  213:20
218:21  249:12, 16
**bought**  38:22
**box**  43:22  83:10
117:24  188:4, 21, 24
189:2
**brand-new**  11:2
**bravo**  272:14, 14
**break**  56:12  116:1,
3, 8  184:18
**brief**  6:12
**briefs**  6:5
**bring**  57:2  58:6
143:2  144:18
230:9  268:7  273:9
295:2, 14
**bringing**  8:4, 17
44:13  294:23
**brings**  57:1, 10
**brought**  13:11
44:17  47:18  55:14
86:8, 22  151:10
155:14  195:12
196:14  198:13
219:15  230:1, 23, 24
231:2, 5  238:6
242:5  275:6  277:5
278:24  279:5, 22
292:24
**BRUCE**  1:1  2:4
3:4  4:3  31:7
54:11, 16  75:12
82:7, 12, 17  83:6, 24
87:19  89:11  90:3
91:9  92:22  94:8,
15, 20  95:11  96:4
99:18  101:5, 9
102:2  103:1, 16
104:6, 14, 19  105:11
106:2, 4, 10  107:2,

18  108:7, 20  110:5,
14  112:11, 12
115:15, 21  135:3
195:10, 23  196:12,
14, 17, 19  198:7, 8
199:2  202:12
203:7, 9, 12, 16, 20
204:2, 2, 10  206:16
208:19  209:7
210:4  211:18
212:18  213:3, 23
214:17  215:13, 17,
20  217:22  218:12
220:7  227:10  231:2
**Bruce's**  107:11
203:11
**burden**  26:15
286:14  287:9
**Bureau**  127:21
150:6  265:20
**burglary**  16:19, 19
45:19  59:24  138:6,
10, 13  139:9  140:19
141:9, 12  236:9
**bus**  124:19
**butts**  103:2
**buzz**  17:4  288:2

**< C >**
**cafeteria**  53:24
82:20  171:23
**call**  21:1, 8  27:22
40:4  55:5  72:13
84:19  85:4, 7, 18
86:4  151:16
158:23  165:24
166:2  173:19
193:2  194:1, 3, 4
199:13  200:14
206:16  229:22, 24
230:6  241:12
260:18
**called**  21:2  29:15
54:21  55:4  57:11
110:24  111:11
152:1  158:24
171:8  223:22
229:21  230:2
232:14  290:2
292:17  295:1, 12



2:17-cv-02112-CSB-EIL # 41 Page 154 of 189
Arbitration 10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

**calls** 25:6 55:3
80:8 85:15 192:12
193:22 288:7, 8
**camera** 49:4
**candidate** 246:14
247:5, 13 248:2
249:8, 19
**candidate's** 247:19
**capable** 189:16
**CAPONY** 1:6
**car** 66:23 142:3
**card** 272:14
**cards** 272:14
**care** 17:14 18:2, 5
60:17 129:20
130:3, 14 131:1
159:6 168:3, 9, 17
169:4 174:15
188:14 191:16
244:21 245:1, 3
258:10 262:4
264:24 265:5, 8, 10
279:6
**careful** 70:11
**Carle** 75:6 181:13,
13
**carpal** 68:6, 12, 19
69:18 70:10, 21
73:7, 18, 24 74:4, 10
79:13 112:1
162:17 178:6
179:2, 12, 18 182:18
183:9, 21 184:8, 23
185:9, 22 186:3
190:16 297:10
**carrier** 70:24 72:8
**carts** 64:15 240:15
272:22
**CASE** 3:4, 6 5:15,
16 6:5, 11 7:13, 20,
22 9:13 10:16, 19,
23 12:6 16:3, 11, 21
19:10, 22, 24 20:21
25:24 28:9 43:20
56:22, 23 57:1, 10,
16, 23 58:4, 5 59:13
93:16 97:19 121:7
122:18 129:7
149:22 155:1
161:7 163:14
165:11 175:11

247:8, 8 253:23
259:13 268:3
273:10 274:11
275:14, 21 276:6
277:4 278:12, 14, 15,
21, 23 284:5, 6
296:17, 18, 18
297:19 298:2
299:6 300:3
**cases** 39:19, 21
49:23 149:18
150:8, 9 249:24
250:1, 3, 4
**cast** 15:12
**Cathleen** 215:14
**causation** 179:11
**cause** 302:9
**caused** 187:14
**censures** 62:14
**Central** 127:7
**CEO** 192:20, 21
193:7, 10, 16 194:6,
7 200:22 207:14, 20
208:3 218:4
253:11, 14 290:4, 8
291:13, 13
**certain** 18:8 19:4
21:24 47:4, 4
48:18 57:7 147:22
155:5 169:8 175:7
214:14 254:1
264:14 270:8
**certainly** 7:9, 12
36:19 237:16
244:2 248:21
274:8 279:10
281:1 283:12
**certificates** 101:15
**certification** 101:18
**certified** 33:14
34:1, 8 260:15
**certify** 302:4, 8
**cetera** 64:15 65:14
106:15 214:21
**CFO** 201:9 202:16,
17
**Chad** 2:7 4:6
**chain** 272:2
**challenge** 282:12
**challenged** 281:5

**Champaign** 1:15
2:5 46:22 302:5
**chance** 34:20 39:7
57:10 146:23
**change** 47:12 51:18
77:23 156:15
215:17 216:12
217:15, 19 219:8
293:17
**changed** 47:7
273:21, 21 293:16
**changes** 63:17
**changing** 77:16
293:21
**chapter** 270:6
**characteristic** 259:2
**charge** 136:19
138:16 139:3, 5, 8,
11, 14 140:22
141:12 192:18
235:7 236:1, 21
247:6, 12
**charged** 16:15 60:9
119:10 135:19
136:13, 15, 20, 23
137:1 138:3, 6, 10,
13, 23 139:23 140:3,
6, 9, 12, 15, 19 141:1,
8 150:4 245:7
278:3 281:20
**charges** 16:16, 17,
23 18:13 22:24
26:4 60:7, 14
119:3 122:1
134:11, 13, 19, 21
135:5, 6 137:5, 15,
20 138:16 139:17
141:4 221:21
222:8 231:9, 23
232:5, 20, 20, 21, 23
233:1, 7, 8, 9 237:17
238:6 239:14
242:3, 4, 6 244:9, 11
245:8, 14, 19 247:2,
14, 16, 24 248:8, 10,
10 249:17, 20
252:20 262:23, 24
267:5, 9 276:22
277:5, 15 278:5, 8,
17 279:8, 9, 18, 22
280:2, 12, 20, 21

281:15 283:4
284:16, 16 285:19
296:8
**Charles** 91:16
205:17
**check** 18:9, 17, 22
22:16, 18, 22 23:12
31:17, 19, 20 32:7, 8,
19 36:11, 14 50:19
108:13 112:15
113:3 115:18
119:15 125:23
126:8, 18 127:8
128:4 129:9
131:20 145:18
171:2, 6, 8 220:4, 24
221:13 223:4, 16, 23,
24 224:11 225:1, 3,
9 226:9 227:7
228:6, 9, 13, 16, 20
229:1, 23 230:9, 19
234:11 241:15, 17
255:12, 14 256:3, 15,
19, 20 257:10
262:14, 19 265:13,
22
**checked** 37:23
43:21 117:24
171:10 188:24
**checking** 248:19
271:17
**checks** 169:6
171:15 221:5
222:14 239:1
265:16
**Chicago** 1:19 2:9
**CHIEF** 3:4, 6 28:9
57:11 163:15
165:11 179:1
268:4 271:3
**child** 17:14 18:2, 5
60:17 129:19
130:3, 14, 24 168:17
169:4 191:16
244:21 245:1, 3
262:4 264:24
265:5 279:6, 6
**children** 17:18, 23
47:16 52:14, 19
60:24 66:19 109:5
118:20 148:14

2:17-cv-02112-CSB-EIL   # 41   10/29/2019   Page 155 of 189
Arbitration
Bruce Melton vs. Pavilion Behavioral Health System, et al.

167:12  168:11, 24
169:10, 16  192:8
224:17  229:7
265:4, 7  268:12
270:10, 12  276:18
277:8  280:5  282:8,
20
**children's**  254:17
**choice**  300:15
**choose**  149:16
273:15
**chose**  199:9  291:6
**chronic**  189:13
**church**  47:19
**circle**  189:11
**circumstance**  12:8
281:10  282:8
**circumstances**  6:3, 3
9:12  11:19  12:5
15:1  16:21  55:1
79:6  276:7  280:24
281:23  286:24
287:7  294:18
299:16
**citation**  7:21  278:5
**cite**  274:15  277:16
**cited**  277:1
**Civil**  40:23  300:24
**Claim**  69:11  70:13
71:1, 10, 17, 18
72:10, 14, 17  116:15,
20  160:16  161:5
164:10  173:20
178:9  180:9  184:8
296:24
**claims**  17:7  26:8,
10, 11, 21  27:5, 6, 8,
10  70:4, 5  294:2
**clarification**  281:19
**class**  46:23  99:21
100:19  101:17
102:3  147:13
149:16  210:7, 11, 19
**classifications**
251:20

**CLayton@smsm.com**
2:10
**clean**  106:18  215:6
**cleaning**  19:16
157:2

**clear**  7:10  26:11
84:4  128:7  172:22
200:19  222:22
244:6, 11  253:5
256:23  258:19
267:2, 7  277:17
284:19  294:13
295:16  296:20
297:2
**clearance**  37:24
43:17  127:12, 15, 19,
22  227:2, 6  239:4,
21  285:4
**clearing**  49:22
**clearly**  11:12
284:19  287:6
295:18
**client's**  155:6
**clocked**  89:12, 15
**clocking**  88:15
89:7  90:4  201:13
289:6
**close**  17:13  56:22
263:15  275:23
**closed**  6:21
**CLOSING**  3:10
6:14, 16  268:13
269:3, 5, 9, 10, 11
287:21
**collaborative**  208:22
**colleagues**  282:21
286:23
**color**  258:24
**column**  233:12
**come**  7:6  19:22
46:19  109:14, 17
113:13  154:22
155:17  162:23
167:22  168:5
171:22  173:17
176:14, 15  192:19
217:8, 11  225:5
246:6  251:1
269:15  270:13
273:15  275:21
299:14
**comes**  58:16
106:10  208:19
214:17  280:11
**comfortable**  225:23

**coming**  161:23
182:18  217:5
**command**  272:3
**Commencing**  4:1
**comment**  13:17
85:11  100:20
197:3  199:6
289:20  296:20
**comments**  67:16
82:18  83:10, 11
196:21  197:5, 23
**Commission**  116:16
155:12  302:19
**communicated**
74:23  266:1
**communications**
252:23
**comp**  27:10  54:17
70:24  77:15  78:5,
20  112:13, 21, 23
154:17  184:8
215:20  218:23
299:7
**company**  61:21, 22
62:12  70:7  155:3
171:8  173:15
246:13  248:1
249:7  271:7  285:20
**compelling**  164:5
282:7
**compensable**  70:14
**compensation**  27:5
63:10  70:13  71:1
155:12  180:7, 10
187:21  219:11
299:5
**complain**  290:3
**complained**  289:2,
22  292:8, 8, 13
293:5
**complaining**  89:6
194:13  199:15
217:19  281:15
290:10  291:18
**complains**  290:12
**complaint**  33:5, 8, 9
91:1  100:17  179:1
194:11  199:20, 22
211:12  218:1
253:8  254:16
272:3, 6, 11  290:19

**coming**  292:20, 24  299:22,
24  300:2
**complaints**  15:19,
21  20:22  33:3, 6
52:6, 11, 13  151:8
192:16  198:13
201:12  271:12, 13,
13, 14, 14, 17  272:4,
9  288:4, 15  289:5,
16  300:18
**complete**  88:14, 16
90:6, 13  97:7
113:16  154:23
173:22  200:19
201:20  204:14
210:19  237:22
**completed**  77:1
103:24  113:20
120:6  145:18
188:16  225:8
228:13  238:24
257:10
**completely**  22:7
58:1  160:9  283:18
286:1
**completing**  224:14
**compliance**  193:11,
24  194:5  200:12
218:9  301:17
**compliancy**  56:1
252:24, 24  299:20,
21
**comply**  18:4  189:24
**complying**  175:17
**component**  28:12
152:20
**concern**  155:19
176:6, 10  204:13
212:5
**concerned**  108:9
148:5
**concerning**  85:4
88:9  92:5  93:17
104:12  105:7, 21
197:15, 17  202:5
212:1, 12  224:6
237:10  245:19
253:3  278:7  279:16
**concerns**  87:10, 13,
15, 16, 19, 20  88:1
90:5, 12  176:15



2:17-cv-02112-CSB-EIL # 41   Page 156 of 189   10/29/2019
Arbitration
Bruce Melton vs. Pavilion Behavioral Health System, et al.

194:2  196:*11*, *14*
201:*19*  203:*3*
282:*1, 6*
**conclude**  117:*19*
**concluded**  163:*13*
**concludes**  96:*16*
**concluding**  70:*10*
96:*23*
**conclusion**  6:*10*
68:*3, 12*  90:*10*
96:*12*  194:*12*
205:*23*  219:*24*
288:*23*  290:*16*
**conclusions**  289:*14*
**condition**  185:9, *10*
245:*4*  278:*1*
**conditional**  246:*20*
**conditions**  61:*23*
62:2
**conduct**  20:*19*
135:*20*  136:*20*
169:*12*  193:*14*
240:9  289:*19*
**conducted**  22:8
101:*3*  117:*16*
131:*21*  171:*15*
205:*3, 15*  206:*23*
213:*10*  219:*19*
224:*1*  288:*19*
289:*12*
**conducting**  192:*24*
291:*11*
**conference**  158:22,
*24*
**conferences**  4:*17*
**confident**  17:6
**confidential**  194:*16*,
*18*  212:*15*
**confirmed**  232:*4*
**confirming**  69:*16*
137:*15, 19*
**confirms**  224:*10*
**confront**  9:7, *24*
44:*16*  97:22  143:*13*
**confronts**  153:*17*
**confusing**  92:*15*
103:*12*
**conjunction**  63:2
69:*17*  120:*3*
125:22  183:8
224:24

**consider**  18:*11*
160:*15*  232:*10*
245:*13*  246:*14*
247:2, *15*  249:8
267:9  274:*13*
277:5  278:*17*
279:*21*  280:2
283:*4, 17*  295:*15*
296:7
**consideration**  70:*11*
286:*19, 21*
**considerations**
284:*11*
**considered**  278:*10*
296:*16*  297:*15, 15*
**considering**  26:*3*
**considers**  250:*12*
**consist**  250:*16, 17*
**consistent**  174:5
198:*18*  248:*15*
293:*11, 12*  294:7, 9
**constant**  291:22
**constitutionality**
281:6
**consulted**  24:*10*
**consulting**  207:*24*
**contact**  18:*15*  34:5
40:5  54:*17, 24*
71:*18*  72:*16*  111:*3,
16*  118:*11*  159:7
288:9
**contacted**  22:*14*
112:*20*
**containers**  106:*15*
214:22
**contendere**  246:*20*
**contending**  256:*16,
18*
**contends**  23:*19*
27:*3*  275:7
**content**  35:7
**contention**  121:*17*
**contents**  241:*11*
**context**  14:22
29:*18*  99:*23*  144:*10*
**continual**  154:*14*
**continually**  15:*17*
**continue**  5:*15, 17*
24:*14*  28:2  78:*20*
146:9  243:*3*

248:*17*  262:*16*
287:*3*
**continued**  27:*21*
178:2  189:*19*
**continues**  125:*4*
**contract**  38:22
**control**  112:*16*
**convenient**  188:*14*
**conversation**  38:*11*,
*14*  54:*14*  82:7
87:*14, 22*  147:*17*
190:*10*  193:*3*
253:*18, 20*  260:*10*
**conversations**  56:*1*
93:*21*  193:5  206:7
274:22
**convicted**  16:*15*
35:2  36:*1, 8*  45:*23*
46:7, *24*  49:*23*
59:*18, 24*  60:*3*
119:*10*  124:6
150:*23*
**conviction**  110:*15*,
*21*  124:*16, 22*  125:*5,
11*  129:*18*  130:*20*
145:*20*  241:22
242:6  246:*15, 23*
247:*3*  262:*1*  281:*13*
**convictions**  16:*16*,
*17, 23*  18:*12, 24*
19:*11*  22:*24*  25:*23*
26:*4*  34:*17, 19, 24*
35:*1, 2, 23*  39:*5, 8, 9*
40:*13*  45:*19*  46:*1,
3, 6, 9, 13, 15*  55:*11,
19, 20*  60:6  62:*13*
119:*3, 5*  121:*24*
126:*4*  134:*20*
137:*5, 15, 20*  141:*5*
151:*1, 4*  224:*3*
225:*18*  231:*24*
237:*17*  240:*9, 19, 22*
241:*5, 19*  242:*1*
243:*18*  244:*8, 12*
267:*5, 9*  273:*24*
274:*7*  276:*21*
277:*14*  278:*9, 18*
279:*16, 18, 21*
280:*13*  284:*17*

**cook**  19:*14, 15*  63:6
64:*10*  100:*3, 5, 6*
154:6  171:*19*
**cooking**  66:*15*
171:*20*
**cooks**  101:*14*
**cooperated**  117:*13*
**cooperation**  301:5
**copies**  301:*12, 13*
**copy**  25:*11*  34:24
37:*10*  39:9, *11, 12*
49:*5*  53:6  54:*12*,
*20*  59:9, *13*  66:8
102:8  131:*4*  143:6,
*21*  145:24  193:*16*
203:*10, 16*  226:*23*
**corporate**  14:*17*
21:*3*  24:*10, 11*
52:2  148:*1*  193:*11,
13, 19, 24*  200:*12, 14,
17, 24*  218:7, 7, 8, 9,
18*  232:*15*  238:*1, 2,
3*  246:7  288:9
290:9  291:*16*
**correct**  59:*19, 22*
60:*1, 7, 8, 11, 12, 15,
18, 22, 23*  61:*1, 2, 8,
9, 16, 19*  62:*3, 10, 20*
63:*6, 7, 12, 13, 18, 19*
64:2, *7, 11, 17*  65:*8,
12, 15, 18, 24*  66:*1, 6,
9, 10, 17, 21, 23, 24*
67:*5, 8, 11, 15, 18, 22,
23*  68:*1, 8, 9, 13, 20,
21*  69:*18, 23, 24*
70:8, *19, 21, 22*  71:*3,
7, 8, 14, 19, 23*  72:*1,
2, 11, 18, 23*  73:*4, 10,
13, 16, 20, 22*  74:*1, 2,
8, 12, 16, 20, 24*  75:*3,
4, 9, 11, 16, 20, 23, 24*
76:*6, 10, 13, 14, 19,
20, 24*  77:*2, 3, 6, 7,
12, 18, 19, 22*  78:*2, 3,
14, 15, 23*  79:*3, 4, 10,
13, 14, 19, 22*  80:*2, 4,
13, 14, 16, 17, 20, 22*
81:*4, 5, 8, 19, 20, 24*
82:*1, 4, 9, 10, 16, 23,
24*  83:*5, 13, 14, 16*
84:6  85:*4, 5, 9, 12,*



2:17-cv-02112-CSB-EIL # 41    10/29/2019    Page 157 of 189
Arbitration
Bruce Melton vs. Pavilion Behavioral Health System, et al.

13, 14, 17, 21, 22
86:2, 6, 10, 11, 19, 20,
23, 24   87:6, 7, 11, 17,
23   88:5, 6, 11, 17
89:8, 14, 18, 21   90:7,
8, 17, 21   91:2, 12, 17,
18   93:12, 23, 24
94:4, 5, 8, 9, 13   95:1,
4, 9, 10, 17, 21, 24
96:15, 18   98:21, 21
99:7, 12, 13, 22
101:4, 7, 8, 12, 19, 20,
24   102:4, 5, 9, 10, 14,
17, 18, 22   103:3, 4,
15, 21, 22   104:5, 10,
12, 13, 16, 17, 22, 23
105:8, 9, 13, 14, 18,
22   107:5, 6, 13, 14,
21   108:3, 4, 9, 10, 14,
21   109:1, 2, 6, 13, 14
110:1, 4, 6, 8, 9, 18,
21, 22   111:21   112:1,
2, 6, 10, 18, 23, 24
113:6   115:21, 22
116:13, 14, 16, 17, 21,
24   117:4, 9, 12, 15,
20   118:8, 21, 24
119:19   120:15
121:11, 11, 16, 20, 21
124:7, 10, 17, 20, 23
125:2, 6, 9, 13, 17, 18,
20   126:1, 6, 10, 16
127:6, 9, 14, 17, 20,
23   128:1, 5, 12, 16,
24   129:3, 6, 15, 16
130:4, 5, 9, 10, 16, 18,
19, 22   131:1, 2, 7, 8,
12, 13, 17, 22   132:2,
5, 14, 18, 22   133:3, 5,
6, 9, 10, 14, 17, 18
134:1, 8, 12, 16
135:4, 7, 10, 11, 20,
21   136:1, 5, 10, 11,
13, 21, 22   137:24
138:1, 3, 4, 7, 8, 10,
11, 13, 14, 17, 18, 20,
21, 24   139:1, 4, 7, 9,
10, 12, 13, 16, 18, 19,
22   140:2, 5, 8, 11, 14,
17, 20, 24   141:2, 3, 5,
6, 10, 12, 15   142:14

145:8, 9, 11, 15, 16,
21, 22   146:4, 5, 9, 10,
14, 16, 17   162:19, 22
163:2   168:16
170:10, 11, 13, 23
172:5, 17, 18   177:4,
10, 14, 15, 19   178:4,
6, 7, 10, 11, 14   180:4,
5, 13   181:6, 10, 21,
24   182:1, 15, 16
183:7   184:3, 21, 24
185:23   187:7, 9
189:3, 18   190:17
191:1, 2, 20   193:20
198:11, 24   199:11,
13   200:7, 8   202:3, 7,
18   204:11, 12, 19
206:9, 12, 24   207:1,
21, 22   208:9   209:9,
15   211:6, 10, 16, 22
212:17, 21   213:14,
15   214:2, 12, 15, 22
215:9, 15   216:5, 8,
10   217:23   218:20
219:3, 21   220:4, 5, 8
221:23, 24   222:24
223:1, 13   224:3, 4, 8,
13, 20, 21   228:4, 7,
17   229:13, 16   231:4
233:14, 19, 23   234:7
235:9, 17, 18, 23
236:3, 6, 9, 10, 19, 22
237:6, 12, 19   238:9,
16, 20   242:7, 12, 13,
18, 19   243:5, 6, 9, 13
244:10, 14   245:8, 15,
24   251:12   252:3
253:19   254:2, 13
255:1, 15   256:13
259:7   261:12
262:12   266:18, 22
267:1, 6, 11   282:13,
14
corrected   132:17
correcting   186:6
corrective   81:23
82:11   93:16
103:20   194:21
198:6   291:1
correctly   84:1
94:17, 22   95:16

96:10, 11   98:22
106:8, 21   107:20
111:4, 5   115:18
129:21   142:9, 10
144:22   161:14
208:16   214:1
216:21   219:12
correlated   271:12
Costantini   218:18

C-O-S-T-A-N-T-I-N-I
218:18
count   134:18, 20
counterpart   193:12
238:1
country   291:5
counts   27:14
298:10
COUNTY   302:2, 4
couple   7:6   53:23
54:6   159:20
233:24   264:4
289:1, 16
course   7:14   11:12
20:3   22:6   24:7
25:10   65:22   70:7
185:15   188:20
211:3   214:7
231:18   232:16
275:2   277:2
280:22   283:14, 18
285:15, 15
court   6:17   28:14
33:4   36:12   38:9
41:8, 23   47:16
49:3   56:12   58:12,
14   148:18   149:9
155:8   301:11
court-approved
232:4
cover   131:23
185:16
covered   112:21
187:21
covers   183:2
coworker   82:8, 9, 12,
17   84:7, 13   195:10
290:1
coworkers   82:21
88:15   89:6, 15
90:3, 12   91:11

93:22   96:9, 14
103:2   197:24
198:14   201:13
204:14   205:1
206:8   209:13
288:17, 18   289:2, 6
292:18
CRABTREE   1:7
2:12   3:8   4:8, 8, 10,
13   14:16   15:7, 10,
21, 24   21:10   22:14
23:4, 20, 23   24:3, 8,
19   26:17   30:19, 24
33:3   34:4, 5   36:9,
12   37:23   38:9, 22
39:4, 7, 18   43:1, 20
44:5, 16   45:10
50:15   51:9, 23
52:24   53:12, 13
54:10   55:12, 23
56:2   62:23   64:3
67:10, 19   69:14
70:18   73:12, 14
77:21   78:4   79:21,
24   82:3   86:9, 19
87:9, 21   89:7
91:17   93:9   94:7
95:9, 19   96:3, 12, 16,
23   99:12   101:2
102:21   103:24, 24
105:7, 21   108:2, 16,
17   111:10, 11, 14, 19
112:5   113:11
114:2   131:11
133:5   137:3, 4, 14,
19   142:19   143:11
144:11   145:10, 12
147:17   150:13
151:6   154:10, 21
155:2, 14   156:14
159:5   166:2, 4, 5, 10
172:21   178:20
192:9   198:21
205:20   207:19
209:6   215:15
237:8   240:11
242:11   250:19
252:22   253:16, 16
254:8, 11   255:23
259:4, 11   260:6
270:5   271:5, 14



272:8 273:10
277:2 282:21, 24
283:1 284:3, 14
285:17, 22 286:15,
23 287:11, 18 288:5,
10, 15, 19 289:3, 7,
10, 17, 24 290:3, 5, 6,
11, 12, 14, 20 291:3,
10, 19, 21 294:20
295:1, 3, 12, 21, 22
296:15 300:2
**Crabtree's** 44:9
88:8 91:21 92:5
107:8 143:3, 18
286:19, 21
**crawling** 65:14
**created** 285:2
**credible** 296:21
**crime** 119:11 245:7
278:4
**crimes** 46:24 47:1
60:10 136:23
244:13
**criminal** 11:8, 10
16:16, 18, 20, 23
18:9, 12, 13, 17, 21
19:7, 23 22:10, 16,
18, 21, 23 23:11
24:16 25:23 26:4
34:15 35:1, 7 38:5,
10, 12, 15 39:5, 19
40:19, 21, 21 41:3, 5
43:1, 5 44:6, 10, 23
45:2, 6, 11 46:12
47:6, 15, 17, 17 48:5,
17, 21 49:6 51:11,
12, 16 52:3 55:9, 10
60:7, 10 62:20
108:12 110:15
119:3, 6, 7, 15
121:24 125:23
126:14, 18, 20, 22
129:9 130:12
131:4, 12, 20 137:5
138:17, 19, 23
139:24 140:9, 13
145:24 147:4, 5, 12
148:4, 16 149:9, 15
151:2, 3, 18, 20, 22
154:22 169:12
171:1, 6 191:6, 14

220:20 221:5
222:2 223:4, 16
224:3, 7 225:17
228:6, 16, 20 229:1
236:15 237:15, 21
238:5 243:18
245:14, 19 247:2
249:23 252:18
253:17, 19, 23 254:3,
5 265:12, 16 266:17,
20 267:4 271:2
276:11, 21, 22
277:14, 15 278:7
279:22 280:12
284:13
**critical** 16:12 276:8
**CROSS-EXAMINAT
ION** 3:5, 9 58:23
59:2 249:1, 3
**cross-examine** 11:14
36:18, 20 57:17
**cross-examining** 9:4
221:20
**crouching** 65:13
**CSR** 1:20 302:15
**cubicle** 142:22
**current** 71:22 72:1
78:9 112:8
**currently** 101:9, 13
111:23 115:16
166:12, 13 220:2
**cutting** 106:14
214:20

**< D >**
**daily** 15:17
**damage** 138:17
**data** 122:21
**database** 128:15
223:7
**date** 71:15 127:12,
12, 15, 19, 22 155:6
189:7 222:16
234:9, 13 235:21
236:2, 11 239:5, 6, 7,
8 253:17
**dated** 37:24 62:24
67:3 70:18 75:10
76:2, 11 86:15
118:22 119:4
120:5 125:16

127:1, 16, 19 128:17
129:15 130:7
131:23 145:8
148:8 181:13, 13
190:21 210:23
218:13 222:23
224:20 229:12
**dates** 148:8 159:10
**Davis** 215:14
**day** 15:17 52:18
53:6 54:21 84:18,
19 85:10 107:17
110:24 111:11
113:12 151:13
182:24 183:1
186:11 191:24
192:1 238:13
261:1 269:23
270:21 301:21
302:11
**days** 76:17 90:2
107:12 186:12
**DCFS** 17:24 18:3,
10, 22 19:10 22:6, 6,
8, 14 23:9, 14, 14
24:5 25:20, 21
35:8 36:10, 13
39:11 42:8 50:23
54:12, 23, 24 55:1,
18 108:8, 17 109:7,
14 110:13 111:2, 4,
16 113:2, 9 114:4, 7
115:3 118:20
119:18, 22 121:3, 9,
18 122:2, 6 125:19,
24 127:5 128:11, 14,
22, 23 129:5 130:2
131:24, 24 132:3, 8,
14, 19, 23, 24 145:13,
18 162:16 167:18,
21 168:3, 13, 21
169:4, 14 171:10
190:24 191:22
192:5 219:16
221:4, 11, 13, 14, 22
222:13, 14 223:23
224:6, 19 225:11, 19,
24 226:24 227:5, 14
228:10, 14, 23
229:11, 22 233:9
234:11 238:11, 12

239:7, 17, 20 241:16
243:11, 19 245:11
255:11, 17 257:9, 13
262:14 264:3, 24
265:21, 21 266:1, 2
267:19 270:8
279:8 280:21
294:19, 23 295:5, 10
**DCFS's** 108:18
**deal** 276:10
**dealing** 280:10
**deals** 70:2
**DeAntre** 48:5
**debate** 282:17
**December** 23:8, 8,
24 43:21 67:14
77:9 78:19 79:7,
17, 18 101:10, 22
102:9 110:11, 12
113:10 129:15
130:7 148:12
162:16 177:6
186:4 189:20
190:22 210:20, 24
216:3 218:13
229:12 238:13
239:6 270:14
293:3, 16 295:5
**decide** 12:6 30:14
42:3 150:18 151:5
228:18 275:15
**decided** 35:14 43:2,
16 151:6 248:12
**deciding** 12:10
278:11
**decision** 22:4 24:11,
13 27:17, 18 187:8
237:23 238:3, 18
241:24 242:2, 12
244:7, 8 248:5
249:24 252:19
253:13 285:23
286:21 300:1, 14, 15
**decision-making**
283:13
**decisions** 38:7
40:22 282:22, 22, 23
284:7
**declare** 6:20
**deem** 270:9

deemed  23:*13*
148:*19*  219:*17*
243:*10*  257:7
272:*4*, *12*
defend  51:*19*
Defendants  1:*9*  2:*5*
DEFENDANT'S  3:*6*
deferred  246:22
degree  102:*14*
270:*15*
deliver  240:*16*
delivering  171:*21*
delivery  19:*17*
77:*16*  106:*12*
208:*19*  214:*18*
demands  64:*13*
65:*11*
demonstrate  23:5
demonstrated  292:*4*,
5
demoted  154:*6*
denial  226:9
denied  37:*24*  38:*17*
178:*10*  180:6, *9*
207:*12*, *15*  281:22
denoted  30:5
deny  131:7  158:*21*
239:*4*
denying  71:*1*
dep  164:*11*
Department  17:*23*
90:7, *16*  95:*15*
101:*6*  109:*5*  127:*4*
172:*4*  176:*4*, *11*
201:22  202:*21*
203:2, *23*  204:*17*
206:*20*  208:*21*
215:*18*  216:*15*
217:*4*  218:7  228:*9*
240:*13*  244:*24*
245:*11*, *18*  277:*24*
278:*6*  279:7  293:*23*
departments  218:*24*
Depending  246:*16*
deposition  8:*9*, *14*
9:*6*, *8*, *14*, *18*, *19*
11:*15*  24:*21*  25:*10*
26:2, *9*  38:*17*
41:22  44:*9*, *13*, *17*,
*18*  48:*19*  49:2
51:*24*  55:*15*  59:*9*,

*10*, *14*  61:*6*  97:*4*
98:*13*  141:*18*
143:*3*, *9*, *10*, *18*
144:*12*  151:*11*
152:*23*  153:*6*, *17*, *18*
159:*8*  160:*20*
164:*11*  264:*1*, *22*, *23*
265:*19*  274:*19*
278:*8*
depositions  8:*11*, *13*,
*23*  9:*1*  10:22
24:*20*  25:*9*  97:*10*,
*11*, *17*
describe  81:2
166:22  170:*17*
173:7  176:*12*
206:*14*  226:2
232:*17*  276:*12*
described  95:7
175:*6*  198:*9*
describes  64:*9*
describing  252:*6*
description  96:7
97:*1*  98:*19*, *20*
172:*10*  173:2
203:*11*, *12*, *13*, *16*, *21*,
*22*  204:2, *3*  209:*12*
250:*8*
descriptions  273:*4*
deserve  273:*20*
deserving  273:*20*
designate  192:*21*
designated  288:*11*
designating  191:22
despite  7:*21*  19:*11*
289:*11*
detail  22:2  23:*18*
27:*6*  44:*10*, *23*
119:2  253:22
detailed  42:*19*
details  21:*4*  288:*6*
determination
117:*17*  130:*13*
146:*3*  191:*15*
determine  112:*16*
173:*24*  178:*16*
179:*11*  245:*5*
253:*11*  278:*3*
determined  104:2
146:7  154:7
167:*20*  168:*1*

178:*12*, *17*  243:*1*
248:*9*  250:*4*
developed  74:*14*
178:*6*
developing  179:*17*
diabetes  179:*17*
diagnosed  68:*6*
diagnoses  241:*3*
dietary  90:*16*, *16*
95:*14*  100:*4*  101:*6*,
*16*  107:2  172:*3*
176:*3*, *11*, *18*  195:*9*
203:*23*  204:*17*
206:*20*  208:*15*, *20*,
*21*  213:22  240:*13*
289:*4*
different  20:*6*  54:*1*
64:*20*  80:*6*  116:*2*
120:*18*, *23*  134:*6*, *19*,
*20*  237:*10*  239:*14*
246:*8*  265:*1*
276:*24*  280:*11*, *14*
292:7  296:*17*
differentiation  242:*1*
difficult  41:*15*
179:*11*  272:*13*
DIRECT  3:*5*, 8
30:*1*  121:*13*  166:*8*
176:*8*  201:*11*
directly  225:*4*
279:*24*  288:*14*
director  4:*10*  16:*1*
55:*3*  87:*9*  166:24
167:*3*  202:22
207:*10*, *20*  283:2
disability  72:7, *15*
184:*14*, *17*  186:*5*, *16*,
*19*  187:*4*  259:*1*
272:*18*
disadvantage  42:*1*
disciplinary  104:*21*
194:*14*
disclosure  12:*12*
discovery  11:*12*
275:*3*
discretion  113:*12*,
*21*  226:*13*  263:*6*
278:*16*
discriminated
161:*10*, *11*  258:*23*

discriminating
40:*20*  158:*3*
discrimination
158:*3*  160:*15*
161:*5*  164:*10*
discriminatory
26:*18*  286:*12*, *13*
287:*10*  294:*10*
295:*17*
discuss  87:*10*
220:*19*  244:*1*
260:*17*
discussed  43:*5*  61:*6*
85:*13*  94:*3*  112:*3*
207:*19*  218:*17*
238:*18*  287:*16*
294:*8*
discussing  80:7
243:*23*
Discussion  165:*15*
179:7  202:*4*  231:*7*,
*19*  260:2, *8*  279:*15*
282:*16*  287:*24*
discussions  26:*20*
117:2  259:22
260:*18*
dish  106:*17*, *18*
107:*13*  195:*23*, *24*
215:*5*, *5*
dishes  156:*21*  208:*9*
dishwasher  100:7
dishwashing  64:*14*
disinterested  302:*9*
dismissal  150:7
281:*14*
dismissed  137:*20*
149:*20*  150:*8*, *10*
151:22  232:*6*
246:*18*  296:*1*, *3*, *15*
disorderly  135:*20*
136:*20*
disposition  245:*8*
246:22  278:*4*  279:*9*
dispositions  245:*20*
246:*17*  247:7
dispute  6:*23*  7:*3*
46:*3*, 6
disputes  20:*20*
167:7
disregarded  274:*16*



2:17-cv-02112-CSB-EIL # 41 10/29/2019 Page 160 of 189
Arbitration
Bruce Melton vs. Pavilion Behavioral Health System, et al.

distinct 22:8 70:6
diversion 246:19
Dockery 91:14
D-O-C-K-E-R-Y
91:15
doctor 157:3
173:22, 22 174:2, 15, 16 180:1 187:17
doctor-ordered
175:17
doctors 178:15
doctor's 156:18
157:8
document 31:21, 22
32:5, 18 34:18, 20
36:1 37:1 40:3
43:3 46:7 48:2, 2, 3, 20 49:17 50:9, 14, 19, 20 51:6 56:6
62:23 64:9, 20
65:19 66:4 67:3, 9, 12 69:13, 16 73:11
74:18, 22 75:1, 5, 18, 21 76:2, 4, 11, 12, 21
79:16, 20, 23 80:24
81:3 83:24 98:17
100:21, 24 101:21
102:1 103:13
109:17, 18 116:18
121:4 125:16, 21, 22
126:2, 3, 12, 12
127:1 128:11, 17, 22
129:8, 15 133:21
134:5, 17, 19 143:11
144:16, 21 154:19
172:1 180:4, 7, 19
186:8, 9, 17 188:11, 12, 20 189:7 190:2
199:24 200:15
210:2 221:4, 11
222:12, 13 223:2, 2, 14, 15 224:2, 5, 10, 15 226:22 228:21
229:10, 10, 17 230:3, 17, 22 231:15
232:13 238:10, 11, 22 242:17 246:2, 3
249:6 255:16, 24
256:3, 4, 7 257:9
261:10, 11 290:23

291:6, 9 298:17
299:2
documentation 8:10
14:20, 21 15:11
45:1 116:19 146:6
242:24 296:2
documentations
238:24
documented 198:16
290:15
documents 10:19
11:3, 5, 10, 15, 22
12:1 42:10 44:6
45:3 49:1, 19, 22, 24
59:7 80:10 93:15
118:22 119:4
137:4, 14, 19 176:22
189:23 190:14
227:1 267:4 274:7
295:20, 22, 23
296:13 297:7 301:6
doing 96:14 97:21
118:6 152:6, 24
191:8 192:18
213:17 217:2
258:1 261:5, 6
272:7 273:1 280:9
290:14, 20, 21
291:19
domestic 60:3
139:3, 15, 24 140:3, 6 234:3 235:4, 7, 11
236:1, 4 240:18
241:4
DONNA 1:7 15:7
95:12 99:19
100:17 101:15
195:8, 12, 19, 22, 24
196:4 206:19
210:4, 8, 9
doubt 7:11
drafted 155:1, 20
287:19
Drive 1:18 2:8
driver's 222:2
driving 66:22
124:24 125:7, 11
139:20 140:16, 21, 22 150:2
due 14:15 42:24
58:2 77:14 101:18

105:13 106:12
107:4 108:8 112:8, 14, 22 115:16, 17
145:20 156:1
213:5, 24 214:18
215:19, 20 217:23
220:2, 3 225:4
248:9 271:21, 21
299:15
dues 270:18, 19
DUI 139:20
duly 31:7 166:5
duplicates 232:23
duplication 301:4
duties 15:24 77:10
78:2 90:6 96:7, 8, 13, 17, 18, 18, 24
98:19 106:15, 19
107:11, 17, 19, 19
112:8 118:11
159:24 160:6
167:3 171:18
172:7, 12, 20 176:16
183:13 201:21
202:20 209:11, 13
213:13, 18 215:3, 7
217:9 240:6, 10
247:13 249:18
250:13, 15
duty 77:14 78:7, 8
196:1, 2, 5 219:11, 12 280:5 287:2

< E >
earlier 33:10 39:6
42:8 48:15 51:8, 15 55:16 56:2
85:13 94:11 154:5
156:9 171:24 267:3
early 88:15 89:7
233:22 289:7
earpiece 123:15
ears 300:19
easier 6:7
easily 275:22
easy 281:11
EEO 40:19
EEOC 116:13, 19, 23 117:2, 7, 13, 16, 18
effect 151:23

effective 146:12
243:4
effort 208:22 301:2
efforts 78:6
either 6:24 7:17
8:6 33:1 54:8
168:7 186:18
207:19 256:15
269:12 274:14
275:12 281:13
302:10
ELB 63:24 184:12
186:13
elected 83:6, 24
199:3 266:21
267:10
eligibility 247:7
eligible 42:9 46:14
187:3 238:15
else's 291:12
eluding 149:19
150:1
email 21:9 190:9
emailed 54:17
99:15
emergency 188:15
emotional 152:20
employ 169:22
302:10
employed 14:23
18:7 26:1 38:19
166:13 172:16
248:2, 13 250:5
251:5
employee 16:23
19:7, 9 25:22 37:8
42:5 54:2 66:9
78:7, 9 81:23 83:6, 10, 11, 24 155:9, 10
167:6 169:5, 13, 13, 19 170:9, 14 173:13
174:9, 11, 14, 21
175:4, 6 188:13
194:1, 10, 11, 13, 15, 22 196:16 197:2, 9
199:2, 6 208:2
212:5 216:18
219:5, 8 222:18
226:19 245:2, 6
246:4 258:19



2:17-cv-02112-CSB-EIL # 41    10/29/2019    Page 161 of 189
Arbitration
Bruce Melton vs. Pavilion Behavioral Health System, et al.

272:*12*, *15*  280:*24*
293:7
**employees**  15:*8*
20:*24*  22:*10*, *11*, *15*,
*17*  110:8  145:*14*
169:2, *7*, *20*, *21*
170:*10*, *18*  171:7
173:8  174:6
176:17  195:8
205:13  212:7
219:*1*  221:2, *16*
227:*4*  228:2, *5*, *15*,
*24*  255:18  258:22
265:*23*  293:*18*
**employee's**  18:*12*, *13*
**employer**  42:*3*
61:*18*  155:8  158:9
276:14  280:*12*
286:*10*
**employers**  40:*18*, *20*
41:*1*
**employing**  28:*3*
**employment**  11:5
20:*3*  23:12  27:*16*
35:15  37:*9*, *24*
38:*13*, *23*  40:22
52:*3*  61:*8*, *14*  62:2
64:5  110:*16*  113:*3*
116:*16*  121:*14*
129:19  130:*3*, *14*, *21*,
*24*  132:9, *21*, *24*
145:*19*, *20*  146:9, *12*
151:*7*  156:*1*  158:*2*,
*7*  160:*4*, *9*  175:*14*
191:*16*, *23*  225:22
238:15  239:*4*
240:8  243:*3*, *4*, *10*
245:5  247:8
258:*21*, *22*, *23*
261:*12*  262:2, *3*
267:*14*  271:*10*
276:*13*, *23*  278:2
280:9  281:22  295:*6*
**employment-related**
176:*11*
**ended**  53:*19*  68:*17*
133:*4*  154:15  182:*8*
**enduring**  259:*12*
**enforce**  293:*14*
**engage**  183:*16*

**engaging**  290:*1*, *13*
291:2
**ensued**  87:*14*
**ensuring**  276:*17*
**enter**  27:*13*
**entire**  167:*1*  264:7,
*17*
**entirely**  26:*10*
**entities**  62:*16*
**entitled**  20:*14*  58:2
62:*19*  64:5  73:2
170:*18*  175:7
212:*14*  277:*4*, *15*
278:*17*  283:7, *9*, *16*
293:7  296:7  297:*18*
**entity**  22:7  278:*11*
**entries**  237:*8*, *10*
**entry**  136:*1*  235:*4*,
*10*
**envelope**  108:*20*
109:*1*, *4*, *7*, *12*, *24*
226:*23*  227:*3*
255:*17*
**environment**  240:*24*
**Epstein**  1:*15*  4:2, *9*,
*12*, *14*  5:*13*, *19*, *24*
6:2  7:2, *16*, *24*  8:*3*,
*8*, *24*  9:*11*, *17*, *23*
10:*3*, *6*, *9*, *12*  12:*3*,
*18*  13:*4*, *9*, *15*, *19*, *23*
14:2, *7*, *10*  16:7
25:*14*, *17*, *19*  28:*6*,
*11*, *22*  29:*1*, *4*, *10*, *13*,
*24*  30:*4*, *8*, *20*  31:*4*,
*8*, *12*, *23*  32:2, *14*
33:*15*, *17*, *19*, *23*
34:*21*  35:*20*  36:*3*,
*6*, *17*, *22*  37:2, *4*, *11*,
*14*, *17*, *20*  38:*1*  39:2
40:*16*  41:*4*, *7*, *12*, *18*
42:*14*, *18*, *23*  43:*11*,
*18*  44:*1*, *12*, *20*
45:*14*, *17*, *24*  46:*4*,
*11*, *17*, *19*  48:*7*, *10*
49:*8*, *11*, *13*, *17*  50:*2*,
*10*, *22*  51:*3*, *5*  56:*8*,
*11*, *16*, *19*, *24*  57:*9*,
*15*  58:*8*, *22*  61:*11*
87:*3*  88:*24*  90:22
92:*11*  94:*23*  97:*12*,
*16*, *21*  98:2, *5*, *9*

99:*1*  115:8  116:*3*,
*7*  117:*24*  118:*17*
122:*20*, *23*  123:*5*, *7*,
*12*  137:*10*  143:*4*, *7*,
*12*, *15*, *22*  145:*4*
146:22  147:7
148:*9*, *23*  149:*1*, *5*, *8*
152:*5*, *9*, *12*, *15*, *19*
153:*10*, *13*, *16*, *21*
154:*1*, *3*  157:*10*, *16*,
*21*  158:*16*  159:*17*
161:*23*  162:*2*, *4*, *8*,
*11*  163:*12*, *20*, *24*
164:6, *18*, *20*, *24*
165:6, *10*, *13*, *16*, *19*,
*23*  166:*3*, *6*, *15*
185:*20*  191:*8*, *11*
200:*3*  209:*20*, *23*
220:*11*, *14*  234:*12*,
*16*, *20*  235:*1*  240:*1*
241:*8*, *10*, *14*, *23*
242:*4*, *8*, *20*  243:*24*
244:*17*, *19*  248:*21*
249:*1*, *13*  251:*19*
252:*5*, *8*, *11*, *13*
253:7  256:6, *10*, *14*,
*22*  257:*2*, *22*  258:*1*,
*4*, *11*, *18*  259:*15*, *17*,
*21*  260:*1*, *22*  261:*3*,
*5*, *17*, *20*, *24*  262:*5*,
*10*  263:*1*, *4*, *9*, *17*, *21*
264:*10*, *20*  266:*5*, *8*,
*11*  267:*12*, *21*, *24*
268:*3*, *6*, *13*, *16*, *21*,
*23*  269:*2*, *4*, *8*, *16*, *19*
274:*4*, *10*, *13*, *21*
275:*1*, *10*, *24*  276:*4*
277:*19*, *23*  278:*22*
279:*2*  281:*4*, *9*
282:*4*  283:*6*, *11*, *24*
284:*2*, *18*  285:*1*, *8*,
*11*  286:*5*  287:*20*
293:*2*  294:*15*
296:*6*, *10*  297:*23*
298:*4*, *11*, *13*, *19*, *23*
299:*10*  300:*21*
301:*15*, *20*
**Equal**  116:*16*
258:*21*
**erased**  273:*24*  274:*8*

**especially**  11:*21*
**essential**  64:*19*, *20*
**essentially**  225:*11*
**establish**  17:2
26:*16*  286:15  287:6
**established**  179:*16*
267:6  297:*5*, *18*
**establishes**  117:*19*
288:8  294:*5*, *10*
**et**  64:*15*  65:*14*
106:*15*  214:*21*
**evaluate**  27:*21*
133:*12*  247:*23*
280:*12*, *23*  295:*3*
**evaluated**  24:*10*
178:*15*  286:*24*
**evaluating**  25:22
**evaluation**  203:*18*
237:22  276:*21*
**event**  63:*17*  302:*10*
**eventually**  158:*12*
182:2  238:7
**everybody**  30:*21*
154:*10*  214:*4*
264:*4*  282:9
**evidence**  12:7
15:*23*  17:*1*, *6*
20:*17*  21:*5*, *13*
23:*2*  23:*7*  24:*17*
26:*13*, *19*  27:*6*, *13*,
*16*  28:*3*  50:*5*
58:*11*  163:*14*
164:*21*  165:*3*
263:22  264:*1*
268:*1*  274:9, *11*, *14*,
*16*, *23*  275:*19*
287:*14*, *17*  288:*3*
292:*1*, *3*, *5*, *14*  294:*4*,
*4*  295:*10*  296:*4*, *21*
297:*5*  298:8
**ex**  46:*8*
**exacerbated**  183:*21*
185:*4*
**exact**  144:*21*
**exactly**  144:*16*
163:*18*  267:*20*
275:*13*  280:*3*
285:*16*  291:*3*
**EXAMINATION**
3:*1*, *5*, *6*, *8*  121:*13*



2:17-cv-02112-CSB-EIL # 41    Page 162 of 189
Arbitration    10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

146:*21*  166:*8*
201:*11*  277:2
**examined**  146:*24*
**example**  9:*12*
85:*19*  134:9  141:7
222:1  234:1  252:2
297:9, *22*
**excellence**  15:2
**excellent**  272:*16*
**excessive**  54:*4*
**excessively**  58:*15*
**exchange**  11:*1*
**exchanged**  10:*16*
**excited**  270:*21*
**excuse**  10:*24*  23:*20*
25:*18*  41:*12*  63:*23*
73:*11*  76:*3*, *12*
78:*8*  114:2  134:*3*
177:*1*  185:*18*
186:6  209:*18*
220:*11*  229:*9*
244:*17*
**excused**  223:*3*, *15*
**exercise**  226:*13*
278:*15*
**exercised**  263:6
**exhibit**  11:*1*  32:*11*,
*13, 15*  35:22  37:*12*,
*15, 20*  38:2  39:*1*
40:*14*  48:2, *22*
49:20  51:2  54:*9*,
*10, 11*  55:8  61:*4, 5*,
*21*  62:22  63:*9*
64:*8, 21*  65:*4, 10*
66:2  67:*2, 2*  68:*23*,
*24*  69:20, *22*  70:*17*
73:*5, 11*  74:*17, 18*
75:*6, 17*  76:*2, 12*
77:9  79:*12, 12*
80:*11, 22*  81:22
84:*23*  85:*3*  86:*13*
88:*4*  90:*10, 20*
92:*16*  94:*19*  95:*3*,
*6, 7*  99:*9, 10*  102:7,
*15*  104:*18, 24*  105:*6*,
*24*  107:22  108:*1, 6*,
*24*  109:*21*  110:*11*
115:*12*  116:*12*
117:*23*  118:*14, 19*
120:*1, 6*  121:*24*
122:*12*  125:*15, 21*

126:*14*  127:*1*
128:9  129:*14*
130:6  131:*18, 19*
132:*7, 11*  133:*1, 21*
134:*3, 4*  135:2
141:*8*  142:*15*
145:*1, 3*  147:*7, 9, 10*
148:*8, 11*  156:*4, 6*,
*12*  157:9  158:*20*
163:*3*  170:*15*
171:*24*  177:*12*
178:*8, 19, 23*  180:*10*
181:*12*  183:*3*
185:*17, 18*  186:*1*
187:*24*  190:*19, 21*
195:*4, 5*  196:*8*
197:*13*  198:*5*
199:*12*  200:*2, 20*
202:*10*  204:*9, 21*
205:*10*  206:*14*
207:9  208:*12*
210:2  211:*7, 13*
215:*11*  216:*2, 2*
217:*17*  218:*11*
219:*7, 15*  220:*18, 23*
221:*4, 22*  222:*11, 23*
223:*14, 20*  224:*9, 18*
225:*1, 6*  226:*21*
227:9, *20*  229:*8, 9*
230:*4, 15*  231:*7, 13*,
*19, 24*  232:*12*  233:2
238:*10, 21*  239:*5, 12*,
*23*  240:2  241:*11*
242:*21, 22*  244:*16*,
*20*  245:*17*  246:*2, 10*
247:*23*  249:*6, 10, 16*
250:9, *10, 10*  251:*14*,
*15*  258:*8*  261:*10*
277:*17, 18*  279:*17*
280:*19*  284:*10*
286:6  290:*24*
**exhibits**  10:*20*
11:*20*  29:*16, 19, 20*,
*22*  30:*1*  31:*24*
59:*14*  170:*16*
195:*1*  207:*6*
250:*11*  301:*3*
**existed**  104:*2*
**expect**  19:*15*  20:*17*
**expedite**  68:*24*

123:*4*  170:*7*
**experience**  280:*17*
**experienced**  47:*5*
**expert**  267:*14*
**expiration**  102:*9*
**expire**  101:*15, 22*
210:*24*
**expired**  101:*18*
210:*19*  211:2
292:*23*
**expires**  101:*10*
211:*5*  302:*19*
**explain**  12:*15*
45:*21*  51:*10, 22*
52:*21*  97:*12*
153:*19*  168:*19*
171:*4*  173:*11*
184:*4*  186:*7*
188:*10*  189:*5, 22*
193:*22*  195:*5*
196:9, *13*  197:*13*
198:*5*  200:*9*
202:*14*  205:*11*
220:22  223:*21*
224:22  226:22
230:*4, 16*  233:*5*
238:22  243:*7*
246:*3*  253:22
**explained**  15:*13*
38:*14*  45:*12*  48:6
150:*10, 11*  152:2
212:*11*  216:*17*
230:6  273:*1*  295:*23*
**explanation**  208:*13*
**Express**  38:*23, 23*
279:*19*
**expressed**  39:*18*
49:2
**expressly**  278:*16*
280:*20*
**expunge**  46:*14*
**expunged**  38:*16*
39:22  45:*13, 23*
47:*2, 21*  48:*23*
136:*3, 5, 9*  137:*6, 16*
147:*12*  231:*11, 21*
232:*1*  246:*19*
254:*1*  295:*24, 24*
296:*4, 15*
**expungement**  45:*18*

46:*23*  150:*7*  275:*7*
**expunging**  49:*22*
**extended**  63:*24*
71:*24*  170:*17*
175:*9*  177:*13*
186:*19*
**extent**  24:*15*  274:*14*
**extra**  80:*16*
**extremely**  16:*18*

**< F >**
**Facebook**  53:*2, 13*,
*15, 18*  93:*4, 7, 11, 18*
103:*3, 9*  206:6
292:*10*
**faced**  284:*12*
**facilitated**  24:*24*
**facilities**  246:*8*
265:2
**facility**  17:*15*  52:*8*,
*9, 10*  60:*17, 21*
110:*20*  115:*17*
118:*12*  129:*20*
130:*3, 15*  131:*1*
166:*14*  168:*5, 8, 17*
169:*2, 4, 16*  171:*16*
191:*17*  192:*8*
219:*1*  220:*3*
225:*14*  229:*7*
230:*20*  238:*4*
240:*14*  241:*7*
245:*1, 3*  248:*13*
262:*4, 22*  276:*14, 19*
277:9  282:*19*
**fact**  6:*5*  17:*8*
66:*11*  72:*3*  79:*24*
86:*4*  117:*1*  118:*19*
141:*14*  161:*5*
169:*3*  196:*5*
198:*16*  199:*16*
206:6  210:*18*
221:*20*  243:*17*
256:*4*  276:9
277:*24*  284:*21*
293:*15*  294:*8*  296:*8*
**factor**  179:*17*  248:*5*
**factors**  179:*18, 19*,
*20*  247:*11*
**factory**  280:*9*
**facts**  12:6  20:*21*
21:*21*  117:*7*

2:17-cv-02112-CSB-EIL # 41    10/29/2019    Page 163 of 189
Arbitration
Bruce Melton vs. Pavilion Behavioral Health System, et al.

282:*23*  287:*5, 8*
292:*6, 11*
**factual**  117:*5*  297:*4*
**factually**  206:*11*
**fail**  294:*3*
**failed**  31:*19*  249:*17*
261:*14*
**failure**  297:*3*
**fair**  58:*1*  172:*11*
180:*21*  183:*12*
189:*20*  210:*14*
213:*16*  225:*10*
226:*11*  227:*17*
241:*23*  266:*22*
271:*19*
**fairly**  26:*24*
**faith**  285:*2*
**fall**  107:*19*  160:*3*
250:*13*
**falling**  241:*1*
**falls**  167:*8*  300:*13*
**false**  111:*5*
**familiar**  279:*11*
**families**  168:*8*
**Family**  17:*23*  109:*5*
167:*23*
**far**  14:*17*  148:*4*
168:*23*  173:*21*
186:*12*  239:*3*
251:*13, 14*  266:*23*
267:*7*  281:*17*
282:*24*  283:*1*
**fashion**  259:*7*
**fast**  157:*5*
**fault**  84:*2*  159:*10*
**favor**  27:*14*  298:*9*
**FBI**  22:*10, 13, 18*
23:*11*  31:*20*  36:*11*
108:*12*  110:*14*
126:*8, 13, 17*  128:*4*
129:*17*  130:*11*
131:*5, 20*  132:*1*
134:*5, 17*  142:*16*
145:*17*  146:*1*
191:*6, 13*  224:*11*
227:*2, 6, 14, 15*
228:*11*  229:*23*
230:*8, 19*  233:*8, 8*
239:*1*  241:*15, 18*
257:*10*  265:*17, 18,*
*20, 23*  266:*3, 16, 20*

267:*4*  268:*9, 10, 12*
276:*10*
**February**  16:*13*
33:*13, 18, 19, 21*
34:*1, 2*  51:*7, 8*
145:*8*  146:*12*
155:*6*  238:*17*  243:*4*
**federal**  40:*17, 19*
62:*15*  127:*21*
259:*3*  265:*20*
**feel**  82:*19*  272:*7*
275:*14*
**feels**  105:*11*  213:*3*
215:*20*  217:*22*
**fell**  18:*14*  19:*5*
164:*17*  213:*14, 17*
214:*24*  300:*18*
**fellow**  288:*18*
**felon**  59:*19*
**felonies**  251:*21*
**felony**  60:*5*  148:*21*
149:*17*
**felt**  51:*13*  196:*16,*
*19*  197:*4*  225:*20, 23*
270:*5*
**fifth**  76:*16*  205:*10*
**figure**  33:*7*  52:*16*
232:*24*
**file**  6:*12*  15:*21*
31:*21*  32:*22*  86:*5*
89:*23*  119:*22, 24*
121:*14*  128:*14, 23*
195:*16*  256:*1, 19*
272:*6*  299:*24*
**filed**  27:*11*  33:*2, 5,*
*8*  116:*15, 15, 18*
151:*8*  231:*20*
246:*21*  253:*8*
271:*12*  272:*3*
281:*15*  300:*2*
**files**  201:*2*
**filibuster**  58:*15*
**filing**  27:*4*
**fill**  200:*13, 16*  226:*5*
**filled**  239:*3*
**final**  198:*7*  298:*13*
**finally**  72:*19*
146:*16*  295:*7*
**finance**  202:*17, 20*
**find**  7:*21*  14:*14*
31:*21*  33:*4*  34:*18*

35:*4*  37:*1, 8*  57:*3,*
*4, 13*  117:*21*  120:*8*
123:*13*  154:*20*
155:*3*  158:*19*
165:*7*  175:*2*
250:*11*  298:*16*
301:*6*
**finding**  27:*14*
53:*19*  57:*6*  209:*16*
**Fine**  29:*1, 4, 24*
31:*2*  57:*8*  116:*8*
162:*3, 12, 12*  261:*6*
264:*11*  266:*12*
284:*3*  298:*4*
300:*16, 20*
**finest**  301:*7*
**fingerprint**  50:*20*
110:*14*  128:*14*
129:*17*  130:*11*
191:*6, 13*  221:*18*
223:*10*  241:*16*
256:*12*  257:*7*
266:*4*  268:*11*
**fingerprinted**  32:*23*
119:*18*  221:*17*
222:*18, 20*  223:*6, 19*
227:*5, 11, 18*  256:*2*
257:*8, 20*
**fingerprints**  119:*21,*
*23*  128:*23*  129:*5*
223:*7*  256:*19*
257:*19*  265:*24*
268:*12*
**fingers**  179:*2, 12*
**finish**  54:*14*  84:*11*
113:*17*  172:*19*
**fire**  134:*14*
**firearm**  150:*3*
**fired**  190:*11*
**firm**  280:*9*
**first**  11:*2*  12:*5*
18:*20*  19:*4*  22:*22*
23:*1*  29:*20*  37:*6*
38:*12*  42:*12*  44:*23*
48:*6, 19*  50:*17*
55:*13*  58:*9*  61:*8*
64:*3*  65:*22*  66:*14*
68:*18*  84:*19*  89:*22,*
*23*  110:*11*  114:*10*
120:*3, 20*  121:*9, 15*
122:*9*  134:*24*

135:*18*  157:*1, 1*
158:*5*  171:*2, 6*
172:*24*  175:*5*
184:*18*  191:*3*
195:*4*  199:*13*
207:*8*  208:*12*
232:*22*  234:*10*
235:*3, 13*  237:*2*
238:*12, 14*  246:*19*
249:*5*  258:*12, 17*
262:*11, 13*  270:*12*
274:*23*  289:*22*
292:*23*
**fit**  197:*4*  270:*9*
**fitness**  240:*9*
**five**  56:*13*  67:*7*
106:*11*  107:*12*
109:*12*  110:*8*
116:*4*  134:*11*
214:*17*  217:*6, 11, 12*
**fix**  289:*9*
**flags**  76:*23*
**fleeing**  149:*19*
150:*1*
**flip**  133:*21*  215:*23*
283:*5*  284:*7*
**flirtatious**  82:*18*
290:*2*  291:*2*
**focussed**  55:*10*
**folders**  8:*19*
**folks**  21:*3*
**follow**  105:*12*
168:*23*  174:*19*
202:*14*  213:*4*
255:*18*  257:*15*
**followed**  175:*18*
272:*2*
**following**  38:*7*
61:*23*  75:*14*
128:*13*  130:*12*
176:*19*  190:*5*
191:*7, 14*  205:*24*
302:*4*
**follows**  40:*14*
**follow-up**  76:*16*
211:*8*
**food**  19:*16, 17*
77:*16*  82:*20, 23*
99:*20*  100:*1, 18*
101:*6, 9, 14, 14, 17*
102:*2, 12*  106:*11, 13*



2:17-cv-02112-CSB-EIL # 41 10/29/2019 Page 164 of 189
Arbitration
Bruce Melton vs. Pavilion Behavioral Health System, et al.

208:*18*  210:7, *10*
214:*18*  240:*12*
292:*19, 22*
**force**  284:22  286:*1,*
*2, 18*
**forced**  94:*11, 16, 21*
**FORD**  302:2, *4*
**forget**  283:*21*
**form**  37:*10*  71:*12*
181:*1*  188:5, *16, 21*
200:*13*  222:19
223:22  224:*14*
225:*4, 9*  226:5, *10*
238:*23*  241:*21*
301:*17*
**former**  299:*3*
**forms**  227:*3*
**forward**  7:*19*
273:15
**forwarded**  193:*11*
237:24
**forwards**  194:*5*
226:7
**foster**  168:*9*
**found**  33:*10*  35:*21*
86:*3*
**foundation**  267:*13*
**founded**  92:22
**four**  10:22  101:*13*
105:*23*  107:*11*
109:*12*  110:8
139:*17*  222:16
**fourth**  105:*24*
205:*10*
**frame**  25:*21*  35:*13*
43:*14*  108:*11*
183:*13*  184:*10*
211:*13*  216:6
219:*16*  250:3
251:*4*  254:15
**frankly**  26:*10*  27:7
57:*23*  292:*1*  293:*11*
**Friday**  107:*16*
154:*15*  208:*19*
**Fridays**  77:*17*
106:*11*  214:*17*
215:*18*  217:5  251:*1*
**friend**  53:*16*
**friends**  53:*15*
**front**  34:*21*  49:*3*
134:*24*  152:*3*

227:*24*  271:*5*
285:*23*
**fronted**  143:*16*
**fruit**  106:*14, 14*
214:*21, 21*
**FTE**  219:2, *4*
**full**  11:*18*  38:*15*
78:*13*  159:*10*
160:*7*  287:*12*
**full-time**  63:*6*  219:*5*
**functions**  64:*19, 20*
**further**  14:*20*  45:*1*
67:*16*  95:*19*
104:*18*  145:*23*
146:*23*  159:*18*
161:*17*  183:*17*
208:8  218:*16*
236:7  245:*17*
248:*24*  267:*23*
281:*19*  297:*12, 23*
302:8
**furthermore**  157:*24*
249:*20*

< G >
**GADEKEN**  1:*8*
15:7  95:*13*  99:*19*
101:*15*  195:8
206:*19*  210:*4, 8, 9*
**G-A-D-E-K-E-N**
95:*13*  99:*19*  195:8
**gears**  192:*10*
**general**  170:*19*
246:*12*  249:7
280:*15*  281:2
**generally**  19:*18*
118:*5*  167:2
170:*17*  173:6, *11*
174:*14*  176:2, *12*
192:*23*  194:9
224:22  226:2
**generated**  21:*9*
126:*12*
**generating**  200:*11*
**gentleman**  76:*16*
**getting**  15:*5, 11*
38:*16*  39:22  46:8
47:*20*  48:*23*  74:6
75:7  154:*15*  211:*1*
231:*11, 21*  253:*24*
266:*14*

**give**  4:*23*  17:*11*
29:*18*  30:*10*  36:24
39:*12*  42:*5*  43:2, *7,*
*17*  48:*24*  54:*12*
79:*1*  117:*11*  123:9
142:*5*  150:*15*
157:*1*  160:*14*
161:6  165:*4*
173:*18*  194:*4*
203:*12*  212:2
217:*10*  271:*4*
285:*3*  297:*10*
**given**  4:*19*  9:*13*
14:*21*  15:*16*  24:*15*
27:8, *24*  28:*19*
29:*14*  45:*10*  54:*11*
104:*21*  114:9
154:*18*  156:*17, 18*
182:*17*  188:*16*
198:7  230:8
255:*24*  281:22
301:*11*  302:8
**gives**  170:*19*  226:8
**giving**  114:9  184:*16*
**glad**  13:*11*  143:*15*
278:*24*  279:4
285:7, *9, 11, 12*
**glasses**  123:*15*
**go**  7:*7, 18*  18:8
29:22  33:*1*  34:*11,*
*13*  35:*3*  36:6  37:8
39:*4, 16*  40:9, *12*
41:*18*  47:20  48:*14,*
*15*  49:*12, 14*  51:2
55:8, *21*  57:5
59:*17*  61:*11*  65:9
67:*16*  69:20, *21*
82:*20*  92:*14*  98:8
99:6, *9*  105:*15, 19,*
*23*  108:*23*  110:*10*
113:*4, 18, 24*  115:*11*
118:*17*  119:*14*
124:*11, 21*  125:*3*
126:*3*  127:*10*
135:22  136:*18*
137:22  141:7
143:7, *16*  145:*3*
147:*4*  152:*23*
153:7, *8*  154:*18*
157:8, *18, 22*  161:*17*
162:*5*  165:*13, 19*

168:8  173:22
183:*3*  188:*14*
192:*20*  193:*19*
197:9  200:*10*
208:7  209:*10*
217:*17*  218:*10*
221:2  222:*15*
223:*16*  224:*24*
226:*21*  227:*4*
228:*5*  234:*8*  235:*1,*
*10*  236:7, *20*  237:*7,*
*8*  239:22, *23*  245:*16*
249:*5, 9*  250:*7, 9*
253:22  255:*9*
257:*11, 19*  258:*8*
261:6, *9*  264:*9, 11*
268:*21*  269:*4, 19*
272:*1, 12, 19*  276:*4*
288:9  290:9
291:*13*  299:*8, 13*
**goes**  54:8, *19*  63:*20*
71:*20*  72:6, *12, 12*
88:*18*  89:*10*  90:*1,*
*4*  94:6  96:*1*
101:*13*  104:*14*
106:*10*  110:*10*
130:8, *20*  140:*18*
146:*11*  179:*15*
181:22  200:*23*
204:6  233:*12*
249:*20*  275:*12*
291:*15*
**going**  4:*15*  5:*1, 7*
7:6, *11*  11:7  12:22
17:*1, 8*  18:*3, 7*
20:16, *18, 21*  21:6,
*13, 23*  22:*1*  23:*3*
24:*18*  25:*12*  26:2,
*14, 20*  27:7, *13*
30:*19*  31:*21*  37:7
38:*19*  40:9  41:*8*
43:2  44:*11, 14*
47:2, *14*  50:*3*
51:*17, 18*  53:*16*
54:*4*  57:*14, 22, 24*
58:*3, 5*  59:*4*  65:*23*
80:*5, 16*  113:*23*
115:*24*  116:*1*
123:8, *8*  133:*21*
141:*20*  143:2
147:*11*  148:*16*



2:17-cv-02112-CSB-EIL # 41 Page 165 of 189
10/29/2019
Arbitration
Bruce Melton vs. Pavilion Behavioral Health System, et al.

150:9 153:9
155:18 156:24
158:12 170:6
183:4 192:10
194:24 202:19
210:16 213:20
215:23 217:15
238:4 245:13
256:24 257:3, 6
259:10, 14 261:1
263:15 266:12
274:2, 3 285:13, 14
287:18, 22 288:16
292:21 295:2, 13
298:7 299:19
301:12
**Good** 4:2 12:24
14:3 25:3 41:9
46:16 52:17 54:2
166:10 258:2
272:15 277:7
285:2 299:23
**Goodson** 102:24
104:3
**G-O-O-D-S-O-N**
102:24
**gotcha** 124:1
**gotten** 74:11
283:22 284:4
**governed** 27:17
**grab** 142:17
**grabbing** 178:22
**grant** 114:3, 20
131:7 208:1
**granted** 13:21
20:10 73:7 159:2
180:11 185:6
224:15 225:14
297:5
**granting** 185:11
**grants** 114:16 226:4
**gravity** 247:14, 15
249:20
**great** 52:17 118:17
276:9
**green** 9:13
**grew** 47:4
**grounds** 5:8 34:13
**grown** 47:11
**guess** 30:18 31:19
32:20 43:1 57:19

68:14 93:13 188:9
264:3 272:4
277:23 296:19
298:1 299:14
**guidance** 7:24
**guilty** 246:17
**guy** 154:8 202:17
295:8

< H >
**Haeme** 1:20 302:2,
12, 15, 18
**half** 14:24 20:2
33:2 52:5 122:18
127:11 254:12, 12
269:22, 22
**hall** 196:24 197:2
**hand** 31:5 94:16,
21 143:2 166:4
179:1 181:17
193:6 256:17
302:11
**handbook** 66:9, 11
170:9, 14, 16 258:19
**handed** 142:18
143:11 144:20, 21
147:5 246:7
253:17, 21 295:20,
21
**handle** 167:7 270:2
**handled** 174:18
212:8
**hands** 183:14, 18
**handwriting** 83:5
136:9 182:13
227:23 228:1
**handwritten** 81:3
99:15 109:11, 12, 16
135:10 182:11
195:7 196:10
231:13, 18
**happen** 148:23
169:14 192:4
193:8, 9 229:4
251:3 301:9
**happened** 21:7
24:6 53:20, 21
81:8 119:6, 8
150:20 153:14
161:18 211:14

271:16 295:11
300:9
**happy** 14:5, 11
104:19 176:23
178:9 264:15
298:14
**harassed** 288:3
296:22
**harassing** 289:23
**harassment** 17:4
148:6, 7 199:20, 22
296:23
**hard** 51:14
**Harris** 112:20
**Hartford** 69:9 72:9,
16 186:10 187:5
**head** 143:22 271:23
**HEALTH** 1:6 2:12
4:4 17:15 70:3
166:14 265:9
**hear** 11:7 12:21
14:5, 11 20:16, 19,
22 23:3 24:18
26:20 31:13
149:10 166:16
260:3 264:7, 15
298:14 299:21
**heard** 28:7 49:9
155:21 195:23
222:6 266:8
274:10 290:6
300:17, 19, 21
**hearing** 4:3, 15
6:12, 16, 19, 21 7:7
11:1, 8 23:18 29:6,
7, 8 158:21 256:7
263:23 301:10
**hears** 17:6
**heart** 16:11 276:6
**heavy** 65:24 172:2,
23 173:2
**he'd** 264:13
**heightened** 276:15,
16 277:10 280:5
**held** 20:11 102:3
150:21, 24 177:24
182:5
**help** 32:2 42:3
50:7 73:1 106:11
107:2, 15 160:14, 18
161:7 182:14, 19, 22,

24 183:1 208:19
213:22 214:18
219:1 289:4
**helped** 154:13, 14
250:22 251:1, 2
**helpful** 37:18
**helping** 88:16
201:14 289:2 301:6
**helps** 106:13 214:20
**hereunto** 302:11
**hesitation** 64:24
**Hey** 258:1 289:8
**Heyl** 1:13 302:5
**hide** 201:1
**high** 265:8
**highest** 251:22
**highlight** 264:13, 15,
16
**hire** 19:3, 9 42:15,
16 62:2
**hired** 19:5, 12, 13,
14 23:1 25:4
31:17 45:5 61:8
63:3, 5 64:4 65:22
66:14 121:9, 15
154:5 170:22
171:2, 6, 17, 19
172:24 203:17
233:18 235:3, 13
237:2 262:11, 13
271:7
**hiring** 24:24 27:21
167:4, 5, 6 169:5
170:21 171:12
248:17 283:13
287:4
**Hispanics** 42:2
**historical** 227:14
**histories** 48:5
**history** 31:21 34:15
35:1 36:11 38:10,
12, 15 40:19, 21, 22
41:5 43:1, 6 44:7,
10, 23 45:6, 11
46:13 47:17 48:17,
21 49:6 51:11, 12,
16 52:3 55:9, 10
119:6 126:23
130:12 147:5, 6, 12
148:4, 16, 19 149:15
151:3, 4, 18, 20, 22

154:22  179:16
191:7, 14  241:4
249:23  252:18
253:18, 19, 23  254:3,
6  271:2
**hits** 225:3
**hold** 150:19  271:23
273:18
**holds** 101:9
**home** 71:5  139:6
168:2, 8
**honest** 25:1  53:3
**honestly** 270:1
**Honor** 5:23  7:1, 8,
13  8:7, 18  10:8, 11,
15  11:9, 18  14:6, 13,
14  15:22  16:4, 11
17:1, 6, 11  21:18
22:5  23:23  24:12,
20  26:24  28:10, 23
29:9, 21  30:3, 7
31:3, 6, 11, 15, 16, 22
32:12  33:4, 7, 12
34:17, 20  35:3, 4, 18,
24  36:7, 24  37:3, 7,
8, 22  38:3  39:3
40:7, 12, 15  42:6, 7,
13, 17, 21  43:4, 9, 12,
16, 24  44:3, 4, 19
45:9, 20, 21  46:3, 16,
18, 22  47:3, 14, 24
48:1, 1, 12, 19  49:1,
20  50:6, 8, 9, 11, 24
51:1, 4, 14  52:4, 20
53:4  54:1, 8  55:1,
8, 21  56:10, 15
57:12, 20  59:23
92:13  97:6  116:9
147:1, 2, 19  149:4,
11, 13, 21  152:14, 17
153:1  154:4
156:24  157:2, 23, 24
158:5, 11, 18  159:11
162:6  163:17
164:3, 23  165:9, 20
209:18  249:2
257:1, 24  258:6, 9
260:8, 24  261:23
263:10, 16  264:19
268:9  270:4, 14
271:24  272:14, 19

273:17  274:1, 17, 18
275:6, 13, 15, 18, 23
276:5, 13  277:1
279:11  280:17
283:19  290:23
298:18  299:6, 23
300:13, 19  301:19
**Honor's** 48:14
300:15
**hope** 78:24  275:17
**hopefully** 168:6
**hospital** 175:2
181:13  192:20
194:2  219:10  221:2
**hospital's** 66:9
**hostage** 273:18
**hostilely** 15:6
**hot** 20:23  21:2, 8,
20  25:7  56:1  80:8
84:19  85:4, 15, 19
86:8, 23  90:21
102:17  192:12
193:11, 22, 23, 24
194:3  199:13
200:12, 14  206:16
218:9  272:5  288:7,
8, 21  290:2
**hourly** 63:10
**hours** 63:23, 23, 23
71:22  72:1  77:17
117:1  186:13, 13
**HR** 15:24  20:17, 17
24:11  55:2  80:7, 8
87:9  91:2  167:2
192:11, 15, 16
193:12, 19  194:19
195:16  200:6
218:7, 8, 18  232:15
237:24  271:3
283:2  291:4, 16
292:7, 8, 13  293:6
**HR-related** 167:8
193:15
**hug** 196:18
**human** 4:10  27:23
82:6  166:24
207:20  248:1, 16
285:21  287:3
**hundred** 291:5
**hurt** 74:11  161:12

**husband** 53:3
**hypotheticals** 283:20

**< I >**
**idea** 282:15
**identification**
129:18  150:6
**identified** 18:24
22:9  91:22  126:4
190:1  267:5
**identifies** 64:21
134:19
**identify** 96:8
**ignorant** 270:16
**ignore** 195:19
198:13  199:22
205:6  229:2
**ignored** 199:20
229:4
**IL** 1:19  2:5, 9
**Ill** 155:13
**illegal** 270:7
**Illinois** 1:15  18:2, 5
109:4  127:18
129:20  130:3
155:7, 12  167:18, 19
273:23  277:3
302:1, 4, 6, 19
**illness** 188:12
**impact** 169:5
**implication** 278:8
283:11
**important** 17:20
21:19  23:2, 18
97:18  143:1  264:6
282:20  292:4, 5
293:23  294:12
**impression** 133:12
250:24
**improperly** 292:9
**improvement** 155:11
**inadequate** 299:20
**inadmissible** 259:23
**inappropriate** 20:19
36:18  82:7, 18
84:8, 14  85:11
91:10  93:21
196:21  197:23
204:24  206:7
290:13  291:14, 16
**inappropriately** 87:5

**incident** 87:1  89:23
91:9  95:6  102:20,
21  153:22  197:17
236:5  249:21
270:16
**incidents** 53:23
269:24  271:10
**include** 60:24  65:5
92:5  170:2  193:12
240:18  247:12
**included** 66:15
71:12  121:14
126:14  172:12
234:10  253:9
**includes** 46:13
65:13  121:24
**including** 10:19
16:18  19:16  60:10
167:11  170:12
176:10  179:19
228:15  265:2, 23
**inconsistent** 9:24
97:23  143:9
153:18  159:9
**increase** 207:11, 15
208:2
**INDEX** 2:1  3:1
**indicate** 135:9
186:17  190:14
191:4  196:4  198:1
201:19  204:9
205:19  209:4
213:12
**indicated** 93:6
94:10  113:2  202:1
265:5
**indicates** 61:10, 13
65:4  66:3, 7  67:12,
19  69:1, 4  70:9, 20,
23  71:4  73:6
74:21  75:1, 12, 21
76:7, 15  77:1, 13
79:16  80:15  82:5
85:6  95:6, 11
102:8, 19  103:16
105:15  109:4
112:19  124:2, 5, 15
125:4  130:2
135:19  136:12
137:23  138:2, 5, 9,
12  172:2  178:20



2:17-cv-02112-CSB-EIL    # 41    10/29/2019    Page 167 of 189
Arbitration
Bruce Melton vs. Pavilion Behavioral Health System, et al.

181:*16*  187:*24*
190:*21*  195:*21*
199:*9*  201:*4*
202:*11*  205:*20*
210:*23*  215:*13*
224:2  229:*14*
**indicating**  120:*10*
123:2, *24*  124:*13*
274:7  286:2
**indication**  188:*1*
234:2
**individual**  38:*6, 7*
55:*3*  129:2  130:*13*
131:*3*  191:*15*
218:9  253:*4*
**individuals**  41:2
42:*1*  55:*24*  151:*9*
227:*1*  270:*1*
**individual's**  128:*13*
247:7
**ineligible**  23:*13*
42:*9, 11*  110:*20*
113:2, *10*  114:*5, 8*
115:*16*  130:*17*
145:*19*  191:*19, 23*
192:6  219:*17*
220:2  229:*15*
230:*20*  243:*10*
261:*11, 15*
**inform**  51:*11*
155:22
**information**  8:*21*
18:*11*  24:8, *9, 10, 12,
15*  25:5  38:6
40:*21, 22*  41:*3, 5*
45:*11*  48:*16*  62:*19*
68:*11*  70:*12*  71:*9*
72:*16*  73:*1*  74:*23*
117:*5, 19*  121:*14, 19*
126:*13, 18, 20*
128:*14*  131:*4*
133:*13, 16*  146:*1*
173:*21*  174:*1*
184:*16*  194:*4, 17*
204:7  205:*21*
212:*15*  223:*24*
229:*24*  230:7, *9, 10*
232:9, *14*  233:*11, 15,
17, 21, 21*  234:5
235:5, *12, 15, 22*
236:*24*  237:*1, 4, 11,*

14, *16, 20, 21*  241:*15,
18*  242:*10*  245:*13,
18, 23*  246:*21*
262:*14*  266:*17, 19*
271:*4*  272:*19*
273:8  276:*10*
278:7  279:*16*
280:22  283:*10, 16*
289:*14*  293:8
295:*19*  296:*16*
**informed**  8:*12, 18*
38:*15, 17, 18*  39:8
48:*22, 22*  52:*24*
53:*11, 11, 20*  54:22
71:*5*  93:8  111:*1,
14*  112:*15, 20*
147:*10*  153:*4*
155:*15*  274:*19*
**initial**  45:*3*  85:*18*
86:*4*  250:*1*
**initially**  87:*12, 12*
91:*5, 24*  253:*17*
**injured**  74:6
**injuries**  20:9  107:*4*
214:*1*  218:*23*
**injuring**  183:*17*
**injury**  77:*15*
106:*12*  112:9, *14, 23*
158:*24*  163:8
174:22  175:*1*
185:*4*  188:*12, 14*
214:*19*  215:20
297:*12*
**innocence**  281:*11*
**inquiries**  40:*13*
**inquiry**  164:*1*
**inside**  109:*17*
226:*24*
**insisted**  112:*12*
**instance**  6:*13*
**instances**  270:8
**institution**  265:6
**instruction**  266:*3*
302:7
**instructions**  255:*19*
**insurance**  72:22
150:*1*  155:*3*  187:*21*
**intended**  10:*20*
**intending**  279:2
**intends**  11:*4*

**intent**  26:*18*  287:*10*
294:*11*  295:*17*
**intention**  133:7
234:*23*  264:7
**intentional**  279:*13*
**intentions**  158:*4*
**interacting**  241:6
**interaction**  66:*18*
204:*1*
**interest**  25:*24*  170:8
**interested**  302:9
**interim**  101:*16*
195:9
**internal**  22:8
**interpreted**  256:*15*
**interrupt**  32:*10*
153:*11*
**interview**  105:*17*
**interviewed**  205:*16*
**interviewing**  167:*4*
**interviews**  91:*13, 14*
105:*16, 16*  205:*4*
288:22
**intimidated**  82:*13*
**introduce**  263:*23*
**introduced**  166:*11*
274:*15*
**invasion**  139:6
**investigate**  194:6
253:*3, 10*  288:*11*
300:*4*
**investigated**  21:*15*
86:9  194:*12*  204:8
205:*15*  290:7, *21*
291:*15, 17, 21*
**investigating**  21:*11*
192:*17*  290:*11*
**investigation**  33:*11*
88:*8*  92:6, *21*
95:*20, 23*  96:2
99:*11*  101:*3*
103:*19, 23*  104:*1, 7,
22*  105:*21*  107:*9*
110:*12*  115:*13*
117:*17, 18*  127:22
192:22  193:*3, 6, 15*
196:*11, 11*  197:*16*
200:*15*  205:*12, 24*
206:*15, 23*  207:*9*
209:*1, 5*  210:*3*
211:*15, 18, 19*

213:*10, 12*  219:*19*
220:*1*  238:2  245:5
253:*12, 13, 14*
255:22  278:2
288:*20*  289:*12, 19*
293:6  300:*4*
**investigations**  20:*18*
91:*21*  167:7
192:*19, 24*  194:*8, 20*
205:*15*  265:*21*
272:*10*  291:*11*
**investigator**  33:9
56:2
**involve**  20:9
106:*16*  215:*4*
244:*12*
**involved**  16:*17*
25:22  142:*3*  167:6
173:*3*  193:*3*  194:7
232:*15*  238:2
276:*23*  288:*13*
**involvement**  52:*14*
291:*12*
**involving**  80:7
236:5  276:*20*
**irrelevant**  257:*20*
**issue**  10:*10, 14*
13:*10, 10*  16:*12*
19:*20*  54:*23*  74:*10*
86:*21*  88:9  89:*19*
90:*20*  92:6  95:*20*
102:*16*  105:7
108:6  111:*15*
115:*1, 17, 20*  161:9
192:*19*  202:*5*
204:*20*  206:*10*
212:*12*  219:*14*
220:*3, 6*  272:*1*
284:*19*  289:22
290:*11, 21*  291:22
292:*17*  297:*10, 21*
**issued**  23:*14*
**issues**  7:*10*  12:23
15:*14, 14, 20*  19:22
20:*4, 17, 22*  21:*1, 4,
12, 14, 17, 20*  26:23
47:*8, 10*  52:6  54:2
57:6  70:*3*  74:*4*
75:*19*  80:7  86:8
111:*3*  147:*23*
162:*24*  175:*13*

2:17-cv-02112-CSB-EIL # 41   Page 168 of 189
Arbitration
10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

192:*11, 15, 17*  212:*6*
215:*14*  219:*20*
220:*19*  225:*4, 21*
253:*1*  265:*9, 9*
272:*18, 20*  273:*5*
276:*22*  281:*8*
288:*14, 20*  289:*13,
20*  291:*24*  292:*7*
293:*9, 10, 11, 20*
300:*18*

**item**  61:*21*  62:*11*
136:*5*  137:*22*
138:*2, 5, 9, 12, 15, 22*
139:*2, 5, 8, 11, 14, 17,
23*  140:*3, 6, 9, 18, 21*
163:*3*  246:*10*
**items**  29:*5*  57:*1*
106:*19*  122:*1, 5*
140:*15*  141:*2*
208:*21*  215:*6*  222:*2*
**its**  16:*22*  18:*1*
22:*9*  27:*18*  117:*16,
18*  126:*17*  219:*8*
221:*13*  266:*24*
267:*8*  279:*19*
280:*1*  293:*17*


**< J >**
**James**  1:*15*
**January**  54:*11*
131:*23*  154:*20*
162:*21*  203:*18*
234:*2, 14*  299:*8*
**jeans**  197:*4*
**jeopardy**  282:*9*
**jepstein@jamsadr.co
m**  1:*20*
**JIM**  1:*6*
**job**  20:*11*  41:*14*
55:*24*  64:*13, 21*
65:*4, 11, 22*  73:*21*
74:*6*  78:*2*  96:*7, 17,
18, 24*  98:*19, 20*
100:*13*  102:*13*
172:*3, 9, 23*  173:*1*
177:*24*  182:*5*
202:*6, 20*  203:*10, 12,
13, 16, 20, 21*  204:*2,
3*  209:*12*  213:*18*
240:*14*  247:*13*
249:*18*  250:*8, 12*

258:*2*  261:*6*
271:*18*  272:*16*
273:*4*  281:*20*
290:*14, 20*  291:*19*
293:*24, 24*
**jobs**  175:2  217:2
**JOE**  1:*6*  96:*2*
207:*13, 20*  208:*4*
209:*5*  271:*5*
**Joey**  53:*16*
**judge**  6:*1*  7:*3, 23*
11:*17, 20*  12:*6, 7*
13:*8, 14, 20*  16:*10,
16, 20*  18:*6, 17, 21*
19:*14*  20:*8, 16*
21:*6, 13*  22:*22*
23:*2, 6, 14, 19*  24:*17*
25:*13, 24*  26:*7, 13*
27:*6, 12, 15*  28:*4, 19,
19, 20*  32:*1*  36:*15,
21, 23*  44:*11*  48:*9*
50:*1*  57:*18*  58:*19,
20, 21*  59:*1, 12*
61:*12*  87:*4*  115:*9,
10*  118:*16*  123:*3*
137:*12*  143:*1, 21*
146:*19*  149:*14*
159:*19*  162:*3*
163:*11*  164:*5*
166:*1*  168:*19*
170:*7*  173:*12*
185:*21*  188:*10*
200:*9*  209:*24*
220:*22*  242:*22*
243:*23*  244:*4, 18*
248:*20, 23*  252:*3*
263:*19, 24*  264:*3, 21*
265:*14, 19*  266:*7*
267:*17, 22*  268:*2, 5*
276:*3*  277:*7, 17*
278:*19*  279:*5, 9, 14,
21, 24*  280:*10*  281:*8*
282:*14, 17*  283:*4, 8*
284:*5, 16*  285:*10*
286:*7, 18*  287:*5, 12,
19*  288:*1, 6, 24*
289:*20*  290:*14, 15,
17, 18*  291:*8, 20, 24*
292:*3*  293:*4, 19*
294:*2, 9, 12, 13, 17,
24*  295:*11*  296:*9, 13,

19*  297:*1, 4, 9, 17*
298:*1, 1, 6, 8*  301:*14,
22*
**judges**  12:*4, 4*  29:*6*
**judgment**  27:*13*
298:*9*
**July**  73:*9*  86:*15*
87:*9*  89:*11*  94:*7*
127:*2, 19*  128:*2*
180:*15*  181:*14, 20*
182:*9*  202:*11*
224:*20*
**jump**  68:*24*  204:*7*
**jumping**  211:*7*
**June**  1:*20*  18:*20*
62:*24*  125:*16*
127:*12, 16*  128:*17*
170:*22*  176:*23, 24*
181:*17*  222:*23*
223:*3*  235:*4*  302:*2,
12, 15, 18*
**jurors**  29:*6*
**justification**  286:*3*
**justified**  17:*2*  26:*3,
5*  287:*16*
**justify**  92:*10*


**< K >**
**Kat**  106:*1, 4, 6, 7*
273:*4, 7*
**K-A-T**  106:*2*
**keep**  12:*22*  116:*4*
152:*21, 22*  215:*24*
298:*17*
**keeping**  168:*23*
287:*2*
**Kevin**  112:*20*
**keys**  34:*10, 11, 12,
14*
**kids**  47:*12*  52:*7*
118:*7, 11*  119:*8, 14*
128:*20*  167:*17*
221:*16*  224:*17*
248:*11*
**kind**  32:*20*  34:*5*
57:*4*  170:*7*  194:*21*
196:*20*  202:*21*
203:*1*  211:*8*  231:*7*
232:*22, 24*  250:*19*
271:*11*  286:*16*

287:*6, 17, 18*  289:*9*
292:*15*  296:*5, 24*
**King**  53:*16*
**kitchen**  19:*16*
100:*4, 6*  106:*14*
153:*2, 2*  154:*7, 9, 12*
156:*15*  164:*14, 16,
17*  176:*16*  195:*11*
197:*8, 9*  202:*13*
214:*20*  273:*7*
**kneeling**  65:*13*
**knew**  14:*19*  53:*3, 8*
151:*1, 21*  190:*4*
220:*14*  271:*2*  273:*4*
**know**  10:*15*  11:*18*
21:*10*  23:*1*  24:*4*
26:*7, 15*  27:*12*
28:*11, 19*  29:*17*
31:*24*  38:*9, 18*
40:*9*  41:*4, 6*  44:*7*
45:*22*  46:*8*  47:*5,
11*  48:*13*  51:*14, 16,
16, 17*  52:*23*  53:*21*
55:*7*  57:*7, 22, 24*
58:*3, 7, 10*  59:*16*
70:*1*  71:*16, 18*
72:*14*  78:*17*  83:*21,
21*  84:*9*  92:*8, 10*
93:*13*  98:*14*
103:*18, 20*  104:*8, 15*
105:*1*  120:*22*
121:*22*  122:*13*
123:*12*  141:*22*
142:*5*  144:*5*  147:*3*
148:*20*  149:*7, 9, 12,
12*  151:*24*  152:*4, 5*
155:*15*  157:*14*
159:*4, 4*  160:*23*
165:*8*  166:*15*
170:*6*  175:*21*
178:*20*  184:*7, 11*
186:*15*  188:*17*
190:*3, 8*  194:*13, 21*
205:*9*  211:*14, 20*
212:*19*  220:*15*
234:*1*  239:*20*
251:*3, 9*  254:*9*
255:*5*  256:*3*
257:*19*  259:*11*
260:*8*  263:*19*
264:*8, 14*  266:*11*

2:17-cv-02112-CSB-EIL # 41 Page 169 of 189
10/29/2019
Arbitration

Bruce Melton vs. Pavilion Behavioral Health System, et al.

269:*21* 271:6
273:*10, 17* 275:17
277:9 279:5 280:*8,*
*17* 281:24 282:*4, 5,*
*14* 283:19, 22 284:7
286:*9, 9* 287:*12, 12*
288:*6, 24* 289:*1, 3*
292:*3, 7* 293:*2, 5*
294:*2, 4* 296:5
297:22 300:*6, 11*
**knowing** 53:*14*
157:7 267:*13*
**known** 18:2
**knows** 149:*14*
151:*11* 251:*21*
300:9

**< L >**
**labeled** 92:*17*
122:*11* 134:*4*
135:*15*
**lack** 241:*24* 287:6
294:*10*
**ladies** 53:*23*
**lady** 52:*20*
**land** 138:*24* 140:*1,*
*10*
**language** 279:*13, 19*
**large** 21:*18* 22:23
**Largely** 243:*24*
**late** 11:*18* 12:*11*
22:5 113:9 126:*9,*
*19* 131:*21* 158:*13,*
*13* 190:*15* 233:22
294:*19*
**LAURIE** 1:7 2:*12*
*3:8* 4:*8* 8:*15*
14:*16* 21:9 22:*14*
23:*4, 19, 20, 23* 24:*2,*
*8, 19* 26:*16* 30:*19,*
*23* 33:*3* 54:*12, 14*
62:*23* 64:*3* 67:*10,*
*19* 69:*13* 70:*17*
71:*11, 17* 72:*12, 19,*
*24* 73:*12, 14* 77:21
78:*16, 24* 79:*20, 23*
82:*3* 83:2 86:*4, 9,*
*19* 87:*8, 13, 15, 18,*
*24* 88:7 89:*6, 7, 19*
90:*1, 4, 10* 91:*17, 21*
92:5 94:*6, 7, 14*

95:*9, 19* 96:*3, 12, 16,*
*23* 99:*11* 101:2
102:*21* 103:*17, 23,*
*24* 104:6 105:*7, 20*
107:*1, 8* 108:*2, 16,*
*16* 110:*13, 24*
111:*10, 11, 14, 19*
112:*5, 14, 19, 20*
113:*11* 114:*1, 2*
115:2 131:*11*
132:*10* 133:*5, 11, 12,*
*15* 137:*3, 3, 7, 14, 18*
142:*19* 143:*3, 11, 18*
144:*11, 17, 19*
145:*10, 12* 147:*5, 11,*
*17, 24* 162:*23* 166:*2,*
*5* 205:*20* 207:*19*
209:6 211:*18*
213:*21* 215:*14*
218:*12, 17* 272:2
273:*3, 7, 7* 282:*21,*
*24* 283:*1* 284:*14*
285:*17, 22* 286:*15,*
*19, 21, 23* 287:*11, 18*
288:*5, 10, 15, 19*
289:*17, 19, 24* 290:*3,*
*5, 6, 10, 12, 14, 20*
291:*10, 19, 21*
294:*19* 295:*1, 3, 12,*
*19, 21, 22*
**Laurie's** 54:*16*
88:*8* 92:*20* 103:*19*
291:*12, 14, 17*
293:*24*
**Law** 1:*13* 2:7 7:*9,*
*10, 12, 13, 22* 13:*20*
16:*20* 18:*9* 19:*1*
27:7 28:*3* 40:*17,*
*19* 45:*22* 47:*8*
58:*12, 14* 155:5
156:*3* 245:*12*
246:*16* 259:*3, 21*
267:*14* 276:*16*
277:*1, 3, 6, 10, 14, 16*
278:*14, 15, 21, 23*
279:*17, 19* 280:*4, 8,*
*9, 16* 282:*23* 283:*3,*
*3, 15, 18* 284:*9, 22*
285:*2, 4* 286:*1, 3, 18*
293:*12* 294:*4, 8*
297:*14, 19* 298:2

299:*6, 16, 17* 300:6
302:5
**laws** 40:*19*
**lawyer** 13:2 30:*11*
156:2 261:2
**lawyers** 6:*4, 11*
58:*10* 284:*21*
**Layton** 2:7 3:*3, 5,*
*6, 8, 11* 4:6, 19 5:*7,*
*24* 6:*1* 7:*2, 3, 23*
8:*2, 10* 10:*12, 13*
12:*17* 13:*8, 13, 14,*
*18* 16:*8, 10* 25:*15,*
*18, 20* 28:*18, 23*
29:*2, 11, 12* 30:*17,*
*18, 22* 31:*18* 32:*1, 4,*
*9* 33:9 35:*5, 9, 13,*
*16* 36:*15, 21, 23*
39:*13* 40:9 42:7
43:*13* 44:*11* 47:*18*
48:*9, 15, 24* 49:*2, 4,*
*24* 50:*12, 16* 55:22
56:22 57:*14, 16, 18*
58:*9, 19* 59:*1, 3, 12*
61:*12* 87:*4* 90:*23*
97:7 98:*11* 115:*9,*
*24* 116:*6, 11* 118:*15*
123:*3, 17, 19* 137:*12*
142:*24* 143:*5, 8, 14,*
*17, 21, 23* 146:*19*
147:*15, 20* 151:9
152:*23* 156:*4, 8, 13*
157:*14, 14, 19*
158:*11* 159:*19, 22*
162:*1, 3, 13, 14*
163:*10, 17* 164:*4, 8*
165:*21, 24* 166:*1, 9*
170:6 185:*21*
209:*24* 210:*1*
220:*17* 234:*14, 17,*
*22* 235:2 240:2
242:*9, 22* 244:*4, 18*
248:*19, 23* 249:6
252:22 259:*14*
261:*10, 14* 263:*19,*
*24* 264:*21* 266:*7, 10,*
*13* 267:*17, 22* 268:*2,*
*5* 269:*3, 5* 273:*14*
274:*2, 5, 12, 19, 19,*
*22* 275:*2, 6* 276:*1, 3,*
*5* 277:22 278:*19, 23*

279:*4* 281:7 282:*3,*
*13* 283:*8, 14* 284:*1,*
*4, 24* 285:*7, 9, 13*
286:7 287:*21*
288:*1* 293:*4*
294:*17* 296:*9, 12*
298:*1, 6, 12* 299:*1,*
*18* 301:*14, 22*
**leading** 100:22
**leaf** 270:*19*
**learn** 212:*14* 293:8
**learned** 16:*14*
22:23 24:*16* 28:*1*
47:*11* 126:*20, 22*
225:*15, 16* 276:9
**learning** 236:*4*
**leather** 197:*3* 270:*3*
**leave** 20:*10, 13, 15*
63:24 67:*13, 20, 23*
68:*3* 71:*10, 11, 20,*
*24* 72:*4, 13, 20* 73:*3,*
*7, 14, 17* 78:*18*
79:*12, 16* 80:*1*
94:8 111:*23* 112:*4*
162:*17* 170:*18*
173:*13, 17* 174:*1, 10,*
*12* 175:9 176:*24*
177:*3, 5, 13, 18*
180:*11, 18, 21, 22*
181:*2, 3, 5, 8* 182:8
185:*7, 11* 186:*3, 19,*
*20* 190:*12, 15* 214:*8,*
*9* 297:*13* 301:9
**leaves** 20:*5, 7*
172:*16* 173:*5, 8, 16*
174:6 297:5
**leaving** 90:6 201:*21*
**led** 240:*8* 276:7
282:*16*
**left** 25:*4* 233:*6, 20*
237:*9, 10*
**left-hand** 109:*3*
233:7
**legal** 7:6, *14, 20*
16:22 17:*24* 18:*4,*
*6* 24:*11* 40:*10*
60:*19* 226:*12*
238:2 243:*14*
266:*24* 267:*8*
278:*13* 280:*1*
281:2 293:*13*



2:17-cv-02112-CSB-EIL # 41    Page 170 of 189

Arbitration    10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

**legally**  17:2, *9*
23:*13*  26:*3, 5*  27:*1*
131:*15*  226:*16*
277:*4*  287:*16*
291:*20*  292:2
293:*10*
**legislature**  279:*12,*
*13*  282:*16*
**legitimate**  294:*6*
**letter**  23:9, *10, 14,*
*15, 24*  24:5  33:*13*
34:*1, 8, 9, 17*  35:*16,*
*17*  36:*10, 13*  39:*23*
43:*21*  50:*16, 18, 23*
51:22  54:*12, 23*
70:*17*  75:6  77:*13,*
*20*  78:*16, 17*  94:9
108:8  110:*13*
111:2, *15*  113:9
114:8  130:*1, 7, 8*
131:*23*  132:*20*
145:8, *18, 23*  154:*24*
155:*20, 21, 22*  156:5
157:*13, 15*  158:*11*
162:*16*  181:*13*
183:5  184:5, *6*
190:2*1*  191:*4, 22, 24*
192:5  216:2, *12*
218:*12, 17*  224:*19,*
*23, 24*  225:5, *7, 7*
229:*20, 21*  239:*10,*
*13, 15, 18*  242:*17*
260:*13, 14*  261:22
262:6, *14*  263:2
293:*19*  294:*19, 23*
295:5, *9*  299:*11*
**letters**  120:*12*  121:*3*
**letting**  71:*17*  78:*17*
98:*14*  184:*11*
**level**  13:5  265:8, *10*
297:4
**levels**  65:5
**license**  18:*1*  100:*1,*
*5, 6, 8, 11*  101:*10, 22*
102:8, *13*  124:*24*
125:8, *12*  139:*21*
140:*16, 22*  150:2
168:*15, 23*  169:*15*
192:7  210:*19, 24*
211:4  222:*3*  229:6
257:*16*  292:*19, 22*

**licensed**  6:6  17:*14,*
22  60:*17*  129:*19*
130:*14, 24*  167:*16*
168:*13, 16, 21*  169:*4*
191:*16*  245:*1*
262:*4, 21*  265:5
279:*16*
**Licensing**  127:7
226:6  265:*1*
267:*19*  278:*1*
**licensure**  171:*11*
267:*14*
**lie**  47:*3*  82:*24*
**lied**  53:*24*  111:*20*
**lieu**  5:5  6:*12*  8:9,
*21, 22*
**life**  273:*21*
**lift**  64:*15*  65:6
156:*18*  160:6  189:*9*
**lifting**  65:5, *24*
157:*4*  172:*3, 23*
173:*3*  181:*23*
182:*21, 22, 23*
272:*24*
**light**  196:*1, 2, 5*
241:*2*
**liked**  25:*1*  38:*18*
**limitations**  79:9
174:*17*
**limited**  181:22
182:*23*
**line**  5:*15, 17*  20:*23*
21:*2, 8, 20*  25:7
56:*1*  80:8  84:*20*
85:*4, 15, 19, 20*  86:9,
*23*  89:*1*  90:21
98:*16*  102:*17*
105:*24*  141:*20*
142:*2*  144:*2, 8, 14*
160:22  164:*1*
171:22  192:*12*
193:*12, 22, 23, 24*
194:*4*  199:*13*
200:*12, 14*  206:*16*
218:9  252:*24*
253:*1*  272:5, *5*
288:7, *8, 21*  290:*3*
299:*20, 21*
**lines**  99:*1*  287:*10*
**list**  22:*15*  34:*20, 23*
35:6  55:*11*  64:*19*

65:*10*  157:2, *7*
163:*4, 6, 21, 22*
202:*12, 14*  203:22
**listed**  75:*23*  110:*8*
221:*21*  233:6, *12*
**listen**  300:*1*
**listened**  85:*20*
**listening**  293:*3*
**listing**  35:*23*
**lists**  126:*4*  134:*11*
**little**  17:*11*  20:2
41:*19*  56:*12*  67:7
76:*1*  123:*13*
142:*24*  167:*11, 12*
169:*19*  245:*17*
254:*12*
**live**  24:*18*  118:7
167:*19*  168:2, *2*
240:*16*
**lived**  52:*10*
**lives**  168:*5*
**load**  77:*15*
**loading**  106:*17*
215:5
**local**  62:*15*  259:*3*
**located**  17:*13*
28:*16*  31:*20*  38:*24*
40:*14*  49:*19*
**location**  61:*24*  62:*1*
**long**  81:*3*  88:*4*
113:*23*  166:*19*
254:9  286:*12, 13*
298:*17*
**longer**  54:7  169:*17*
187:*1*  192:7
202:*23*  250:6
**long-term**  241:*4*
**look**  9:*19*  15:2
34:*19*  37:22  39:*16*
48:*2*  51:*17*  63:8
65:*3*  79:*15*  87:*24*
99:*4*  105:*3*  107:7
120:5  133:*19*
144:*2*  148:7  149:*8,*
22  150:*15, 17*  179:6
198:*20*  203:9
204:*21*  205:9
232:22  244:5
250:*10*  261:9
272:*20*  275:*18*
277:*14, 15*  282:6

284:5  287:*19*
295:*15*
**looked**  33:6  132:7
147:24  148:*19*
164:*11*  171:*24*
178:2*1*  198:*10*
242:*11*  248:7
250:2, *2, 3, 4*  252:*20*
277:*20*  289:*3*
290:5  295:*21*
**looking**  37:*11*
39:*13*  44:*4*  45:*4*
48:*13*  50:*9, 13*
98:*23*  109:*20*
142:*15*  178:22
190:*19*  195:*3, 4*
200:5, *20*  217:*18*
224:9  277:*19*
279:9  284:*10*
298:*24*  299:2
**looks**  76:*3*  91:*16*
135:*14*  180:*3*  205:3
**Lord**  164:22  165:*1*
**lose**  169:*15*  192:7
229:6
**losing**  257:*16*
**loss**  112:*15*
**lot**  17:4, *17*  19:*15*
20:*17*, 22  36:2, *8*
40:*10*  46:22  47:5
57:*13*  147:2, *15*
164:*3*  265:9  282:6
291:*23*  297:*19*
301:*3*
**lots**  60:*6*
**low**  76:*17*  188:2
**lunches**  106:5
107:*18*

**< M >**
**ma'am**  260:*16*
**machine**  64:*14*
106:*18*  195:24
215:6
**Mahoney**  2:8
**mail**  33:*14, 14*
109:*8*
**maintain**  18:*1*
171:*11*
**Maitland**  69:*11*

Arbitration
Bruce Melton vs. Pavilion Behavioral Health System, et al.

majority 21:*19*
288:*13*
making 152:*6*
175:*18* 194:*10*
196:*21* 197:*23*
201:*5* 285:*23*
male 154:*12*
man 47:*11*
manage 64:*14*
manager 101:*16*
112:*16* 176:*18*
190:*3, 8* 195:*9*
273:*8*
managers 70:*4, 5*
mandatory 61:*23*
manner 17:*9*
March 48:*3* 80:*13*
81:*7* 207:*9*
mark 15:*18*
marked 170:*15*
200:*20* 230:*3*
marking 301:*3*
matter 4:*20* 19:*18*
27:*7* 32:*21* 101:*3*
104:*1* 193:*15*
212:*5* 256:*4*
matters 9:*2* 11:*6*
16:*18* 19:*8, 24*
46:*14* 212:*6*
288:*12* 295:*24*
Mattis 2:*4*
M-A-T-U-S-Z-C-Z-A
-K 155:*11*
maximum 155:*10*
McCambridge 2:*8*
meal 240:*15*
meals 100:*7* 106:*7,
16* 171:*20, 21* 215:*4*
240:*17*
mean 13:*6* 30:*20*
43:*19* 52:*9* 58:*2,
20* 95:*1* 100:*14*
149:*21* 150:*21*
159:*3* 223:*3* 231:*1*
234:*9* 242:*21*
251:*16* 264:*12*
269:*7* 270:*8*
275:*13* 285:*3*
293:*12* 294:*13*
meaning 61:*22*
62:*12* 75:*2* 89:*3*

90:*12* 106:*7*
108:*18* 111:*12*
129:*4* 131:*5*
179:*15* 196:*1*
246:*13*
means 109:*7* 129:*8*
150:*4* 168:*20, 21*
180:*20* 189:*5, 6*
234:*10* 249:*13*
Mediator 1:*18*
medical 15:*14, 14,
15* 20:*4, 5, 12* 26:*23,
23* 74:*22* 75:*7, 17*
76:*13, 21* 78:*18*
94:*8* 155:*11*
156:*23* 173:*9*
174:*10* 175:*13*
297:*21*
medicine 178:*15*
180:*2* 188:*15*
meet 77:*24* 78:*1*
175:*2* 216:*14*
217:*3* 218:*24*
219:*10* 293:*22*
meeting 54:*3* 87:*18*
94:*1*
MELTON 1:*1* 2:*4*
3:*2, 4, 5, 6, 9, 10, 11*
4:*3, 5, 18, 19, 23* 5:*1,
6, 9, 12, 18, 22, 23*
6:*6, 24* 7:*1, 15* 8:*7,
9* 9:*10, 16, 22* 10:*2,
5, 8, 10, 11, 18* 11:*2,
9, 14, 24* 13:*3, 15, 17,
22* 14:*1, 6, 9, 11, 13*
16:*8, 12, 15* 17:*3, 3*
18:*14, 19, 24* 19:*4,
10, 13, 19* 20:*1, 5, 7,
10, 13, 18, 20, 23, 24*
21:*1, 8, 12, 23* 22:*5,
16, 18* 23:*1, 3, 9, 12,
17, 19, 21* 24:*1, 2, 4,
6, 9, 14, 19, 22, 24*
25:*1, 3, 7, 9* 26:*6, 8,
15, 16, 19, 21, 23, 24*
27:*3, 18, 21* 28:*1, 8,
10, 14* 29:*8, 15, 21*
30:*3, 7, 19, 23* 31:*2,
6, 7, 11, 15* 32:*5, 10,
12, 16* 33:*16, 18, 21,
24* 34:*23* 35:*6, 9, 11,*

14, 17, 21* 36:*5, 7, 24*
37:*3, 5, 13, 16, 19, 22*
38:*3* 39:*3, 14, 15*
40:*17* 41:*5, 10, 17,
20, 24* 42:*16, 21, 24*
43:*12, 13, 15, 19, 24*
44:*3, 19, 22* 45:*16,
20* 46:*2, 5, 16, 18, 21*
48:*5, 12* 49:*10, 12,
15, 19* 50:*6, 11, 12,
14, 18, 24* 51:*4, 6*
56:*10, 14, 21* 57:*2,
12, 22* 58:*1, 22* 59:*4,
10, 15, 18* 60:*16*
61:*3* 62:*23* 65:*14,
21* 66:*3* 67:*1*
68:*10, 22* 73:*6*
74:*3, 14* 75:*6, 12*
76:*11* 77:*8* 79:*5,
11* 80:*6, 11* 81:*21*
83:*6, 10, 15, 24*
84:*18, 22* 86:*13*
88:*22* 90:*19* 91:*10*
92:*2, 13, 22* 94:*3*
95:*11* 96:*5, 6* 97:*3,
5, 8, 9, 14, 20* 98:*1, 4,
7, 12* 99:*4, 18* 101:*5*
102:*7, 11* 103:*1*
107:*9, 23* 108:*20*
109:*19* 110:*15, 19,
24* 111:*11, 22*
114:*13* 115:*12, 15*
116:*8, 12* 118:*4, 5,
18* 119:*9, 14* 120:*10*
121:*22* 122:*10, 22,
24* 123:*1, 4, 7, 11, 16,
20* 125:*14* 126:*7, 24*
128:*7* 129:*8, 14*
131:*9, 18* 133:*19*
134:*23* 135:*3, 9*
136:*12* 137:*13*
141:*14, 17* 142:*15,
17* 143:*2, 6, 20*
144:*10, 24* 145:*7*
146:*20, 21, 23* 147:*1,
9* 148:*10, 24* 149:*3,
7, 11* 152:*4, 8, 11, 14,
17, 22* 153:*12, 15, 20,
24* 154:*2, 4* 155:*7*
156:*5, 6, 10, 14*
157:*12, 18, 20, 22*

158:*18* 159:*20*
161:*19* 162:*6, 9, 12*
163:*16, 22* 164:*3, 12,
19, 22* 165:*4, 7, 12,
18, 20* 170:*12, 22*
171:*1, 5, 17* 172:*2,
15, 22* 173:*6* 175:*12,
13* 176:*10, 14, 24*
177:*2, 12, 20* 178:*5,
10* 179:*16* 180:*11*
181:*8, 12, 16* 182:*2,
7, 18* 183:*6, 16*
184:*1, 5, 19, 22*
185:*3, 14, 18, 22*
186:*2, 18* 187:*11, 17*
188:*1* 189:*16*
190:*11, 15* 191:*9, 18,
22* 192:*1, 4, 10, 12*
194:*24* 196:*23*
197:*18, 21* 198:*2, 17*
199:*3, 5, 9, 13, 15, 21*
201:*5, 12, 17* 202:*19*
204:*20, 22, 24* 205:*7*
206:*10* 207:*10, 13,
17* 208:*8, 13* 209:*7,
10, 18* 210:*4, 8, 15,
18* 211:*3, 10, 12, 24*
212:*9, 11, 14, 23*
213:*2, 13* 214:*8*
215:*12, 13* 216:*3, 6,
11, 18* 217:*2, 14, 18*
219:*15, 17, 20* 220:*1*
221:*20* 223:*3, 15*
224:*1, 6, 10* 225:*12,
17* 228:*15, 19, 24*
229:*15, 19, 21* 230:*2,
5, 11* 231:*5, 7, 12, 17,
22* 232:*3, 8* 233:*18*
234:*6* 235:*3, 12*
236:*5, 12* 237:*2*
238:*6, 7, 14, 19*
239:*21* 242:*12, 18*
243:*10, 19* 244:*7*
247:*9, 14, 20* 248:*6,
17* 249:*2, 4* 252:*7,
10, 12, 15, 16* 256:*6,
9, 13, 21, 24* 257:*3, 5,
24* 258:*3, 5, 7, 12*
259:*16, 19, 24* 260:*4,
5, 24* 261:*4, 7, 19, 23*
262:*8* 263:*3, 8, 10,*

2:17-cv-02112-CSB-EIL # 41 Page 172 of 189
10/29/2019
Arbitration
Bruce Melton vs. Pavilion Behavioral Health System, et al.

*15* 264:*13*, *19*
265:*12*, *23* 266:*1*, *3*,
*22* 267:*1*, *6*, *11*
268:*8*, *15*, *19*, *22*
269:*1*, *7*, *14*, *17*, *20*
274:*6*, *17*, *24* 275:*5*,
*12* 276:*1*, *10* 277:*6*
279:*23* 280:*3*, *7*
281:*2* 283:*22*, *22*
286:*11*, *14*, *14*, *16*, *22*
287:*4*, *8*, *13* 288:*1*, *6*,
*14* 289:*1*, *4*, *5*, *6*, *11*,
*17*, *22* 290:*10*, *12*, *22*
291:*2*, *6*, *18*, *24*
292:*6*, *13*, *17*, *20*, *24*
293:*5*, *9*, *15*, *18*
294:*5*, *18*, *20* 295:*2*,
*4*, *12*, *13*, *20* 296:*1*,
*13*, *19*, *21*, *24* 297:*9*,
*11*, *17* 298:*14*, *16*, *21*
299:*2*, *12* 301:*19*, *23*
**Melton's** 11:*8* 17:*7*
21:*14*, *19* 23:*6*, *22*
25:*8*, *22* 26:*4* 27:*9*
59:*13* 93:*1* 170:*21*
171:*14* 172:*7*, *12*, *20*
173:*5* 176:*3*
177:*16* 183:*13*
193:*22* 195:*15*
198:*14* 201:*11*
202:*1*, *5*, *6* 206:*3*, *18*
207:*18* 214:*4*
218:*1* 220:*10*, *19*
222:*3*, *8* 237:*15*, *21*
240:*12*, *18*, *22* 241:*4*
266:*17* 276:*7*
286:*4* 288:*20*
292:*23* 293:*20*, *24*
294:*2* 297:*3*
**members** 52:*7*
**mental** 265:*9*
**mention** 28:*18*
117:*9* 298:*2*
**mentioned** 19:*24*
163:*4* 168:*15* 233:*3*
**mercy** 164:*22* 165:*1*
**merits** 52:*17*, *18*
**method** 4:*22* 9:*6*
**middle** 68:*20* 118:*1*
124:*12* 218:*11*
**military** 259:*1*

**mind** 29:*22* 98:*14*
117:*11* 123:*9*
163:*17* 178:*22*
258:*9*, *17* 276:*9*
299:*23*
**minds** 285:*3*
**mine** 53:*16* 58:*4*
**minimal** 14:*24*
**minorities** 169:*22*
170:*1*
**minors** 17:*18*
**minute** 11:*21* 38:*1*
39:*12* 183:*4*
192:*10* 259:*10*
288:*16*
**minutes** 56:*9*, *13*
116:*4*, *6* 176:*22*
264:*5*
**misdemeanor** 124:*6*,
*22* 125:*5*, *11* 148:*20*
251:*18*, *20*
**misdemeanors**
222:*7* 251:*22*, *24*
**missed** 52:*18*
269:*23* 270:*21*
**missing** 15:*17*
**misspoke** 90:*23*
135:*1* 142:*10*
145:*2* 234:*17*, *18*
**misspoken** 234:*21*
**mistreated** 105:*13*
213:*5*
**mistreatment** 15:*10*
**misunderstanding**
21:*23* 210:*15*
**misunderstood**
292:*20*
**mixed** 292:*11*
**modified** 75:*2*
189:*3*
**modify** 61:*14* 79:*8*
**moment** 36:*4* 93:*19*
113:*1* 157:*23*
165:*14* 191:*21*
**monetary** 259:*13*
**money** 47:*22*
**monitors** 173:*16*
**month** 16:*13*
155:*24* 166:*20*
**monthly** 72:*21*
**months** 67:*7* 211:*4*

**morning** 4:*2* 75:*13*
217:*13*
**motion** 11:*23*, *24*
**motor** 138:*17*
**mounds** 158:*14*, *14*
**move** 156:*19* 217:*8*
275:*11*
**moved** 218:*22*
**muddy** 252:*11*

**< N >**
**name** 7:*20* 25:*15*
52:*23*, *24* 53:*15*
110:*2* 135:*2*
222:*15* 227:*13*
**names** 109:*11*, *12*,
*16*, *17* 193:*4*
**narrative** 88:*5*
105:*20*
**national** 259:*1*
**Naturally** 277:*10*
**nature** 12:*15* 82:*18*
104:*4* 168:*1*
247:*14*, *15*, *24*
249:*19* 284:*15*
285:*19*
**necessarily** 13:*6*
**necessary** 7:*5* 49:*7*
62:*6*, *8* 100:*8* 275:*9*
**necessity** 44:*16*
**neck** 189:*10*
**need** 7:*7* 22:*15*
30:*15* 37:*4* 52:*20*
56:*8* 57:*19* 58:*21*
59:*9*, *13* 63:*17*
64:*13* 65:*6* 71:*5*
77:*16* 79:*2* 87:*19*,
*20* 92:*11* 100:*5*, *6*, *8*
107:*2*, *3* 129:*4*
134:*18* 135:*14*
162:*9* 167:*21*
168:*3* 169:*8*
173:*17* 176:*19*
178:*9* 181:*22*
182:*14*, *19*, *22* 183:*1*
185:*16* 196:*20*
208:*3* 210:*13*
213:*22* 217:*10*
222:*17*, *20* 223:*5*, *11*,
*18* 228:*24* 264:*9*
268:*7*, *10* 298:*3*

**needed** 39:*8* 71:*13*
77:*24* 87:*13* 99:*24*
102:*12* 108:*19*
118:*6* 213:*23*
228:*19* 230:*6*, *8*
255:*13*, *14* 257:*11*
297:*6*
**needs** 61:*20*, *22*
62:*9* 77:*24* 173:*21*
215:*18* 216:*14*
217:*4* 219:*1*, *10*
289:*4* 293:*22*
**neighborhood** 47:*5*
**Neil** 1:*15* 302:*5*
**neither** 96:*2* 209:*5*
**never** 8:*22* 11:*3*, *11*,
*20* 15:*17*, *17* 32:*6*, *7*
34:*10*, *12* 36:*1*
38:*10* 39:*6*, *20*
40:*2* 44:*7* 47:*10*
49:*23* 50:*20* 51:*9*,
*20*, *21* 52:*1*, *5*, *10*, *18*,
*18* 53:*20* 55:*4*, *5*, *5*,
*12*, *14* 90:*8* 91:*23*
93:*10* 103:*5*, *7*, *8*
129:*8* 131:*10*
137:*7* 147:*17*
151:*18*, *19* 152:*1*, *1*
155:*20*, *21* 164:*17*
199:*22* 207:*19*
256:*2* 268:*10*
269:*23*, *24* 270:*21*
271:*24*, *24* 272:*8*, *16*
292:*10*, *13*, *16* 296:*1*,
*4* 299:*17*
**new** 24:*12*, *15* 58:*6*
126:*20* 178:*21*
204:*3* 232:*20*
233:*1*, *7*, *20*, *21*
234:*5* 235:*15*, *22*
237:*4*, *20* 241:*14*, *18*
257:*24* 258:*9*
266:*16*, *19* 270:*19*
276:*10*
**nice** 283:*23*
**Nine** 158:*7*
**nolle** 246:*17*, *17*
**nolo** 246:*20*
**nonconvictions**
46:*10*



2:17-cv-02112-CSB-EIL # 41 Page 173 of 189
10/29/2019
Arbitration
Bruce Melton vs. Pavilion Behavioral Health System, et al.

**nondiscriminatory** 294:7
**nonlicensed** 245:4
**nonsworn** 30:17
**nonwork-related** 111:24 174:21 175:20
**normal** 4:22 9:1 15:3 29:4 276:13, 14, 23
**normally** 5:3 41:14
**North** 1:15 302:5
**notarial** 302:11
**Notary** 302:2, 16, 19
**notate** 241:17
**note** 63:15 83:4 99:15 114:4 155:2 182:11, 22 183:1 195:7, 15, 19 196:23 200:5 203:12 207:12, 15 218:22 241:21 270:4
**noted** 34:17 82:8, 17 189:8 218:17 241:20 253:24
**notes** 81:4 87:15, 21 88:8 92:5 93:1 135:10 156:18, 23 196:10 197:13, 15, 20 198:10 205:12, 14 206:3 208:8 231:13, 18 248:19 287:19 290:15, 17 302:7
**notice** 54:22 61:15 79:1 110:15 111:1, 12 116:13 132:7 158:20 186:22 243:18
**notification** 71:16 108:17
**notified** 238:12, 14
**notify** 38:7
**noting** 90:2
**November** 67:4, 13 76:13 102:3 103:18 107:16 108:16 145:13 177:2, 6 189:19 213:2 214:7

227:16, 18, 21
228:20 302:12
**number** 22:23 30:5 37:15, 16 61:21 62:11 133:23 134:13 136:1, 5, 10 137:22 138:2, 5, 9, 12, 15, 22 139:2, 5 140:12, 18, 21 141:20 142:2 148:11 150:5 156:4, 6 163:3 173:19 213:7 225:4 230:7 239:24 240:3 246:10 247:24 248:7, 9 250:3 284:15 285:18
**numerous** 15:7, 9 21:3 33:2 60:5 151:8 288:7
**nuts** 282:18

**< O >**
**oath** 9:20
**object** 5:8 15:4 36:15 44:11 158:12 161:19 259:14 274:2
**objection** 5:4, 9, 11, 14 12:14 13:6 14:4 31:13, 14 44:13 49:9 50:1, 4 274:4, 5
**objectionable** 5:7 13:5 86:3
**obligated** 131:15 226:16 279:20
**obligation** 60:19 243:14 248:15 276:15, 16 277:11
**obtain** 18:11 62:19 73:2
**obtained** 34:24 117:19 265:24
**obviously** 24:18 25:24 57:21 59:8 80:18 133:15 164:6 182:7 205:6 286:2
**occasion** 65:6

**occasions** 15:9 85:16 282:6
**occupational** 178:15 180:1 188:15
**occur** 226:3
**occurred** 148:12 249:21
**occurs** 5:9
**o'clock** 106:11 214:17 217:6, 8, 11, 12
**October** 1:13 75:18 76:2 99:15 187:24 210:23 236:8 292:24 302:6
**offender** 127:11 246:19
**offense** 124:16 240:8 251:17 252:2
**offenses** 222:7 240:18 251:11, 16, 23
**offer** 152:16 168:24 259:13 275:7
**offered** 12:14 38:13 49:15 62:1 267:18
**offering** 281:3
**office** 40:1, 3 69:11 75:13 127:7 148:1 231:2, 3, 6
**officer** 134:14 150:4, 5 194:5 236:22
**Offices** 1:13 193:13 200:24 302:5
**OFFICIAL** 302:18
**oftentimes** 6:10 21:22
**Oh** 35:16 41:10 46:21 54:2, 8 69:2 90:23 113:7 118:2 123:6 144:3 157:18 164:22 173:10 191:13 234:17 255:10 258:15 259:5 260:23 261:9 273:24

**Okay** 4:14 5:18 9:10 10:2, 5, 6 13:22 14:10 16:10 19:12 23:4 25:19, 19 31:1, 4, 15 32:5, 12, 14, 15 33:23 34:19 35:13, 17, 21 36:7, 9 37:6, 14, 16 39:1, 2, 3, 15 40:9, 16 43:10 44:1, 1, 3, 4, 8 45:4 46:4 48:7, 12, 13, 14 49:15 50:2 51:3, 6 54:19 56:6, 16 57:2, 12, 12 58:20, 22 59:12, 15, 18, 24 61:10, 12 62:11 63:2, 8 65:3, 16 66:2 67:1 68:15, 17, 22 69:4, 22 70:4 71:20 72:19 74:13, 18 80:5 81:10, 16, 18, 21 83:3, 9, 9, 15 84:3, 22 85:3 86:7 88:3 89:5 90:1, 19 91:4, 8, 9, 13 92:13, 14 93:10, 15, 20 94:14 95:5 97:3, 16, 20 98:9, 16 99:3, 8 100:10, 15, 15, 23 102:15 103:5, 11, 23 104:24 105:6 106:4, 10 107:7, 11 108:1, 5 109:10 110:2 111:7, 7, 22 112:3 113:7, 18 114:15, 22 115:2, 4, 8, 11, 23 116:7 118:2, 3, 10 119:13 120:1, 14, 18, 23 122:3, 4, 8, 11, 17 123:11, 20, 23 124:1, 4, 5, 11, 14, 15 125:14 126:24 128:6, 21 129:13 130:1 131:9 132:11, 19, 23 134:17, 23 135:5, 12, 13, 18 136:4, 8, 18 137:2, 18, 22 140:15 141:1, 4, 14 142:2, 3,



2:17-cv-02112-CSB-EIL    # 41    10/29/2019    Page 174 of 189
Arbitration

Bruce Melton vs. Pavilion Behavioral Health System, et al.

*12, 15, 21, 23* 143:*12, 14, 23, 24* 144:*1, 7, 8, 9, 13, 14, 24* 145:*2, 6* 146:*18* 147:*1, 2* 148:*11* 149:*11* 152:*14* 153:*8, 19, 20, 24* 154:*4* 155:*5, 17, 19* 156:*24* 157:*18, 21, 23* 158:*16, 18, 19* 160:*8, 12, 19, 22, 24* 161:*3, 16, 20, 20* 162:*11, 13* 163:*3, 9, 12* 164:*12* 165:*4, 6, 10, 18, 19* 166:*18* 167:*2, 10* 170:*2, 5, 9, 20* 171:*17, 24* 172:*11, 15* 173:*4* 174:*3* 175:*4, 11, 24* 176:*7, 21* 177:*24* 178:*18* 180:*9, 14, 20, 24* 181:*4* 182:*2* 183:*2, 2, 24* 184:*18* 185:*6, 13* 186:*17, 23* 187:*23* 188:*20* 189:*12* 190:*7, 11, 19* 191:*10, 18, 21* 192:*15, 23* 193:*8, 14, 21* 194:*9, 9, 23* 195:*2, 12, 18, 21* 196:*8, 13* 197:*6, 12, 20* 198:*1, 16* 199:*9* 200:*18* 201:*4, 10* 202:*4, 19, 24* 204:*1* 205:*23* 206:*2, 13, 17* 208:*4, 6* 209:*3* 211:*17* 212:*3, 9* 213:*9* 215:*3, 10, 10, 12, 23* 216:*11, 17* 217:*14* 218:*1, 6, 10, 10, 21* 219:*24* 220:*9, 21* 221:*3, 10, 19* 222:*6, 22* 223:*8, 14, 20* 224:*2, 9, 18* 225:*10, 23* 226:*8, 11* 227:*8, 12* 228:*12, 23* 229:*8, 9* 230:*2, 13, 15, 21, 24* 231:*5, 12, 22* 232:*3, 17* 233:*2, 5, 11, 15, 24* 234:*19* 235:*3, 7, 24* 236:*7* 237:*4* 238:*7, 17, 21*

239:*2, 15, 18, 22* 240:*4* 242:*8, 14, 15* 243:*7, 8, 13, 22* 244:*11, 19, 20* 245:*16* 246:*1, 9, 15* 247:*5, 18* 248:*14* 249:*12* 250:*7, 15, 19, 21* 251:*3, 7, 10, 16* 252:*1, 7, 12, 17, 21, 21* 253:*15, 15* 254:*8, 21, 24* 255:*2, 5, 9, 9, 20, 23, 23* 257:*2, 12, 14, 21* 258:*8, 9* 259:*4, 9, 17, 18, 24* 260:*6, 16, 20* 261:*3, 8, 9, 14, 24* 262:*1, 10, 19* 263:*14, 17, 21* 264:*4, 20* 266:*14* 267:*2, 21, 24* 269:*2, 14, 17* 274:*12, 17, 24* 275:*5, 10, 12* 277:*22* 282:*20* 283:*4, 5, 9, 20* 284:*17* 285:*14* 286:*8, 12, 16* 293:*4, 4* 294:*19, 23* 296:*10* 298:*6, 21*

**old** 17:*19* 153:*3* 236:*15*

**once** 6:*19* 15:*4* 39:*11* 46:*12* 47:*7* 50:*7* 51:*9* 52:*1, 6, 10* 55:*5, 5* 72:*9* 136:*6* 158:*19* 184:*13* 186:*14* 200:*23* 229:*17* 269:*21* 299:*17* 301:*15*

**ones** 147:*22, 23* 264:*15*

**ongoing** 167:*5*

**open** 6:*17* 32:*14* 58:*3* 71:*10, 18* 72:*13* 173:*19* 301:*10*

**opened** 71:*17*

**OPENING** 3:*2* 6:*7* 8:*5* 10:*14* 14:*11* 16:*9* 28:*7* 72:*17* 269:*9*

**operating** 150:*1* 171:*15*

**operations** 202:*23* 207:*11*

**opinion** 70:*12* 151:*15* 267:*15*

**opportunity** 7:*13* 11:*14* 34:*3* 44:*15* 51:*20* 57:*16* 58:*5, 18* 79:*1* 81:*7* 116:*16* 151:*16* 152:*10* 194:*3* 217:*10* 258:*21* 295:*6, 7*

**option** 23:*16* 30:*9* 148:*22* 150:*17*

**oral** 11:*24*

**order** 17:*21* 18:*1, 18* 77:*24* 99:*24* 119:*13, 17* 131:*6* 145:*14* 146:*8* 157:*8* 159:*5* 171:*11* 182:*23* 217:*3* 218:*24* 237:*22* 243:*2* 257:*15* 262:*15* 301:*13*

**organization** 27:*24* 248:*2, 17* 285:*22* 287:*3*

**organized** 56:*9*

**origin** 259:*1*

**original** 232:*19* 233:*9*

**originally** 203:*17* 242:*5*

**outcome** 103:*18* 104:*7* 211:*19*

**outset** 10:*16* 19:*24*

**outside** 54:*2* 55:*18* 96:*7, 17, 24* 98:*19, 20* 160:*9* 167:*24* 173:*15* 209:*11* 250:*21* 270:*1* 271:*10*

**outweigh** 151:*4*

**ovens** 64:*15*

**overall** 15:*2* 45:*6*

**overcome** 275:*17*

**overheard** 195:*10*

**overlap** 122:*1*

**overrule** 50:*4* 281:*1*

**overruled** 5:*14* 36:*22*

**overseeing** 202:*21* 203:*1, 5*

**overstated** 12:*4*

**overtime** 61:*23* 88:*14*

**overview** 170:*19*

**owed** 271:*20* 299:*4*

**< P >**

**p.m** 56:*18* 77:*17* 78:*22* 89:*12, 12, 12, 16* 90:*4* 165:*22, 22* 209:*22, 22* 301:*24*

**page** 9:*18* 30:*5* 37:*23* 38:*2* 39:*17* 44:*8* 53:*18* 63:*8* 65:*4, 9* 80:*21* 83:*3* 88:*4, 5* 90:*11* 92:*5, 14, 15, 16* 94:*19* 95:*3, 18, 22* 97:*4* 98:*13* 99:*1* 102:*6* 104:*19* 105:*19, 24* 107:*7* 108:*24* 109:*19, 20* 110:*11* 115:*11* 120:*5* 122:*11, 14, 15, 22, 23, 24* 123:*23* 124:*11* 125:*4* 127:*11* 133:*22* 134:*2, 4, 24, 24* 135:*1, 24* 139:*2* 140:*19* 141:*7, 17* 143:*20, 24* 144:*1, 3, 5* 149:*23* 153:*6* 160:*19, 22* 179:*6* 198:*20* 202:*9* 204:*9* 205:*10* 207:*8* 208:*7, 12* 209:*4* 216:*1* 218:*11* 219:*6, 7* 225:*6* 227:*9* 239:*23* 240:*3* 242:*14, 16, 20* 246:*10* 247:*22* 258:*14, 15* 265:*6, 6, 14* 266:*14* 267:*3*

**pages** 91:*19* 92:*3* 133:*20* 207:*3* 233:*13, 16*



2:17-cv-02112-CSB-EIL # 41 Page 175 of 189
Arbitration 10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

**paid** 47:*21*, *22* 54:*15* 63:*10*, *13*, *22* 71:*21*, *21* 72:*8* 95:*15* 108:*9* 112:*12* 170:*17* 175:*8*, *9* 186:*2* 206:*21* 220:*13* 270:*18* 299:*15* 300:*11*

**pain** 74:*14*, *19* 76:*5*, *17* 154:*16* 179:*1* 188:*2*

**pans** 106:*17* 107:*12*, *15* 215:*4*

**pants** 197:*3*

**paper** 35:22 48:*20* 273:*23* 284:*6*

**papers** 34:6 37:5 49:*5* 150:7 275:7

**paperwork** 22:9 28:*15* 57:5 137:*3* 158:*13*, *15* 173:*18*, *21* 231:*20* 232:*4* 253:*20* 275:*20* 295:*14*

**Paragraph** 6:22 63:*20* 81:*3* 88:*21* 89:*1* 136:2 202:*11* 208:*12* 239:*24* 240:*3* 278:*6* 301:*18*

**paramount** 240:*24*

**parentheses** 179:*1*

**parents** 254:*18*

**parole** 247:*19*

**part** 20:*21* 24:*23* 29:6 38:*4* 43:5 45:2, *3* 55:*17* 56:*23* 61:7 64:*21* 66:*15* 92:*4* 100:*13* 109:*3* 118:*10* 122:*12* 129:22 148:*3* 159:*24* 160:*15* 161:*4*, *8* 164:*10* 172:*3*, *12*, *23* 189:*11* 196:22 198:*9* 221:*4* 240:*14* 244:*12* 245:2 249:9 250:*8* 258:*13*, *16*, *17* 264:*16* 270:*17*

**participation** 300:*22*, *23*

**particular** 19:*10* 41:*21* 82:*12* 175:*11* 221:*3* 277:*4* 278:*12* 281:*6* 291:22

**particularly** 114:6

**parties** 6:*4*, *8*, *14* 28:*8* 30:*9*, *14*

**Parts** 29:*16* 264:*14*

**party** 302:*10*

**pass** 156:*12*

**patients** 17:*16*, *17* 60:*21*, *24* 66:*19* 78:*1* 82:*21* 171:22 254:*17*, *22* 265:*4* 269:*24* 276:*18*

**pattern** 21:*7*

**PAVILION** 1:*5* 2:*12* 4:*4*, *13* 14:*15*, *23* 15:*8* 16:*13*, *14*, *21* 17:*2*, *10*, *12*, *14*, *20*, *22*, *24* 18:*4*, *8*, *10*, *15*, *18*, *20* 19:*2*, *3*, *5*, *6*, *8*, *11*, *13* 20:*2*, *11* 21:*15*, *17* 22:*7*, *12*, *20*, *22* 23:*10*, *13*, *16*, *19* 24:*13*, *15*, *22* 25:*4* 26:*1*, *3*, *17* 27:*2*, *14*, *19*, *20*, *20*, *22* 28:*1* 29:*15* 31:*17* 32:6 34:*13* 38:*13* 42:*10*, *11* 52:22 53:*15* 60:*17*, *19* 61:*13*, *17*, *22* 62:*7*, *9*, *12*, *18* 63:*3*, *18* 64:*6*, *10* 65:*23* 66:*14*, *20* 67:*6*, *24* 68:*7*, *11* 70:*7*, *23* 72:*4*, *20* 73:*19* 74:*15*, *23* 77:*10* 78:*6* 79:*7*, *24* 80:*13* 84:*7*, *20* 86:22 92:*17* 102:*12* 108:*19* 113:*5*, *11* 114:*1*, *16*, *19* 115:*5* 116:*20* 118:*4*, *5* 120:*4*, *15*, *19* 121:*10*, *15*, *19* 122:*10*, *12* 126:*19*, *19* 129:*10* 130:*9* 131:*6*, *10*, *14* 132:*9* 146:*9*, *16* 158:*21* 159:*1* 160:*3* 166:*13*, *19*, *21* 167:*13* 168:*12*, *16* 169:*3*, *11*, *20*, *23* 170:*21*, *22* 172:*4*, *8*, *13*, *17* 173:*7* 174:*3*, *4*, *18* 175:*14*, *19* 177:*21* 181:*7* 182:*5* 187:*12*, *15* 189:*24* 192:*17* 193:*16* 207:*16*, *24* 216:*18* 219:*7* 222:*4*, *9* 226:*12* 228:*3*, *15* 229:*15* 231:*3*, *6* 243:*3* 246:*13* 248:*16* 254:*11*, *16*, *19*, *19* 258:*20* 259:*12* 262:*21* 265:*2*, *5*, *7*, *8* 266:*15*, *19*, *21*, *23* 267:*8*, *10* 269:*21* 270:*9*, *20* 272:*1* 273:*18* 274:*6* 276:*9* 277:*4*, *10* 279:*19* 280:*1*, *6* 284:*6*, *9*, *12* 285:*20* 286:*10*, *23* 287:*11* 288:*10* 290:*5* 291:*12* 292:*21* 293:*13*, *17* 294:*11*, *21* 295:*18* 296:*2* 297:*6*, *10*, *13* 298:*9* 299:*3*, *7*

**Pavilion's** 27:*17* 174:*5* 216:*24* 271:*23* 287:*2* 300:*18*

**pay** 38:*4* 45:*8* 63:*24* 69:*2*, *5*, *17* 112:*13* 155:*8*, *16*, *18*, *23* 156:*3* 184:*12* 186:*11*, *12* 207:*11*, *14*, *18* 221:*14* 223:*9* 270:*18* 292:*14*, *15*

**paying** 156:*2*

**186:*14*, *15* 187:*1***

**payroll** 181:*1*, *2*

**pays** 221:*17*

**peace** 150:*4*, *5*

**penalized** 273:22

**people** 4:*21* 22:*19* 41:*9*, *12* 51:*17* 52:*9*, *10* 54:*7* 70:*2* 91:22 158:*24* 164:*14* 193:*2* 194:*21* 282:*6* 300:*23*

**percent** 170:*1* 291:*5*

**perfect** 47:9 295:*6*, *7*

**perform** 96:6, *13*, *24* 98:*18* 102:*13* 209:*11*

**performance** 19:*20*, *21*

**period** 48:*18* 63:*24* 74:*13*

**permanently** 119:*24*

**permission** 123:*3* 225:*12*

**permit** 285:*4*

**person** 18:7 24:*23* 42:*3* 51:*24* 85:*19*, *23* 173:*16* 190:*10* 192:*18*, *21* 202:*20* 218:*8* 253:*2* 254:*18* 258:*22* 271:*17* 281:*19*, *21* 283:*23* 288:*11* 291:*4* 302:*9*

**personal** 79:*3*

**personally** 142:*18* 143:*11* 144:*19* 240:*17*

**petty** 124:*16* 222:*7* 251:*11*, *16*, *17*, *23* 252:*2*

**phone** 85:*20* 116:*23* 159:*1* 173:*18* 230:*7*

**photocopy** 109:*1*, *23*

**phrasing** 96:22

**physical** 64:*12*, *14* 65:*10*, *24* 76:*18* 77:*2* 79:*9*

**pick** 41:*21* 186:*15*



**picking**  99:*20*
100:*17*  210:*4, 9*
**picture**  53:*1, 2, 5, 8,
9, 12*  202:*12*  292:*9*
**pictures**  93:*3, 7, 11,
18*  94:2, *6*  103:2, *8*
104:2  206:5
**place**  78:7  277:*13*
282:*17*
**placed**  76:*18*
**plain**  16:*4*
**Plaintiff**  1:*3*  2:*1*
134:*3, 4*  135:*15*
**PLAINTIFF'S**  3:*4*
**plan**  28:2*0*  179:7
**plans**  240:*23*
**plant**  202:22
**Please**  56:*10*  59:*16*
61:*4*  63:*15*  67:*1*
68:*23*  70:*16*  73:*6*
79:*11*  80:*12*  83:*5*
84:22  95:5  97:*4,
14*  99:*10*  104:*24*
116:*12*  125:*14*
128:*9*  129:*1, 13*
130:*6*  132:*11*
137:*11*  141:*17, 22*
145:*1*  160:*23*
166:*4, 11, 22*  168:2*0*
169:*18*  171:*4*
173:*12*  179:*5, 23*
180:*17*  181:*11*
184:*4*  186:*7*
187:*23*  188:*10*
189:*5, 22*  191:*4, 12*
195:*5*  197:*12*
198:*5*  206:*14*
209:*23*  218:22
220:22  223:*21*
225:6  226:*2, 21, 22*
230:*16*  233:*5*
239:*9*  240:*5, 10*
243:*7*  246:*1, 2*
252:*3*  253:*15*
258:*10*  260:2*1*
261:*16*  295:*14*
**pleases**  28:*14*
**plug**  222:*15*
**point**  9:*1*  11:*11*
12:*18*  16:*4*  21:*19*
38:2*1*  41:2*1*  42:5

43:9  44:*4*  48:*18*
49:*9, 13*  53:22
58:*8, 16, 21, 23*
113:*4*  123:9
132:*19*  154:7
158:*17*  164:2*0*
168:7  178:2*4*
179:*10*  182:*17*
191:*19*  202:*1, 22*
206:2  223:*8*
232:*18*  243:9, *22*
256:*9*  267:2*0*
278:2*1*  279:*1, 5*
280:8  283:*15*
285:24  286:*1*
287:*13*  290:22
299:*12*  300:*9, 16*
**pointing**  286:*5*
**pointless**  283:*18*
**points**  7:*6, 9, 14, 20*
289:*1*
**Police**  127:*18*
134:*14*  150:*3, 6*
236:22  245:*18, 22*
278:*6*
**policies**  27:*16, 20*
41:2  174:*5*  198:*18*
216:24  293:*14*
294:*8, 9*
**policy**  78:*5, 13*
173:*12*  194:*19*
216:*18*  219:*12*
246:*4, 6, 7*  247:*1*
252:*24*  258:2*0*
284:8, *22, 23*  285:*17,
18, 24*  286:*17, 18, 19*
287:*1*
**Polly**  218:*17*
**population**  169:*19*
171:*13*  248:*11, 12*
**portion**  41:22
145:*17*  228:*11*
**pose**  240:2*0*
**position**  4:9  23:*23*
78:8, *10*  129:7
146:*8*  203:*11*
216:2*0*  240:*7, 12*
243:2  247:*13*
249:*18*  250:2*0*
267:*18*  287:*15*

**possess**  34:*14*
**possessed**  124:*18*
**possession**  230:22
**possibility**  57:*8*
**possible**  13:*17*
163:*23*  209:*19*
259:22  263:*5*  300:*5*
**post**  6:*12*
**posted**  35:7, *8*
39:*23*  53:*1, 13*
93:*4, 7, 17*  103:2, *8*
202:*12*  203:22
206:*5*  273:*4, 5*
**posting**  93:*11*  292:*9*
**postmarked**  227:2*1*
**postures**  189:*13*
**potential**  18:*12*
169:*13*
**potentially**  133:*8*
169:*14*  182:*19*
185:*4*  192:*3*
**pots**  272:*24*
**pounds**  64:*16*  65:*6,
17*  160:*6, 6*  189:*9*
**practically**  282:*19*
**practice**  29:*5*
**practices**  41:2
**preaches**  196:*19*
**preaching**  196:22
**preamble**  275:*3*
**pre-employment**
40:*13*
**preferably**  30:*4*
**preference**  30:*16*
**preferred**  100:9
**pregnancy**  259:*1*
**prehearing**  6:*5*
**prejudge**  12:*23*
**prejudice**  12:*11, 16,
20, 22*  50:*3*
**prejudicial**  58:*3*
**preliminary**  10:*14*
**premiums**  72:22
**prepare**  6:22  100:7
**prepared**  86:*19*
95:*9*  99:*12*  102:2*1*
105:*7, 20*  108:2
120:*2*  125:22
128:22  163:*6, 7*
178:*19*  211:*8*

218:*3*  219:22
288:22  290:7
**preparing**  19:*16*
171:2*0*
**prepping**  106:7
**Present**  2:*10*  4:7, *7*
9:*2*  28:*9*  153:*1*
159:*4*  165:*2*
**presented**  45:*1*
47:*15*  262:*12*
283:2*1*
**presents**  19:2  56:22
**presume**  173:7
**presumption**  281:*10*
**pretty**  7:*10*  16:*3*
17:*13*  152:6  154:*6,
8*  263:*8*  281:*11*
**prevent**  181:*8*
**prevented**  275:22
**previous**  96:*4*  209:*6*
**previously**  11:*23*
22:24
**principal**  105:*10*
206:*17*  213:*3*
**print**  120:*13*  123:*18*
**printed**  129:2
**prints**  265:*18*
**prior**  9:*24*  16:*14*
61:*15*  97:*23*  143:*9*
148:*19*  211:*1*
218:*19*
**prison**  53:*4*  59:2*1*
141:*15*  142:*7, 8, 11,
12*  148:*16*  270:*15*
**private**  212:*5, 6*
**privy**  194:*17*
**Pro**  2:*4*  4:*5*  57:2*0*
**probably**  14:2  58:*6,
14*  117:*8*  238:*13*
264:*5*
**probation**  246:2*0*
247:*19*
**problem**  22:*1, 1*
23:22  98:7  100:2
123:*14*
**problems**  47:*4*  52:*8,
18, 19*  187:*12*
254:2*1*
**procedure**  6:*24*
58:*11*  171:*16*



2:17-cv-02112-CSB-EIL  # 41  Page 177 of 189
Arbitration  10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

173:*12*  264:*12*
**procedures**  18:*23*
**proceed**  9:2, 7  31:*9*
166:*7*  209:*23*
**proceeded**  10:*23*
11:*16*  25:*10*  203:*11*
**proceeding**  4:*22*
31:*14*
**PROCEEDINGS**
1:*12*  6:*19*
**process**  32:*16*  34:*9*
36:*9*  47:*13*, *19*
58:*2*  192:*24*  226:*3*
231:*10*, *21*  245:*2*
259:*11*  271:*21*
283:*13*
**processes**  159:*15*
**produce**  12:*1*
163:*14*
**produced**  11:2*1*, *23*
12:*9*
**production**  10:*17*,
*18*  11:*13*, *18*
**profession**  301:7
**professional**  62:*15*
152:*22*  301:*1*
**Professionals**  38:*23*
**proficiently**  269:*23*
**program**  167:*22*
168:*4*, *22*  169:*7*
171:*10*  219:*12*
246:*19*
**programs**  168:*24*
**progressed**  76:*19*
**prohibit**  40:*18*, *20*
**prohibited**  124:*18*
**prohibits**  41:*1*
**proof**  26:*15*  286:*14*
**proper**  9:*6*  152:*3*
**properly**  29:*13*
159:*6*  275:*4*  278:*10*
**property**  124:*19*
**propositions**  281:*2*
**pros**  246:*17*
**prosecuting**  281:*16*
**prosecution**  246:*22*
**prosequi**  246:*18*
**protect**  118:*7*
**protected**  42:*1*
259:*2*
**protecting**  60:*21*

**protection**  276:*17*
297:*18*, *22*
**protections**  277:*13*
**protocol**  189:*14*
**prove**  48:*11*  287:*13*
**provide**  7:*13*, *20*
10:*18*  17:*21*  28:*20*
29:*3*, *14*  132:*24*
133:*15*  137:*3*, *14*, *18*
156:*24*  168:*6*
169:*1*  205:*21*
232:*3*  245:*18*, *22*
258:*21*  278:*7*
**provided**  11:*2*, *11*
29:*6*  71:*9*  126:*19*
133:*4*, *11*  137:*2*
146:*7*  170:*10*
243:*1*  274:*6*  296:*1*
**provider**  245:*4*
**provides**  17:*15*, *20*
282:*19*
**providing**  30:*13*
72:*24*  214:*3*  266:*16*
**proving**  287:*9*
**PTO**  63:*22*  177:*13*
184:*12*  186:*13*
220:*11*
**public**  124:*18*
302:*2*, *16*, *19*
**pull**  64:*15*  65:*16*
176:*23*  178:*9*  189:*9*
**pulling**  181:*23*
**pure**  57:*21*
**purpose**  97:*17*
130:*24*  171:*14*
184:*5*  224:*23*
262:*3*  301:*10*
**purposes**  4:*16*
32:*23*  37:*9*  158:*3*
282:*15*
**pursuant**  18:*22*
216:*24*
**pursue**  23:*16*  146:*8*
238:*5*  243:*2*  295:*16*
**push**  64:*15*  65:*16*
189:*9*
**pushing**  181:*23*
**put**  5:*4*  14:*4*  31:*18*
38:*24*  42:*7*  86:*5*
87:*13*, *19*, *20*  92:*12*
109:*8*  142:*22*

147:*18*  154:*14*
193:*5*  256:*1*  259:*6*,
*20*  279:*24*  282:*8*
283:*12*  284:*21*
299:*16*
**puts**  181:*1*
**putting**  54:*5*
106:*14*, *18*  195:*23*
208:*21*  214:*21*
215:*6*  301:*2*
**PUTVIN**  1:*7*  15:*7*
87:*2*  91:*16*  95:*12*
96:*2*  201:*6*  206:*19*
209:*5*  251:*1*  273:*2*
**P-U-T-V-I-N**  87:*3*

**< Q >**
**qualify**  149:*2*
297:*21*
**question**  4:*24*, *24*
5:*4*  7:*17*  10:*7*
27:*22*  45:*15*  46:*16*
48:*14*  56:*21*  92:*2*,
*12*  97:*5*  98:*17*, *20*
99:*8*  112:*11*
113:*17*  115:*4*, *8*
119:*9*  120:*18*, *24*
131:*3*  137:*8*, *13*
142:*3*  144:*9*, *14*, *18*,
*20*  147:*3*  153:*7*
161:*3*, *4*, *7*, *21*
163:*18*  240:*6*
241:*8*  252:*17*, *21*
255:*10*  263:*4*
277:*23*  280:*1*
282:*2*, *10*  289:*18*
**questioning**  248:*1*
285:*20*
**questions**  7:*8*  59:*5*,
*8*  97:*18*  117:*3*
144:*11*  159:*18*
203:*3*  225:*8*
**quick**  13:*18*  154:*20*
**quicker**  41:*13*
**quite**  4:*14*
**quotes**  196:*19*

**< R >**
**race**  258:*24*

**raise**  7:*19*  8:*6*
31:*5*  166:*4*  292:*14*,
*16*
**raised**  20:*23*  21:*2*,
*12*, *14*, *20*  50:*8*  88:*9*
89:*20*  90:*21*  105:*8*
108:*5*  112:*11*
176:*9*  204:*20*
211:*12*  219:*20*
280:*2*  288:*14*, *21*
289:*13*  290:*22*
292:*7*, *17*  293:*9*
**raises**  291:*24*
**raising**  205:*7*
206:*10*  211:*3*
**ran**  126:*17*  184:*12*,
*13*  194:*2*
**ranges**  168:*10*
**rate**  63:*10*, *22*
**ratings**  15:*2*
**RAY**  1:*6*  24:*21*
90:*8*  96:*5*  154:*7*
164:*8*  202:*23*
207:*10*, *15*, *23*, *24*
209:*7*  251:*2*
**reach**  51:*10*, *21*
255:*21*
**reached**  155:*10*
194:*12*  288:*23*
289:*13*  290:*16*
**reaching**  260:*17*
**reaction**  30:*18*
**read**  29:*7*  40:*8*
41:*13*, *23*  43:*4*
66:*8*, *11*  84:*1*
94:*17*, *22*  96:*9*, *11*
98:*22*  106:*8*, *20*, *22*
107:*20*  111:*4*, *5*
115:*18*  129:*20*
142:*9*, *10*  144:*22*
153:*15*  161:*14*
162:*4*, *9*  163:*23*
208:*16*  214:*1*
216:*21*  219:*12*
240:*5*, *11*  249:*7*, *17*
256:*7*  258:*10*, *16*
261:*10*, *14*, *15*, *21*
264:*5*, *17*  266:*9*
267:*16*  275:*19*
299:*5*



2:17-cv-02112-CSB-EIL # 41 Page 178 of 189
10/29/2019
Arbitration
Bruce Melton vs. Pavilion Behavioral Health System, et al.

**reading** 41:*13, 16, 19* 91:*3* 99:*5* 105:*3* 191:*12* 249:*6* 264:22
**Ready** 51:*4* 59:15, *17* 69:2, *3, 21* 165:*19*
**real** 13:*18* 114:*12* 154:20 222:22
**realize** 57:*19* 236:15
**really** 16:*11* 21:*18* 22:*1* 23:2 24:*23* 30:22 41:9 45:7 74:*21* 92:4 100:8 147:*3* 184:*1* 210:*13, 15* 222:3 254:9 258:*4* 270:*16* 281:*17, 21* 290:*18* 292:*5* 293:*3* 296:22 297:2, *17*
**reason** 11:22 19:*23* 98:*9* 112:22 142:6 150:*12, 13* 155:*10* 174:*11* 265:*11* 266:*3* 275:5 277:*7, 8* 285:8 286:*11* 293:22 294:*6, 24*
**reasonable** 60:*20* 78:6 247:*24* 277:12 285:*19, 21*
**reasonably** 12:*9* 118:*7*
**reasons** 25:7 34:*16* 151:*14* 173:*9* 287:*16*
**rebut** 57:*1, 10* 269:*12*
**rebuttal** 57:*11, 21, 21, 22* 58:*17* 146:20 268:6, *17* 269:*9, 10* 298:*14*
**recall** 61:5 170:*21* 175:*12* 187:*11* 192:*9, 11* 221:*19* 230:*12* 260:*17*
**receipt** 227:*10* 260:*15*
**receive** 25:*11, 13* 40:*4* 48:*17* 52:*13*

158:*10* 188:*13* 189:*23* 193:*16* 221:*1* 245:*13* 254:*20*
**received** 6:*20* 8:*24* 15:*3* 20:*13* 23:*24* 24:*13* 28:*17* 33:*24* 34:*8* 51:7 54:*12, 21, 22* 66:*8, 12* 68:*11* 70:*24* 71:*15* 72:*3* 103:*21* 108:*8, 17* 110:*13* 111:*1, 2, 12, 15* 131:*4* 132:*6, 10* 133:*23* 137:*17, 21* 145:*18* 174:*1* 177:*13, 17* 191:*21, 24* 226:*24* 227:*3* 229:*17, 21* 230:*3* 232:*12* 241:*15* 255:*16* 262:*13* 272:*13, 16* 292:*14, 16* 297:*7* 299:*18* 301:*16*
**receiving** 8:*21, 22* 24:*8* 34:*9* 69:*1, 4, 17* 186:*18* 301:*10*
**Recess** 56:*18* 116:*10* 165:22 209:*21, 22*
**recognized** 25:*2*
**recollection** 117:*6* 254:*4*
**recommendation** 131:*7* 232:*18*
**reconciled** 241:*5*
**record** 4:*16, 17* 15:*23* 16:*5* 35:*7* 38:*16* 39:*22* 41:*15* 47:*1, 21* 49:*4, 22* 56:*17, 20* 76:22 84:*4* 92:*16* 99:*24* 103:*5, 12* 128:*7* 144:*10, 17* 147:*14* 149:*13* 164:*13* 165:*14, 15* 170:*15* 171:*4* 179:*23* 180:*17* 185:*14* 191:*5* 195:*5* 222:*23* 223:*21* 230:*16* 237:*9* 243:*8* 244:6 254:*1*

258:*19* 264:6 267:*3* 282:*15* 287:*24* 288:*8, 18* 302:*8*
**records** 145:*15*
**recourse** 281:*21*
**recovered** 73:*18*
**recovering** 177:*21*
**RECROSS-EXAMIN ATION** 3:*6* 159:*21*
**red** 9:*15* 76:22
**REDIRECT** 3:*6* 263:*18*
**redo** 265:*15, 16*
**redone** 227:*2*
**reduced** 302:*7*
**REESE** 1:*7*
**refer** 59:*7* 195:*1*
**reference** 301:*4*
**references** 279:*7*
**reference's** 172:*1*
**referred** 58:*15* 252:22
**referring** 30:*2* 39:*19* 44:*18* 46:*9* 50:*23* 119:*6* 148:*5* 151:*10* 256:*4*
**refers** 148:*15* 245:*11*
**re-fingerprinted** 108:*19* 145:*14*
**reflect** 16:*5* 88:*8* 197:*20* 205:*14* 237:*9* 265:*20*
**reflected** 211:*13*
**reflects** 79:*23* 83:*23* 134:*5* 210:*3* 288:*18*
**refuse** 19:*3* 246:*13* 249:*8* 266:*2*
**refused** 107:*16* 169:*12* 229:*5*
**refusing** 155:*23*
**regard** 87:*14* 209:*8*
**regarding** 25:*6* 54:*23, 24* 72:*17, 22* 87:*15* 90:*5* 108:*17* 111:*3, 4, 15* 130:*13* 191:*15* 197:*21* 201:*20* 202:*5*

203:*9* 207:*18* 245:*13*
**regardless** 155:*9* 268:*11* 299:22 300:*2*
**regards** 96:*5* 239:*13*
**register** 290:*19*
**registry** 127:*12*
**regular** 107:*19*
**rehash** 298:*7*
**Reis** 8:*13* 24:*21, 21, 23* 25:*2, 4* 38:*12, 14, 17, 21* 96:*5* 151:*20* 154:*7* 160:*13* 161:*5* 164:*9* 202:*23* 207:*10, 16, 18, 23, 24* 209:*7* 251:*2* 271:*1*
**R-E-I-S** 96:*5*
**relate** 11:*5* 20:*9* 240:*9* 293:*9, 11*
**related** 86:*21* 104:*8* 202:*6* 211:*20* 247:*12* 249:*18*
**relates** 70:*10* 76:*4* 108:*11* 118:*19* 213:*1* 219:*16*
**relating** 11:*10* 18:*11* 20:*18* 25:*5, 8* 62:*19* 74:*19* 75:*18* 116:*19* 162:*24* 194:*24* 220:*19* 222:*2*
**relation** 70:*21*
**relationship** 61:*14*
**relative** 302:*9*
**released** 75:*2, 22* 76:*8* 155:*17* 188:*5, 18, 21* 189:*2, 6, 8* 299:*8, 13*
**relevance** 267:*15*
**relevant** 10:*19* 25:*21* 222:*3, 8* 273:*13, 14* 286:*8, 9*
**reliable** 42:*4*
**reliance** 285:*2*
**relied** 224:*6*
**relief** 13:*21*
**religion** 258:*24*
**rely** 17:*19* 168:*11*



2:17-cv-02112-CSB-EIL # 41    10/29/2019    Page 179 of 189
Arbitration
Bruce Melton vs. Pavilion Behavioral Health System, et al.

**remain** 6:*17*
**remark** 49:*6*
**remember** 53:*7*
144:*15* 151:*21*
163:*18*, *24* 201:*10*
260:*14* 299:*10*
**reminder** 214:*3*
**reminding** 31:*9*
**renew** 292:*18*
**renewed** 292:22
**reopen** 57:*23* 58:*4*,
*5*
**rep** 226:*6*
**repeat** 85:*23*
287:*22*, *23*
**rephrase** 96:*15*
**report** 18:*23* 21:*9*,
*9* 62:*13* 76:*13*
81:*23* 82:*5*, *11*, *17*
83:*1*, *4*, *15*, *18* 84:*10*,
*13* 85:*3*, *6* 86:*18*
89:*23* 91:*2*, *6* 92:*8*
94:*3* 95:*8* 99:*11*
102:*21* 103:*16*
104:*18* 105:*6*
106:*24* 108:*2*, *15*
110:*23*, *23* 111:*10*
112:*7*, *19* 120:*2*, *6*, *8*,
*14*, *19* 121:*18*, *20*, *23*
122:*2*, *5*, *6* 124:*3*
126:*8* 132:*1*, *3*
133:*1*, *5*, *8* 134:*7*, *9*
142:*16*, *18* 178:*18*
179:*24* 188:*12*
193:*9*, *17*, *19* 198:*6*
200:*10*, *11*, *13*, *16*, *19*,
*21* 201:*4*, *16* 203:*14*
204:*21* 206:*15*
207:*3*, *6* 210:*22*
211:*8*, *9* 213:*21*
214:*16* 215:*12*
217:*22* 218:*3*, *4*
219:*22* 221:*23*
266:*16* 268:*10*
288:*22* 290:*7*, *7*
291:*1*, *12*, *14*
**reported** 82:*6* 91:*6*,
*24* 92:*8*, *9* 94:*7*
102:*16*, *23* 158:*23*
246:*16* 254:*23*, *24*
255:*3*, *6*, *7*

**reporter** 6:*17* 41:*8*,
*23* 49:*3* 56:*12*
301:*11*
**reporting** 95:*12*
203:*2* 206:*18*
**reports** 93:*16*
122:*8* 200:*7*
212:*22* 290:*8*
**represent** 245:*11*
**represented** 4:*6*
**representing** 4:*5*, *20*
6:*4*
**reprint** 227:*14*
**request** 10:*17* 19:*6*,
*8* 37:*9* 54:*13*, *20*
80:*1* 108:*18*, *18*
115:*2* 120:*19*
131:*3*, *15* 132:*4*
133:*8* 145:*24*
146:*3* 186:*2*
207:*12* 215:*21*
217:*23* 226:*14*
229:*5*, *18* 230:*8*
243:*15* 262:*15*, *17*
266:*21*, *24* 267:*10*
**requested** 12:*9*
20:*11* 41:*22* 174:*9*
**requesting** 224:*14*
225:*23* 227:*1*
**requests** 10:*17*
11:*13* 110:*21*
**require** 65:*23*
244:*24* 265:*8*, *10*
277:*24*
**required** 6:*22* 20:*4*
26:*23* 27:*20* 63:*16*
145:*13* 169:*13*
171:*5* 183:*13*
239:*19*, *19* 247:*2*
265:*17* 279:*20*
**requirement** 164:*15*,
*15*
**requirements** 18:*4*, *6*
**requires** 62:*13*
**requiring** 228:*9*, *10*
**research** 278:*20*
**researched** 278:*13*
281:*5*
**reserve** 269:*8*, *10*
**residential** 16:*19*
138:*6* 139:*9*

140:*19* 141:*9*, *12*
167:*17*, *22* 168:*4*
169:*7* 171:*9*
221:*16* 236:*8*
240:*14* 241:*6*
**residents** 17:*17*
18:*16* 66:*19*
167:*11*, *12* 168:*11*,
*13* 240:*16*, *17*, *19*, *22*
241:*1*, *6* 265:*4*, *7*
276:*18* 277:*9* 280:*6*
**resisted** 148:*20*
**resisting** 138:*6*
148:*18* 149:*1*, *17*, *18*,
*21* 150:*4*, *5*
**resolved** 115:*21*
220:*6*
**resources** 4:*11*
82:*6* 166:*24* 207:*20*
**respect** 196:*5*
270:*11*
**respected** 297:*8*
**respectfully** 15:*15*
50:*4*
**respectively** 89:*13*
**respects** 214:*4*
**respond** 5:*10* 7:*18*
58:*18*
**responded** 155:*21*
204:*4*
**respondent** 4:*6* 5:*5*
43:*20* 256:*17*
**response** 31:*14*
54:*16*
**responsibilities**
64:*10*, *22* 66:*15*
156:*16* 167:*3*
171:*18* 172:*7*
202:*6* 208:*9* 240:*7*,
*10*, *15*
**responsibility** 21:*11*
**responsible** 19:*14*
27:*23* 28:*2* 42:*4*
66:*22* 171:*20*
248:*1*, *16* 265:*1*
285:*21* 287:*3*
**responsive** 11:*13*
**rest** 57:*14* 100:*23*
106:*16* 146:*20*
165:*10* 215:*3*

261:*15*, *16* 268:*3*, *17*
300:*13*, *20*
**restart** 234:*24*
**restate** 214:*9*
234:*19*
**restraint** 139:*12*
**restricted** 77:*14*
215:*19* 219:*11*
**restriction** 181:*20*
213:*5*, *14*
**restrictions** 71:*7*
74:*5* 75:*3*, *23* 76:*8*
77:*6* 78:*2*, *11*, *21*
105:*12*, *13* 106:*20*
107:*4* 112:*8*, *14*
174:*16*, *19*, *22*, *24*
175:*1*, *3*, *18* 176:*20*
188:*17*, *19* 189:*8*, *17*
190:*1*, *4*, *6* 213:*4*, *24*
214:*5*, *10* 215:*1*, *8*
216:*7*, *14*, *21* 217:*4*,
*7* 218:*23* 219:*9*
272:*21*, *22* 297:*7*, *11*
**rests** 57:*11*
**result** 18:*16* 23:*11*
104:*22* 183:*24*
208:*24* 225:*2*
228:*21* 246:*15*
247:*3* 278:*9*, *17*
280:*13*
**resulted** 94:*2*
110:*15* 129:*18*
130:*12* 141:*4*
191:*7*, *14* 230:*19*
247:*6*
**resulting** 90:*14*
204:*15*
**results** 92:*20* 95:*23*
96:*1* 107:*8* 115:*13*
131:*19* 193:*6*
204:*8* 209:*3*, *4*
220:*1* 221:*1*
222:*17* 223:*24*
224:*13* 229:*22*
230:*18* 293:*6*
**retaining** 26:*5*
**retaliated** 14:*15*
15:*6* 159:*14* 272:*8*
288:*4*
**retaliation** 17:*5*



2:17-cv-02112-CSB-EIL  # 41  Page 180 of 189
Arbitration   10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

27:4  296:23
**retention**  280:23
**retired**  207:16
246:21
**retrospect**  272:7
**return**  55:3  73:9,
24  75:14, 22  76:8
77:5  78:18  108:7
109:4  154:18
162:21  174:6, 23, 23
181:19  182:2
260:15  273:6
**returned**  67:24
73:19  94:8  155:20
177:20  181:3
185:15
**returning**  260:18
**revealing**  8:10
**review**  15:3  193:7,
10  200:22  226:8
264:8
**reviewed**  38:5  39:5
231:9  247:8, 11
**reviewing**  146:6
242:16, 24
**revocations**  62:14
**revoked**  124:24
125:8, 12  140:22, 24
150:2
**revolves**  276:6
**rid**  23:4  24:3, 5
46:8  295:4, 8
**right**  5:22  8:1
10:9  14:8  17:13
28:7  29:14  31:5, 8
33:17  34:14  35:18
43:18  48:1  50:2
51:19  54:9  55:12
56:19  57:13, 15
60:14  61:3, 15
62:7  63:3, 11  64:1,
6, 10, 16  65:11, 14,
17  66:5, 16  67:3, 4,
10, 14, 17, 21  69:6,
14  71:2, 13, 22
72:10, 17, 22  73:3, 9,
15  74:7, 15, 19, 23
75:8, 15, 19  76:23
77:11  78:11, 12, 22
79:8, 9, 18  80:3, 19
81:11, 13, 14  82:14

83:7, 13  84:5, 8, 14
85:8, 16  86:1, 5, 12
87:16  88:1, 10, 16,
19  89:3, 8, 13, 17, 22
91:11, 22  92:3
93:5, 18  96:15, 19,
22  97:3  100:1, 11,
19  101:11, 23
102:13  103:14
104:4, 9  105:17
108:13  109:5, 8, 24
110:5  111:17
112:9, 17  113:5
116:5, 23  117:3
118:3, 3, 12, 18, 20,
23  119:20  120:7
121:10  122:8
123:1, 20, 24, 24
124:2, 6, 9, 13, 16, 19,
22  125:1, 5, 12, 24
126:5, 9  127:5, 13,
16, 22  128:11, 15
129:2, 14  130:15, 21
131:16, 21  132:4, 21
133:2, 13  134:7, 11
135:2  136:16
139:21  140:23
141:9  143:15
145:7, 10  146:13, 22
147:8  150:15, 15, 16,
19  151:5, 5  153:8, 8
154:24  158:1, 2
162:11, 13, 18, 21
163:1, 12  165:13, 16,
23  166:3, 4, 16
169:18  172:4
173:4, 5  177:3, 7
178:5, 5  179:6
180:12, 15  181:11,
14, 17, 17, 20  183:6
184:20  187:15
192:3, 13  194:13
196:2  198:4, 21
199:12, 17  201:6, 14,
17, 22  203:18, 23
204:4, 18, 22  205:17
209:8  210:5
211:21  212:20
213:6  214:24
215:8, 21  216:4
217:1, 17, 19  218:10,

19  219:2, 17  220:7
226:11, 12  229:18
233:9, 12, 12, 16
234:8  236:2
237:20  244:15
247:4, 20  248:23
249:14  252:23
255:15  261:15
264:10  266:10, 13
268:18, 20  269:16
270:9, 15  276:4
277:19  281:16
285:16  287:5
289:4, 8  291:3
298:22  299:14
**rights**  16:22  40:23
158:21  216:23
217:1  219:8
266:24  267:8
280:1  293:13, 17
**risk**  74:6  179:17,
18, 20  241:1  257:15
**risked**  183:17
**risking**  297:12
**role**  18:14  175:16
176:2, 5  192:16
225:20  241:6
267:19  283:2
**roles**  18:8
**room**  106:17
107:13  188:15
215:5
**rotate**  63:16
**rotating**  61:24
**roughly**  42:15
**Royster**  1:13  302:5
**rule**  5:13  12:19
98:6  246:12  249:7
259:18
**rules**  58:10
**rumors**  103:1, 14
104:3  211:10
**run**  120:15, 17
169:6  227:6
**running**  227:15
282:19
**runs**  291:23
**rushing**  156:10

**< S >**

**sack**  106:5  107:18
**SACWIS**  127:15
**safe**  42:4
**safety**  240:23
**sake**  172:1
**salads**  106:14
214:21
**salary**  96:6  209:8
**sanctions**  62:13
**sanitation**  99:21
100:1, 18  101:10, 15,
17  102:3, 13  210:10
**sat**  149:8
**satisfactory**  19:19
**satisfied**  104:15
212:19
**saved**  301:3
**saw**  8:22  53:7
55:13, 14, 16  157:23
158:19  249:23
268:10  290:15, 16
291:13, 16  293:19
**saying**  9:14  13:18
21:22  23:10  47:9
53:22  55:22  64:24
89:7  91:3, 6
100:16, 16  111:19
113:10, 11, 14  114:4,
8  136:2  151:13
159:9  160:12
161:4  166:17
174:17  182:22
186:24  192:5
195:22  198:2
210:6  217:21
222:17, 19  223:18
271:16  273:13, 15
274:6  283:15
295:5  296:3
**says**  7:12  9:5, 12
17:4  18:7, 10  28:3
38:5  43:22  62:11
63:5, 9, 15  64:12, 18
65:16  67:17  69:9,
23  71:15  72:19
76:21, 22  77:4, 23
78:6, 13, 16, 17  82:5
83:1, 3, 6, 9, 11, 23,
24  84:10, 13  87:1, 8,
12, 12  89:2  90:11,
18  91:9, 9, 13, 14



2:17-cv-02112-CSB-EIL # 41    Page 181 of 189
Arbitration    10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

92:20, *21*  93:1, *20*
94:*1*, *4*, *9*, *20*  95:22
96:*13*  99:*6*, *15*, *18*,
*21*  100:*19*  101:5, *9*
102:2, *23*  103:*3*
104:4, *6*, *18*  105:*10*
106:*4*, *9*  107:*1*, *11*,
*15*  108:*6*, *15*, *16*, *22*
110:5, *11*, *12*, *19*, *23*
111:*17*, *18*, 22
115:*13*  120:6, *24*
122:*18*  124:*8*, *8*, *16*,
*18*, *24*  125:7, *15*, *19*
127:7, *11*, *15*, *18*, *21*
128:*13*  129:*1*, *17*
130:*11*, *17*  132:*14*
133:*23*  135:2
136:*19*  138:*23*
141:*11*  144:*8*
145:*12*  149:*9*, *12*
151:*21*  153:*8*
178:*24*  179:7, *10*
181:*12*, *19*  182:*14*
188:*4*, *21*  189:2
191:*18*  199:2
202:9  203:*20*
206:*3*  207:*8*, *9*
208:*18*, *18*  210:*8*
211:*17*  212:*18*
213:2, *21*  214:*16*
218:*12*, *16*  219:7
220:6  223:5  225:6
227:*13*  234:*3*, *8*
235:*21*  236:*1*, *8*, *11*,
*15*, *21*  239:5, *9*, *9*
240:6  242:*16*
244:*21*, *24*  245:*10*,
*12*, *16*, *17*, *22*  246:*12*,
*12*  247:*1*, *5*, *11*, *18*,
*22*  256:*11*, *11*
261:*16*  262:*1*
277:6, *16*  279:*19*
280:*4*  282:5  283:*3*,
*3*, *6*  284:*16*
**scenario**  175:5
**schedule**  61:*24*
62:7  77:*23*  79:*3*, *8*
215:*17*  216:*13*
217:*15*, *19*  219:*9*
293:*16*, *18*, *21*

**scheduled**  78:*19*
162:*20*  210:7
**scope**  160:*3*  213:*18*
**screen**  41:2
**screening**  246:5
**Se**  2:*4*  4:5  57:*20*
**seal**  302:*11*, *18*
**sealed**  47:2, *21*
48:*23*
**search**  22:*11*, *13*
110:*14*  121:*8*
126:*13*  129:*17*
130:*11*  169:*12*
191:6, *13*  266:*20*
267:5  276:*11*
**second**  22:*16*, *17*, *21*
32:*19*  35:*3*, *6*, *22*
36:*11*  37:*1*, *7*, *10*, *10*
39:*17*  42:*13*, *23*, *24*
43:*8*  48:*4*  50:6, *16*,
*22*  63:*8*  65:*3*
79:*13*  80:*21*  83:*3*
88:*4*  89:*1*  92:*15*,
*16*  94:*19*  95:*3*, *18*
104:*19*  105:*19*, *24*
108:*12*, *24*  118:*15*
120:5  122:*20*, *22*
135:*1*, *22*  159:*19*
165:*4*  185:*22*
190:*16*, *20*  202:9, *10*,
*11*  208:7, *12*  218:*11*
223:9  225:6  227:9
253:*15*  260:*21*
262:*19*  263:7
265:*12*  266:*4*  283:*1*
**section**  64:*18*
105:*17*  199:6
205:*20*  227:*15*
279:*14*
**security**  271:*3*
276:*15*
**Sedgwick**  69:*23*
70:*1*, *9*  71:*11*, *16*, *18*
72:*13*  173:*19*, *20*, *20*,
*23*, *24*  174:*4*  178:*10*
180:*4*, *6*, *23*  181:*4*
**see**  12:*8*, *10*  17:*8*
21:6  23:*16*  29:*19*,
*20*  32:*15*  33:*4*
35:*11*  36:*16*  38:2
39:*12*  40:9  44:22

45:5  47:*24*  50:*3*
55:22  62:*16*  67:*3*
69:*8*, *11*, *23*  70:*14*
78:*13*  83:9, *10*
86:*15*  87:*8*  88:*23*
89:*16*  91:*1*, *3*, *20*
92:*17*, *22*  93:*19*
95:*18*, *22*  99:*14*, *16*
106:2  107:9
108:*20*, *24*  109:*10*
110:2, *16*  115:*12*
120:*11*, *13*, *24*  121:*3*,
*3*  122:*17*, *19*  127:*1*
132:*12*, *16*  133:22
134:*14*  135:*15*
141:*11*  149:22
151:*3*  155:*3*  157:*1*
165:*8*  179:*3*, *7*, *8*, *13*,
*20*  180:2  182:*12*
188:*4*, *7*, *22*  189:*14*
201:*1*  206:*21*
207:*11*, *15*  215:*24*
218:*14*  225:6
227:*13*, *20*  232:*15*
234:2  236:*16*
239:9, *23*  244:*20*, *21*
245:*20*  246:*10*, *23*
248:*3*  249:*10*
251:*10*  259:*21*
275:*20*  279:6  300:*5*
**seeing**  43:*1*  123:*17*
249:*24*
**seek**  278:*12*
**seeking**  43:22
239:*21*
**seen**  11:*3*  39:*10*
44:6, *10*  45:7  51:5
53:5  75:*13*  93:*15*
256:7  269:*13*  281:7
**Seets**  91:*15*
**S-E-E-T-S**  91:*16*
**Segal**  2:*8*
**Selena**  107:*3*
**send**  8:*20*  32:7
55:2, *2*  71:5  72:*16*,
*21*  129:*1*  144:*17*
173:*20*, *23*  190:*9*
194:7  200:*13*, *16*, *22*
221:*10*, *15*, *15*
222:*18*  226:5, *6*
227:5  228:*24*

239:*15*, *18*, *19*
256:*12*  301:*12*
**sending**  35:*8*
131:*24*  132:*3*
144:*15*
**sends**  23:9  223:*23*
**sense**  5:*20*  12:*24*
**sent**  8:*10*, *18*, *23*
35:*16*, *22*  36:*10*, *13*
40:*4*  49:5  50:*15*
62:*24*  70:*18*  113:*9*
114:*4*  116:*19*
130:9  132:*18*, *19*
158:*14*  178:*14*
180:*4*  183:*5*  184:*5*,
*6*  186:*10*  190:*24*
216:*3*  224:*16*, *19*
228:22  229:*10*
239:*7*, *8*  257:9, *13*
260:*12*, *14*  294:*19*
299:*3*
**sentence**  94:*24*
106:*1*  149:2  191:*3*
**separate**  22:7, *8*
70:6  121:*8*, *8*
126:7  221:9, *10*
**September**  66:5
74:*19*  75:*10*  302:*20*
**series**  4:*17*
**serious**  16:*18*  60:*10*,
*13*  244:*12*
**seriously**  21:*16*
288:*21*
**Serlena**  107:*3*
213:*23*
**S-E-R-L-E-N-A**
107:*3*  213:*23*
**serve**  78:*1*  106:*15*
208:*13*  214:22
**served**  10:*21*
**service**  99:*21*
100:*18*  101:6, *10*, *14*
210:7, *10*  240:*13*
245:*4*  292:*19*, *22*
**services**  17:*16*, *20*,
*21*, *23*  27:*23*  109:5
167:*14*  168:*11*
169:*1*  248:2, *17*
282:*20*  285:*21*
287:*3*



2:17-cv-02112-CSB-EIL    # 41    10/29/2019    Page 182 of 189
Arbitration
Bruce Melton vs. Pavilion Behavioral Health System, et al.

serving 19:*17*
106:*16* 171:*21*
215:*4*
set 129:*5* 175:*21*
265:*24* 302:*11*
setting 11:*19*
286:*17*
settlements 259:*22*
seven 141:*11* 149:2
severe 12:*21*
sex 127:*11* 258:24
sexual 16:*20* 39:*20*
47:*18* 60:*10* 119:*7*
131:*12* 138:*19*
148:6, *6* 236:*15*
Shakes 143:22
share 131:*5* 146:*1*
212:6
Sharif 102:*24*
103:*20* 104:2, *8, 12,*
*16, 21* 205:*17* 211:*9,*
*15, 20* 212:*1, 12, 20*
S-H-A-R-I-F 102:*24*
she'd 34:*12*
SHEEHY 1:*6*
38:22 96:*3* 207:*14,*
*20* 208:*4* 209:*6*
271:*5* 273:2, *2*
S-H-E-E-H-Y 96:*3*
207:*14*
sheet 46:*6* 88:*19*
89:2
sheets 89:*16*
shift 61:*23* 78:*9*
shifts 63:*16* 78:*10,*
*21* 88:*14* 89:*10*
216:*19* 217:*3*
218:*24*
short 116:*1* 300:*18*
shortcut 32:*3*
shortly 4:*16*
short-term 72:*7, 15*
184:*14, 17* 186:*5, 16,*
*18* 187:*3* 297:*20*
shoulder 67:*17, 21*
177:*3, 11, 18, 20*
show 9:*18* 15:*12,*
*23, 23* 21:*13* 36:*12*
47:*14* 96:2 151:*12*
208:*13* 209:*5*

224:*16* 232:*19*
showed 43:*4*
showing 48:*3*
223:*23* 241:*14*
296:*13*
shows 53:*9*
sic 1:6, *7* 161:*11*
sick 69:2, *5, 17*
side 6:*8, 18, 24*
7:*17* 8:*6* 13:*24*
233:7, *16* 237:*10*
238:*4* 283:*5* 284:*7*
300:*23*
sides 5:*21* 7:*17*
13:*1* 14:*7* 284:*20*
side's 274:*14*
sign 72:*7* 83:*7*
84:*1* 199:*3*
signature 80:*23*
signed 50:*19, 20*
65:*19* 66:*4* 67:*10*
69:*13* 72:*7* 73:*12*
77:*21* 79:*20* 82:*3*
83:*18, 20, 22* 102:2
173:2 179:*24*
180:*18, 19* 184:*14,*
*15* 198:*21, 22, 23*
203:*16* 210:*18*
291:*7, 7, 9*
significantly 41:*24*
signing 99:*20*
100:*18* 210:*10*
similar 75:*5* 247:*7*
similarly 6:2, *10*
simple 16:*4* 268:*9*
simply 7:*20* 174:*11*
241:*19* 243:*17*
246:*14* 290:*19*
291:*20*
Singer 2:*8*
single 106:*15*
134:*10* 214:*21*
singly 301:*3*
sir 5:*12, 18, 23* 7:*1*
9:*16, 22* 10:*5, 8, 11*
13:*3* 14:*6, 9, 13*
28:*10* 29:*8* 30:*3, 7*
31:*6, 11, 15* 32:*12*
35:*12* 36:*5* 38:*3*
39:*15, 16* 42:*17, 21*
43:*15, 23, 24* 44:*19*

45:*16* 48:*12* 49:*10*
50:*24* 59:*6, 20, 23,*
*23* 62:*5, 17, 21*
63:*14* 64:*8* 65:2
67:*23* 68:*5* 69:*12,*
*15, 19* 70:*15* 80:22
81:*19* 84:*12, 15, 17,*
*21, 24* 86:*17* 92:2, *7,*
*19* 97:*14* 98:*1, 4*
99:*17* 100:*12, 21*
101:*1* 109:22
111:*9, 13* 114:*14, 21*
115:*14* 118:2, *9*
119:*1* 121:2, *2, 6*
122:*7* 128:*8*
135:*17* 136:*14, 24*
137:*8* 141:2 147:*1,*
*9* 152:*8, 23* 153:*12*
154:*4* 157:*12, 20*
159:*17* 160:*1, 12, 20,*
*21, 22* 161:*21, 22*
163:*5* 165:*12, 20*
252:*10, 15* 258:*12,*
*12* 259:*19* 260:*4, 22*
261:*19, 23* 263:*3, 10*
268:*19* 274:*17*
298:*16* 301:*19, 23*
sitting 21:*10* 166:*15*
situation 19:*5*
44:*24* 57:*20*
103:*21* 113:*15*
159:*6* 203:*4*
276:*13, 20, 23*
280:*11, 14* 281:*23*
283:*21*
situations 19:*4*
21:*24*
six 109:*12* 110:*8*
181:*23* 227:*1*
228:2, *5, 15* 255:*17,*
*18*
skip 249:*9*
skipped 249:*10*
slow 191:*11* 260:*24*
slowly 41:*19*
small 92:*4* 120:*9,*
*12* 123:*18* 240:*24*
smiling 53:*9*
snapping 272:*2*
so-called 241:*18*
social 222:*16*

sole 56:2 179:*11*
301:*10*
solely 224:*6*
somebody 9:*12*
19:*1* 53:*11* 54:*5*
116:22 169:*11*
176:*9* 255:*3, 6*
281:*11* 283:*13*
288:*9* 290:*19*
297:*20*
somebody's 276:*21*
280:*8*
Somewhat 100:*14*
son 47:*13* 48:*4, 6*
soon 126:*12*
sorry 25:*14* 33:*16*
37:*7* 41:*11* 44:*3*
45:*16* 61:*12* 68:*23*
69:2, *22* 90:*23, 24*
96:*20* 97:*8, 15*
98:*8* 103:*7* 105:2,
*5* 106:*3, 22* 109:*15*
118:2 129:22
137:*12, 12* 144:*4*
148:*10, 24* 152:*8*
153:*7* 156:*7*
158:*18* 162:*6*
166:*18* 185:*21*
191:*13* 200:*5*
227:*23* 240:*1*
249:*15* 250:*21*
253:*16* 257:*4*
258:*15* 259:*16*
260:*4* 262:*8* 266:*7,*
*10, 13* 267:*12*
268:*15* 273:*9*
281:*18* 294:22
sort 120:*9* 280:*15*
297:*20*
sounds 274:*5*
source 55:*18*
sources 167:*24*
South 1:*18* 2:*4, 8*
speak 15:*9* 34:*3, 4*
39:*7* 40:2 41:*14*
53:*17* 55:*6* 91:*5*
147:*21, 23* 273:*3*
299:*23*
speaking 19:*18*
41:*10* 118:*5* 167:2
173:*11* 174:*3, 4, 15*



176:2, *12*  192:*23*
194:*10*  273:*12*
**speaks**  55:*4*
**specialist**  264:*24*
**specific**  7:*14*  17:*24*
21:*5*  50:*9*  114:*12*
161:*4*  194:*14*
240:*6*  278:*14, 20*
280:*18, 19*  281:*1*
**specifically**  18:*10*
98:*13*  103:*19*
131:*11*  157:*3*
161:*8*  175:*12*
176:22  186:*7*
212:*15*  228:*8*
254:*2*  277:*16*
278:*16*  279:*8*
298:*24*
**specifics**  175:22, *23*
194:*24*  212:*2*
**spelled**  95:*13*
**spent**  142:*16*
**spine**  189:*14*
**spoke**  38:*10*  47:*20*
55:*7*  116:22  137:*7*
147:22  151:*19, 20*
156:*1*  271:*1*  272:9
273:*6*
**spoken**  147:*20*
**spot**  24:2  294:*21*
**spread**  4:*17*  104:*3*
**spreading**  103:*1*
211:*9*
**spreadsheet**  232:*19*
233:*3, 4*  237:*24*
241:*12*
**spring**  25:*4*
**Springfield**  282:*5*
**squatting**  65:*14*
**SS**  302:*1*
**staff**  14:*17*  15:*5*
52:*7*  62:*13*  78:*1*
90:*16, 16*  101:*17*
107:2  108:*19, 21*
194:*20*  197:*24*
203:*2*  204:*17, 17*
208:*15, 20*  211:*1*
213:22  218:22
289:*4*
**stamped**  121:*4*

**stand**  9:*3*  123:*9, 21*
132:*17*  271:*6*
275:*14*
**standard**  171:*15*
**standards**  18:*1*
**stands**  220:*11*
**start**  6:*21*  10:*14*
28:*15*  29:*18*  31:*16*
37:*15*  79:*17*  80:*7*
141:*20*  186:*15*
255:*21*
**started**  15:*4*  18:*19*,
*20*  120:*3, 20*
**starting**  98:*16*
122:9  142:*2*  144:*8*,
*14*  160:22
**starts**  106:*1*  202:*10*
**state**  5:*8*  34:*15*
62:*15*  89:*21*  98:*18*
104:*14*  114:*1*
127:*18*  139:*24*
140:*10*  146:*11*
147:*6, 10*  150:*6*
161:*17*  164:*13*
167:*18*  168:*16*
179:*15, 23*  180:*17*
204:*13*  221:*17*
223:*15*  226:*7, 7, 8*
245:*18*  246:*16*
249:*21*  259:*3, 5*
269:*17, 20*  278:*6*
282:9  302:*1, 4, 19*
**stated**  32:*18, 22*
33:*10*  39:*5, 6*  40:*1*
42:*10*  43:*6*  44:*7*
45:*1, 10*  48:*15*
51:*8*  52:*1*  54:*19*
55:*12, 15*  82:*12, 19*
87:*13*  88:*13*  104:*3,*
*8*  106:*6*  107:*1*
154:*5, 5*  173:*1*
191:*6*  203:*7, 8, 21*
211:*20*  213:*21*
249:*17*  251:*10*
253:*16*  255:*10, 23*
299:*17*
**statement**  10:*1*
16:*9*  54:*13*  72:*22*
80:*15*  88:*19*  89:*3,*
*3*  97:*23*  111:*6*
143:*10*  278:*15*

**STATEMENTS**  3:*2*
5:2  6:*8*  8:*5*  10:*15*
14:*12*  16:*2*  28:*7*
151:*12*
**states**  23:*15*  32:*5*
40:*14, 17*  54:*10, 18,*
*20*  61:*20*  78:*4, 24*
82:*11, 15, 16*  109:*9*
110:*24*  112:*7*
115:*15, 20*  145:*23*
148:*11*  149:*24*
150:*7*  151:*17*
153:*7*  154:*10*
155:*5*  158:*1, 11*
177:*12*  215:*13*
250:*11*  270:*7*
272:*14*  280:*20*
299:*18*
**static**  189:*13*
**stating**  31:*16*  32:*16*
34:*1*  36:*9*  50:*18*
54:*3*  91:*24*  92:*7*
93:2  107:*17*
110:*14*  137:*4*
144:*16*  145:*19*
155:*3, 4*  191:*4*
206:*4*  243:*9, 13*
256:*1*  268:*10*
273:*23*  299:*4*
**status**  63:*21*  219:*2,*
*4*  259:*2*
**statute**  18:*2*  117:*20*
149:*9, 12*  252:*14*
280:*18, 19*  281:*1, 6*
282:*5*
**stay**  107:*3*  119:*23*
213:*24*
**stayed**  74:*9*
**stenograph**  302:*7*
**step**  12:*10*  95:*8*
102:*20*  168:*7*
172:*19*  183:*4*
188:*9*  225:*16*
227:*8*  238:*11*  243:*8*
**steps**  21:*16*  60:*20*
277:*12*
**Sterling**  121:*1, 20,*
*23*  122:*5*  124:*3*
171:*8*  221:*1*
**stipulate**  48:*7*

**stood**  220:*15*
**stooping**  65:*13*
**stop**  5:*10*  14:*3*
31:*13*  93:*5*
**stoplight**  9:*13, 14, 20*
**straight**  16:*4*
**Street**  1:*15*  302:*5*
**stretched**  58:*11*
**strict**  58:*13, 16*
168:22
**strike**  177:*1*  187:*10*
**structure**  168:*4, 6*
**struggling**  123:*13*
**stuff**  35:*24*  36:*2, 8*
38:*15*  48:*23*  57:*4,*
*13*  117:*8*  147:*13*
148:*5*  149:*19*
150:*20, 23*  151:*12*
289:*9*  296:*3*
**subject**  50:*1*  58:*23*
146:*19*  257:*8*
**submission**  42:*20*
264:*17*  272:*10*
**submit**  6:*4*  7:*9*
11:9  14:*20*  264:*7*
**submitted**  33:*13*
129:*5*
**substantially**  12:*20*
**substantiating**  89:*19*
**sudden**  47:*9*  228:*19*
**suggest**  7:*18*  58:*24*
116:*1*  264:*3*  285:*19*
**suggested**  255:*11*
**suggesting**  255:*13*
257:*18*
**suggests**  247:*24*
**suit**  215:*18*
**Suite**  1:*15, 18*  2:*8*
302:*5*
**summaries**  91:*21*
**summarized**  207:*2*
**summary**  95:*19, 19*
**superceded**  203:22
**supervising**  176:*3*
**supervisor**  102:*11*
176:*8*  291:*8, 8*
**supervisors**  294:*1*
**supply**  6:*17*
**support**  17:*7*  21:22
26:*14*  287:*8, 14*
296:*23*



2:17-cv-02112-CSB-EIL # 41    10/29/2019    Page 184 of 189
Arbitration
Bruce Melton vs. Pavilion Behavioral Health System, et al.

**supported** 23:*7*
288:2 292:*1* 294:*3*
**supports** 298:*9*
**supposed** 8:*20*
32:23 34:*13*
119:*23* 148:*1, 2, 12*
151:*17* 154:*18*
156:*3, 21* 157:*4*
202:*14* 247:*23*
260:*3* 270:*11, 22, 23*
272:23 273:*1, 9*
280:*21* 283:*4*
284:*15* 285:*18*
300:*3*
**supposedly** 17:*7*
35:*23* 292:*16*
**sure** 7:*5* 8:8 37:2
39:22 41:*8* 59:*20*
60:*20* 61:*5* 73:*1*
80:22 81:*9* 84:*3*
85:24 94:*19*
100:*10* 105:*4*
106:*3* 113:*7*
116:*14* 118:*6*
123:5 128:*6*
141:*19* 149:*5*
162:*1* 167:*15*
169:*8* 171:*11*
173:*10* 174:*19*
175:*18* 176:*14, 19*
185:*14* 189:*23*
200:*18* 201:*10*
203:*8* 209:*20*
214:*4* 221:*19*
240:*12* 253:*5*
267:*15* 270:*11*
277:*11, 12* 294:*14*
**surgeries** 20:6, *8*
68:*18*
**surgery** 67:*17, 21*
68:*17, 18* 73:8, *19,
24* 79:*13* 94:*15, 21*
111:*24* 112:*1*
162:*18* 174:*10*
177:*3, 11, 18, 21*
181:*17, 24* 182:*19*
185:*23* 190:*12, 16*
**surprised** 278:*22*
**suspended** 139:*21*
140:*16, 24* 150:*2*
**suspensions** 62:*14*

**sustained** 5:*16*
44:*14* 259:*15, 16*
287:*8*
**swearing** 30:*10*
**switch** 116:*1*
192:*10* 217:*2*
259:*9, 10*
**switched** 77:*10*
100:*3*
**sworn** 30:*13, 17*
31:7 166:*5*
**syndrome** 68:*7, 12,
19* 70:*11, 21* 178:*6*
179:*2, 13, 18* 183:*10,
22* 184:*24*
**SYSTEM** 1:*6* 2:*12*
4:*4* 167:*21* 181:*2*
222:*15, 21* 230:*19*
265:*18*

**< T >**
**table** 300:*24*
**tailored** 282:*11*
**take** 6:*11* 13:*10*
20:*5* 34:*6* 35:*20*
36:*4* 37:*7* 50:*10*
52:*24* 56:*12* 57:*14*
60:*20* 94:*11, 16, 21*
101:*17* 113:*23*
150:*21* 159:*10*
173:8, *13, 17* 174:*6*
175:*5* 209:*21*
212:*24* 225:*16*
227:*8* 240:*15*
243:8 244:*5*
248:*21* 249:*22*
260:*22* 264:*5*
274:*20* 275:*18*
279:*11* 281:*4*
287:*19, 20* 295:*14*
**taken** 21:*15, 16*
58:*9* 62:*14* 87:*21*
93:*3, 7* 103:*1*
104:*12, 16* 121:*23*
188:*18* 190:*15*
194:*14* 202:*2*
206:*5* 211:*24*
212:*20* 288:*21*
302:*4, 6*
**talk** 18:*3* 22:2, *4*
23:*17* 27:*5, 15*

46:8 82:22 91:*8*
100:*23* 111:*7*
119:2 122:*4*
131:*18* 135:*13*
151:*18* 159:*7*
170:*20* 175:*12*
176:*1, 21* 194:*23*
204:*6* 212:*23, 24*
220:9 222:*6*
233:24 254:*2*
288:*16* 300:*10*
**talked** 26:8 52:*12*
93:22 121:*12*
128:*19* 152:*1*
159:*23* 176:*17, 17*
193:*21* 199:*17*
201:*10* 218:*14*
221:*20* 241:*10*
265:*11* 286:*20*
295:*22*
**talking** 14:*3* 32:*11*
48:*21* 123:*14*
142:*17* 147:*15*
152:*13* 156:*11*
157:*5* 175:*20*
221:*5* 279:*15*
281:*24* 282:*18*
283:*20*
**talks** 88:*12* 278:*24*
279:*8, 18* 280:*16, 19*
297:*19*
**targeted** 215:*20*
217:*23* 240:*7*
**task** 160:2, *3, 8*
163:*4, 6, 21, 22*
202:*12* 203:*22*
**tasks** 19:*18* 62:*8*
88:*15, 16* 90:*13*
105:*12* 160:*4, 10*
176:*11* 203:*8*
204:*15* 213:*4, 17*
**teaches** 46:*24*
**team** 38:*20* 90:*6,
13* 201:*20* 204:*14*
208:*22*
**technically** 19:*1*
**teed** 284:*19*
**telephone** 4:*19*
158:*20*
**tell** 26:2 72:*12*
81:*15* 114:*24*

117:*21* 123:*7*
142:*6* 143:*5*
149:*13* 153:*13, 21,
22* 159:*13* 164:*2*
165:*1* 166:*12*
167:*10, 12* 169:*18*
196:*16* 211:*23*
231:*17, 22* 232:*8*
254:*8* 261:*17*
264:*16* 270:*2*
274:*1* 278:*19*
285:*13, 14* 298:*19,
20, 23*
**telling** 37:*15* 51:*7*
64:*4* 145:*13* 149:*6*
162:*15* 184:*19, 22*
216:*11* 217:*14*
228:*14, 23* 231:*10*
266:*15* 273:*10*
295:*10*
**tells** 196:*20* 281:*16*
**temp** 120:*4, 17, 21*
**temporary** 113:*16,
19* 114:*3* 203:*4*
270:*20* 297:*20*
**ten** 158:*8* 217:*8*
**tendency** 41:*13*
**tendered** 296:*13*
**term** 136:*8*
**terminate** 16:22
20:*12* 22:5 23:*21*
27:*17, 18* 35:*15*
61:*14* 151:*7* 158:*2,
9* 174:*11* 177:*21*
238:*19* 242:*12*
244:7 248:*6*
286:*11, 22* 301:*21*
**terminated** 14:*18*
16:*1, 12* 17:*3* 24:*1*
26:*13, 18* 27:*4*
33:*12, 21* 34:*2, 16*
39:*18* 51:*8, 24*
52:2 55:*11* 68:*3*
73:*23* 146:*12, 16*
151:*14* 155:*9*
158:*6* 159:*15*
182:*7* 238:*8* 243:*4,
19* 254:*13* 260:*16*
286:*16* 294:*5, 21*
295:*9* 299:*4, 6*
300:*10*

Arbitration
Bruce Melton vs. Pavilion Behavioral Health System, et al.

**terminating** 26:*6*
260:7, *9* 294:22
**termination** 16:*14*,
*24* 19:23 25:8
26:*14* 27:9 34:2, *4*
155:7 242:*17*
259:5, *6* 276:8
286:*4* 287:15
**terminations** 167:*5*
**terms** 24:*17* 164:*21*
276:16 288:24
297:*1*
**test** 101:*18*
**testified** 264:2
**testifies** 10:*4*
**testify** 9:*3*, 20
30:*11* 290:*6*
**testifying** 5:*6* 36:*19*
**testimony** 4:*23*
5:*10* 6:*11* 9:*4*, *6*, *8*,
*9*, *14* 24:*18* 26:2
28:*12*, *15* 29:*18*
30:*14* 44:5, *13*
97:*23* 113:8 143:*3*
146:*23* 152:*13*
163:*13* 264:2
267:*15* 302:8
**Thank** 5:*12* 16:7
28:5, *6* 39:*15*
50:*11* 58:*19*, *19*, 20
59:*1* 87:4 99:8
149:*11* 156:*13*
159:*17* 166:*1*, 6
170:5 173:*4* 186:6
209:*24* 220:15
234:*18* 242:*23*
244:4 249:2 259:*4*
263:*17* 264:*21*
276:5 284:*1*, *4*
294:*17*, *17* 298:5, *11*,
*12* 301:20, 22, 23
**Thanks** 46:*17*
115:9, *9*
**theirs** 292:*23*
**theme** 291:*23*
**theory** 47:8
**therapeutic** 240:*24*
**therapy** 76:*18* 77:2
187:*18*
**thing** 54:*1* 136:7
142:*17* 150:*16*

151:*1*, 22 157:*17*
191:9 221:*14*
258:*11* 264:*17*
268:9 271:*18*
280:*16* 291:*3*
299:*21* 300:8
**things** 12:8, *14*
13:5, *11* 17:5
19:*15* 27:*15* 47:20
57:7 58:6, *13*, 20
69:*1* 85:24 88:*12*
159:8, *20* 167:*24*
174:*18* 194:2
214:*14* 217:*12*
254:*1* 264:*4*
271:*11* 274:*15*
287:22 289:7
291:*23* 296:*14*
299:*20*
**think** 4:*21* 5:*21*
7:*4*, *10* 12:*3* 13:9
24:*24* 25:2 26:9
27:*3* 29:2 32:10
35:*18* 39:*13* 43:*10*
46:*21* 55:24 57:*23*
92:*11* 96:22 116:2
143:*1* 146:2 164:7,
*18* 183:*3* 185:*13*
195:*3* 234:22
244:*11* 248:20
253:7 260:7
261:*19* 263:*4*
264:6 265:*13*
267:6 273:*19*
275:16 276:6, 8, 22
279:*10* 280:*10*
291:22 294:*12*, *13*
297:8 298:4, 8
299:*5*
**thinking** 156:*11*
**thinks** 275:*15*
**third** 38:2 65:9
90:*11* 92:*4* 102:6
107:7 108:*23*
109:20 122:*11*, *14*,
*15*, 23, 24 123:23
136:*19* 204:9
205:*10* 209:*3*
219:7 235:*18*
239:*23* 240:2 246:9

**thorough** 288:*19*
294:*14*
**thought** 6:7 117:*11*
120:*12*, *16* 200:*3*
206:2 234:*21*
270:*23* 272:4
**threat** 240:20
**three** 20:6 26:8, *10*
89:*10*, *15* 105:23
109:*11* 110:7
207:2 251:20 256:8
**thumb** 216:*1*
**tight,** 197:*4*
**time** 5:*3*, 6 6:*11*
11:2, *11*, 16 13:*10*
14:*3* 16:24 18:23
19:*12* 20:7 21:7
22:22 24:*13*, 23
25:21 27:*1* 28:8
29:2 34:6 35:*13*,
20 38:*11* 40:2
42:*14*, *16*, *19*, 23, 24
43:2, *7*, 8, *13* 44:*18*
47:*12* 48:*18* 49:*1*
50:*10* 51:9, *13*, *21*
61:*15* 62:*1* 63:22
67:7 69:*17* 71:*21*
72:24 74:4, *10*, *13*
76:9 77:2, *14*
78:*21* 88:*19* 89:2,
*16*, 20, 23 90:6, *14*
94:*1*, *11*, *15*, *16*, 20,
21 108:*11* 110:*19*
111:*24* 112:*12*, *21*
113:*1* 114:*11*
119:*21* 121:*23*
126:5 128:2, *21*
131:9 133:7, *16*
135:*13* 137:2
142:*16* 146:*21*
148:*13* 150:*18*
154:*11* 155:*1*
160:*18* 162:*15*
164:7 165:9 167:*1*
170:8, *17* 173:9, 9
175:5, 8 178:24
179:*10* 180:*14*, *21*
183:8, *13* 184:2, *10*
185:*3* 186:20
191:*19* 195:9
196:6 201:9, *21*

204:*16* 207:*12*
209:*16* 211:*13*
213:*17* 214:7, *10*
216:6, 9 217:8
219:*16* 220:*13*
223:*19* 224:*12*
225:*16*, *19* 227:8
229:*14* 230:*12*
231:22 232:4, 8
239:2 243:9, *15*, 20
244:6 248:22
250:*3* 251:4, 5
254:*15* 260:22
264:*23* 275:4, 8
287:*13*, 20 296:2
297:*12*
**times** 20:*15* 134:6
158:8 172:*15*
254:*16* 256:8
272:*13* 286:9, *10*
297:8
**timing** 23:2, 5 27:8
**Title** 40:*23* 41:*1*
42:*1* 166:22 270:6,
6, *6*
**today** 7:7 11:*1*, *4*, 9
14:*13* 15:22 24:*18*
25:6 26:*16* 28:21
34:*14* 47:*10* 75:*15*
97:*24* 113:9
150:*12* 159:8
195:22 259:5
286:*13*
**to-do** 293:*15*
**told** 8:*12*, *15* 48:20,
*21* 54:*21* 84:9
87:*18* 93:*14* 97:*10*
104:*11*, 20 106:5
131:*11* 132:8, *23*
154:*21* 157:*3*
162:23 176:*18*
196:*18* 212:7
230:*4* 265:*21*
275:*1*, 8, 9 293:5
**tolerated** 241:2
**tomorrow** 7:8
**tooken** 14:*21*
147:*13* 159:6
**tools** 152:*3*
**top** 38:4 39:*17*
43:*4* 63:6, 9 66:7

2:17-cv-02112-CSB-EIL # 41   Page 186 of 189   10/29/2019
Arbitration
Bruce Melton vs. Pavilion Behavioral Health System, et al.

69:*8, 9, 23*   80:*23*
83:*11*   85:*7*   95:*7*
110:*3*   115:*12*
120:*24*   121:*4*
125:*19*   129:*23*
132:*14*   133:*24*
171:*9*   179:*7*
195:*22*   214:*16*
236:*20*   244:*21*
**topic** 80:*6*   116:*2*
**total** 55:*24*   110:*7*
167:*15*
**totally** 255:*11*   270:*5*
**touch** 40:*6*
**touched** 80:*9*   267:*3*
**touchy-feely** 196:*17*
198:*3*
**tough** 270:*3*
**traditions** 301:*7*
**TRANSCRIPT** 1:*12*
6:*18, 20*   25:*11, 12*
59:*10*   264:*8, 9*
301:*11*   302:*8*
**treated** 15:*6, 15*
17:*8*   76:*17*   204:*10*
271:*19*   272:*17*
**treating** 87:*10*
**treatment** 15:*5*
17:*16*   20:*6*   26:*24*
75:*8*   95:*12*   206:*18*
240:*21, 23*   241:*2, 7*
**trespass** 138:*23*
139:*24*   140:*10, 13*
**trespassing** 252:*4*
**trial** 11:*19*   170:*16*
281:*13*
**tried** 34:*11*   40:*5*
51:*21*   158:*21*
271:*24*
**trigger** 179:*2, 12*
288:*15*
**trouble** 123:*17*
**troubles** 15:*12*
**truck** 19:*17*   77:*11,
16*   79:*7*   106:*12, 13*
153:*3, 5*   154:*2, 3, 9,
13*   159:*23, 24*   160:*2,
7, 9, 14*   161:*6, 10, 12,
13*   164:*9, 13, 16*
172:*13*   182:*14, 20,
24*   183:*1*   208:*18, 20*

214:*18, 18, 20*   216:*9*
217:*6, 7*   250:*9, 16,
18, 22, 23*   251:*2, 2*
**trucks** 250:*12*
**true** 53:*19*   88:*19*
89:*3, 4, 9*   137:*9*
142:*18*   151:*23*
154:*11*   160:*13, 16*
199:*3*   230:*21*
237:*14*   273:*14*
274:*8*   283:*8*
292:*10*   302:*8*
**truly** 275:*20*
**Truss** 8:*13*   25:*13,
16, 20*   26:*1*   32:*17*
35:*23*   50:*15*   52:*12*
226:*6*   264:*2, 22*
265:*3, 11*   266:*2, 15*
267:*16*
**T-R-U-S-S** 25:*18*
**T-R-U-S-T** 25:*17*
**truth** 159:*12, 13*
270:*2*   273:*11*
**try** 170:*6*
**trying** 33:*7*   46:*2, 5,
8*   52:*16*   97:*11, 22*
98:*6*   120:*8*   149:*13*
150:*16*   163:*18*
196:*4*   258:*5*
271:*22*   273:*18, 19*
293:*21, 22*   298:*16*
**TTD** 155:*8*
**Tuesday** 54:*11*
103:*17*
**tunnel** 68:*7, 12, 19*
69:*18*   70:*10, 21*
73:*8, 18, 24*   74:*4, 10*
79:*13*   112:*1*
162:*18*   178:*6*
179:*2, 12, 18*   182:*18*
183:*10, 22*   184:*8, 23*
185:*10, 23*   186:*3*
190:*16*   297:*10*
**turn** 8:*12*   26:*22*
36:*13*   61:*4*   62:*22*
64:*8*   66:*2*   67:*2*
68:*22*   70:*16*   73:*5*
74:*17*   76:*1*   77:*8*
79:*11*   80:*5, 9, 11, 21*
81:*21*   84:*23*   86:*12*
88:*3*   90:*19*   91:*19*

95:*5*   97:*4*   99:*10*
102:*6, 15*   104:*24*
107:*22*   116:*12*
118:*4, 14*   120:*1*
122:*10*   125:*15*
126:*24*   128:*9*
129:*13*   130:*6*
132:*11*   134:*24*
135:*14*   141:*17*
144:*1, 24*   151:*20*
156:*19*   160:*19*
173:*5*   179:*5*
180:*10*   181:*11*
185:*17*   187:*23*
196:*8*   197:*12*
198:*4*   200:*2*
206:*13*   215:*10*
216:*1*   219:*6*
220:*18*   223:*20*
224:*18*   229:*8*
230:*15*   233:*2*
238:*21*   239:*12*
242:*14*   244:*15*
246:*1, 9*   273:*3*
**turned** 148:*21*
227:*10*   270:*19*
**turning** 156:*22*
157:*5, 6*   210:*2*
**turns** 93:*10*
**twist** 156:*19*
**twisting** 156:*22*
157:*5, 6*   189:*10*
**two** 6:*13*   10:*24*
12:*2*   24:*19*   28:*24*
29:*15*   47:*16*   68:*18*
92:*4*   105:*23*
107:*18*   109:*11*
110:*7*   116:*6*
118:*20*   171:*14*
211:*4*   225:*2*
233:*13, 16*   238:*13*
264:*5*   268:*12*
**type** 7:*22*   65:*24*
103:*20*   104:*11, 20*
168:*8*   281:*20*
284:*13*   294:*10*
296:*23*
**types** 169:*1*   248:*8,
10, 11*   250:*4*   262:*23*
276:*22*
**typewriting** 302:*7*

**typewritten** 88:*5*
91:*20*
**typically** 189:*11*

**< U >**
**Uh-huh** 86:*14*
91:*12*   115:*14*
128:*10*   141:*21, 23*
163:*5*   177:*8*   188:*8*
203:*15*   249:*11*
**UHS** 85:*3*
**ultimately** 181:*4*
226:*4*   242:*11*   248:*6*
**umbrella** 167:*9*
**unable** 71:*6*   77:*15*
79:*6*   117:*18*   158:*23*
**uncomfortable**
82:*19*   197:*5*
**undergo** 18:*17*
22:*15, 17*   108:*12*
129:*9*   171:*1, 5, 7*
224:*11*   228:*16*
265:*12*   266:*4*
**undergoing** 223:*4*
**undergone** 22:*10,
12*   128:*3*
**underneath** 113:*22*
141:*11*   235:*19*
**understand** 13:*4*
32:*21*   42:*18*   51:*15*
52:*4*   60:*16*   62:*12*
74:*22*   86:*18*   88:*7*
97:*11, 17*   98:*7*
100:*15*   103:*11*
109:*19*   113:*7*
148:*3*   151:*24*
152:*19*   234:*20*
245:*12*   266:*23*
267:*7, 17, 19*   270:*10*
271:*15*   272:*11*
284:*21*   285:*5*
**understanding**
40:*11*   43:*19, 23*
65:*21*   113:*8*
114:*15, 17, 19*
129:*11*   172:*6, 21, 22*
187:*10, 20*   222:*12*
266:*18*   275:*16*
**understands** 282:*24*
283:*2*

Arbitration
2:17-cv-02112-CSB-EIL # 41 Page 187 of 189 10/29/2019
Bruce Melton vs. Pavilion Behavioral Health System, et al.

Understood 12:*17*
13:*8* 61:*17* 62:*6*,
*18* 102:*12* 152:*1*
176:*9* 187:2 216:*24*
underwent 18:*21*
185:*19*, 22
unemployment
158:*7*, 8, *10*, 22
159:2
unemployment-relate
d 11:*6*
unfair 95:*12*
206:*18* 281:*23*
unfairly 204:*10*
unfortunately
179:*19*
unfounded 15:*20*
21:*21* 91:*7* 204:*11*
206:*1*, 3
unilaterally 228:*18*
uninsured 150:2
unit 63:*17* 127:8
units 171:*21* 240:*16*
unlawful 139:*12*
158:*3*
unload 77:*11* 79:6
106:*11*, 13 153:*3*, 4
154:*9*, *13* 160:*7*, 13
161:*6* 164:*9*, 16
208:*20* 214:*18*, 19
216:*9* 217:*6*, 7
250:*8*, 12 251:*1*, 2
unloading 19:*17*
106:*18* 159:*23*, 24
160:*2*, 8 161:*9*, 13
164:*13* 172:*12*
215:*5* 250:*16*, *17*, 22,
23
unnecessary 287:*22*
unpaid 72:*20*
unrelated 177:*9*
178:*12*
untrue 54:*14*
unusual 142:*24*
update 145:*15*
upgrade 149:*15*
upgraded 149:*17*
upper 14:*16* 109:*3*
use 8:*11*, *13*, *14*, *15*,
*19* 32:*18* 40:*20*
55:*16* 57:*22* 60:*21*

71:*12* 97:*11*
167:*13* 173:*15*
183:*14* 184:*13*, 17
194:*1* 209:*19*
251:*11* 270:*7*
uses 17:*3*
Usually 109:*16*
225:*1*

< V >
validity 90:*15*
204:*16*
valuable 272:*12*
variance 9:*8*
varies 9:*5*
various 65:*5*
vast 21:*19* 288:*13*
vehicle 138:*17*
verified 122:*21*
version 81:*8*
versus 4:*4* 29:*15*
155:*12*
viable 246:*14* 249:8
victim 241:*1*
victims 240:*20*
view 6:*5* 248:*14*
279:*21* 286:*2*
violate 40:*23*
violation 124:*9*
violations 117:*20*
violence 139:*3*
visit 76:*16*
visits 187:*17*
Voelker 1:*13* 302:5
volunteer 245:*3*, 6
vs 1:*4*
vulnerable 248:*12*

< W >
Wacker 1:*18* 2:*8*
wage 208:2
waist 189:*10*
Wait 38:*1* 40:*15*
45:*14* 143:*7*
234:*12* 274:*21*, 21
waiting 73:*21*
waive 30:*10*, 14
269:*9*
waived 130:*23*
262:*3*

waiver 19:*6*, 8
23:*17* 37:*9* 42:*12*,
*12*, *20*, 22 43:*3*, *7*, *17*,
22 110:*21* 113:*16*,
20 114:*3*, *9*, *10*, *11*,
*16*, 20 115:*1*, *3*, 6
131:*7*, *15* 133:*9*
146:*4*, 8 224:*14*, 15
225:*13*, *19*, 24 226:*3*,
4, *14*, 17 229:*18*
238:*5*, 23 243:*2*, 15
252:*19* 262:*12*, *15*,
*17* 263:*7* 266:*21*, 24
267:*10* 278:*12*
295:*16*
waiving 269:*5*
Walking 196:*24*
197:2
walls 272:*23*
Walmart 53:*8*
want 4:*16* 7:*9*, *12*,
*19* 8:*14* 16:*5* 24:*5*
29:*19*, 20 30:*17*, 19
32:*9* 36:*12* 37:*8*,
22 38:*3*, 9 39:*4*
40:*7*, *8*, *12* 41:*15*, 21
43:*7* 51:*2* 52:*4*
54:*9* 55:*8*, *21* 56:*7*
57:*24* 58:*14* 72:*14*
81:*17* 84:*3* 98:*12*
103:*11* 105:*3*
122:*4* 124:*12*
126:*2* 128:*6* 147:*2*,
*4*, *6*, *10* 149:*10*
150:*18* 151:*6*
152:*12*, *15* 153:*1*, 22
162:*4* 163:*14*
165:*1*, *2*, *5*, 16
183:*16* 200:*18*
220:*19* 223:*9*
225:*15* 243:*22*
244:*2*, 5 249:*5*, 9
250:*7*, 9 256:*15*, 19
258:*8* 259:*6*, *9*, 11
261:*20* 263:*23*
264:*14*, *16* 267:*2*
268:*16*, 23 269:*13*
270:*4* 271:*19*, *20*, 22
273:*17* 280:*7*
281:*18* 282:*8*

294:*14* 295:*14*, 15
298:*15*, 20
wanted 8:*11*, *15*, 19
23:*4*, *20* 24:*2*, 3
25:*9* 34:*11* 38:*20*
42:*5* 100:*10*, 12
103:*19* 104:*8*
106:*7* 133:*19*
151:*7* 164:*12*
183:*20* 196:*18*
199:*5* 211:*14*, 20
216:*12*, *13* 217:*8*
232:*9* 263:*11*, 12
265:*23* 268:*8*
274:*1*, *18* 280:*7*
295:*4*, 8
wanting 48:*16*
103:*18*
wants 11:*9* 12:*6*, 7
161:*24* 173:*13*
226:*13*
wards 167:*18*, 19
warning 198:*7*
wash 107:*12*, 15
washing 106:*17*
156:*21* 208:*8*
215:*4* 272:*22*, *23*, 24
way 9:*1*, *23* 19:*2*
32:*20* 33:*1*, 5
38:*18* 50:*8* 54:*8*
77:*21* 100:*2* 165:*2*
269:*12* 275:*12*
285:*6* 296:*22* 301:*1*
ways 269:*13*
WC 155:*13*
wearing 197:*3*
website 222:*15*
week 4:*18* 103:*17*
104:*6* 106:*16*
211:*18* 215:*3*
weeks 10:*24* 12:*2*
24:*7* 181:*23*
weigh 151:*2*
welcome 4:*15*
220:*16*
Well 7:*16* 11:*18*
12:*3* 13:*19* 14:*17*
15:*13* 16:*19*, 22
18:*13* 23:*5*, *10*, 22
26:*15* 29:*21* 30:*18*
36:*17* 37:*6*, 14



2:17-cv-02112-CSB-EIL  # 41   10/29/2019   Page 188 of 189
Arbitration
Bruce Melton vs. Pavilion Behavioral Health System, et al.

45:2, *20*, *24*  46:*18*,
*21*, *22*  47:*12*  50:2
51:*17*  57:*9*, *15*, *18*
58:8  68:*18*  76:*19*
78:*1*  80:8  83:*23*
84:*10*  91:2, *8*  95:7
97:*9*  102:*20*
107:*19*  109:*19*
113:*24*  114:*12*
120:*23*  135:*9*, *12*, *22*
136:*4*  137:*8*
142:*12*  147:*11*
148:*13*, *20*, *23*  152:*4*
155:*4*, *19*  156:*15*
164:*12*, *24*  168:*1*
175:*21*  179:*12*, *20*
184:*6*  210:*6*
211:*23*  221:*15*
228:*10*  229:*20*
238:*3*  243:*8*  250:*9*
259:*10*, *19*  260:*20*
266:*24*  274:*10*
275:*5*, *10*  277:*15*
279:2, *21*  280:*17*
283:*8*  284:*1*
285:*11*  287:*12*
289:2, *7*  290:*13*
291:*17*  292:*20*
293:*7*, *17*, *24*  296:*9*
299:*5*  300:*22*
**well-being**  240:*23*
276:*17*
**went**  15:*24*  20:7
34:6  40:*1*, *2*  47:*19*
142:*11*  147:*12*
148:*17*  152:*23*
159:7  176:*16*, *16*
180:2  187:*17*
202:*13*  227:*11*
239:*17*  265:*16*
270:*15*, *19*, *21*  271:*4*,
*14*  273:*3*  277:*20*
281:*16*, *17*  288:*5*
290:7
**We're**  4:*15*  18:*3*
25:6  37:20  56:*16*
57:20  109:*20*
152:*13*  167:*16*
168:*13*  171:*12*
176:*19*  195:*4*
200:6, *20*  217:*14*

225:*13*  256:*4*
279:*15*  281:*24*
282:*18*  283:*3*, *20*
284:*18*  293:*19*, *20*,
*21*, *22*
**we've**  4:*20*  5:*20*
10:22  28:7  221:*5*
230:*3*  267:6  284:*4*,
*10*  286:*20*  287:*16*
**whatsoever**  281:*21*
286:*12*
**wheel**  64:*15*
**WHEREOF**  302:*11*
**wife**  53:6
**wise**  45:22
**wish**  14:*12*  267:*16*
**wishes**  5:2  8:*12*
**withdraw**  281:*18*
**withheld**  117:7
246:*18*, *21*
**witness**  9:2, *4*, *5*, *7*,
*24*  10:*4*, *24*  137:*11*
165:*24*  220:*13*, *16*
241:*9*, *13*, *20*  242:2,
*7*  244:2  249:*15*
251:*8*  281:*15*
302:*11*
**witnesses**  30:*11*
98:*3*  193:*4*, *5*
**woman**  52:22
**women**  154:*13*
**wondering**  121:7
**word**  70:*24*  279:*12*
**words**  9:*11*  17:*4*, *4*
27:*24*  29:5  68:2
73:*23*  81:6  89:5
113:*1*  119:*20*
126:*17*  128:*21*
177:*16*  182:*17*
185:*9*  201:*24*
228:*14*  243:*17*
265:*19*  279:*17*
286:22  288:2
289:*10*  298:*13*
**work**  18:*18*  22:20
23:*13*  24:*14*  31:20
42:*9*, *11*  54:*4*, *6*
61:*24*, *24*, *24*  62:7
64:*9*  65:*24*  67:*24*
73:*19*  74:*9*  75:2, *3*,
*14*, *22*  76:8  77:*5*, *5*,

*17*  78:*10*  79:8
80:*16*  94:*11*  95:*14*
99:*24*  100:*4*, *6*
106:*12*, *20*  108:*8*
110:*20*  112:*8*, *22*
113:*4*, *10*, *13*  114:*8*,
*11*  115:*16*, *16*, *21*
122:*9*  152:*24*
154:*11*, *18*, *19*, *22*
155:*17*, *24*  156:*17*
158:*9*, *23*  162:*21*, *24*
166:*12*  169:7
171:*9*  174:*7*, *18*, *23*
176:*3*  177:*5*, *9*
178:*3*, *13*  181:*19*
182:*3*  183:*9*, *17*, *21*
184:*10*  185:*15*
186:*20*  187:*15*
188:*5*, *18*, *19*, *22*
189:*3*  190:*1*  192:*1*,
*4*  206:*20*  208:*14*
213:*14*  214:*13*, *19*,
*24*  215:*7*, *19*  216:*7*,
*12*, *13*, *19*  217:*3*
218:*23*  219:*2*, *9*, *17*
220:2, *2*, *7*  222:*4*, *8*
224:*16*  225:*12*, *14*
229:*15*  230:*20*
262:*12*, *16*, *21*
270:*10*, *19*  297:7
299:*8*, *13*, *14*  300:6
**worked**  20:*1*  24:22
25:20  33:*1*  38:*19*
52:*5*, *9*, *15*, *20*, *22*
53:*14*, *24*  62:*9*
68:7  89:*11*  129:*10*
131:*10*  156:*15*, *16*
166:*19*  172:*8*
186:*11*  187:*12*
207:*23*  254:*11*
264:*23*, *24*  269:*21*
271:*9*
**worker**  19:*20*  25:*3*
100:*4*  101:6  154:7
240:*13*
**workers**  101:*14*
155:*12*  292:22
**worker's**  27:*4*, *10*
54:*17*  70:*13*, *24*
71:*1*  77:*15*  78:*5*,
*20*  112:*13*, *21*, *23*

180:*7*, *10*  184:*8*
187:*21*  215:*19*
218:*23*  219:*11*
**working**  18:*19*, *21*
19:*11*  22:*12*  54:*5*
67:6  88:*13*  90:*3*, *5*,
*13*, *14*  101:*16*  120:*3*,
*20*  189:*16*  201:*20*
204:*14*, *15*  217:*3*
254:*15*, *19*  301:*16*
**workman's**  154:*17*
299:7
**work-related**  19:*21*
20:*9*  68:*13*  71:6
112:*9*  174:*16*, *24*
178:*16*, *17*  188:*13*
214:*4*, *10*  297:*11*
**works**  107:*12*
**worry**  152:*20*
162:*10*  254:*10*
**worse**  214:*14*
**worth**  90:2
**write**  81:*8*, *14*, *18*
83:8  94:6  135:*24*
199:*24*  217:*21*
225:*3*
**writes**  71:*12*  90:2,
*10*  94:*14*  111:*10*
**write-up**  54:*3*
80:*12*  81:7  93:2
94:2  206:*4*, *6*  253:*3*
**write-ups**  55:22
147:*20*  299:*19*, *19*
**writing**  87:*14*, *20*
198:8  218:*19*  291:*4*
**written**  6:22  15:*1*
34:*10*  80:*18*  83:*19*
84:*4*, *16*  85:*11*
93:*6*, *11*, *21*  109:*17*
136:*10*  198:7
199:*4*, *16*  253:*1*
289:*23*, *24*  292:*9*, *10*,
*12*  301:*17*
**wrong**  83:6  95:2
97:2  98:*5*  141:*16*
151:*14*  252:*3*
292:6  300:*12*
**wrongful**  26:*14*
155:6  270:*5*
**wrongfully**  14:*18*
26:*12*  150:*14*



2:17-cv-02112-CSB-EIL   # 41   10/29/2019   Page 189 of 189
Arbitration
Bruce Melton vs. Pavilion Behavioral Health System, et al.

151:*14*   159:*14*
288:*17*
**wrote**   39:*11*   51:*22*
55:*23*   83:2, *8*   86:*5*
91:*23*   103:*24*
111:*20*   136:2, *4, 6*
147:*21, 22, 23*   164:2
198:*17*   218:*12, 21*
239:*13*   290:*3, 12*

**< Y >**
**Yasmiene**   52:*23*
53:2, *8*   91:*15*
106:*5*   198:*1*   205:*16*
**Y-A-S-M-I-E-N-E**
91:*15*   205:*16*
**Yasmiene's**   53:*3*
**yeah**   35:*18*   49:*13*
51:*5*   90:*18*   117:*9,*
*23*   120:*13*   129:*24,*
*24*   144:*5*   148:*6*
156:*12*   157:*24*
165:*6*   185:*18*
197:*1*   234:*18*
251:*14*   269:*4, 17*
299:*12*
**year**   10:*16, 21*
14:*24*   20:2   33:2
52:*5*   94:*11*   148:*15*
149:2   254:*12, 12*
269:22, 22
**years**   17:*19*   141:*11*
166:*20, 21*   265:*1*
270:*13*
**yell**   195:*23*
**yelled**   82:8
**yelling**   195:*10*
**yellow**   89:*17*
**yells**   82:*13*
**Yep**   106:*3*
**young**   7:*21*   17:*19*
**youth**   18:*16*   47:*3*

**< Z >**
**zero**   295:*16, 17*

